UNITED STATES OF AMERICA

v.                                          Case No. 3:19-mc-27-J-39JRK

ALEKSANDR ROTKO

## MEMORANDUM OF LAW REGARDING DETENTION
## PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its treaty obligations to Estonia, respectfully requests that the fugitive in this case, Aleksandr Rotko ("Rotko" or the "fugitive"), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why the fugitive should be detained. In short, Rotko should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he is not a risk of flight or a danger to the community and that special circumstances exist to warrant his release.

## BACKGROUND

Rotko is wanted to stand trial in Estonia on charges of using the movable property of another, in violation of § 201(2)(4) of the Estonian Penal Code, and

damage and destruction of government property, in violation of § 203 of the same code. A warrant for Rotko's arrest was issued on August 25, 2007, by the Harju County Court, in Tallinn, Estonia. *See* Extradition Request, D.E. 1-1 (hereinafter "Req.") at 56-60. The warrant was issued on the basis of the following facts.

Rotko served as the Supervisory Board Member of three companies (AS Verest, OÜ Agrin Partion, and AS BPV), as well a board member of a fourth company (ELA Tolli AS), all of which conducted business at Kuti 17 and Kuti 17a in the Seaplane Harbor district of Tallinn, Estonia.[1] *Id.* at 46. That property housed, *inter alia*, a seaplane hangar, a saw-mill building, an administrative building, a wharf with a pier covered in concrete slabs, and train tracks.

According to the government of Estonia, the four companies, along with another company, OÜ B & E, illegally possessed those buildings and property. Therefore, in 1997, Estonia filed an action with the Tallinn City Court against three of the companies, asking the Court to recognize Estonia's ownership of the buildings and property. *Id.* at 44. In February, 2005, Estonia submitted a supplemental claim seeking to evict the defendant companies from the buildings. *Id.* at 45. Shortly thereafter, Estonia added the remaining two companies as defendants in the action. *Id.*

---

[1] Rotko was also the sole shareholder of the holding company that owned OÜ Agrin Partion. Req. at 133.

2

On July 4, 2005, the Tallinn City Court ruled in favor of Estonia in all respects except that it dismissed the action against defendant AS BPV. *Id.* On March 1, 2006, an appellate court affirmed the decision, except that it reversed the dismissal with respect to AS BPV, and thus ruled in favor of Estonia in all respects. *Id.* On June 7, 2006, the Supreme Court of Estonia refused to grant leave for the defendants to appeal further. *Id.* Accordingly, the companies were ordered to vacate Kuti 17 and Kuti 17a by July 31, 2006. *Id.*

Before complying with that order, the companies, which operated under the direction of Rotko, removed certain property located at the premises. *Id.* at 46, 70, 84, 93, 97, 116, 138. Some of the property was destroyed in the process, and some was sold. *Id.* at 115. According to the bookkeeper for one of the companies, Olga Novoseltseva ("Novoseltseva"), Rotko tried to sell anything he had installed that could be sold because of the order to vacate. *Id.* at 153.

In June and July, 2006, several witnesses saw workmen removing concrete slabs from the pier, as well as railroad tracks and a boiler, and saw cranes being dismantled. *Id.* at 88, 97, 103. The roof was removed from the boiler room in order to evacuate the boiler. *Id.* at 88. Pursuant to contracts executed by Rotko, the rails were sold to AS Kuusakoski, a company that purchases scrap metal, for 204,328.80 kroons (approximately USD $14,650), and the concrete slabs were sold to another company, Paldiski Sadamate AS, for 2,528,727.20 kroons

(approximately USD $181,310). *Id.* at 79, 115. At AS BPV's direction, Paldiski Sadamate AS transferred the latter amount, less VAT, to a bank account for a Danish company, Merimpex Co. Ltd., which was managed by Rotko. *Id.* at 115-16, 162, 164-65. Rotko was also the sole director and shareholder of that company. *Id.* at 162, 166.

When Estonia took possession of the property at Kuti 17 and Kuti 17a on August 1, 2006, the government observed that railway tracks, berth cover plates, boilers, hatches to the openings of the seaplane hangar canopy, and gates had been removed. *Id.* at 45-46. The government further observed that the administrative building had sustained damage due to the water, heat, and power—which had previously been supplied—having been cut off. *Id.* at 46, 153. In addition, locks had been destroyed. *Id.* at 46. As a result of the above, Estonia incurred 1,988,260 kroons (approximately USD $142,500) in damages. *Id.*

After Estonia had taken possession of Kuti 17 and Kuti 17a, Rotko took steps to avoid prosecution by leaving the country at least as of the fall of 2006, after Novoseltseva had informed him of the pending criminal case against him. *Id.* at 48, 70. He was subsequently discovered to be living in the United States. *Id.* at 48, 58.

