**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CASE NO.:  3:19-mc-27-J-39JRK1

IN THE MATTER OF THE
EXTRADITION OF
ALEKSANDR ROTKO

_____

_____/

**ALEKSANDR ROTKO'S MOTION FOR RELEASE**
**ON BAIL AND ACCOMPANYING MEMORANDUM OF LAW**

Marcos Daniel Jiménez
Florida Bar No. 441503
**Marcos D. Jiménez, P.A.**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone:    305.772.6026
Email:  mdj@mdjlegal.com

John R. Byrne
Florida Bar No. 0126294
**León Cosgrove LLC**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone:    305.570.3233
Facsimile:    305.437.8158
Email:  jbyrne@leoncosgrove.com

David Barksdale
Florida Bar No. 957331
The Bedell Firm
101 East Adams Street
Jacksonville, Florida 32202
Telephone: 904. 353.0211
Email: ODB@bedellfirm.com

Estonia seeks to extradite Mr. Rotko, a U.S. citizen with strong ties to the U.S. and the Jacksonville community, based on acts that allegedly occurred in 2006, more than 13 years ago. Any criminal charges that could have been brought against Mr. Rotko are not the proper subject of extradition because they are time-barred under black letter Estonian law.

Estonia has known since at least 2007 that Mr. Rotko was living permanently in the United States, but it did not request his extradition until 2013, almost seven years ago. Four years later, in 2017, the Estonian government produced a report in connection with Mr. Rotko's application for U.S. citizenship indicating there were ***no*** criminal charges outstanding against him and that he did not have a criminal record. Mr. Rotko then became a U.S. citizen. Despite that, Estonia now claims that Mr. Rotko is a flight risk and danger to the community.

Mr. Rotko is 70 years old, has been a U.S. permanent resident for more than 20 years, and became a U.S. citizen in 2019. His family, including his wife and daughter, are U.S. citizens living in the U.S. Mr. Rotko never hid his identity or the location where he lives; his name and address appear in public records available on the internet, including corporate filings and property records in Florida; and he has no criminal record or history of violence. Everything Mr. Rotko owns is in the United States, and he will pledge it all, including three valuable real estate properties, to guarantee his appearance during these proceedings.

These solid, longstanding ties belie the U.S. government's rote claim that Mr. Rotko is a flight risk or that he is a fugitive from prosecution in Estonia. The U.S. government tacitly has admitted Mr. Rotko is not a flight risk when the State Department issued him a passport well after receiving Estonia's extradition request.

Special circumstances warrant Mr. Rotko's release on bond. <u>First</u>, because the 13-year

old criminal case is time-barred, Mr. Rotko cannot be extradited under the terms of the US-Estonia extradition treaty. Second, Mr. Rotko would be eligible for bond in Estonia. Third, Mr. Rotko is suffering health issues that render his confinement a detriment to his health, including very high blood pressure. Fourth, Estonia's time-barred action and belated extradition request clearly violates international norms that the United States has pledged to uphold with respect to a pending investor-state treaty claim brought by Mr. Rotko's company against Estonia.

Specifically, in 2017, approximately seven months after Estonia advised that there were no criminal charges pending against Mr. Rotko, ELA USA, Inc. ("ELA USA"), a company owned by him, commenced a $188 million international investment treaty arbitration for violations by Estonia of protections offered to American persons and entities pursuant to the *Treaty between the Government of the United States of America and the Government of the Republic of Estonia concerning the Encouragement and Reciprocal Protection of Investment* (the "Investment Treaty"). ELA USA's claim against Estonia is for the wrongful expropriation of the Lennusadam Sea Port, including the very property that Estonia now claims Mr. Rotko ordered to be stolen or destroyed. Mr. Rotko is the sole shareholder of ELA USA, and thus the cornerstone of the arbitration.

After Estonia learned of ELA USA's intent to commence the arbitration, Estonia's April 2013 request to extradite Mr. Rotko suddenly reemerged in December 2017, after a four-year dormancy. Subsequently, the international tribunal appointed by the parties to adjudicate ELA USA's claim warned Estonia regarding aggravating the dispute, which includes pursuing Mr. Rotko's extradition, because of the detrimental effect it would have on ELA USA's rights and the arbitral process. The tribunal ordered Estonia not to aggravate and burden those

proceedings, which would include pursuing extradition, yet Estonia acted in flagrant disregard of that interim award and continued the extradition proceedings. The United States, as a party to the Investment Treaty, has its own obligation not to assist Estonia in aggravating the dispute.

In sum, Estonia seeks the detention and the time-barred extradition of a 70 year-old U.S. citizen who is the key witness and driving force behind a U.S.-authorized international arbitration proceeding by an American company against Estonia for its unlawful expropriation of $188 million in property. This Court should grant Mr. Rotko's release on bond because: (1) the sham charges against him are time-barred; (2) there is no diplomatic necessity for detaining him and, on the contrary, detaining him risks violating U.S. obligations under the Investment Treaty by aggravating the dispute by assisting Estonia in preventing ELA USA from proceeding in arbitration; (3) detaining him is detrimental to his health; and (4) he is neither a flight risk nor a danger to the community. Certainly, the State Department did not believe that he was a flight risk when it issued him a U.S. passport last month.

## I. FACTS

As shown below, Estonia first sought extradition more than *six* years ago (March 2013), D.E. 1-1 at 36, based on a criminal proceeding that commenced more than *13* years ago (in September 2006), D.E. 1-2 at 2, that is, in turn, based on a civil case that Estonia commenced against three companies connected to Mr. Rotko more than *22* years ago (in 1997). *Id.* at 2-3.

