**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

CASE NO.: 3:19-mc-27-J-39JRK1

IN THE MATTER OF THE
EXTRADITION OF
ALEKSANDR ROTKO

_____/

**ALEKSANDR ROTKO'S SUPPLEMENTAL MEMORANDUM
OF LAW IN SUPPORT OF HIS MOTION FOR RELEASE ON BOND**

Mr. Rotko was arrested and is currently detained under the extradition treaty between the United States and Estonia (the "U.S.-Estonia Treaty") despite Estonia's failure to satisfy the treaty's express requirement that it submit **both** (a) "a copy of the warrant or order of arrest issued by a judge, court or other authority" **and** (b) "a copy of the charging document." *U.S.-Estonia Treaty*, Article 8 § 3. Estonia has not produced the requisite charging document, and its submissions prove that it cannot produce a valid charging document.

The only court to have examined a situation like this one denied extradition because of the requesting country's failure to produce the requisite charging document. *See Aguasvivas v. Pompeo*, CV 19-123-JJM-PAS, 2019 WL 4456034 (D.R.I. Sept. 18, 2019) (involving extradition treaty between the United States and the Dominican Republic). There, like in this case, the treaty at issue required the foreign state to produce **both** an arrest warrant **and** a charging document. *Id.* at *5. Basing its ruling on the plain language of the treaty, the court held that, because the Dominican Republic failed to produce **both** documents (the foreign state only produced the arrest warrant), the extradition complaint had to be dismissed. So too here.

Estonia's failure to produce the requisite charging document requires dismissal of the extradition complaint and also constitutes a special circumstance that counsels his release on bond.

## BACKGROUND AND SUMMARY OF FACTS

Mr. Rotko, a 70-year-old U.S. citizen, was arrested at his home near Jacksonville, Florida based on Estonian allegations that—***13-years-ago***—he ordered the theft and destruction of approximately $144,000 in property. *See* D.E. 1-2 at 2. The property was part of the $188 million Lennusadam Port in Tallinn, Estonia (the "Port"), *id.*, which the Estonian government unlawfully expropriated from Mr. Rotko's company, ELA USA, Inc. ("ELA USA"). D.E. 17-1 ¶¶ 21, 26.

ELA USA, through its subsidiaries, had purchased the property Mr. Rotko allegedly ordered stolen or destroyed—like boilers, gates, and locks—as part of its restoration of the Port. D.E. 1-3 at 32, 34. ELA USA purchased and restored the Port with the Estonian government's knowledge and approval, D.E. 17-1 ¶ 21; yet, in 2006, the government expropriated the Port without compensation to ELA USA after Mr. Rotko refused to bribe Estonian government officials, including the Chancellor of the Ministry of Justice. *Id*. ¶¶117-36, 154-57, 366.

In early October 2006, after having been robbed of his reason for being in Estonia in the first place, Mr. Rotko traveled back to the United States, **Exhibit A** (Mr. Rotko's Estonian passport with U.S. entry stamp), where he had been a permanent resident since 1998, D.E. 17-3, and had incorporated ELA USA in 1993. D.E. 17-2. Unbeknownst to him, however, the Estonian Ministry of Justice had commenced a "criminal procedure" on September 22, 2006, 15 days prior to Mr. Rotko's departure from Estonia. D.E. 1-2 at 2.

The Estonian government has known since at least 2007 that Mr. Rotko was living in the United States, *see* D.E. 1-1 at 36; D.E. 1-2 at 55, but did not file the instant extradition request until more than six years later, in 2013. D.E. 1-1 at 2 [¶ 3]. On August 1, 2017, ELA USA notified Estonia of its intent to file an arbitration pursuant to an investment treaty between the U.S. and Estonia, D.E. 17-8, and in April 2018, ELA USA filed its $188 million arbitration claim (the "Arbitration") against the Estonian government for its unlawful expropriation of the Port. D.E. 17-9 ¶ 3. In November 2019, Mr. Rotko became a U.S. citizen, and the State Department issued him a U.S. passport. On December 3, 2019, Mr. Rotko was arrested at his home near Jacksonville, Florida, after living openly in the United States for more than a decade. *See* D.E. 17 at 5-6.

Mr. Rotko is the cornerstone of the Arbitration, as the international tribunal chosen by the parties to adjudicate the matter concluded two months ago, when it warned Estonia that pursuing extradition would impede ELA USA's ability to fairly present its case. D.E. 17-9 ¶ 113 ("an arrest of Mr. Rotko—in Estonia **or elsewhere** in the course of extradition proceedings—would significantly harm [ELA USA's] access to an important witness and greatly complicate the exchange between [ELA USA] and its counsel.") (emphasis added).

