UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN THE MATTER OF THE
EXTRADITION OF                  Case No. 3:19-mc-27-J-39JRK
ALEKSANDR ROTKO

## UNITED STATES' RESPONSE TO MOTION FOR RELEASE ON BAIL

The United States, through the undersigned Assistant United States

Attorney, hereby responds to Aleksandr Rotko's Motion for Release on Bail and

Accompanying Memorandum of Law (doc. 17), which was filed on

December 10, 2019, and Aleksandr Rotko's Supplemental Memorandum of Law

in Support of his Motion for Release on Bond (doc. 24), which was filed on

December 13, 2019. For the following reasons, and as discussed in the

government's Memorandum of Law Regarding Detention Pending Extradition

Proceedings (doc. 12) filed on December 6, 2019, Aleksandr Rotko (hereinafter

"Rotko") should be detained because he cannot overcome the strong presumption

against bail in international extradition cases. Specifically, he cannot satisfy his

burden of establishing both that special circumstances exist to warrant his release

and that he is not a flight risk.

In his initial motion and memoranda, Rotko argues, first, that he is not a

flight risk and, relatedly, that his proposed conditions of release will guarantee his

appearance and, second, that special circumstances warrant his release.  The

purported special circumstances are (1) that he has a high probability of success

because, he claims, the limitations period for the alleged offenses has run, (2) that

his detention would violate the bilateral investment treaty between the United

States and Estonia (hereinafter the "Investment Treaty")[1] because detention

would interfere with the ability of his company, ELA USA, Inc., to pursue a

claim in arbitration against Estonia, a claim filed well after Estonia requested his

extradition, and that continuing to pursue the extradition would, he contends,

violate an order of the arbitration tribunal, (3) that detention will be detrimental

to his health, (4) that the extradition process will be lengthy because he plans to

raise numerous challenges to his extradition and to pursue all avenues of review if

the Court certifies his extraditability, (5) that bail is available in Estonia for the

alleged offenses, (6) that there is a lack of diplomatic necessity for detention,

given the delay between the commission of the alleged offenses and the request

for extradition, (7) that he has no prior criminal history and that the allegations

involve offenses against property and not persons, and (8) that he is a United

States citizen and not a flight risk, and that due process requires his release.  In his

supplemental memorandum, Rotko seeks essentially to bolster his "high

---

[1]      Treaty Between the Government of the United States of America
and the Government of the Republic of Estonia Concerning the Encouragement
and Reciprocal Protection of Investment, with Annex, U.S.-Estonia, Apr. 9,
1994, S. Treaty Doc. No. 103-38, 1987 U.N.T.S. 131.

probability of success" argument by asserting that the extradition treaty's requirement of a "charging document" has not been met in this case. Below, the government first addresses the purported special circumstances proposed by Rotko and then his arguments regarding risk of flight, none of which has any merit. Rotko has failed to demonstrate that he should be released pending these extradition proceedings, and, therefore, his motion for release should be denied.

## I.  ROTKO'S PURPORTED LIKELIHOOD OF SUCCESS IS NOT A SPECIAL CIRCUMSTANCE

Rotko argues that he should be released because he is likely to defeat extradition based on his arguments that the Estonian limitations period has run and that there are no charges (and no charging document) pending in Estonia upon which his extradition may be based. See doc. 17 at 14-18; doc. 24. He is incorrect. As an initial matter, arguments pertaining to the merits of an extradition request should be reserved for the extradition hearing and are not relevant to a fugitive's application for bail. See, e.g., United States v. Castaneda-Castillo, 739 F. Supp.2d 49, 61 (D. Mass. 2010) (rejecting likelihood of success as a special circumstance, while recognizing that "it is clear that [the fugitive] has raised serious issues which will require briefing and detailed analysis by the court"); In re Extradition of Sidali, 868 F. Supp. 656, 658-59 (D.N.J. 1994) (probability of success is not related to the bail determination).

To the extent that outlier courts have considered the likelihood a fugitive will succeed in defeating extradition at the bail stage of a proceeding, they have required the fugitive to establish a "high" probability of success. See, e.g., Kin-Hong v. United States, 83 F.3d 523, 524-25 (1st Cir. 1996); see also In re Extradition of Pelletier, 2009 WL 3837660, *3 (S.D. Fla. Nov. 16, 2009) ("[The fugitive] has not shown any special circumstances warranting bond. He has not shown that he has a substantial probability that he will succeed on the merits . . ."). As explained below, Rotko has no likelihood of succeeding on his limitations period and charging arguments, let alone a high likelihood.

A.     **The Limitations Period Has Not Run**

Rotko's claim that the limitations period has run for the offenses he is alleged to have committed in Estonia is grounded in his argument that he did not "abscond" under Estonian law and therefore that the limitations period is not fifteen years under section 81 of the Estonian penal code but is instead five years under that same section. He submits an affidavit from an Estonian lawyer who reviews the facts as he sees them and opines that the fifteen-year limitations period does not apply because the evidence, he contends, does not establish that Rotko knew about the pending criminal proceedings and, therefore, Rotko could not have absconded under Estonian law. See doc. 17-13 (Exhibit M) at 12-13.

The lawyer concludes that a five-year limitations period applies and that the five-year period expired on September 6, 2011. See id. at 13.

Unfortunately for Rotko, another Estonian law expert—an Estonian judge—has found otherwise. In a ruling dated August 25, 2007, Judge Eha Popova of the Harju County Court conducted a detailed review of the evidence presented by the prosecutor and found that an arrest warrant for Rotko should be issued. See doc. 1-2 at 14-18. In reaching this conclusion, Judge Popova made many findings, but the important one relevant to the defendant's limitations argument is this: "On the assessment of the total of the above, it has been proven that Aleksandr Rotko and Olga Kotova are aware of the pending criminal case against them and are deliberately avoiding the criminal proceeding." See id. at 17; see also id. at 16 ("During the proceedings, it appears that Aleksandr Rotko is avoiding the criminal proceedings and hiding his location"); id. at 18 ("The criminal case materials show that A. Rotko is aware of the criminal proceedings, but in spite of this he has realized his property located in Estonia and has probably left the Republic of Estonia"); id. at 18 ("Such facts provide a basis to assume that the suspect may while remaining at large continue to avoid the criminal proceedings" and therefore an arrest warrant should be issued).