Estonia subsequently submitted a request for Rotko's extradition pursuant to its extradition treaty with the United States (the "Treaty").[2] The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. § 3181 *et seq.*, filed a complaint in this District seeking a warrant for the fugitive's arrest. This Court issued the arrest warrant and Rotko was arrested and made his initial appearance on December 3, 2019. *See* doc. 8.

## ARGUMENT

## I.  Legal Framework of Extradition Proceedings

### A.  The Limited Role of the Court in Extradition Proceedings

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Kastnerova v. United States*, 365 F.3d 980, 984 n.5 & 986 (11th Cir. 2004). The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828-29

---

[2]     The Treaty Between the United States and Estonia for Extradition of Fugitives from Justice, U.S.-Est., Nov. 8, 1923, 43 Stat 1849, *as amended by* the Extradition Treaty Between the United State of America and Estonia, U.S.-Est. February 8, 2006 S. Treaty Doc. No. 109-16 (2006).

(11th Cir. 1993). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Martin*, 993 F.2d at 828-29. If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

### B. The Requirements for Certification

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial

officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, *10 (S.D. Fla. Aug. 31, 2017); *In re Extradition of Shaw*, 2015 WL 3442022, *5 (S.D. Fla. May 28, 2015) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). The following sections briefly discuss each of those requirements.

### 1.     Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," *In re Extradition of Kirby*, 106 F.3d 855, 866 (9th Cir. 1996), but rather is acting in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also, e.g., Martin*, 993 F.2d at 828 ("The extradition magistrate conducts

a hearing simply to determine whether there is evidence sufficient to sustain the charge against the defendant under the provisions of the proper treaty or convention") (internal quotation marks, brackets, and citation omitted). The Local Rules for this District specifically delegate the authority to handle extradition matters to magistrate judges. Rule 6.01(c)(9), Local Rules of the U.S. District Court of the Middle District of Florida.

## 2. Jurisdiction over the fugitive

The Court has jurisdiction over fugitives who are found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged"). Because Rotko was found in the Middle District of Florida, this Court has jurisdiction over him.

## 3. Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Arias v. Warden*, 928 F.3d 1281, 1285 (11th Cir. July 8, 2019); *Kastnerova*, 365 F.3d at 987. The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State attesting that there is a treaty in full force and effect between

the United States and Estonia. The Court must defer to the Department of State's determination in that regard. *Arias*, 928 F.3d at 1288 (where "[Department of State] declaration set forth the United States Executive Branch's position—that the Treaty remains in full force," courts "have no answer but this: the Treaty remains in effect"); *Kastnerova*, 365 F.3d at 985-87; *Martinelli Berrocal*, 2017 WL 3776953, at *11 (noting that "every Circuit Court, including our own, has deferred to the executive branch" as to whether an extradition treaty is in force).

### 4. Crime covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the applicable treaty in this case provides for the return of fugitives charged with, or convicted of, an extraditable offense, as that term is defined under the Treaty. Article 2 of the Treaty defines offenses as extraditable if the criminal conduct is punishable under the laws of both the United States and Estonia by deprivation of liberty for a period of more than one year or by a more severe penalty. This requirement is known as "dual criminality." *See Arias*, 928 F.3d at 1292.

In assessing whether the crime for which extradition is requested meets the dual criminality requirement of the Treaty, the Court should examine the description of criminal conduct provided by Estonia in support of its charge and decide whether that conduct, if it had been committed here, would be criminal

under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See id.* at 1293 (noting that "courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"); *see also, e.g.*, *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000). A requesting country need not establish that its crimes are identical to ours. *Arias*, 928 F.3d at 1293 ("Dual criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours") (internal quotation marks and citation omitted). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 298-300; (1933); *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations

to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

### 5. Probable cause that the fugitive has committed the offense

To certify the evidence to the Secretary of State, the Court must conclude that there is probable cause to believe that the crimes charged by Estonia were committed by the person before the Court. *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1432 (S.D. Fla. 1993). The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (citation omitted).