### Aleksander Rotko Founds ELA USA and Invests in Estonia

Aleksander Rotko cut his teeth as a sea captain in the Baltic region. **Ex. A** (*Memorial of Claimant*) ¶ 14. In 1993, he founded ELA USA, a commodities trading company incorporated originally in Minnesota and now in Florida. *Id*. ¶ 12; **Ex. B**. By the late 1990s,

3

ELA obtained enough trade volume that it made sense financially to obtain access to an Estonian port. Ex. A ¶ 15. Accordingly, in October 1997, ELA, through an Estonian subsidiary, leased the Lennusadam Port in Tallinn Estonia (the "Port") from its private owners. *Id*. Earlier that year, the United States and Estonia entered into the Investment Treaty, where Estonia guaranteed that investments by U.S. companies in Estonia that, *inter alia*, could not be expropriated except under certain, rare circumstances. *Id*. ¶ 16. The Investment Treaty also required Estonia to provide fair and equitable treatment and to refrain from arbitrary and discriminatory acts against American investors and their investments in Estonia. *Id*. After leasing the Port—which had been under Soviet control until its military occupation of Estonia ended in 1994, *id.* ¶ 18—ELA USA discovered the extent of the Port's dilapidation and that it required extensive capital investment. *Id*. ¶ 20. Before making those expenditures, ELA USA secured ownership of the Port by purchasing the private companies that owned it, which became ELA USA subsidiaries in 1999. *Id*.

### Estonia Expropriates the Port After Rotko Refuses to Bribe Officials

For years after the Lennusadam Port's privatization, Estonia recognized private parties' ownership, control, and title over the Port by, *inter alia*, imposing property taxes, recognizing those parties' ownership in the public property registry, and issuing government work authorizations for expansion of the Port. *Id*. ¶ 21. However, after word spread that Russian-speaking Estonians had taken control of the Port and planned to refurbish it and make it profitable, jingoism took hold and the new Estonian government brought a civil lawsuit claiming ownership of the Port. *Id*.

In July 2006, after ELA USA refused to pay bribes to senior Estonian government

officials, including the Chancellor of the Ministry of Justice, *id*. ¶¶ 117-36, 154-57, 366, the Estonian government unlawfully expropriated the Port without any compensation to ELA USA. *Id*. ¶ 26(a). Estonia claims that, later that month, representatives of the Ministry of Justice went to the Port and observed that ELA USA's subsidiaries had "started removal of significant parts of the buildings which are subject to transfer to the Republic of Estonia in the composition of buildings and immovable property." D.E. 1-2 at 3-4. All told, Estonia claims that ELA USA's subsidiaries removed, destroyed, or sold approximately $144,000 worth of cover plates, railway rails, boilers, locks, and gates, and that all this was done on Mr. Rotko's orders and with knowledge of his then wife, Olga Kotova. *Id.*

## Rotko becomes a US Permanent Resident in 1998

In early October 2006, four months after ELA USA was ordered to surrender the Port as the result of a decision by the Estonian courts that violated international law, and having had his business destroyed by Estonia, Mr. Rotko sold his apartment in Estonia and traveled back to the United States, where he had been a permanent resident since 1998, **Ex. C**, and had formed ELA USA in 1993. Ex. B. At the time of his departure, he had no knowledge of any criminal proceeding against him. He left Estonia very shortly after the criminal procedure against him purportedly commenced on September 22, 2006. Mr. Rotko has lived openly in the United States ever since and publicly listed his name and address on property records, as well as ELA USA's corporate records, all of which are readily available online. *Id.*; **Ex. D** (STN Properties corporate records); **Ex. E-F** (property records).

## 2006—Estonia Investigates Rotko but Does Not File Charges

Estonia claims it began investigating Mr. Rotko in September 2006, D.E. 1-2 at 2, and

had him declared a "fugitive" in 2007 because it was impossible to determine his whereabouts. D.E. 1-2 at 16 ("there is no way to identity the location of Aleksandr Rotko"), 18. Yet, Estonia admits that it conducted surveillance and found at the time that he was living in the United States. D.E. 1-1 at 36; D.E. 1-2 at 55. Estonia still has not served Mr. Rotko with any process relating to any investigation or criminal proceeding. At most, Estonia claims it attempted to mail Ms. Kotova a summons, which it admits was returned undeliverable, to an address where Mr. Rotko and Kotova lived before he traveled back to the United States. D.E. 1-2 at 16.

The Government nevertheless contends that Mr. Rotko fled Estonia *after* being told by Olga Novoseltseva, a bookkeeper for ELA USA's Estonian subsidiaries, that he was under investigation. D.E. 12 at 4. In fact, the documents attached to the Complaint show the opposite. Alex Rotko left for the United States in October 2006. When interviewed by the Estonian police in November 2006, Ms. Novoseltseva testified that she had not spoken to Alex Rotko since summer 2006—before he left for the United States and before she knew of the criminal investigation. D.E. 1-3 at 53 ("Last time I saw Olga Kotova in December 2006. I did not see Aleksandr Rotko again after summer of 2006"). Given that the investigation did not start until September 2006, D.E. 1-2 at 2, and she had not spoken to Alex Rotko since the summer of 2006, there was no way Ms. Novoseltseva could have told Mr. Rotko about an investigation that did not even exist the last time she spoke to him.

Ten years later, in December 2016, Estonia had Olga Kotova detained in Finland, and held her in an Estonian prison for almost five months until she agreed to pay 32,000 EURO to settle the criminal charges against her. Ex. A ¶ 216. During questioning, an Estonian prosecutor told Kotova that the Estonian government tried to extradite Mr. Rotko in 2013. Kotova told

Mr. Rotko about the extradition request in December 2016. That is when Mr. Rotko first learned that he had been under criminal investigation in Estonia and that the government had attempted to extradite him.

### 2013—Seven Years After It Investigates the Alleged Crime—Estonia Seeks Extradition

In April 2013, seven years after Mr. Rotko's alleged misconduct and at least six years after Estonia admits knowing that he was in the United States, the Ministry of Justice of Estonia first requested Mr. Rotko's extradition from the United States, and submitted additional information in 2014. D.E. 1-1 at 2 [¶ 3]. The extradition did not proceed for three years.

### 2017-Estonia Reactivates Extradition After Rotko's Company
### Brings Investment Treaty Claim Against Estonia for $188 Million

In 2017, Mr. Rotko requested records from Estonia, which produced a report indicating that there were **no** criminal charges against Mr. Rotko as of September 2017. **Ex. G**.

On August 1, 2017, ELA USA notified Estonia of its intent to file an arbitration pursuant to the Investment Treaty. **Ex. H**. It was only then, after three years of inaction, that the State Department requested additional evidence related to Estonia's extradition request in November 2017, relating to four areas, including probable cause. D.E. 1-3 at 11. Estonian then submitted supplemental evidence in December 2017. D.E. 1-3 at 14.