## ARGUMENT AND MEMORANDUM OF LAW

The U.S.-Estonia Treaty authorizes only the extradition of persons ***charged with*** or convicted of a crime. This "charging requirement" is common in U.S. extradition treaties. Admittedly, U.S. courts have interpreted the charging requirement liberally, finding in most cases that it is satisfied by the foreign state's demonstrated intent to prosecute the person sought for extradition. Based on those cases, a warrant issued by a judge in the foreign state typically would satisfy a treaty's charging requirement. But the treaties at

issue in those cases did not include certain requirements that are common among more modern treaties, including the U.S.-Estonia Treaty, which states expressly that Estonia "shall" submit "a copy of the warrant or order of arrest issued by a judge" ***and*** "the charging document." Based on the treaty's plain meaning and a century's worth of U.S. jurisprudence on treaty interpretation, the warrant and the charging document cannot be one and the same.

The Estonian government never submitted a charging document because it has not charged Mr. Rotko with a crime in the 13 years since the alleged acts were committed. On December 11, 2019, at Mr. Rotko's detention hearing, the Government stated that it was unaware of a charging document. Moreover, the complaint filed by the Government attaches an October 2019 letter from an Estonian prosecutor admitting that Mr. Rotko has not been charged with a crime. Any such charge would have been time-barred since August 2012 (at the latest) under black-letter Estonian law.

There was no basis to arrest Mr. Rotko, and there is no basis to detain or extradite him.

1. **The U.S.-Estonia Treaty Requires the Government to Produce a Charging Document**

Article 1 of the U.S. Estonia Treaty states that "[t]he Parties agree to extradite to each other . . . persons whom the authorities in the Requesting State ***have charged*** with or convicted of an extraditable offense." D.E. 1-1 at 20 (emphasis added). Article 8, of the U.S.-Estonia Treaty lists the documents that "shall" be included in a request for extradition, and section 3 of that article specifies the documents that "shall" be included when the request is made to extradite "a person who is sought for prosecution." Those documents are:

> (a) a copy of the **warrant** or order of arrest issued by a judge, court, or other authority competent for this purpose;
>
> (b) a copy of the **charging document**; **and**
>
> (c) such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought.

*Id*. at 24-25.

A warrant does not suffice as a "charging document." In *Aguasvivas v. Pompeo*, CV 19-123-JJM-PAS, 2019 WL 4456034 (D.R.I. Sept. 18, 2019), the Dominican Republic requested the extradition of a person suspected of conspiracy, homicide, illegal possession of a firearm, and robbery. The provisions set forth in Article 7 § 3 of the U.S. extradition treaty with the Dominican Republic required that an extradition request include "a copy of the warrant or order of arrest or detention issued by a judge" ***and*** "a copy of the document setting forth the charges against the person sought," which "refers to a formal charging document." *Id.* *5. In the extradition proceedings, the Government argued that the arrest warrant produced by the Dominican Republic could serve simultaneously as a warrant or

order of arrest [as required by Article 7 § 3(a)], and a charging document [as required by Article 7 § 3(b)]. *Id*. The District Court rejected that interpretation, holding that the "plain language of the Treaty supports the requirement that the requesting country must produce a formal charging document ***in addition to*** the warrant to support extradition." *Id*. at *5 (emphasis added).

The court reasoned that "[t]he use of the qualifier 'the' instead of 'a' in front of 'document setting forth the charges' in § 3(b) signifies that there must be a specific charging document presented." *Id.* at *6. Moreover, applying the canon against surplusage, the court held that, if the provision requiring a charging document "is to have any meaning, it must impose a requirement beyond what is required" by the subsection requiring a warrant or order of arrest. *Id.* The District Court concluded that the Government's position was predicated erroneously "on cases involving extradition treaties with other countries that did not contain the added requirement of a charging document." *Id.*

Notably, Article 7 § 3 of the U.S.-Dominican extradition treaty at issue in *Aguasvivas*, is nearly identical to Article 8 § 3 of the U.S.-Estonia Treaty, except the U.S.-Estonia Treaty expressly requires "the charging document," while the U.S.-Dominican Treaty requires "a copy of the document setting forth the charges against the person sought," which the District Court held was the "charging document." *Id.* A side-by-side comparison is illustrative:

| U.S.-Estonia Treaty, Article 8 § 3 | U.S.-Dominican Treaty, Article 7 § 3[1] |
|---|---|
| A request for extradition of a person who is sought for prosecution also shall include:<br><br>(a) a copy of the warrant or order of arrest issued by a judge, court, or other authority competent for this purpose;<br><br>(b) a copy of the charging document; and<br><br>(c) such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought. | In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is sought for prosecution shall also be supported by:<br><br>(a) a copy of the warrant or order of arrest or detention issued by a judge or other competent authority;<br><br>(b) a copy of the document setting forth the charges against the person sought; and<br><br>(c) such information as would provide a reasonable basis to believe that the person sought committed the offense or offenses for which extradition is requested. |