The person alleged to have been Rotko's co-conspirator, Olga Kotova, appealed Judge Popova's ruling, with her attorney arguing that "O. Kotova left

for a place of residence abroad in December 2006, that is before she learned that the police were looking for her" and that there were not "any indications that O. Kotova would have been aware of the criminal proceedings initiated against her," and therefore that Judge Popova "erroneously found that O. Kotova deliberately absconded from criminal proceedings." See doc. 1-4 at 37. The Tallinn Circuit Court, Criminal Chamber, in a ruling dated October 10, 2016, rejected Kotova's appeal. See id. at 37. In rejecting the appeal, the court discussed the evidence showing that Rotko was aware of the criminal proceedings and stated, "Since A. Rotko was the spouse of O. Kotova during the aforementioned period, the District Court does not consider it credible that O. Kotova was not aware of her being declared fugitive." See id. at 36.

Rotko (and his expert) may disagree with the these courts' findings, may disagree with the facts presented by the prosecutor, may believe that the "true" facts would lead to a different conclusion, but that disagreement and that belief cannot be the basis for this Court to disregard the rulings of two Estonian courts and reach a contrary conclusion. See, e.g., Fejfar v. United States, 724 Fed. Appx. 621, 622 (9th Cir. 2018) (rejecting a Czech fugitive's statute of limitations argument where a Czech court "held that [his] sentence was not statute-barred for lapse of time"); Skaftouros v. United States, 667 F.3d 144, 160 n.20 (2d Cir. 2011) (stating that "we defer to the Greek courts, which may consider whether [the

fugitive] or the Greek prosecutors have the better of the argument"); United States v. Struga, 231 F. Supp.3d 244, 251 (E.D. Mich. 2017) (relying on Albanian court decision holding that the statute of limitations had not run because "it is not for this Court to second-guess or preempt the Albanian courts"); In re Extradition of Jimenez, 2014 WL 7239941, *2 (D. Md. Dec. 16, 2014) ("[T]his Court will not question the reliability or trustworthiness of a judicial decree from a foreign nation") (citing Jhirad v. Ferradina, 536 F.2d 478, 484-85 (2d Cir. 1976) ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another nation")); In re Extradition of Hughes, 2013 WL 1124294, *7-8 (C.D. Cal. Mar. 18, 2013) (relying on decision of a Mexican court finding that the statute of limitations expired almost three years later than when fugitive claimed it expired); see also United States v. Trabelsi, 845 F.3d 1181, 1192 (D.C. Cir. 2017) ("U.S. courts will defer to the judgment of foreign courts construing their own laws."); In re Assarsson, 635 F.2d 1237, 1244 (7th Cir. 1980) ("We often have difficulty discerning the laws of neighboring States, which operate under the same legal system as we do; the chance of error is much greater when we try to construe the law of a country whose legal system is much different from our own").

Rotko's argument that the limitations period has run is also contrary to the conclusion of the Estonian prosecutor's office. In an October 23, 2019, response

to an inquiry by the Department of Justice, the Estonian prosecutor's office stated

the following:

> Criminal proceedings against Aleksandr Rotko in the criminal matter No. 06730000427 were continued on a general basis. Pursuant to section 81 of the Penal Code, if the suspect or accused person absconds from criminal proceedings, the time limit for prosecuting this person for the commission of a criminal offence in the second degree expires in fifteen years after the commission of the said offence. Based on the time of the commission of the last episode of crime, the said time limit in Aleksandr Rotko's case would expire on 6 September 2021. Until then, Aleksandr Rotko can be prosecuted and tried by a court.

Doc. 1-4 at 46; see also doc. 27-1 (December 16, 2019, response of Estonian

prosecutor) at 9 ("[I]n this case, the limitation period should be calculated starting

from date of the completion of the acts, which according to the suspicion was no

later than 6 September 2006, and by adding 15 years thereto, thus making the

date of expiry 6 September 2021"). The Court should defer to the Estonian

government's interpretation of its own law. See, e.g., Cornea v. United States

AG, 771 Fed. Appx. 944, 947 (11th Cir. 2019) (following the "authoritative

statement" provided by the Greek government and rejecting a Greek fugitive's

(and his expert's) argument that the limitations period for the offense for which

his extradition had been sought had run); In re Extradition of Schumann, 2018

WL 4777562, *4 (N.D. Ill. Oct. 3, 2018) (relying on statement of Polish

prosecutor regarding the date on which the statute of limitations expires);

Schmeer v. Warden of Santa Rosa Cty. Jail, 2014 WL 5430310, *5-6 (N.D. Fla.

Oct. 22, 2014) (relying on statement by German authorities that the statute of limitations had been "interrupted" and restarted anew).

In view of the above, this extradition proceeding is not the proper forum for resolution of any dispute over the statute of limitations. Given the limited role of a court in such a proceeding—as discussed elsewhere in this response and in the government's memorandum regarding detention (doc. 12) at pages 5-6—the Estonian court's determination that Rotko absconded and that a warrant for his arrest should be issued resolves the matter, at least for the purposes of extradition. As the case law cited above demonstrates, courts in the United States are ill-suited to interpret foreign law and should not undertake to do so, especially where, as in this case, a judge in the foreign jurisdiction already has issued a definitive interpretation. Rotko can raise any defenses he may have to the allegations, including a statute of limitations defense, with the State Department to try to convince the Secretary of State to exercise his discretion and refrain from ordering extradition and, if that attempt fails, with the courts in Estonia after his extradition. See Kamrin v. United States, 725 F.2d 1225, 1227 (9th Cir. 1984) ("It may not always be clear whether a prosecution is time-barred, and the general rule allows the prosecuting state to resolve the issue. The extraditee has an opportunity to raise the defense in the requesting country."). His argument

regarding the limitations period is not a special circumstance warranting his release on bond.