### C. An Extradition Hearing Follows Unique Procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—

that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828. Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *See Martinelli Berrocal*, 263 F. Supp. 3d at 1284, and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

The Federal Rules of Evidence do not apply to extradition proceedings. *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition"). Indeed, hearsay evidence is admissible at an extradition hearing, and, moreover, "[a] certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government." *Shaw*, 2015 WL 3442022, at *4; *see also, e.g.*, *Afanasjev*, 418 F.3d at 1165 (unsworn statements may be sufficient to justify extradition) (citing *Collins*, 259 U.S. at 317). Nothing more is required, and typically nothing more is provided. *See, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011) ("It is exceedingly rare for the Government to submit anything

other than documents in support of an extradition request"); *see also, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1212-13 & 1226-29 (S.D. Cal. 1997) (statements of co-conspirators and other witnesses sufficient in extradition to Mexico). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. *See, e.g.*, *Afanasjev*, 418 F.3d at 1164-65; *see also* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive"). A fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005). Furthermore, many constitutional protections applicable in criminal cases do not apply. For example: a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Nunez-Garrido*, 829 F. Supp. 2d at 1282-83 (collecting cases holding that there is no right to cross-examination in extradition hearing); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *Martin*, 993 F.2d at 829; the Fifth Amendment guarantee against double jeopardy does not apply to successive

extradition proceedings, *see, e.g.*, *In re Extradition of Batchelder*, 494 F. Supp. 2d 1302, 1309 (N.D. Fla. 2007) ("Double jeopardy has no role at all in an extradition proceeding") (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. *See, e.g.*, *Nunez-Garrido*, 829 F. Supp. 2d at 1281. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913); *Schmeer*, 2014 WL 5430310, at *4. A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *Shaw*, 2015 WL 3442022, at *8 ("Defendant has consistently attempted to contradict the case brought against him in [the requesting country]. . . . This the Defendant cannot do"). "The extent to which a fugitive may offer explanatory proof is largely within the discretion of the court." *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"); *Martinelli Berrocal*, 2017 WL 3776953, at *27 (citing cases); *Fernandez-Morris*, 99 F. Supp. 2d at 1373 n.5. These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

## D. Rule of Non-Inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184 & 3186. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Arias*, 928 F.3d at 1295 ("We have neither the power nor competence to consider a foreign fugitive's concern about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch"); *Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held

that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. Rather, humanitarian considerations are matters properly reviewed by the Department of State") (citation omitted); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II.    <u>Rotko Should Be Detained</u>

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal

case.[3] *See In re Extradition of Shaw*, 2015 WL 521183, \*5 (S.D. Fla. Feb. 6, 2015).

Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

## A. Applicable Law

### 1. A strong presumption against bail governs in an international extradition proceeding

Unlike in domestic criminal cases, "there is a presumption against bond." *Martin*, 993 F.2d at 827; *see also Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process"). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The

---

[3] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, the fugitive is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed in violation of the law of the requesting state, Estonia.

enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction").

2. **Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community**

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community *and* (2) "special circumstances" warrant their release. *See, e.g.*, *Shaw*, 2015 WL 521183, at *5.[4] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, age, and incentive to flee based on the severity of the offense. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304-06; *In re Extradition of Beresford-*

---

[4]     "The case law . . . reflects an inconsistency among courts in their analysis of flight risk in relation to the 'special circumstances' inquiry. Most courts treat flight risk as a separate, independent factor from the special circumstances analysis. The courts that examine risk of flight and special circumstances separately thus require the potential extraditee to establish the following two factors before [they] can grant bail in a foreign extradition case: (1) 'special circumstances' exist in their particular case; and (2) they are not a flight risk or a danger to the community. The majority of cases that have examined this question, especially those in our Circuit, have concluded that the risk of flight analysis is a separate inquiry." *Martinelli Berrocal*, 263 F. Supp. 3d at 1303 (citations and quotation marks omitted).

*Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 2008 WL 941628, *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee"). Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See, e.g.*, *Shaw*, 2015 WL 521183, at *6; *In re Extradition of Perez-Cueva*, 2016 WL 884877, *2 (C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Martin*, 993 F.2d at 827 (stating that "a defendant in an extradition case will be released on bail only if he can prove 'special circumstances'" and declining to consider the fugitive's argument that the district court erred in determining that he was a flight risk); *Salerno*, 878 F.2d at 317-18 (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even if special circumstances may exist. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *In re Extradition of Mainero*, 950 F. Supp. 290,

294 (S.D. Cal. 1996) (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *In re Extradition of Noeller*, 2017 WL 6462358, *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *Matter of Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, 2009 WL 3837660, *1, *3-*4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *In re Extradition of Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re the Extradition of Kyung Joon Kim*, 2004 WL 5782517, *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Shaw*, 2015 WL 521183, at *8; *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *In re Extradition of Antonowicz*, 2017 WL 1197855, *3 (C.D. Cal. Mar. 27, 2017); and