In April 2018, ELA USA filed its formal notice of arbitration against ELA USA. **Ex. I** ¶ 3. The arbitration is being administered under the Investment Treaty by the Permanent Court of Arbitration in the Hague. A three-person international tribunal has been constituted to hear this matter. The President of the Tribunal is former International Court of Justice Judge Bruno Simma (Judge Simma is currently a judge of the US-Iran Claims Tribunal at the Hague). *Id.* at 1. Judge Peter Tomka of the International Court of Justice (former President of the

International Court of Justice), and Professor Helene Ruiz-Fabri (the Director of the Max Planck Institute for Procedural Law and the former dean of law of Sorbonne University) are the other two tribunal members. *Id.*

### International Tribunal Orders Estonia Not to to Interfere in Arbitration Including Proceeding with Extradition

On October 25, 2018, ELA USA filed a motion before the Tribunal pursuant to Article 26 of the UNCITAL Arbitration Rules to protect the Tribunal's effective jurisdiction and other relief. Specifically, ELA USA sought, *inter alia*, production of documents by Estonia relating to the criminal investigation about which Mr. Rotko had learned in 2016, for preservation of evidence, and an interim award preserving the status quo between the parties and preventing the aggravation of the dispute through the extradition of Mr. Rotko for the prosecution of retaliatory criminal proceedings in Estonia. *Id.* ¶ 4. With respect to the records, ELA USA sought all criminal investigative records involving Mr. Rotko that, as noted above, the Estonian local prosecutor would not produce informally because the "Prosecutor's Office did not want the criminal documents used in what is, in fact, this proceeding against Estonia." *Id.* ¶ 46.

On March 4, 2019, the Tribunal issued its decision on the ELA USA's Interim Measures request in Procedural Order No. 3.[1] With respect to extradition issue, the Tribunal agreed with ELA USA it had jurisdiction over this issue and that "the non-aggravation of a dispute after the initiation of an arbitration under the US-Estonia BIT is a right capable of protection through an interim measures order." *Id.* ¶ 107. Notably, the Tribunal held that "an

---

[1] With respect to the production of the documents, while not ordering their immediate production, the Tribunal noted that the failure to produce relevant documents at the appropriate time could justify the imposition of negative inferences. Procedural Order ¶ 101.

arrest of Mr. Rotko—in Estonia **or elsewhere** in the course of extradition proceedings—would significantly harm [ELA USA's] access to an important witness and greatly complicate the exchange between [ELA USA] and its counsel." *Id.* ¶ 113 (emphasis added).

The Tribunal then analyzed whether the measures were urgent, necessary, and proportionate. On urgency, the Tribunal noted that the "extradition request" "deserves special attention." *Id.* ¶ 117. Persuaded by a November 2016 statement by an Estonian public prosecutor that 'so far the extradition has not been granted,'" *id.*, the Tribunal stated it would not speculate whether after two years the United States would grant the request. *Id.* ¶ 118. But, the Tribunal thought it important that "**the Claimant and its counsel would still have adequate access to an important witness and the Claimant's (primary) decision-maker**." *Id.* (emphasis added).

For that reason, it held: "The Tribunal therefore considers **the extradition request to the United States to constitute a risk to the integrity of the proceedings**." *Id.* (emphasis added). The Tribunal found the request urgent because "access to a key witness and its primary-decision maker is part of a fair process that seeks to yield a just award." *Id.* at 119. The Tribunal also found the request necessary because "[s]uch an influence on the proceedings can for obvious reasons not be repaired by an award on damages." *Id.* ¶ 121.

The Tribunal ultimately denied the request on proportionality because the status quo had not changed—ELA USA had been able to file its arbitration and the Tribunal was not in "a position to assess—at least roughly—the risk that the extradition request, despite having

been unsuccessful for quite some time now, will still be granted." *Id.* ¶ 129.[2]  The Tribunal

did warn both parties going forward "**not to take any action that may aggravate the dispute**

**or affect the integrity of the arbitration proceeding**." *Id.* ¶ 133(b) (emphasis added).

Yet, despite the Tribunal's clear directive and in direct and flagrant violation of the

Tribunal's order and authority, Estonia seeks to detain and extradite Mr. Rotko to Estonia.

Indeed, five months after the Tribunal issued the Procedural Order, the Estonian Northern

District Prosecutor wrote to the U.S. Government reiterating Estonia's request to extradite Mr.

Rotko, D.E. 1-4 at 44, who was arrested at his home on December 3, 2019.  Estonia did not

notify the Tribunal or ELA USA of its actions.

On December 5, 2019, ELA USA notified the Tribunal of Estonia's violation of the

order. The Tribunal ordered Estonia to respond by December 13, 2019.  **Ex. J.**

## II.  ARGUMENT

A Court may issue a bond in an extradition case if (A) the defendant is not a flight risk;

and (B) special circumstances warrant the defendant's release.  Both factors apply here.

### A.  Mr. Rotko Is Not a Flight Risk

Mr. Rotko poses no risk of flight for numerous reasons:[3]

### 1.  <u>Mr. Rotko's Ties to the Community and Inability to Flee</u>

Numerous courts have released a defendant facing extradition based on the defendant's

substantial ties to the community.[4] There is no question that such ties exist here, a fact the U.S.

---

[2] The Tribunal noted that the extradition request had been filed before the Arbitratrion but the Tribunal was not aware of the re-activation of the proceedings after ELA USA had given notice of the proceedings.

[3] Courts are split as to whether the standard of proof is clear and convincing evidence or a preponderance of the evidence. *In re Extradition of Shaw*, 14-M C-81475-W M, 2015 WL 521183, at *5 (S.D. Fla. Feb. 6, 2015). Either way, it is clear that Mr. Rotko is not a flight risk.

[4] *See In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1027 (D. Haw. 2006) (ordering release of three

State Department tacitly admitted when it issued Mr. Rotko a U.S. passport—his ticket to leave this country—*well after* receiving Estonia's extradition request.