*Aguasvivas* is among the first of a nascent body of case law born of modern extradition treaties like the U.S.-Estonia Treaty, which, unlike their predecessors, expressly require a charging document ***in addition to*** a warrant. *See, e.g., supra note* 1 (U.S.-Dominican Treaty executed in 2015); D.E. 1-1 at 8 (U.S.-Estonia Treaty executed in 2006). Nascent though it may be, *Aguasvivas* is supported by a hundred years' jurisprudence

---

[1] Available at https://www.state.gov/wp-content/uploads/2019/02/16-1215-Dominican-Republic-Law-Enforcmt-Extradition.pdf.

addressing treaty interpretation[2] and international law.[3]

Moreover, as noted by the *Aguasvivas* court, the United States Courts of Appeal for the Seventh and Ninth Circuits specified that a charging document was not required for extradition, but only because the operative treaty did not expressly require a charging document. *In re Assarsson*, 635 F.2d 1237, 1243 (7th Cir. 1980) (interpreting 1961 extradition treaty between the U.S. and Sweden and concluding: "If the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided."); *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1448 n. 3 (9th Cir.

---

[2] *See Yapp v. Reno*, 26 F.3d 1562, 1569 (11th Cir. 1994) ("Treaties, like statutes, should be construed so that no words are treated as being meaningless, redundant, or mere surplusage.") (citing *Foster v. Neilson*, 27 U.S. 310-11 (1829) (Marshall, C.J.) ("But the insertion of these words materially affects the construction of the article. They cannot be rejected as surplusage. They have a plain meaning . . . We cannot say they were inserted carelessly or unadvisedly, and must understand them according to their obvious import."); *Cross v. Washington*, 911 F.2d 341, 344 (9th Cir. 1990) (treaties should not be construed so as to render any clause inconsistent or meaningless), *cert. denied*, 499 U.S. 922, 111 (1991); *cf. U.S. v. Menasche*, 348 U.S. 528, 538-39 (1955) ("The cardinal principle of statutory construction is to save and not to destroy. It is our duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section, as the Government's interpretation requires.")); *Tax Analysts v. I.R.S.*, 217 F. Supp. 2d 23, 28 (D.D.C. 2002) ("It is a well-established principle that when interpreting statutes or contractual provisions, a court should 'absent a clear indication to the contrary, . . . read the statute [or provision] so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or nugatory.'") (quoting *Air Line Pilots Ass'n, Int'l v. Pension Benefit Guar. Corp.,* 193 F. Supp. 2d 209, 218 (D.D.C. 2002)); *Sacirbey v. Guccione*, 589 F.3d 52, 66 (2d Cir. 2009); *see also Potter v. U.S.,* 155 U.S. 438, 446 (1894).

[3] The applicable canon of treaty interpretation in international law is known as "ut res magis valeat quam pereat" (so that the matter may flourish rather than perish) (also known as "effet utile"). That canon indicates that an interpreter should avoid reading a treaty in a manner that would render language in the treaty redundant, void, or ineffective. *See* **Exhibit B** ¶ 40; **Exhibit C** ¶¶ 177, 199. One example of this principle in application can be found in paragraph 309 of the attached *Conoco* decision, **Exhibit D**, in which the tribunal held that, to avoid violation of the "effet utile" principle, exceptions to two different provisions of the Netherlands-Venezuela BIT must be read to be given independent meaning.

1987) (interpreting 1978 extradition between the U.S. and Germany). Here, the U.S.-Estonia Treaty, like its modern counterparts, expressly requires a charging document in addition to a warrant. Indeed, a court applying similar language in the 2007 extradition treaty between the U.S. and Romania concluded that extradition was proper where the Government submitted copies of the arrest warrant ***and*** an indictment. *See In re Extradition of Manea*, CV 15 MJ 157 (JGM), 2018 WL 1110252, at *12 and n.39 (D. Conn. Mar. 1, 2018). The Government has failed to do so here.[4]