### B. The Treaty Requirement of a "Charging Document" Has Been Met

In his supplemental memorandum, Rotko contends that, to comply with the extradition treaty, Estonia must provide "***both*** (a) 'a copy of the warrant or order of arrest issued by a judge, court or other authority' ***and*** (b) 'a copy of the charging document.'" Doc. 24 at 1 (emphases in original). He claims that because Estonia has not, in his view, provided a "charging document"—that is, in his view, a formal document initiating criminal proceedings against him, like an indictment in the United States—it has not complied with the treaty. Concomitantly, he claims that he must actually be charged with a crime before he can be extradited under the treaty, and that the judge's order authorizing his arrest is insufficient because it does not charge him with a crime.

In support of his argument, Rotko cites Aguasvivas v. Pompeo, 2019 WL 4456034 (D.R.I. Sept. 18, 2019), stating that the court in Aguasvivas is the only one "to have examined a situation like this one" and that the court "denied extradition because of the requesting country's failure to produce the requisite charging document." Doc. 24 at 1. However, the order in Aguasvivas was appealed by the government and has been stayed by the First Circuit pending that appeal. See Aguasvivas v. Pompeo, Appeal No. 19-1937 (1st. Cir.), orders

entered on September 19 and 24, 2019 (attached).  The government's reply brief in the appeal was filed on December 11, 2019, and oral argument has been scheduled for January 6, 2020.  Accordingly, any reliance on the order in Aguasvivas as persuasive authority is premature because the case is not yet final. Furthermore, contrary to Rotko's claim, several other courts have determined that an order for the arrest of a subject can also be the document setting forth the charges against the defendant—that is, that two separate documents are not required—and that a formal charging document like an indictment is not necessary to comply with an extradition treaty.

One such case that squarely addressed whether a separate charging document was required is In re Extradition of Sarellano, 142 F. Supp.3d 1182 (W.D. Okla. 2015).  In that case, the court noted that "[a]t the extradition hearing, Mr. Rios questioned whether an arrest warrant alone provided sufficient evidence that he has been 'charged with' aggravated homicide."  Id. at 1186 n.2. In response, the court stated, among other things, that "Judge Mercado Camarillo's arrest warrant 'is a charging document' in the sense that 'it identifies the offense in the [Zacatecas] criminal code, sets out the essential facts of the alleged crime, and details the evidentiary basis for the charge.'"  Id. (bracketing in original) (quoting Martinez v. United States, 793 F.3d 533, 543-44 (6th Cir. 2015), opinion vacated and rehearing en banc granted (Oct. 14, 2015), on

rehearing en banc, 828 F.3d 451 (6th Cir. 2016) (not specifically addressing whether arrest warrant can be "charging document" but holding, in part, that arrest warrant tolled the limitations period)); see also Sainez v. Venables, 588 F.3d 713, 717 (9th Cir. 2009) ("We agree that for the purpose of a civil proceeding such as an extradition, a Mexican arrest warrant is the equivalent of a United States indictment . . ."); Matter of Extradition of Rovelli, 977 F. Supp. 566, 568 (D. Conn. 1997) ("The arrest warrant issued by the Italian authorities constitutes a charging document under Italian Law . . .").

In United States v. Nolan, 651 F. Supp.2d 784 (N.D. Ill. 2009), Nolan conceded that an arrest warrant could be a charging document in civil law countries but argued that the country seeking to extradite him, Costa Rica, was not a civil law country. See id. at 796. The court disagreed, relying on the description of the Costa Rican criminal justice system in a World Factbook compiled by the Bureau of Justice Statistics at the Department of Justice. See id. That description stated that Costa Rica was a civil law country. See id. Based in part on that finding, the court found that an arrest warrant from Costa Rica was sufficient to satisfy the treaty's requirement of "the charging document, or any equivalent document issued by a judge or judicial authority." See id. at 795, 796. Like Costa Rica, Estonia's legal system is based on the civil law model. See Julia Laffranque, "The Judicial System of Estonia and European Union Law", 33 Int'l

12

Journal of Legal Information Vol. 2, Art. 7 (2005), at 224 (available at:

http://scholarship.law.cornell.edu/ijli/vol33/iss2/7; accessed Dec. 21, 2019)

("Estonia employs a civil law system and follows the legal traditions of

continental Europe . . ."); InvestinEstonia.com

(https://investinestonia.com/business-in-estonia/legal-system/; accessed

Dec. 21, 2019) ("The legal system in Estonia is based on the Continental

European civil law model and has been influenced by the German legal system").

In response to an inquiry from the Office of International Affairs ("OIA")

at the Department of Justice, the Estonian prosecutor's office stated the

following:

> In accordance with the criminal procedure rules of the Republic of Estonia, the State shall not prepare a penal claim addressed to a person as a separate document until presentation of the charges to court for hearing.  In such an event, the Prosecutor shall prepare a statement of charges pursuant to § 154 and § 226 (1) of the Code of Criminal Procedure and presents it to the court.

> Before preparation of the statement of charges, the definition of the charge shall be defined as a part of the minutes of hearing that is formalised in the course of factual hearing of the suspect.

> Since Aleksandr Rotko absconds the proceedings and is hiding himself, suspicion has not been presented to him in person.