- The availability of bail for the same offense in the requesting country, *see, e.g Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 2017 WL 1197855, at *3; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### B. Analysis

The Court should detain Rotko without bond. Rotko is a significant flight risk and a danger to the community. As an initial matter, fugitives charged with crimes in another country are already by definition in flight or deliberately absent from that jurisdiction, and the fact that Rotko has evaded prosecution in Estonia is indicative of his risk of flight in the United States. *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of

pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution") (citing *Jhirad v. Ferrandina,* 536 F.2d 478, 483 (2d Cir. 1976)). Moreover, Estonian authorities have determined that Rotko left Estonia at least as of the fall of 2006, after Novoseltseva informed him of the criminal proceedings against him. Req. at 48, 70. Estonian authorities were unable to locate Rotko as of February 2007, despite repeated efforts, including communicating with his mother-in-law and two brothers-in-law. *Id.* at 58-60. Estonian authorities also repeatedly tried to reach his wife, Olga Kotova, by phone, but were unsuccessful, and on February 12, 2007, an unidentified man answered Kotova's phone but hung up as soon as he learned that the police were calling. *Id.*

Despite being aware of the charges against him in Estonia, Rotko appears to have deliberately chosen not to return to that country. Given this prior history of relocating from Estonia and failing to appear for the criminal proceedings there, further flight from the United States to yet another country or to an underground location in the United States is a reasonable assumption.

Moreover, the seriousness of the offenses with which Rotko is charged—each of which carries a maximum term of imprisonment of five years, *see* Req. at 48—renders him a significant flight risk, particularly when coupled with the fact that he is currently seventy years old. *See United States v. Madoff*, 316 F. App'x 58,

59 (2d Cir. 2009) (combination of a defendant's age and the substantial amount of time he faces if convicted "naturally bears upon and increases the risk of flight"); *see also, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1305 (sixty-six years of age and potential twenty-one-year sentence "materially contribute[d] to [the fugitive's] high risk of flight"); *Perez-Cueva*, 2016 WL 884877, at *3 (seriousness of allegations against fugitive "militates against release on bail"). Allowance of bail in any amount would not guarantee the fugitive's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.[5]

Rotko also presents a danger to the community. *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("danger may, at least in some cases, encompass pecuniary or economic harm"). He is accused of willfully destroying property owned by the Estonian government and selling that property for his own gain. Such conduct is indicative of Rotko's "propensity to commit further crimes," and demonstrates his danger to the community, "even if the resulting harm is solely economic." *United States v. Madoff*, 586 F. Supp. 2d 240, 252-53 (S.D.N.Y. 2009); *see also Reynolds*, 956 F.2d at 192 (finding that the defendant, who was charged with mail fraud, failed to show by clear and convincing

---

[5]     Rotko also is, or at least has been, a sophisticated businessman and he appears to have significant resources at his disposal to aid flight from prosecution, which is another factor militating in favor of detention.

evidence that he did not pose an economic danger to the community); *United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979) (holding that the "a defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute a sufficient risk of danger"); *United States v. DeSimone*, 2009 WL 904688, *11 (D.R.I. April 1, 2009) (denying bail because the defendant had continued to defraud investors while serving a seven-year term of probation for insurance fraud and, therefore, had "shown an ability and a propensity to commit economic crimes").

Rotko's risk of flight and danger to the community are alone sufficient for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that Rotko is not a flight risk and poses no danger to the community here or abroad, the government is unaware of any "special circumstances" that would justify bail in this case. *See In re Drumm*, 150 F. Supp. 3d 92, 97-100 (D. Mass. 2015) (denying bail because of a failure to show a special circumstance, even though the court found that defendant posed no danger to the community and defendant's risk of flight could be adequately mitigated); *Orozco*, 268 F. Supp. 2d at 1117 ("[T]he absence of Defendant being a flight risk, Defendant's desire to take the dental board examination, that Defendant may have naturalization proceedings pending, and that the criminal charge in Mexico

is a bailable offense do not, individually or collectively, constitute special circumstances to warrant Defendant's release from custody at this time").

**III.  Conclusion**

For the foregoing reasons, the United States requests that Rotko be detained pending resolution of this extradition proceeding.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:  /s/ _Arnold B. Corsmeier_
ARNOLD B. CORSMEIER
Assistant United States Attorney
Florida Bar No. 869139
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202-4270
Telephone:   (904) 301-6300
Facsimile:   (904) 301-6310
E-mail:      chip.corsmeier@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 6, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

O. David Barksdale, Esq.

_s/ Arnold B. Corsmeier_
ARNOLD B. CORSMEIER
Assistant United States Attorney