Mr. Rotko's whole life is in the United States, and primarily in Florida. His daughter, a U.S. citizen, lives in California. Mr. Rotko's assets comprise an interest in three properties, approximately $20,000 in a U.S. bank account, and his ownership of STN Properties LLC ("STN") and ELA USA, both of which are Florida companies. Exs. B-C. STN's value is in the properties Mr. Rotko will pledge to obtain a bond, Ex. E, and ELA's remaining value is in the prospect of winning the Arbitration. Mr. Rotko will appear for these extradition proceedings because his failure to do so would mean losing everything—the ability to see his U.S. family, his assets, and his share of the $188 million owed by Estonia to ELA USA.[5]

Moreover, even if Mr. Rotko were willing to sacrifice everything to skip bail and become a 70-year-old homeless, international fugitive with no money or resources to survive, he would have nowhere to go. Mr. Rotko only has a U.S. passport, which he will surrender. Also, Estonia has a warrant out for Mr. Rotko's arrest in Europe, and he believes that Estonia has issued an INTERPOL Red Notice, ensuring that Mr. Rotko would be detained and sent to Estonia upon his arrival in another country. Thus, even if Mr. Rotko wanted to flee (he does

---

Hawaii-based defendants facing extradition and noting that the defendants had "households, children and significant financial interests in Hawaii"); *In re Extradition of Kapoor*, 11-M-456 RML, 2011 WL 2296535, at *5 (E.D.N.Y. June 7, 2011) (ordering release of New York-based defendant facing extradition because defendant's children, husband, and father lived in New York City).

[5] Mr. Rotko's interest in the Arbitration also is a special circumstance warranting release on bond. In *In re Mitchell*, 171 F. 289, 290 (S.D.N.Y. 1909), the court held that special circumstances warranted the defendant's release on bail during the pendency of an existing civil proceeding in which "all his fortune" was at issue. Here, an international tribunal concluded that Mr. Rotko is the central witness to the Arbitration. Ex.I ¶ 118. Thus, as Estonia is well aware, Mr. Rotko's detention in the U.S. or Estonia will severely prejudice Mr. Rotko and ELA USA in the Arbitration.

not), he would have no place to go.

## 2. **Mr. Rotko's Proposed Bond Package Guarantees His Appearance**

To prove to the Court that he is committed to remaining in the United States, Mr. Rotko

will obtain a bond using the following as collateral:[6]

(a) Apartment Building, 234 North 14 Avenue, Jacksonville Beach, Florida 32250. Ex. E. This is owned by STN Properties, LLC, which is wholly owned by Mr. Rotko. Ex.D. The property appraiser shows the assessed value as $384,200 and the market value as $384,200, Ex. E, however, based on the rental income from the building, it actually is worth approximately $600,000. There is no mortgage on the property.

(b) Residence, 54 Sugar Sand Lane, St. Johns, FL 32259. Ex. F. Mr. Rotko jointly owns this property with Tatjana Rotko. *Id.* The property appraiser lists the assessed value at $361,125 and the market value at $377, 594. *Id*. Zillow lists the market value as $497, 612. *Id.* There may be an equity credit line against the house with a balance due of approximately $42,000. Otherwise, there is no mortgage on the property.

(c) Apartment, 6438 Hazeltine Avenue, Unit 9, Los Angeles, CA 31401. Ex. K. Mr. Rotko' daughter lives at this property, which Mr. Rotko jointly owns with Tatjana Rotko. *Id.* Zillow lists its market value at $333,171. *Id.* There is no mortgage on the property.

(d) Residence, 3044 Pescara Drive, Jacksonville, FL 32246. Ex.L. Mr. Rotko does not own this property. It is owned by Tatjana Rotko, who agreed to pledge it to obtain a bond for Mr. Rotko. The property appraiser lists the assessed value at $336,937 and the market value as the same. Zillow lists the market value at $418,566.

*U.S. v. Price*, 611 F. Supp. 502, 506 (S.D. Fla. 1985) (granting $150,000 personal surety bond

collateralized by real property); *United States v. Kollmar*, 19MJ70677MAG1KAW, 2019 WL

2163005, at *2 (N.D. Cal. May 17, 2019) ("Courts have recognized that bail itself 'will present

---

[6]To help put these bond terms in perspective, the Court should consider the *Arias Leiva* case, a case arising out of the Southern District. There, Judge O'Sullivan released the defendant on a $1,000,000 personal surety bond that was co-signed by a United States citizen and secured with real property having equity of at least $1,000,000, along with a condition of electronic monitoring despite that Arias Leiva was accused of an offense, had fled his country prior to being convicted, and did not have a continuous residence in the United States.

a significant financial deterrent to flight.'") (quoting *In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1027 (D. Haw. 2006)).  Mr. Rotko of course will agree to house arrest and electronic monitoring, as well as the usual conditions of a bond.

### B.  Mr. Rotko is not a Danger to the Community

The Government also asks the Court to detain Mr. Rotko because he presents an "economic" danger to the community. D.E. 12 at 24. This argument is legally and factually wrong.  Legally, the Government does not cite a single case in the extradition context standing for the proposition that a court can detain a person who *does* pose an economic danger to the community. Notably, in the Bail Reform Act context, a court may not, under the danger to the community prong of the pre-trial detention analysis, detain a person who poses an economic (as opposed to a physical) danger to the community. *United States v. Giordano*, 370 F. Supp. 2d 1256, 1261 (S.D. Fla. 2005).

Factually, and more importantly, Mr. Rotko poses no danger to the community, economic or otherwise. Since becoming a permanent resident of the United States in 1998, he has been charged with zero domestic crimes. And the Government's attempt to use the Estonian investigation into him as a basis for its economic danger argument fails because, as developed here, the investigation is baseless. To this day, Mr. Rotko has not been charged with a crime anywhere, including in Estonia, where he merely is a suspect based on suspicion of conduct that allegedly occurred 13 years ago. D.E. 1-3 at 16.