### 2. The Government Has Not Produced a Charging Document

No charging document exists. That conclusion is not subject to factual dispute or dependent on an interpretation of Estonian law. Rather, in a recent letter to the State Department dated October 23, 2019, Estonian Prosecutor Andrei Voronin stated:

> The extradition request in question has been submitted to the United States of America to extradite the suspect Aleksandr Rotko to the Republic of Estonia ***for the purpose of charging him*** under clause 201 (2) 4) and section 203 of the Penal Code of the Republic of Estonia ***and bringing Aleksandr Rotko before a court*** to be held liable for the criminal offences committed by him.
> . . . .
>
> The case against Aleksandr Rotko is still relevant and ***under investigation*** by the Prosecutor's Office. In view of the above, I request on behalf of the Republic of Estonia to extradite Aleksandr Rotko to the Republic of Estonia in order to continue with the criminal proceedings, ***bring charges against him, and prosecute him in court***.

D.E. 1-4 at 44-47 (emphasis added).

---

[4] The State Department's interpretation of Article 8 § 3 of the U.S.-Estonia Treaty is not controlling. *Greci v. Birknes*, 527 F.2d 956, 960 (1st Cir. 1976) (plain language of the treaty superseded contrary construction by State Department); *see also U.S. v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) (when interpreting a treaty, courts "first look to its terms to determine its meaning").

Whether read in English or Estonian, the inevitable conclusion is the same: Estonia had not charged Mr. Rotko as of October 23, 2019. *See* **Exhibit E** ¶ 19 ("I have examined and analyzed both the Estonian and English language versions of Mr. Voronin's letter. Mr. Voronin is clear in both versions that he *has not* charged Mr. Rotko.").

In contrast, the sworn statement submitted by the Government in support of Mr. Rotko's arrest and detention, which purports to rely on the documents produced by Estonia (including the October 23, 2019 letter from Prosecutor Voronin), directly contradicts the Estonian government's position by stating that "[a]ccording to the information provided by the Government of Estonia, ROTKO ***was charged*** with using the movable property of another, in violation of § 201 (2) (4) of the Estonian Penal Code; and damage and destruction of government property in violation of § 203 of the same code." D.E. 1 ¶ 4 (emphasis added). Moreover, at the December 11, 2019 detention hearing, the Government admitted that it was unaware of a charging document. Mr. Rotko should not have been arrested and is being held improperly.

A charging document—like a complaint, indictment, or information under U.S. law[5]—exists in Estonian law and, like its U.S. equivalents, "launches the adversarial criminal proceedings with the objective of seeking a conviction." Exhibit E ¶ 8. That document is called a statement of charges, which is defined expressly in the Estonian Code of Criminal Procedure § 154. *Id.* ¶¶ 7-9 ("The statement of charges as set out in Criminal Code of Procedure § 154 is an imperative prerequisite of convicting anyone of a criminal

---

[5] When requesting extradition of a fugitive that "has not been prosecuted," the Department of Justice generally provides the foreign state with "the arrest warrant and complaint or indictment." *See Justice Manual*, 9-15.100 (available at https://www.justice.gov/jm/jm-9-15000-international-extradition-and-related-matters).

offence under the laws of the Republic of Estonia."). The Government has yet to produce a statement of charges against Mr. Rotko, and any such statement of charges would be barred by Estonia's five-year statute of limitations on second degree criminal offenses. *Id.* ¶¶ 20-26.

## CONCLUSION

Mr. Rotko was arrested and is being detained pursuant to the U.S.-Estonian Treaty, which allows only the extradition of persons charged with or convicted of a crime in the foreign state. The U.S.-Estonian Treaty requires the Government to produce both a warrant and a separate charging document in support of extradition, but the Government has not produced a charging document.

The Court should dismiss the extradition complaint and grant Mr. Rotko's immediate, unconditional release. Alternatively, the Government's failure to produce the required charging document would preclude extradition, thereby establishing a special circumstance supporting Mr. Rotko's release on bail.

| | |
|---|---|
| Dated: December 13, 2019 | Respectfully submitted, |

*s/ Marcos Daniel Jiménez*
Marcos Daniel Jiménez
Florida Bar No. 441503
**Marcos D. Jiménez, P.A.**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone:   305.772.6026
Email:  mdj@mdjlegal.com

John R. Byrne
Florida Bar No. 0126294
**León Cosgrove LLC**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone:   305.570.3233
Facsimile:   305.437.8158
Email:  jbyrne@leoncosgrove.com

David Barksdale
Florida Bar No. 957331
**The Bedell Firm**
101 East Adams Street
Jacksonville, Florida 32202
Telephone: 904. 353.0211
Email: ODB@bedellfirm.com