Doc. 1-3 (Estonian prosecutor response dated Dec. 12, 2017) at 16.  In response

to a later inquiry from OIA, the prosecutor stated that "[p]ursuant to the Code of

Criminal Procedure in force in the Republic of Estonia, a person must be

interrogated as a suspect before bringing charges and sending the case to court (subsection 33 (2) of the Code of Criminal Procedure)." See doc. 27-2 (Estonian prosecutor response dated Dec. 17, 2019) at 7. That is, because Rotko has not yet been interrogated, it has not been possible to formally charge him. See id.; see also id. at 8 ("At the moment, A. Rotko's criminal matter is pending before the police, as it has not been possible to perform the procedural acts necessary for bringing charges. In order to do so, it is required, as a minimum, to interrogate A. Rotko as a suspect"). Given the requirement that a suspect be interrogated before he can be formally charged, not only would it make no sense for the extradition treaty to require a formal charge before an extradition could be undertaken, but it would also render the treaty nugatory, as suspects could insulate themselves from extradition simply by fleeing the country before the interrogation required under Estonian law.

The prosecutor also states the following in this response:

Article I of the Estonian-language version of the Extradition Treaty between the Government of the Republic of Estonia and the Government of the United States of America (adopted on 8 February 2006) reads as follows:

"*Obligation to Extradite*
*The Parties undertake to extradite to each other, pursuant to this Treaty, persons who are <u>suspected</u>, accused or convicted by the Requesting State of an extraditable offence.*"

Id. at 8-9 (emphases in original). This English translation of the Estonian treaty

differs, of course, from the United States version, in which Article I reads as

follows:

Obligation to Extradite

> The Parties agree to extradite to each other, pursuant to the
> provisions of this Treaty, persons whom the authorities in the
> Requesting State have charged with or convicted of an extraditable
> offense.

See doc. 1-1 at 20. However, as stated at the end of the treaty, "both [the English

and Estonian] texts are equally authentic." See id. at 34. The wording of

Article 1 in the Estonian version of the treaty (available at

https://www.state.gov/wp-content/uploads/2019/02/09-407-Estonia-

Extradition-Treaty.pdf) is as follows:

> Lepinguosalised kohustuvad vastavalt käesolevale lepingule
> teineteisele välja andma isikud, keda taotluse esitanud riik
> kahtlustab, süüdistab või on süüdi mõistnud sellises kuriteos, mille
> puhul kohaldatakse väljaandmist.

Google Translate (google.translate.com) returns the following result when this

language is translated from Estonian to English:

> The Contracting Parties undertake to extradite each other under this
> Agreement to persons who are suspected, accused or convicted in
> the requesting State of an offense subject to extradition.

Although not an official source, of course, this translation supports a conclusion

that the Estonian prosecutor's translation is correct. The Court should therefore

conclude that Estonia properly sought Rotko's extradition, even though he has not yet been formally charged. See, e.g., In re Extradition of Handanovic, 829 F. Supp.2d 979, 986-88 (D. Or. 2011) (rejecting the argument of a Bosnian fugitive that because he was not formally charged he could not be extradited as "merely a suspect wanted for investigation").

Furthermore, the treaty's requirement in Art. 8(3)(b) that the requesting country provide what is listed as a "charging document" in the United States version of the treaty requires "kahtlustatavaks tunnistamise määruse koopia" in the Estonian version. Google Translate renders these words in English as "a copy of the suspicion order", not "charging document", which again comports with the prosecutor's translation. The treaty clearly does not require a "süüdistusakt", or formal "statement of charges", as Rotko suggests. Cf. doc. 24 at 10-11; doc. 24-5 at 2-4, 9.

In view of the above, the documentary requirements of the treaty have been met. Judge Popova's order for the arrest of Rotko is a "charging document" in the sense that it identifies the offenses in the Estonian criminal code, sets out the essential facts of the alleged crimes, and details the evidentiary basis for the charges. See Sarellano, 142 F. Supp.3d at 1186 n.2; see also, e.g., Fernandez v. Phillips, 268 U.S. 311, 312 (1925) ("Form is not to be insisted upon beyond the requirements of safety and justice."); Grin v. Shine, 187 U.S. 181, 184 (1902)

("[I]t can hardly be expected of us that we should become conversant with the criminal laws of [the requesting country], or with the forms of warrants of arrest used for the apprehension of criminals."); Basic v. Steck, 819 F.3d 897, 901 (6th Cir. 2016) ("We will not second guess th[e] determination" by the Government of Bosnia that a "[d]irective to find and arrest" the fugitive constituted the "arrest warrant" required under the applicable extradition treaty).

Moreover, both the United States and Estonia agree that the charging and documentary requirements of the treaty have been met in this case. As the Supreme Court has explained, "[w]hen the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation." Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 185 (1982). "It is well settled that the Executive Branch's interpretation of a treaty is entitled to great weight." Abbott v. Abbott, 560 U.S. 1, 15 (2010) (internal quotation marks and citation omitted). Such deference is particularly warranted when its view is consistent with that of its treaty partner, as is the case here. See, e.g., Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight"); Arias Leiva v. Warden, 928 F.3d 1281, 1288 (11th Cir.

2019) (holding that the U.S.-Colombia extradition treaty is in full force and effect because, *inter alia*, both the United States and Colombia understand it to be in effect).  The mutual understanding of the United States and Estonia as to what the treaty requires and whether the requirements have been met is another reason the Court should reject Rotko's contrary view.

An additional reason is the canon of interpretation that a treaty should be construed liberally in favor of extradition.  As the Supreme Court articulated in Factor v. Laubenheimer, "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."  290 U.S. 276, 293-94 (1933); see also Grin, 187 U.S. at 184 ("These treaties should be faithfully observed, and interpreted with a view to fulfil our just obligations to other powers, without sacrificing the legal or constitutional rights of the accused").  Numerous courts have observed that Factor demands that ambiguities in an extradition treaty be construed in favor of the state signatories—that is, in favor of surrendering a fugitive to the requesting country.  See, e.g., Martinez v. United States, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("For ambiguity in an extradition treaty must be construed in favor of the 'rights' the 'parties' may claim under it"); United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) ("[E]xtradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement"); In

re Extradition of Howard, 996 F.2d 1320, 1330 (1st Cir. 1993) ("[C]ontrolling precedent requires that, where possible, we interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories"); In re Necolaiciuc, 2011 WL 798144, *12 (M.D. Fla. Mar. 1, 2011) ("In applying an extradition treaty, the Court is to construe it liberally in favor of the requesting nation"). Accordingly, to the extent that the Court finds the charging and documentary requirement ambiguous, it must liberally interpret the provisions and find that Estonia has fulfilled them. Therefore, Rotko's argument that Estonia has failed to comply with the requirements of the treaty cannot be the basis for a special circumstance warranting his release on bond.