### C.  Special Circumstances Warrant Mr. Rotko's Release

To be entitled to bond, Mr. Rotko also must prove the existence of "special circumstances." *In re Extradition of Ghandtchi*, 697 F.2d 1037, 1038 (11th Cir. 1983); *United States v. Valentino*, 4:18-MJ-00146, 2018 WL 2187645, at *1 (S.D. Tex. May 11, 2018) (releasing defendant on bond pending the extradition case where the defendant was 71 years

old, had significant ties to the community, continued to have an active legal practice, had a reasonable likelihood of success on the merits at his extradition hearing, and did not present a flight risk). Special circumstances include: (1) "the raising of substantial claims upon which the appellant has a high probability of success," *Salerno v. U.S.*, 878 F.2d 317, 317 (9th Cir. 1989); (2) the likelihood of "lengthy delays . . . as a result of the actual extradition proceedings themselves and the appeals therefrom," *In re Kirby*, 106 F.3d 855, 863 (9th Cir. 1996); (3) the availability of bail in the requesting state for the underlying crime, *In Re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1220 (D. Nev. 1993); (4) "a lack of any diplomatic necessity" for detention, *In re Chapman*, 459 F. Supp. 2d 1024 (D. Haw. 2006); (5) the fact that the defendant does not have a "prior record" and has not been "charged with a crime of violence," *U.S. v. Taitz*, 130 F.R.D. 442, 446 (S.D. Cal. Apr. 20, 1990); and (6) a "serious deterioration in health while in custody." *Salerno*, 878 F.2d at 317. Although this list is illustrative, it is not exhaustive.[7] And a court may rely on special circumstances, in the aggregate, to order release. *Extradition of Morales*, 906 F. Supp. 1368, 1376 (S.D. Cal. 1995) (relying on four special circumstances to release defendant on bond); *In re Extradition of Valles*, Case No. M-02-008, 2002 WL 34722296, at *1-2 (May 13, 2002) (special circumstances based on several of factors, including lack of evidence that defendant posed a flight risk and defendant's ill daughter).

1. **Mr. Rotko Has a High Probability of Success**

Numerous courts have released a defendant pending an extradition hearing because the

---

[7] *Wroclawski v. U.S.*, 634 F. Supp. 2d 1003 (D. Az. 2009). A court may consider other special circumstances as well. *Id.* "The determination of what [special circumstances] to consider and how much weight to give them is within the 'sound discretion' of the Court." *Id.* (citation omitted); Michael Abbell, *Extradition to and from the United States* § 4-1 (2010) (noting that judges "have been accorded substantial discretionary latitude" when it comes to the question of what constitutes "special circumstances")

defendant presented a substantial claim against extradition.[8] Here, Mr. Rotko has such a claim because the charges against him have been time-barred under Estonian law since 2011. As explained by Estonian law expert Paul Keres, Estonia purports to charge Mr. Rotko with embezzlement (Penal Code § 201) and causing damage to or destruction of a thing belonging to another person (Penal Code § 203), both of which Estonia admits are second degree offenses because each carries a maximum penalty of five years' imprisonment or less. **Ex. M ¶¶ 21, 23, 25-28.** Estonian law provides a five-year statute of limitations on all second degree offenses. *Id.* ¶ 26. Estonia's charges stem from conduct that allegedly occurred in 2006. *Id.* ¶ 27; D.E. 1-2 at 3-5. Accordingly, the statute of limitations on the charges expired eight years ago in 2011, and the prosecutor was "law-bound to terminate the proceedings without delay pursuant to § 200 of the Code of Criminal Procedure" Ex. M ¶¶ 28-31. There is no basis to extradite Mr. Rotko, and there was no probable cause to arrest him, let alone continue to detain him.

Estonia argues that the applicable statute of limitations is 15 years pursuant to Penal Code § 81, which, according to the statement of Prosecutor Andrei Voronin, applies because Mr. Rotko absconded from criminal proceedings. *Id.* ¶¶ 32-33; D.E. 1-2 at 7. This argument, which, "constitutes, by omission, an egregious misrepresentation of the applicable law," Ex.M ¶¶ 31-32, also fails as a matter of fact based on Estonia's own admissions.

The 15-year statute of limitations applies only if the state proves conclusively that a suspect deliberately evaded a criminal proceeding. *Id.* ¶¶ 36, 39-41. The Estonian Supreme

---

[8] *In re Extradition of Huerta*, Magistrate No. H-08-342M, 2008 WL 2557514, at *4 (S.D. Tex. June 23, 2008); *Extradition of Gonzalez*, 52 F. Supp. 2d 725, 741 (W.D. La. 1999) (same); *In re Extradition of Santos*, 473 F. Supp. 2d 1030 (C.D. Cal. Dec. 21, 2006) (same); *U.S. v. Ramnath*, 533 F. Supp. 2d 662, 665 (E.D. Tex. 2008) (same); *Nacif-Borge*, 829 F. Supp. at 1216 (same).

Court has held that, if failing to comply with a summons constitutes absconding from justice, then the state would be required to prove conclusively that a summons was properly served on the suspect. *Id.* ¶¶ 43-44.

Estonia has not provided, and cannot provide, evidence that it properly served a summons on Mr. Rotko because it never did, including in Estonia or through the myriad procedures available for service in the United States. *Id.* ¶¶ 44-47. Indeed, Estonia does not even claim that it attempted to serve a summons on Mr. Rotko. At most, it claimed that it attempted, ***but failed***, to serve Mr. Rotko's now ex-wife, Olga Kotova, in December 2006 with a summons relating to an investigation into *her* involvement with the alleged destruction of government property at the Port. D.E. 1-2 at 16. Specifically, the government mailed a copy of the summons to an apartment in Estonia that Mr. Rotko and Kotova sold before Mr. Rotko returned to the United States in October 2006. *Id.*

Moreover, the Estonian government's basis for claiming that Mr. Rotko knew about the investigation was testimony from Ms. Novoseltseva, who stated that she had not spoken to Alex Rotko since summer 2006—before he left for the United States and before she knew of the criminal investigation. D.E. 1-3 at 53 ("Last time I saw Olga Kotova in December 2006. **I did not see Aleksandr Rotko again after summer of 2006**") (emphasis added). Given that the investigation did not start until late September 2006, D.E. 1-2 at 2, and the testimony establishes that Ms. Novoseltseva had not spoken to Alex Rotko since the summer of 2006, she could not have told him about an investigation that did not even exist when she spoke to him. Ex. M ¶¶ 48-55.