## II. ROTKO'S DETENTION WOULD VIOLATE NEITHER THE INVESTMENT TREATY BETWEEN THE UNITED STATES AND ESTONIA NOR AN ORDER OF THE ARBITRATION TRIBUNAL

Rotko claims that seeking his detention and extradition violates the "clear directive" of the tribunal arbitrating his claim against Estonia and is "in direct and flagrant violation of the Tribunal's order and authority . . . ." Doc. 17 at 10. The "directive" that Rotko claims is being "flagrantly" violated is the following: "[T]he Tribunal . . . reminds the parties of their general duty arising from the principle of good faith not to take any action that may aggravate the dispute or affect the integrity of the arbitration proceeding . . . ." See doc. 17-9 (Exhibit I) at 27, ¶ 133. Nothing in the order directs Estonia, the United States, or any other

entity or person to refrain from continuing to seek Rotko's extradition.[2]  In fact, the tribunal specifically rejected Rotko's request that the tribunal order the suspension of the extradition request.  See id., ¶ 130 (determining that it would be "disproportionate to interfere with [Estonia's] sovereign right to investigate and prosecute crimes by ordering the suspension of the extradition request addressed to the United States").

Although the tribunal stated that Rotko's arrest "would significantly harm [his company's] access to an important witness and greatly complicate the exchange between [his company] and its counsel" (id. at 24, ¶ 113) and also stated that the extradition request constituted a "risk to the integrity of the proceedings" (id. at 25, ¶ 118), it further stated the following:

> It is not for the Tribunal to decide whether Mr. Rotko may still be prosecuted under Estonian law, which the Claimants [*sic*] denies. This is primarily a matter for the Estonian authorities, including its courts, to determine, and the Tribunal is not aware that Mr. Rotko has initiated such proceedings in Estonia, which according to the Respondent would be possible.

---

[2]      Indeed, the United States is not a party to the arbitration.  The fact that it is a party to the Investment Treaty generally does not render it subject to the orders issued by the tribunal presiding over the arbitration between Rotko's company and Estonia.  See Art. VI(6) of the Investment Treaty (providing that any award is binding only "on the parties to the dispute," and requiring that "[e]ach party undertakes to carry out without delay the provisions of any such award . . ."").  In any event, Rotko's argument that Article VI(6) of the Investment Treaty is self-executing, doc. 17 at 19, is incorrect.  See Medellin v. Texas, 552 U.S. 491, 508-09 (2008) (agreeing to "undertake[]" an obligation in a treaty indicates simply a "commitment . . . to take future action," which is not enforceable in U.S. courts).

Id. at 26, ¶ 125.  Accordingly, seeking Rotko's detention and extradition does not violate the tribunal's order at all, much less "clearly", "directly", and "flagrantly", as Rotko claims.

In discussing its concerns relating to the extradition of Rotko, the tribunal opined that "a final decision on the extradition request to the United States could await the outcome of the award on the merits [in the arbitration]."  Id. at 25, ¶ 119.  This statement is simply wrong.  As noted above, the limitations period for the Estonian offenses that Rotko is alleged to have committed expires on September 6, 2021.  See doc. 1-4 at 46.  In his motion for bond, Rotko states that "[i]t is unlikely that there will be a ruling in the Arbitration for several years . . . ."  See doc. 17 at 22.  "Several years" presumably means more than the approximately one year and eight months remaining before the expiration of the limitations period.  If Rotko succeeded in convincing the tribunal or this Court to suspend the extradition proceedings until the end of the arbitration proceedings, he would succeed in "running out the clock" on his extradition (which may be his goal).  And he should not be permitted to use the arbitration proceeding to delay his extradition for the additional reason that he did not initiate the arbitration proceeding until April 18, 2018 (see doc. 17-9 at 3, ¶ 3), more than five years after Estonia sought his extradition on March 13, 2013 (see doc. 1-1 at 36).  If

anything, the outcome of the arbitration proceeding should await the outcome of the extradition proceeding.

Furthermore, at least one court has found that the involvement of the subject of an extradition in a civil matter related to the extradition was not a "special circumstance" warranting bond, as follows:

> The fact that Petitioner is currently involved in pending civil litigation relating to the extradition proceedings is not a "special circumstance" under the circumstances of the matter at hand. This is not a situation where . . . Petitioner faces being arrested on the eve of a complex civil trial upon which his whole fortune depends. Ample time remains for Petitioner to consult with his attorneys as to that pending litigation. Moreover, Petitioner also has ample time in which to consult with his attorneys on the matter at hand, and to guide their investigative efforts. His personal participation in these matters is not required.