Mr. Rotko did not leave Estonia for the United States because of a criminal

investigation Estonia never notified him about. Rather, Mr. Rotko left Estonia in early October 2006 because, four months prior, Estonian officials, who ELA USA refused to bribe, used *ex post facto* regulations and fraudulent judicial proceedings to "nationalize" the Port without any compensation to ELA, including for the more than $9 million in improvements ELA made after purchasing the Port. *See* Ex. A ¶¶ 26, 110. After experienced this Soviet-style "due process" and corruption in the recently emancipated Estonia, and having been robbed of his reason for being in Estonia in the first place, Mr. Rotko traveled back to the United States, where he had been a permanent resident since 1998, Ex. C, and had incorporated ELA in 1993. Ex. B.

Mr. Rotko has been living openly in the United States since 2006, and easily could be found with a simple public records search. *See* Exs. C-F. Nonetheless, the closest Estonia ever has come to notifying Mr. Rotko of the supposed charges against him was during an October 2018 procedural conference call in the Arbitration, wherein Estonia's counsel blithely referred to Mr. Rotko as a "criminal." Notably, in September 2017, the Estonian government admitted that **no** criminal charges were pending against Mr. Rotko. *See* Ex.G. "If the investigative bodies are disinterested in or incapable of determining their suspect's whereabouts, do not avail themselves of assistance from foreign authorities under mutual assistance treaties, and simply allow the case to remain dormant for years, the charges will become time-barred." Ex. M ¶ 19.

There is no evidence that the necessary preconditions for absconding from justice occurred. Indeed, the government's own documents demonstrate that Mr. Rotko did not know about the investigations (to the extent they existed) and, in any case pursuant to "the *in dubio pro reo* doctrine, any doubts as to Mr. Rotko's knowledge of the proceedings, must be

determined in his favour." *Id.* ¶¶ 54-60. Estonia was required to terminate any criminal proceedings against Mr. Rotko in 2011 pursuant to § 200 of the Code of Criminal Procedure and the Penal Code's five-year statute of limitations on second degree offenses. *Id.* ¶¶ 57-60.

### 2. Mr. Rotko's Detention Runs Afoul of Treaty Obligations

The obligation of parties to not aggravate a dispute is well-established in international law. The International Law Commission is the primary legal organ of the United Nations. The International Law Commission codified the principles of international state responsibility in its 2001 *Draft Articles on Responsibility of States for Internationally Wrongful Acts*. Article 30 of the ILC Articles requires that parties not take measures to aggravate disputes. Accordingly, once a State is engaging in an internationally wrongful act, it must cease to do and offer assurances and guarantees that it will not engage in the act again:

> *Article 30 - Cessation and non-repetition*
> *The State responsible for the internationally wrongful act is under an obligation:*
> > *(a) To cease that act, if it is continuing.*
> > *(b) To offer appropriate assurances and guarantees of non-repetition, if circumstances so require.*

Also, article 26 of the *Vienna Convention of the Law of Treaties* codified the customary international law principle of good faith in the carrying out of treaty obligations (*i.e.*, the obligations under the Investment Treaty in this case).

Notwithstanding these well-known principles of customary international law, Estonia, through its efforts to continue its extradition request after the international tribunal issued its March 2019 order has used the United States to take action to aggravate this international dispute or to take measures that would affect the integrity of the arbitration procedure.

Article VI (6) of the Investment Treaty states that "[a]ny arbitral award rendered

pursuant to this Article shall be final and binding on the parties to the dispute. In addition, Article VI(6) of the Investment Treaty obliges the United States and Estonia (the BIT Parties) to carry out without delay the provisions of any such award ("Each Party undertakes to carry out without delay the provisions of any such award and to provide in its territory for its enforcement.").

As the United States must follow the Tribunal's direction, this Court should consider this unique situation as a special circumstance warranting bond. The United States must uphold the decision of the international tribunal under the Investment Treaty. Article VI (6) of the Treaty contains a self-executing obligation to comply with the orders of international Tribunals constituted under the Treaty. The U.S. Supreme Court has made the binding nature of such treaty clear. *Medelin v. Texas*, 552 U.S. 491, 495 (2008) (treaty is binding if "self-executing" and ratified on that basis).

Likewise, Article VI(3)(iii) of the Investment Treaty obligates Estonia to arbitrate the dispute between it and Mr. Rotko under the arbitral rules of the United Nations Commission on International Trade Law (the "UNCITRAL Rules"). Article 26 of the UNCITRAL Rules empowers the arbitral tribunal to "take any interim measures it deems necessary in respect of the subject-matter of the dispute." A failure by a State party to the Investment Treaty to honor a tribunal's order of such measures constitutes a failure by that State to honor the agreement to UNCITRAL arbitration in Article VI(3)(iii) of the Treaty.

In this case, extradition is in direct contradiction with the Tribunal's direction in Procedural Order No. 3, which is binding upon Estonia and the United States. Estonia has acted in direct contempt of the Tribunal's order, and thus in contravention of Articles VI(3)(iii) and

VI(6) of the US-Estonia Bilateral Investment Treaty. The United States, as a Party to the Treaty, also is required to carry out the terms of the Tribunal's orders under the express terms of Treaty Article VI(6).

Among other things, while Estonia's original extradition request was filed more than six years ago in 2013, as recently as **October 2019**, Estonia pushed the U.S. government to extradite Mr. Rotko. Indeed, on October 23, 2019, the Estonian Northern District Prosecutor wrote to the U.S. Government reiterating Estonia's request to extradite Mr. Rotko. D.E. 1-4 at 44. His letter was written *after* the Tribunal's March 2019 Procedural Order No 3. Ex.I. There is no indication in the documents supporting the extradition request that Estonia communicated the contents of the international tribunal order to the U.S. Government.