Matter of Extradition of Russell, 647 F. Supp. 1044, 1049 (S.D. Tex. 1986) (citation omitted), aff'd, 805 F.2d 1215 (5th Cir. 1986). In the present case, Rotko has declared his intention to engage in protracted litigation in this matter, both initially, through all avenues of appeal, and with the State Department. See doc. 17 at 24. If he follows through with that intention, he will remain available in the United States—even if he is detained—to consult with his lawyers regarding both the arbitration proceeding and this extradition proceeding. As in Russell, ample time will remain for Rotko to be involved in these matters, and his interests in the arbitration proceeding can be protected by his lawyers. That his detention may make consulting with his lawyers and assisting in these matters more difficult

does not constitute a special circumstance.  See <u>United States v. Hills</u>, 765 F. Supp. 381, 388 (E.D. Mich. 1991) ("The foregoing discussion makes it clear that 'pending civil litigation' and 'the defendant's asserted "need" to consult with his attorney to assist in the preparation of defense of the extradition proceedings' are not in and of themselves sufficient without some additional 'special circumstances' to warrant departure from the presumption against bail in extradition cases"); <u>United States v. Tang Yee-Chun</u>, 657 F. Supp. 1270, 1271-72 (S.D.N.Y. 1987) (difficulty defending extradition from jail because of difficulties communicating with counsel, the large number of documents to be reviewed, and the complex legal issues involved in the defenses did not constitute a special circumstance).

## III.  ROTKO'S AGE AND HEALTH CONCERNS DO NOT CONSTITUTE A SPECIAL CIRCUMSTANCE

Rotko states that he is 70 years old, that he has high blood pressure, that he has high cholesterol, that he has high creatinine levels (indicating kidney disease), that pre-cancerous polyps were found in his colon in July, 2019, and that he needs additional medical care relating to the polyps.  See doc. 17 at 22-23.  Several courts have found that a subject's advanced age (accepting that 70 years old is an "advanced age" in today's society) and medical issues do not constitute a special circumstance warranting release on bond.  In <u>Matter of Extradition of Martinelli Berrocal</u>, 263 F. Supp.3d 1280 (S.D. Fla. 2017), the subject of the extradition was

a former president of Panama who was 66 years old.  See id. at 1305.  In contesting his detention, he "argued that his health, age, recent surgery, medications, and the stress of detention warrant[ed] bail."  See id. at 1301.  The court rejected this argument, concluding that "special circumstances do not exist for these types of issues."  See id. at 1302.

In its consideration of this issue, the court discussed numerous cases that reached the same conclusion.  See id. at 1301-02.  The government will not repeat that discussion here, but notes that these courts found that persons with more serious health issues than Rotko had not established special circumstances and, in making that finding, observed that the law requires that reasonable and necessary medical care be provided to incarcerated persons.  Rotko will receive any necessary medical care during his detention.

## IV.    THE POSSIBILITY THAT THE EXTRADITION PROCESS WILL BE LENGTHY BECAUSE ROTKO INTENDS TO CONTEST IT AT EVERY STAGE IS NOT A SPECIAL CIRCUMSTANCE

As noted above, Rotko states that he intends to vigorously contest his extradition, both initially, through all avenues of appeal, and with the State Department.  See doc. 17 at 24.  He contends that the prospect of protracted litigation—caused by him—is a special circumstance warranting his release.  One court has succinctly stated why such potential delay is not a special circumstance:

> [T]he relator has expressed his intention to exhaust every possible remedy at every level of the federal judiciary.  The government is

> correct to note that it is "inappropriate for the relator to promise to
> generate delay through the lavish expenditure of resources, and
> thereby lever himself out of detention on the basis that there has
> been 'too much delay.'"

Matter of Extradition of Rovelli, 977 F. Supp. 566, 569 (D. Conn. 1997). The

court in Martinelli Berrocal also rejected such an argument, concluding that "we

do not find here that the length of the anticipated extradition process in this case,

real or imagined, warrants a finding of special circumstances sufficient to grant

bail contrary to the presumption of detention." 263 F. Supp.3d at 1298. As with

its analysis of age and health concerns as a special circumstance, the court cited

numerous cases that reached the same conclusion. See id. And, again, the

government will not list those cases here, but quotes one citation as particularly

applicable: "*Matter of Extradition of Antonowicz*, 244 F. Supp.3d 1066, 1070 (C.D.

Cal. 2017) (holding that the defendant did not show special circumstances,

although the time from his arrest to his extradition hearing could take as much as

four months, as this timeframe is not 'beyond what all defendants face in

extradition') (also holding that the fact that the defendant could appeal after his

extradition proceeding does not constitute a special circumstance because

appealing 'is a choice he will make and will control')." Martinelli Berrocal, 263

F. Supp.3d at 1298.

## V. THE AVAILABILITY OF BAIL IN ESTONIA IS NOT A SPECIAL CIRCUMSTANCE

Even assuming that Rotko is correct that he would be eligible for bail in

Estonia, his eligibility for bail is not a special circumstance. As an initial matter,

the government notes the difference between detention for extradition purposes

and detention in an ordinary criminal case. As the government discussed in its

initial memorandum regarding detention, the Supreme Court made clear long ago

that detention in an extradition proceeding is presumed for reasons that have no

application in a criminal case:

> The demanding government, when it has done all that the treaty and
> the law require it to do, is entitled to the delivery of the accused on
> the issue of the proper warrant, and the other government is under
> obligation to make the surrender; an obligation which it might be
> impossible to fulfill if release on bail were permitted. The
> enforcement of the bond, if forfeited, would hardly meet the
> international demand; and the regaining of the custody of the
> accused obviously would be surrounded with serious
> embarrassment.

Wright v. Henkel, 190 U.S. 40, 62 (1903). Thus, that bail may be available in the

requesting country is essentially irrelevant to the bail determination in an

extradition proceeding.

Furthermore, most courts have rejected assertions that the availability of

bail in the requesting country is a special circumstance warranting release on

bond. Again, the court in Martinelli Berrocal discussed and rejected this

argument, citing numerous cases that reached the same conclusion. See 263 F.

Supp.3d at 1298-99.  The government will not burden this Court with a repetition

of the <u>Martinelli Berrocal</u> court's analysis and simply adopts that analysis and the

cases cited in support of the analysis.[3]

## VI.   ROTKO HAS NOT DEMONSTRATED THAT THERE IS A LACK OF DIPLOMATIC NECESSITY FOR HIS DETENTION

Rotko contends that "Estonia's delay in pursuing Mr. Rotko establishes a

lack of diplomatic necessity" and that this purported lack of diplomatic necessity

is a special circumstance.  The period of alleged delay was about five and a half

years, from the order for the arrest of Rotko issued on August 25, 2007 (<u>see </u>doc.