Estonia's extradition request seeks the United States' complicity in Estonia's violation of its obligations under the Treaty and international law. But the United States, as a party to the Investment Treaty, is also bound to recognize enforce its provisions. This includes a requirement to enforce any awards of the Tribunal under Article VI(6) of the Treaty. Moreover, aiding Estonia in its violation of international law would render the U.S. in violation of international law, as provided in ILC Article 16:

> *Article 16 - <u>Aid or assistance in the commission of an internationally wrongful act</u>*
> *A State which aids or assists another State in the commission of an internationally wrongful act by the latter is internationally responsible for doing so if: (a) that State does so with knowledge of the circumstances of the internationally wrongful act; and (b) the act would be internationally wrongful if committed by that State.*

Accordingly, if the United States continues to aid and carry out Estonia's extradition request (e.g., by detaining Mr. Rotko without bail), it would not only aid Estonia's violation

of international law, but also put the United States in violation of its own obligations under international law and the Investment Treaty.

The United States has based its case for detaining Mr. Rotko on 18 U.S.C. §§ 3181 *et seq.* D.E. 12 at 1. That statute must not "be construed to violate the law of nations if any other possible construction remains."[9] Likewise, Article 31(c)(3) of the *Vienna Convention on the Law of Treaties*, provides that when interpreting a treaty, "There shall be taken into account, together with the context […] Any relevant rules of international law applicable in the relations between the parties."[10]

Mr. Rotko has established special circumstances sufficient to overcome the presumption against bond – namely, that the United States, if it denies him bail (a result that neither treaty nor statute require), would be facilitating the aggravation of the dispute between Mr. Rotko and Estonia in contravention of the Tribunal's order not to do so and the United States' obligations under the Treaty and international law.

### 3.  Detention Will Result in a Serious Deterioration of Mr. Rotko's Health

Another special circumstance justifying release is Mr. Rotko's health.  He is a 70 year-old man with recent high blood pressure reading of 220/114, and high cholesterol that is not

---

[9] *Murray v. The Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804); *see also* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 115(1) (b) (1986)§ 114 ("Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States.").
[10] *See Aquamar, S.A. v. Del Monte Fresh Prod. N.A., Inc.*, 179 F.3d 1279, 1296 n.40 (11th Cir. 1999) ("Although the United States is not a party to the Vienna Convention, it regards the substantive provisions of the Vienna Convention as codifying the international law of treaties.") (quoting *Kreimerman v. Casa Veerkamp S.A. de C.V.*, 22 F.3d 634, 638 n.9 (5th Cir. 1994)); *see also* Brief for the United States as Amicus Curiae Supporting Petitioner at 9 & n.6, *Abbott v. Abbott,* 560 U.S. 1 (2010) (No. 08-645) (citing *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 433 (2d Cir. 2001)). This creates a presumption that the United States' treaty obligations with respect to extradition should be interpreted in harmony with its obligations under the Investment Treaty. *See* ILC Report, UN Doc. A/CN.4/L.682 at 25, para. 37ff (referring to this presumption as the "principle of harmonization")).

being properly treated with medication. He has high creatinine levels, indicating that he has kidney disease. In July 2019, doctors found pre-cancerous polyps in his colon and recommended another colonoscopy in January 2020; the arrest in this case interfered with a follow-up appointment to schedule the procedure. *See U.S. v. Taitz*, 130 F.R.D. 442, 446 (S.D. Cal. 1990) (health conditions are a special circumstance warranting release of extradition defendant who had allergic reactions); *In re Extradition of Sidali*, 899 F. Supp. 1342, 1351 (D.N.J. 1995) (same, defendant's health was failing and the conviction 20 years old).

### 4. The Extradition Process will be Lengthy

Courts have released a defendant pending an extradition hearing based on the likely protracted nature of the extradition proceeding.[11] Here, there likely be a protracted fight:

First, the property allegedly stolen or destroyed on Mr. Rotko's order is the subject of the Arbitration. Ex.A ¶¶ 2, 4, 32. Indeed, the primary issue before the Tribunal is whether Estonia actually owned the Port, including the property that allegedly was destroyed. *Id.* ¶ 26. As a signatory to the Investment Treaty, Estonia bound itself to the Tribunal's holding. Thus, if the Tribunal finds that the Port was wrongfully seized by the government, then Mr. Rotko could not be guilty of the charges levied against him. Mr. Rotko's extradition should not be decided until after the Tribunal renders its decision because there can be no probable cause to arrest Mr. Rotko for the destruction of property owned by companies that he owns. It is unlikely that there will be a ruling in the Arbitration for several years, and that is only if Mr. Rotko, the primary witness and cornerstone of the Arbitration, is not in U.S. or Estonian custody.

---

[11] *Chapman*, 459 F. Supp. 2d at 127; *Taitz*, 130 F.R.D. at 445; *In re Extradition of Kapoor*, No. 11-M-456 RML, 2011 WL 2296535, at *4 (E.D.N.Y. June 7, 2011).

<u>Second</u>, Mr. Rotko intends to raise numerous, meritorious challenges to his extradition, some of which are preliminarily discussed above.[12] <u>Third</u>, because of the 12-year gap between the time of the alleged offenses and the filing of the Complaint requesting extradition, Mr. Rotko will need time to track down and adequately prepare his defenses for the hearing. *Chapman*, 459 F. Supp. 2d at 127 (holding likelihood of lengthy proceedings justified release "[b]ecause the underlying offense occurred more than three years ago" and "it may be difficult to track down witnesses and prepare evidence for the hearing"). This will prove especially difficult in this case because the Estonian government has refused to produce documents relating to its supposed investigation, even though it is required to do so under Estonian law. And, <u>fourth</u>, if the Court were to order extradition, Mr. Rotko intends to pursue all avenues of review, including by filing a petition of habeas corpus, appealing to the Eleventh Circuit, and requesting relief from the State Department.[13]

### 3. **The Availability of Bail in Estonia**

Here, bail would be available for the subject offenses in Estonia.[14] Here, Mr. Rotko would be eligible for bail pursuant to Section 135 of the Estonian Code of Criminal Procedure. Ex. M ¶¶ 61-64. And where, as here, the statutory maximum terms of imprisonment for the charged offenses are low, an Estonian court is more likely to provide bail. *Id.* ¶ 64; *see Nacif-*

---

[12] *Kapoor*, 2011 WL 2296535, at *4 (likelihood of lengthy proceedings supported release where defendant "posited complex and weighty arguments as to why she is not extraditable"); *In re Extradition of Sidali*, 899 F. Supp. 1342, 1351-52 (D.N.J. 1995) (same); *Morales*, 906 F. Supp. at 1375 (same).