1-2 at 14) until the request for extradition dated March 13, 2013 (<u>see</u> doc. 1-1 at

36).  In <u>Martinelli Berrocal</u>, the court found that a delay of two years between

Martinelli's moving to Miami and Panama's seeking his extradition did not

---

[3]     The government also notes that Rotko's showing that he is eligible
for bail in Estonia is a far cry from his showing that bail would in fact be granted,
given Estonia's view that he absconded after learning of the criminal
investigation.  In fact, as noted above, the person alleged to have been Rotko's co-
conspirator, Olga Kotova, appealed the order requiring her detention and the
court rejected her appeal, finding as follows:

> Considering the fact that O. Kotova absconded from criminal
> proceedings for years and has ties and the possibility to leave the
> Republic of Estonia, according to the judicial panel, there is a
> reasonable suspicion that O. Kotova may again abscond from
> criminal proceedings and start hiding in a foreign country.

Doc. 1-4 (ruling of Tallinn Circuit Court, Criminal Chamber, dated October 10,
2016) at 37.

display a lack of diplomatic necessity.  See 263 F. Supp.3d at 1299-1300.  In

reaching that conclusion, the court cited several cases that rejected a similar

claim, including a case in which the delay was ten to eleven years, as follows:

> See [*In re Extradition of Garcia*, 615 F. Supp.2d 162, 171–72, 175
> (S.D.N.Y. 2009)] (denying the defendant's application for bail partly
> because he failed to show diplomatic necessity as a special
> circumstance, despite the fact that the Philippines charged him three
> years before commencing extradition proceedings formally); *United
> States v. De Loera*, 2006 WL 1518981, at *3-*4 (N.D. Ind. May 31,
> 2006) (ordering that the defendant be detained until further order
> partly because he failed to show special circumstances, despite that
> his warrant was issued approximately ten to eleven years before
> Mexico requested his extradition); *In re Extradition of Harrison*, 2004
> WL 1145831, at *9 (S.D.N.Y. May 21, 2004) (denying the
> defendant's application for bail because he "failed to demonstrate
> the presence of special circumstances," because Belgium's delay in
> requesting his provisional arrest did not prolong his incarceration).

Martinelli Berrocal, 263 F. Supp.3d at 1299-1300.  Likewise in the present case,

Estonia's not seeking extradition until about five and a half years after the order

for Rotko's arrest does not establish a lack of diplomatic necessity—especially

given that the purported delay will not prolong his incarceration—and is not a

special circumstance warranting release on bail.  The extent, if any, to which

Estonia's delay in seeking extradition factors into the extradition decision should

be left to the Secretary of State, and is beyond the purview of this Court.  See,

e.g., Martin v. Warden, Atlanta Pen., 993 F.2d 824, 829-30 (11th Cir. 1993)

("[T]here is no due process right to a 'speedy extradition'", and a fugitive "should

direct his argument that extradition is unjust . . . based on [the requesting

country's] alleged lengthy delay in seeking extradition . . . to the Executive Branch").

## VII. ROTKO'S LACK OF CRIMINAL HISTORY AND THE NATURE OF THE CHARGES DO NOT CONSTITUTE A SPECIAL CIRCUMSTANCE

The government does not dispute that Rotko has no other criminal history and that the charges underlying this case are property crimes and not crimes of violence, but these facts do not constitute a special circumstance, especially, again, given the difference between the standards for bail in a domestic criminal case and the standards for bail in an extradition case. In an extradition case, the primary concern is not that the subject will commit other crimes if he is released; it is that he will again abscond, leading to the diplomatic consequences noted by the Supreme Court in Wright. Other courts have rejected similar arguments. See Martinelli Berrocal, 263 F. Supp.3d at 1300-01 ("Our review of this case shows that no special circumstances exist based upon an otherwise clean criminal history"); Extradition of Azizi, 2014 WL 1995083, *2-*3 (N.D. Cal. May 13, 2014) (finding no special circumstances warranting release where the subject argued that, among other things, his having no prior criminal record in the United States and the alleged crime's being non-violent were special circumstances); United States v. Snyder, 2013 WL 1364275, *5 (D. Ariz. Apr. 3, 2013) ("Defendant is charged with a non-violent offense and the presentence

report indicates that she has no criminal history. . . . [T]he non-violent nature of the charges does not establish special circumstances"); <u>Extradition of Boeyink</u>, 2004 WL 6074945, *3 (E.D. Va. Jan. 28, 2004) ("The fact that an accused is charged only with nonviolent, economic crimes is not a special circumstance justifying release on bail").

## VIII.  IN LIGHT OF THE STRONG PRESUMPTION AGAINST BAIL, ROTKO CANNOT ESTABLISH THAT HE IS NOT A FLIGHT RISK

In his motion, Rotko invites the Court to reject the presumption of detention announced in <u>Wright</u> and release him because he, he contends, he is not a flight risk.  However, as recently as a month and a half ago, a court in this District recognized the continued vitality of this presumption.  <u>See</u> <u>United States v. Nascimento</u>, 2019 WL 5853874, *1 (M.D. Fla. Nov. 8, 2019) ("There is a presumption against bail in an extradition case because the United States has an obligation to deliver the person after he is apprehended, and 'granting bond could make that obligation impossible to fulfill'") (citing <u>Wright</u> and quoting <u>In re Headley</u>, 2018 WL 4938553, *6, (S.D. Fla. Oct. 10, 2018)).  This Court cannot ignore a legal principle announced by the Supreme Court, even if it agreed with Rotko that the principle has been "eroded" (a proposition with which the government does not agree).  Absent a holding by, at least, the Eleventh Circuit, that the presumption in <u>Wright</u> should no longer be applied, this Court must apply it.  <u>Cf.</u> <u>Martin</u>, 993 F.2d at 827 ("In extradition cases there is a presumption

against bond. . . . Consequently, a defendant in an extradition case will be released on bail only if he can prove 'special circumstances.'")