[13] *Taitz*, 130 F.R.D. at 445 (likelihood of lengthy proceedings justified release when habeas corpus and appeal "would likely last for as long as two years"); *Kapoor*, 2011 WL 2296535, at *4 (same).

[14] *Castaneda-Castillo*, 739 F. Supp. 2d at 59 (ordering release because, among other things, "if he had been arrested in Peru on the charges presently pending against him [the defendant] may have been released on bail"); *Kollmar*, 2019 WL 2163005 at *3; *Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1221 (D. Nev. 1993) (same); *In re Gannon*, 27 F. 2d 362 (E.D. Pa. 1928) (same); *Kapoor*, 2011 WL 2296535, at *3 (same).

*Borge*, 829 F. Supp. at 1221 (ordering release when defendant "provided a favorable legal opinion" on the availability of bail in Mexico from Mexican criminal attorney).

### 4. **Lack of Diplomatic Necessity**

The lack of diplomatic necessity for refusing to issue a bond to a defendant is another special circumstance justifying bail, particularly when the requesting country has been dilatory in seeking extradition.[15] Here, Estonia's delay in pursuing Mr. Rotko establishes a lack of diplomatic necessity. Despite the fact that Estonia has known Mr. Rotko was in the United States since 2007, D.E. 1-1 at 36, and the fact that Mr. Rotko has lived openly in the United States for more than a decade, Estonia did not file an extradition request until 2013, and Mr. Rotko was not arrested until this month (just over a year after ELA filed its $188 million Arbitration against Estonia). *See In re Extradition of Blasko*, 2019 WL 498986*6 (E.D. Cal. 2019) ("lengthy unexplained delay" can be a special circumstance).

### 5. **Mr. Rotko's Lack of Criminal History and Nature of the Charges**

Another recognized special circumstance is where a defendant "has no prior record and is not charged with a crime of violence." *Taitz*, 130 F.R.D. at 446; *see Kollmar*, 2019 WL 2163005 at *3; *Chapman*, 459 F. Supp. 2d at 1026; *Nacif-Borge*, 829 F. Supp. 2d at 1220-21. Mr. Rotko has no criminal history in the United States, and Estonia admits Mr. Rotko never has been convicted of a crime in Estonia. Ex.G; D.E. 1-2 at 16. And the Complaint does not allege he is suspected of a crime of violence.

---

[15] *Chapman*, 459 F. Supp. 2d at 1027 (ordering release of defendant based partly on lack of diplomatic necessity when requesting country did not act with urgency in seeking extradition); *Kollmar*, 2019 WL 2163005 at *3 (same); *U.S. v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 58 (D. Mass. 2010) (same); *Kapoor*, 2011 WL 2296535, at *3 (same).

### D. Mr. Rotko is a US Citizen, Not a Flight Risk; Due Process Requires Release

If Mr. Rotko is not a flight risk, and he clearly is not, the Court must release him under the United States Constitution's Due Process Clause.[16] In that vein, Mr. Rotko wishes to address the Supreme Court's dated holding in *Wright v. Henkel*, 190 U.S. 40 (1903), that bail ordinarily should not be granted in extradition cases. Numerous courts have recognized the erosion of *Wright's* "presumption" of detention.[17] This liberalization on the bail issue is reflected not just by the numerous cases cited above, but from Florida federal courts.[18] Courts today can impose conditions on released defendants that, to the justices on the *Wright* court, would have been science fiction, i.e. 24-7 electronic monitoring that alerts authorities. In this post 9-11 world, international and domestic travel is heavily surveilled. In any event, the *Wright* presumption is rebuttable and has been rebutted.

### III. CONCLUSION

For the foregoing reasons, the Court should grant Mr. Rotko's immediate release.

---

[16] *Paretti v. U.S.*, 122 F.3d 758, 780 (9th Cir. 1997) ("[U]ntil such time as an individual is found to be extraditable, his or her Fifth Amendment liberty interest trumps the government's treaty interest unless the government proves to the satisfaction of the district court that he or she is a flight risk."), *opinion withdrawn, appeal dismissed on other grounds*, 143 F.3d 508 (9th Cir. 1998) (en banc).

[17] *Beaulieu v. Hartigan*, 430 F. Supp. 915, 916 & n.2 (D. Mass. 1977) ("In the more contemporary reported cases, granting of bail pending completion of the extradition proceedings has been the rule rather than the exception"); *Molnar*, 182 F. Supp. 2d at 688; *U.S. v. Messina*, 566 F. Supp. 740, 744-45 (E.D.N.Y. June 24, 1983); Abbell, *Extradition to and from the United States* § 4-1 ("[T]he special circumstances test is simply 'irrelevant' to the government's concern, and an anachronism based on insufficiently considered and deified dicta in a hundred year old Supreme Court opinion.").

[18] *See, e.g., In re Extradition of Nandwani*, 07-MC-23253-Dube, DE:24 (8 Jan 2008) ($100,000 10% bond, $500,000 personal surety bond, and $50,000 corporate surety bond); *In re Extradition of Villatoro-Monteagudo*, No. 06-MC-20469-Dube, DE:22 (S.D. Fla. 18 Dec 2007) ($200,000 personal surety bond); *In re Extradition of Sepulveda-Mery*, No. 05-CV-22648-O'Sullivan, DE:16, DE:20 (S.D. Fla. 2 Dec 2005) ($500,000 10% bond); *In re Extradition of Rauit*, No. 04-MC-20093-Bandstra, DE7 (S.D. Fla. 12 Feb 2004).

Dated:  December 10, 2019

Respectfully submitted,

*s/ Marcos Daniel Jiménez*
Marcos Daniel Jiménez
Florida Bar No. 441503
**Marcos D. Jiménez, P.A.**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone:    305.772.6026
Email:  mdj@mdjlegal.com

John R. Byrne
Florida Bar No. 0126294
**León Cosgrove LLC**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone:    305.570.3233
Facsimile:    305.437.8158
Email:  jbyrne@leoncosgrove.com

David Barksdale
Florida Bar No. 957331
The Bedell Firm
101 East Adams Street
Jacksonville, Florida 32202
Telephone: 904. 353.0211
Email: ODB@bedellfirm.com