Rotko also argues that "the Court must release him under the United States Constitution's Due Process Clause." See doc. 17 at 26. The only case he cites for the proposition that the Due Process Clause should affect the analysis is Paretti v. United States, 122 F.3d 758 (9th Cir. 1997). However, as he notes, that case was later withdrawn and the appeal dismissed—because the fugitive fled the United States while the appeal was pending. See 143 F.3d 508 (9th Cir. 1998) (en banc). The opinion therefore "has no precedential authority whatsoever." Durning v. Citibank, N.A., 950 F.2d 1419, 1424 n.2 (9th Cir. 1991).

As the Eleventh Circuit has stated, the statutorily prescribed judicial inquiry and subsequent State Department review is all the process due to the subject of an extradition request. Martin v. Warden, 993 F.2d 824, 830 (11th Cir. 1993); see also id. at 829 ("Constitutional procedural protections which by their terms are applicable only in criminal cases, however, are unavailable in extradition proceedings"). This case is not different in any material respect than the myriad extradition cases that come before the courts every year. Due process does not compel the defendant's release. See, e.g., Matter of Extradition of Antonowicz, 244 F. Supp.3d 1066, 1069 (C.D. Cal. 2017) (rejecting due process challenges to the special circumstances test); Matter of Extradition of Rovelli, 977

F. Supp. 566, 567 (D. Conn. 1997) (same); In re Extradition of Johnson, 2012 WL 3929811, *2-4 (W.D. Pa. Sept. 7, 2012) (same).

In any event, in addition to showing that he is not a flight risk, Rotko must also show special circumstances warranting his release despite the presumption of detention. As discussed above, he has not done so. If the Court agrees, it need not even consider whether Rotko is a risk of flight. And if the Court does look at risk of flight, the factors governing release on bond in a criminal case—which are the factors discussed by Rotko—do not apply in this extradition proceeding. Instead, the presumption of detention and the diplomatic considerations identified by the Supreme Court in Wright apply. Given those considerations— especially the obligation of the United States under the treaty to deliver Rotko to Estonia and the embarrassment that would arise if Rotko were released and then absconded, and, if that happened, the risk that other countries would not feel obliged to fulfill extradition requests by the United States—Rotko cannot rebut the presumption and demonstrate that this Court should release him.

As demonstrated in the record—including in Rotko's motion itself—Rotko possesses substantial means to assist him with either going into hiding in the United States or fleeing to another country. Rotko states that he will pledge numerous properties as collateral for bond and says that these properties are everything he has. But the Court would have to take his word for it that these

properties are everything he has and also would have to assume that, even if this statement is true, he does not have family or friends who could provide him with the means to abscond. Furthermore, it appears that he is paying substantial amounts of money to his lawyers in both the arbitration proceeding and this case, and his motion does not identify the source of this money or if additional money is available from that source. In any event, "[n]o amount of money could answer the damage that would be sustained by the United States were [Rotko] to be released on bond, flee the jurisdiction, and be unavailable for surrender, if so determined. The obligation of this country under its treaty with [Estonia] is of paramount importance." See Jimenez v. Aristiguieta, 314 F.2d 649, 653 (5th Cir. 1963); see also Martinelli Berrocal, 263 F. Supp.3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process").

Moreover, Estonia's finding that Rotko absconded after he learned of the criminal investigation and his failure to return to Estonia to resolve the matter after he learned of it demonstrate that he is a flight risk. See United States v. Botero, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution").

33

Finally, as the government discussed in its memorandum regarding detention (doc. 12 at 23-24), that Rotko is 70 years old and faces two charges that each carry a maximum penalty of five years of imprisonment militate in favor of a finding that Rotko is a flight risk. See Martinelli Berrocal, 263 F. Supp.3d at 1305 (Martinelli's age [66] and the seriousness of his offenses [carrying a potential for a 21-year sentence] also materially contribute to his high risk of flight; furthermore, even if the potential for a 21-year sentence was exaggerated, "any period of incarceration is a grave one, especially given his age and his status"); United States v. Madoff, 316 Fed. Appx. 58, 59 (2d Cir. 2009) (combination of defendant's age and the substantial amount of time he faces if convicted "naturally bears upon and increases the risk of flight").[4]

## IX. CONCLUSION

As the above discussion shows, Rotko has not overcome the presumption of detention and has failed to establish that special circumstances warrant his

---

[4] Rotko includes in the heading of the last section of his motion that he is a United States citizen, but he does not cite any cases for the proposition that this fact is a special circumstance. Perhaps he is only implying that his being a U.S. citizen makes him less of a flight risk, but to the extent that he is contending that because he is a U.S. citizen he should be treated more leniently than a non-U.S. citizen, courts have rejected this proposition. Extradition of Shaw, 2015 WL 3442022, *8 (S.D. Fla. May 28, 2015) ("The Court finds that the fact that both the Defendant and the alleged victim are American citizens does not constitute a special circumstance justifying bond"); Extradition of Orozco, 268 F. Supp.2d 1115, 1117 (D. Ariz. 2003) (pendency of naturalization proceedings is not a special circumstance).

release and that he is not a flight risk.  For these reasons, Rotko should be detained pending resolution of this case.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By: /s/ Arnold B. Corsmeier
ARNOLD B. CORSMEIER
Assistant United States Attorney
Florida Bar No. 869139
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202-4270
Telephone:   (904) 301-6300
Facsimile:   (904) 301-6310
E-mail:      chip.corsmeier@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

O. David Barksdale, Esq.
Marcos D. Jimenez, Esq.
John R. Byrne, Esq.

s/ Arnold B. Corsmeier
ARNOLD B. CORSMEIER
Assistant United States Attorney