**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**IN THE MATTER OF
THE EXTRADITION OF
ALEKSANDR ROTKO**

Case No. 3:19-mc-00027-BJD-JRK

<u>**ALEKSANDER ROTKO'S REPLY
MEMORANDUM IN SUPPORT OF HIS MOTION FOR RELEASE ON BAIL**</u>

The United States' Response to the Motion for Release on Bail [D.E. 28] (the "Response") fails to rebut the numerous special circumstances warranting bond, including likelihood of success on the merits because: (1) the statute of limitations has run, and Estonia cannot prove that an extended limitations period applies to rescue its dilatory efforts to prosecute Mr. Rotko; and (2) the plain language of the U.S.-Estonia extradition treaty (the "U.S.-Estonia Treaty") requires Estonia to provide a charging document, in addition to a warrant. That plain-language interpretation of the Treaty is supported not only by the Secretary of State's transmittal memorandum to the Senate but also Estonia's *own* interpretation.

Other special circumstances warranting bail include Mr. Rotko's deteriorating health, the lack of diplomatic necessity to detain him, and the existence of the bilateral investment treaty arbitration (the "Arbitration") brought by Mr. Rotko's company, ELA USA Inc. ("ELA USA"), against Estonia for it unlawful expropriation of a $188 million seaport. It is no coincidence that Estonia reactivated its six-year-old extradition request for a 13-year-old alleged theft one month after Mr. Rotko notified Estonia that ELA USA would bring its claim.

Any suggestion that Mr. Rotko is a flight risk is overwhelmed by the Government's own actions. The Government has had Estonia's extradition request since 2013, more than six years ago, yet it recently granted Mr. Rotko a U.S. passport while processing Estonia's extradition request. Mr. Rotko has offered all of his and his wife's substantial assets to guarantee his appearance. The Government only speculates that Mr. Rotko has somewhere else to go. He does not and has no interest in doing so.

**I. The Government's Response Demonstrates that Mr. Rotko Likely Will Defeat Extradition.**

*A. The Likelihood of Defeating Extradition is a Special Circumstance.*

The Government argues incorrectly that the likelihood of defeating extradition is not a special circumstance warranting bail, claiming that only "outlier courts" have held otherwise.

D.E. 28 at 3-4. The First Circuit, Ninth Circuit, Southern District of Florida, Eastern District of Texas, Southern District of Texas, Central District of California, and District of Nevada are not "outlier courts."[1] And, in the two cases cited by the Government, both courts in fact considered the likelihood of defeating extradition as a special circumstance.[2]

### B. The Statute of Limitations Has Expired Unless Estonia Proves Otherwise.

Contrary to the Government's assertion, defeating extradition in this case does not depend on Mr. Rotko's ability to prove a defense relating to the statute of limitations. *See* D.E. 28 at 9. It is undisputed that the default, five-year statute of limitations on the alleged second-degree offenses has run.[3] Thus, as it stands, Mr. Rotko cannot be extradited pursuant to the Treaty, which states that extradition "shall not be granted" for time-barred offenses.[4]

Under Estonian law,[5] the default statute of limitations period on second degree crimes can be extended from five years to 15 years if the suspect absconds. It is ***not*** Mr. Rotko's burden under Estonian law to prove a negative—that he did ***not*** abscond. Instead, the presumption under Estonian law is that the default five-year statute of limitations applies unless

---

[1] D.E. 17 at 15 (citing *Salerno v. U.S.*, 878 F.2d 317, 317 (9th Cir. 1989), 16 n.8 (citing *In re Extradition of Huerta*, Magistrate No. H-08-342M, 2008 WL 2557514, at *4 (S.D. Tex. June 23, 2008); *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 741 (W.D. La. 1999) (same); *In re Extradition of Santos*, 473 F. Supp. 2d 1030 (C.D. Cal. 2006) (same); *U.S. v. Ramnath*, 533 F. Supp. 2d 662, 665 (E.D. Tex. 2008) (same); *Nacif-Borge*, 829 F. Supp. at 1216 (same)); D.E. 28 at 4 (citing *Kin-Hong v. U.S.*, 83 F. 3d 523, 524-25 (1st Cir. 1996); *In re Extradition of Pelletier*, 2009 WL 3837660, *3 (S.D. Fla. Nov. 2009).
[2] *See U.S. v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 61 (D. Mass. 2010) (granting bail on other grounds but noting likelihood of success on the merits); *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994) (no high probability of success because fugitive already convicted).
[3] *See* D.E. 17 at 14-19 (unrebutted arguments on expiration of statute of limitations); D.E. 17-13 ¶¶ 18-60 (unrebutted opinion of Estonian legal expert on expiration of statute of limitations); D.E. 24-5 ¶¶ 25-26 (same).
[4] Article 6 of the U.S.-Estonia Treaty states: "Extradition shall not be granted when the prosecution or the enforcement of the penalty for the offence for which extradition has been sought has become barred by lapse of time according to the law of the Requesting State." D.E. 1-1 at 23; *Vo v. Benov*, 447 F.3d 1235, 1246 (9th Cir. 2006) (court violates due process by not determining if a mandatory exception to extradition applies).
[5] The Treaty expressly states that Estonian law applies to the statute of limitations issue. D.E. 1-1 at 23; *see also* D.E. 28 at 9 (arguing that Estonian law applies). The Government's citation to *Karmin v. United States*, 725 F. 2d 1225, 1227 (9th Cir. 1984) is misleading because the court in that case stated that statute of limitations issues should be considered in the requesting country unless there is treaty provision to the contrary, which, in this case, there plainly is. D.E. 1-1 at 23.

and until the *State* proves otherwise.[6] Estonia cannot satisfy that burden here because it is undisputed that the state never served, or even attempted to serve, Mr. Rotko with a summons.[7]

The Government claims that an Estonian court, in an order dated August 25, 2007, held that Mr. Rotko absconded, which "resolves the matter." D.E. 28 at 9. That is simply incorrect. No court ever has held that Mr. Rotko absconded, and nothing in the August 25, 2007 document establishes he absconded. Under Estonian law, being declared a fugitive for purposes of an arrest warrant is not the same as absconding for purposes of the extended limitations period. The latter is a matter of *substantive* Estonian law akin to the element of a crime; as such, it must be proven by the state in adversarial proceedings.

Under Estonian law, an arrest warrant is required to hold a suspect in custody during preliminary criminal proceedings. CCP §§ 130-131.[8] To issue the warrant, a preliminary investigation judge must examine the criminal file and interrogate the subject, CCP § 131(3), except if there is cause to declare the subject a "fugitive," in which case the court may issue the arrest warrant *ex parte* based solely on the prosecutor's representations to the court. CCP §§ 131(4). But, this is unrelated to extending the statute of limitations. By analogy to U.S. law, this Estonian procedure is equivalent to a U.S. prosecutor's appearance before a judge to obtain an arrest warrant—the defendant is not present, issuance of the warrant depends on a showing of probable cause, and the court does not make findings of fact that may later be used by the government to satisfy its burden of proof at trial.

The August 25, 2007 "order" is an arrest warrant—Mr. Rotko was not present, the court issued the warrant based on the prosecutor's representations, and the court noted, based on the

---

[6] *See* D.E. 17-13 ¶¶ 37, 44 (unrebutted expert opinion citing an Estonian Supreme Court case in support of state has the "burden to provide conclusive proof that the suspect was aware of being called to appear by proof of service"), *id.* ¶¶ 55-56 (citing codified presumption of innocence and its application here).
[7] *Id.* ¶¶ 45-47, 54 ("It is certain that neither the Estonian police or prosecutors ever attempted to serve [Mr. Rotko] with a summons[.]"); D.E. 17 at 7, 17 (unrebutted arguments on service of summons).
[8] Available at https://www.riigiteataja.ee/en/eli/530102013093/consolide.

3

*assumed* truth of the prosecutor's representations, that Mr. Rotko possibly was evading criminal proceedings. *See* D.E. 1-2 at 14 ("***It appears*** that Aleksandr Rotko is avoiding the criminal proceedings and hiding his location.") (emphasis added). The warrant itself only describes efforts to summon Olga Kotova, not Mr. Rotko. D.E. 1-2 at 16.

Whether Mr. Rotko actually absconded for purposes of extending the limitations period is, like the element of a crime, an issue of substantive law that the state must prove. D.E. 17-13 ¶¶ 37, 44, 55-56. The state cannot satisfy this burden of proof by referring to representations made by prosecutors in support of an arrest warrant or a court's statements in an uncontested proceeding regarding whether there was sufficient cause to issue the warrant or declare the party a fugitive. On the contrary, based on Estonian Supreme Court precedent, the state's burden to prove absconding is high, requiring it to provide ***conclusive proof*** that a suspect was summoned, as evidenced by proof of service, and fled. D.E. 17-13 ¶ 44. No court has found that Mr. Rotko absconded, as needed for application of the 15-year statute of limitations.[9]

For various undisputed reasons set forth in the Motion, *see* D.E. 17 at 15-19, and several others, Estonia has not proven and cannot prove that Mr. Rotko absconded. The undisputed and dispositive fact is that "neither the Estonian police or prosecutors ever attempted to serve [Mr. Rotko] with a summons[.]" D.E. 17-13 ¶ 54, ¶¶ 45-47; D.E. 17 at 7, 17.[10] That fact is dispositive because the Estonian Supreme Court has made clear that, if absconding rests on a suspect's alleged failure to appear, ***proof of service of a summons is paramount*** because it is

---

[9] The Government cites cases for the proposition that this Court should not disregard the rulings of two Estonian courts on the statute of limitations issue. D.E. 28 at 6-7. But no Estonian court has so held, as noted above. The Government also cites cases for the proposition that the "Court should defer to the Estonian government's interpretation of its own law." *Id.* at 7-8. The Estonian government has not provided an interpretation of its own law, let alone one that conflicts with the conclusions reached by Mr. Paul Keres. At most, the Government quotes conclusory statements made by Estonian prosecutors that the 15-year statute of limitations would apply. *Id.* But those conclusory statements ignore the fact that the statute of limitations has expired, and Estonia has not and cannot prove absconding, as needed to extend the limitations period.

[10] While the court in the August 2017 order discusses that Mr. Rotko has not "responded to summons," that does not mean that a summons was issued. In fact, on the face of the same order, it reflects that the prosecutor was **not** able to issue a summons for Mr. Rotko. D.E. 1-2 at 16.

4

the ***only*** means of determining what the investigative bodies compelled a suspect to do, whether the suspect was aware of what was required, and whether he deliberately evaded those obligations. D.E. 17-13 ¶ 44. Mr. Rotko's passport shows he left Estonia and arrived in the U.S. on October 7, 2006. D.E. 24-1. There is absolutely no evidence that he knew the police wanted to speak to him prior to his travel. *See* D.E. 17 at 27.

### C. *Estonia Admits There is No Charging Document, a Treaty Requirement.*

It is now undisputed that Mr. Rokto has ***not*** been charged in Estonia and that Estonia cannot produce a charging document, a requisite for extradition under the U.S.-Estonia Treaty. D.E. 28 at 14. The Government's argument that a charging document is not required ignores the plain language of the Treaty and is based on case law interpreting outdated treaties. It also ignores the President's and Secretary of State's letter of transmittal to the Senate when the Treaty was enacted, and Estonia's ***own*** interpretation of the Treaty.

#### 1. The Treaty Requires a Charge and a Charging Document

The Treaty here is self-executing, and thus, the Treaty as ratified by the U.S. Senate, creates binding federal law. *See Medellin v. Texas*, 552 U.S. 491 (2008); **Exhibit A** at 5. The U.S.-Estonia Treaty requires that a subject individual actually be "charged" and also be the subject of a "charging document." D.E. 17 at 5-9. The Government has no response to the plain language of the Treaty. *Aguasvivas v. Pompeo*, 405 F. Supp. 3d 347 (D.R.I. 2019), which was based on treaty language nearly identical to the Treaty here, contains a thoughtful, text-based analysis showing that treaties with this language mean what they say: "the" charging document is required. The Government does not dispute the holding in *Aguasvivas*, but simply says the case is on appeal. D.E. 28 at 10. That does not diminish the validity of its analysis.

And, when the Government ratified the Treaty, it took the same position as that taken by Mr. Rotko and *Aguasvivas*—a charging document is required in addition to an arrest

5

warrant. As the Government itself contends, the "meaning given [to treaties] by the departments of government particularly charged with their negotiation and enforcement is given great weight."[11] On September 29, 2006, the Treaty was read and sent to the Senate. In the transmittal, Secretary of State Condoleezza Rice included a "detailed, article-by-article analysis" of the Treaty, which provided in relevant part that:

- "Article 1 obligates each Party to extradite to the other, pursuant to the provisions of the Treaty, persons whom the authorities in the Requesting State **have charged with <u>or</u>** convicted of an extraditable offense." Ex. A at 5 (emphasis added).

- "Article 8 establishes the procedures and describes the documents that are required to support a request for extradition. …. Among other requirements, Article 8(3) provides that a request for the extradition of a person sought for prosecution **must** be supported by: (a) a copy of the warrant or order of arrest issued by a judge, court, or other competent authority; (b) a copy **of the charging document**; <u>**and**</u> (c) such information as would provide a reasonable basis to believe that the person." *Id.* at 7 (emphasis added).

Thus, the State Department interpreted the Treaty to require a **charge** and a **charging document** before extradition. Nowhere in the State Department's analysis is a "suspicion" even mentioned, let alone identified as being sufficient to meet the Treaty's requirements. And, in the letter of transmittal, President Bush also noted that "[t]he new extradition treaty with Estonia would replace the outdated extradition treaty between the United States and Estonia, signed on November 8, 1923, at Tallinn, and the Supplementary Extradition Treaty, signed on October 10, 1934, at Washington." Ex. A at 3. This negates the Government's reliance on cases interpreting older treaties, D.E. 28 at 11, such as *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1187 (W.D. Okla. 2015) (addressing 1978 Mexico-U.S. extradition treaty, which provides that parties to the treaty agree to extradite "persons . . . . charged with offenses or [that] have [been] found guilty of committing an offense, *or are wanted by said authorities to*

---

[11] D.E. 28 at 17 (quoting *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961)); *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) ("well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight'").

*complete a judicially pronounced penalty*[.]"[12]

### 2. The Estonian Version of the Treaty Does Not Change the Result

Faced with the plain language of the Treaty, and the Government's own interpretation of it, the Government would have this Court rely on the Estonian version that has different language based on an outdated "suspicion order." This effort fails for many reasons.

The Government has not provided a case, and Mr. Rotko is aware of none, in which a federal court reviewing an extradition treaty has utilized the foreign language version of that treaty, especially when the foreign language version contradicts both the U.S. (English) version and the U.S. State Department's own interpretation of the Treaty. In ratifying the Treaty, the Senate did not ratify the Estonian language version of the Treaty, just the U.S. version.[13] While the Treaty notes that both versions are authentic, the Court should not ignore the plain language of what the Senate adopted and what the State Department expressly interpreted it to mean.

This result is supported by the international treaty interpretation rules pursuant to the Vienna Convention on the Law of Treaties ("VCLT"),[14] and specifically Articles 31, 32, and 33 of the VCLT. Article 31(1) calls for a good-faith interpretation of the "ordinary meaning" of the terms in their context and in light of their object and purpose. As shown above, the plain language of the Treaty supports the requirement that the requesting country must produce a

---

[12] The other cases the Government cites likewise are based on different treaty terms. *Sainez v. Venables*, 588 F.3d 713, 716 (9th Cir. 2009) (based on 1978 Mexico-US treaty); *In re Extradition of Rovelli*, 977 F. Supp. 566, 568 (D. Conn. 1997) (presumably based on the US-Italy extradition treaty, which does not require a separate charging document); *U.S. v. Nolan*, 651 F. Supp. 2d 784, 789 (N.D. Ill. 2009) (1982 US-Costa Rica treaty which extradites individuals "being tried for" an extraditable offense and requiring presentation of a "copy of the charging document, **or an equivalent document issued by a judge or judicial authority**") (emphasis added).

[13] *See* Ex. A at 11 (sending only the English version of the Treaty to the Senate). A search of congress.gov, the Senate Foreign Relations Committee site, and the U.S. Treaties and Agreements Library on Hein Online shows no indication that the Estonian version of the treaty was ratified by the Senate.

[14] Although the United States is not a party to the VCLT, U.S. courts have found the Vienna Convention to codify the international law of treaties. *See, e.g.*, *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 309 (2d Cir. 2000) ("We therefore treat the Vienna Convention as an authoritative guide to the customary international law of treaties"); *Georges v. United Nations*, 834 F.3d 88, 96 (2d Cir. 2016) (same). This includes Articles 31, 32 and 33 of the VCLT. *Bank of N.Y. v. Yugoimport*, 745 F.3d 599, 610 (2d Cir. 2014) (citing VCLT article 33); *U.S. v. Al-Imam*, 373 F. Supp. 3d 247, 284 (D.D.C. 2019) (same, Art. 31).

formal charging document, *in addition* to the warrant, to support extradition. The use of the qualifier "the" instead of "a" in front of "document setting forth the charges" in Treaty § 8(3)(b) means there must be "the" charging document presented.

Additionally, the canon against surplusage supports this interpretation of § 8(3)(b) of the U.S.-Estonia Treaty. If § 8(3)(b) is to have any meaning, it must impose a requirement beyond what is required by subsection (a). In other words, if a warrant, required by § 8(3)(a), satisfied both the warrant requirement and the charging document requirement, § 8(3)(b) would be stripped of any meaning. Here, the Treaty clearly requires that the requesting country produce and include a copy of the warrant "***and***" "the document setting forth the charges against the person." Ex. A at 19-20 (emphasis added).

That interpretation also is consistent with the object and purpose of the U.S.-Estonia Treaty. As noted, in the Letter of Transmittal for the Senate's ratification of the Treaty, President Bush explained that the "object and purpose" of the Treaty was to modernize and replace the "outdated" extradition treaties between the United States and Estonia. *Id.* at 3. The whereas clause of the Treaty captures that goal by noting that the parties to the Treaty enter into the Treaty "[d]esiring to provide for more effective cooperation between the Parties in the fight against crime, and, for that purpose, to conclude a new treaty for the extradition of offenders." *Id.* at 14. Treaty Article 1 confirms that goal noting that the "Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting State **have charged with or convicted** of an extraditable offense." *Id*. at 15. (emphasis added).

Thus, the treaty interpretation analysis required by Article 31(1) of the VLCT is similar

to the analysis conducted in *Aguasvivas*[15] in examining these modern extradition treaties, which, unlike their predecessors, expressly require a charging document ***in addition to*** a warrant. *See* D.E. 24 at 7-8; *see also In re Extradition of Manea*, CV 15 MJ 157 (JGM), 2018 WL 1110252, at *12 & n.39 (D. Conn. Mar. 1, 2018) (2007 U.S. and Romania treaty; Government submitted arrest warrant ***and*** indictment).

VLCT Article 31(3)(a) further provides that the matters to be taken into account when interpreting a treaty include "any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions." In addition to the U.S. transmittal letter, as explained by Estonian law expert Paul Keres in his second Supplemental Opinion, **Exhibit B**, the Estonian version of the Treaty was accompanied by an explanatory note from the Estonian Ministry of Justice." Ex. B ¶ 23. The note does not mention the language of a "suspicion order" from the Estonian version but **adopts the U.S. version:** "Article 1 sets forth the obligation of mutual extradition in respect of persons **who are charged or have been convicted of a criminal offense** by the requesting State, subject to extradition (Article 438 of the CCP; Article 1 of the EU-US Extradition Agreement)." *Id.* ¶¶ 23-25.

This statement is noteworthy for two reasons. First, it makes clear that under the Treaty, an individual must be **charged** or **convicted**. Second, it confirms that Estonia's interpretation of the Treaty is consistent with the U.S.' interpretation, *see id.* ¶ 26, and thus constitutes a subsequent agreement about the interpretation and the application of the treaty by the Treaty parties.[16]

---

[15] *See also See Yapp v. Reno*, 26 F.3d 1562, 1569 (11th Cir. 1994) ("Treaties, like statutes, should be construed so that no words are treated as being meaningless, redundant, or mere surplusage.")

[16] This is also consistent with US Department of Justice practice. When requesting extradition of a fugitive that "has not been prosecuted," the Department of Justice generally provides the foreign state with "the arrest warrant and complaint or indictment." *See Justice Manual*, 9-15.100 (available at https://www.justice.gov/jm/jm-9-15000-international-extradition-and-related-matters).

Even if VLCT Article 31 were not dispositive, the result is the same under the supplementary rules of interpretation of VLCT Article 32. That article provides that one can look at the "circumstances of the [treaty's] conclusion," *i.e.*, documents prepared at the time the treaty was executed. As shown above, both the U.S. and the Estonian governments told their legislative bodies that the U.S.-Estonia Treaty required a "charge" or a conviction **and** a charging document. Those are the "circumstances" that must be considered.

Despite all this, the Government would have this Court use the Estonian language document to conclude that the necessary document is not a "charging document"—despite what the Estonian explanatory note stated—but a "suspicion order." That argument fails. VLCT Article 33 applies when as here there are two versions of a treaty and they show a "different meaning." Article 33(4) states, however, that Articles 31 and 32 control. Thus, because, as shown above, Articles 31 and 32 support the U.S. interpretation, the fact that there is a difference in the Estonian-language version does not make a difference.

Indeed, one need only look at the term "suspicion order" to determine that the Government could not override the English version. The Government contends that under article 8(3) of the Estonian language version of the U.S.-Estonia Treaty, only a "suspicion order" is required instead of a "charging document." D.E. 28 at 16. However, as explained by Estonian legal expert Paul Keres, not only was a "suspicion order" not included in either of the respective government's transmittal letters, a "suspicion order" no longer exists under Estonian criminal law. Ex. A ¶ 11. The VCLT specifically states these transmittal letters control when the language of one text is "ambiguous or manifestly absurd" or a result is "absurd or unreasonable." VCLT, Art. 32.[17]

---

[17] The Government contends that if a treaty fairly admits of two constructions, one restricting the rights and the other enlarging it, the more liberal construction is preferred. D.E. 28 at 18 (citing cases). However, for the reasons noted above, there are no two "fair" interpretations here. The interpretation advocated by Estonia includes

## II. The Government Does Not Dispute Mr. Rotko's Health.

The Government suggests that *In re Extradition of Ricardo Alberto Martinelli Berrocal*, 263 F. Supp. 3d 1280 (S.D. Fla. 2017), prohibits this Court from considering Mr. Rotko's health as a special circumstance warranting bail. D.E. 28 at 23. That was not *Martinelli*'s holding. Instead, the court held that deteriorating health is not a special circumstance ***unless*** the deterioration is caused or made substantially worse by the detention, which was not the case for Martinelli. 263 F. Supp. 3d at 1301-02 ("medical issues ***could qualify as special circumstances***") (emphasis added). The same is not true of Mr. Rotko.

The Motion identified Mr. Rotko's health conditions and explained that detention would result in serious deterioration of his health, D.E. 17 at 22-23, which the Government did not dispute. Since his detention, Mr. Rotko has developed a right-eye hemorrhage and double vision. After learning of these conditions and the state's apparent failure to properly treat them,[18] counsel engaged Dr. Charles Haddad, Associate Chair of the Department of Community Health and Family Medicine at the University of Florida College of Medicine, to provide a medical assessment. *See* **Exhibit C**. He concluded that Mr. Rotko's "depression and anxiety have gotten much worse since his incarceration affecting his blood pressure and the development of a right eye hemorrhage," "he should be seen by neurology or neuro-ophthalmology urgently for the double vision," and should have "evaluation from cardiology for his coronary spasm chest pain." *Id.* at 3. Mr. Rotko also suffered a hernia in prison.

The Government refers generally to cases cited in *Martinelli* for the proposition that courts have "found that persons with more serious health issues than Rotko had not established

---

reference to a legal instrument that has not been presented and does not exist. When interpreting a Treaty, you must start with the "text of the treaty and the context in which the written words are used." *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699 (1988). Here, those words are clear.

[18] There is a well-documented health care crisis in state prisons like the one in which Mr. Rotko is being held (unnecessarily). *See* **Exhibit D** (articles on health care crisis).

special circumstances." D.E. 28 at 23. That misses the point. The issue is not the severity of a defendant's existing medical condition, but the effect that detention is having on the detained person's health and whether that effect is warranted in light of the circumstances.[19]

Thus, it is well within this Court's discretion to conclude that the risk of Mr. Rotko's flight (which, is none), does not warrant the severe deterioration caused to his health from his detention, particularly in light of several other special circumstances discussed in the Motion.[20]

### III. The Lack of Diplomatic Necessity is a Special Circumstance.

With one exception,[21] the Government cites a series of cases holding that a two- or three-year delay in seeking extradition does not constitute a lack of diplomatic necessity. The delay in this case was not two or three years, but six years. The Government made no attempt to distinguish the cases demonstrating that even a three-year delay sufficiently establishes a lack of diplomatic necessity. D.E. 17 at 25. Moreover, it is not merely Estonia's inexcusable six-year delay in seeking extradition, but the additional seven-year delay between the extradition request and the Government's arrest that further confirms the lack of diplomatic necessity. *See U.S. v. Kollmar*, 2019 WL 2163005, at *3 (N.D. Cal. May 17, 2019) (considering the time between the extradition request and provisional arrest).

### IV. The Pending Arbitration is a Special Circumstances

The Government argues that the pending Arbitration is not a special circumstance warranting bail because the United States has not violated the BIT or the Tribunal's Procedural

---

[19] *See, e.g.*, *U.S. v. Taitz*, 130 F.R.D. 442, 446 (S.D. Cal. 1990) (defendant allergic reactions among special circumstances when no flight risk); *In re Extradition of Sidali*, 899 F. Supp. 1342, 1346, 1351 (D.N.J. 1995) (same, deteriorating physical condition manifested by rectal bleeding, hypertension, and depression).
[20] *See U.S. v. De Loera*, 2:06-MJ-98-PRC, 2006 WL 1518981, at *3-*4 (N.D. Ind. May 31, 2006) (case cited by the Government; special circumstances can be considered cumulatively).
[21] The Government cites *U.S. v. De Loera*, 2:06-MJ-98-PRC, 2006 WL 1518981, at *3-*4 (N.D. Ind. May 31, 2006), for the proposition that a ten or eleven year delay does not necessarily establish a lack of diplomatic necessity, but the court's holding was inapposite. The court actually held that other circumstances (not present here) outweighed the court's inclination to grant bail on grounds that the ten or eleven year delay demonstrated a lack of diplomatic necessity. *See id.* (Mexico's delay made its "detention decision a difficult one").

Order No. 3. That is not true, but in any event, a special circumstance need not constitute a violation of international law to warrant bail. Indeed, the mere fact that Mr. Rotko's entire fortune is at issue in the Arbitration is sufficient to warrant bail. *See* D.E. 17 at 12 n.5 (citing *In re Mitchell*, 171 F. 289, 290 (S.D.N.Y. 1909), granting bail during pendency of case in which defendant's entire fortune was at issue).

Moreover, Estonia's delay in commencing and then reactivating the extradition should not be used against Mr. Rotko, as the Government now tries to do. D.E. 28 at 21. Estonia inexplicably waited six years—until 2013 (and after the statute of limitations had expired)—to request extradition. Then, the record shows Estonia did nothing to pursue extradition for another *four* years, until December 2017, when it presented "additional information" to the Department of Justice. *See* D.E. 1-3 at 5. Significantly, this was only ***after*** Mr. Rotko's counsel served the Estonian prime minister on August 1, 2017, with notice of ELA USA's intent to commence an international arbitration due to the expropriation of his business. D.E. 17-8. This is retaliation, pure and simple. To argue that Mr. Rotko is trying to run out the clock on this arbitration is disingenuous.

Finally, the Government quotes Procedural Order No. 3 out of context to muddy the Tribunal's clear holding that Mr. Rotko's arrest in connection with Estonia's extradition request would jeopardize ELA USA's ability to pursue its arbitration claims against Estonia, and its warning that none of the parties to the Arbitration "may aggravate the dispute or affect the integrity of the arbitration proceeding."

When the Tribunal entered Procedural Order No. 3, it knew only that Estonia had made an extradition request to the United States at some point before November 2016, and that the request had not affected Mr. Rotko or his ability to file a claim on behalf of his wholly-owned company, ELA USA. D.E. 17-9 ¶ 117. The Tribunal had no idea that Mr. Rotko would be

arrested in connection with Estonia's extradition request. Nonetheless, the Tribunal concluded that it "has ***no doubt that an arrest*** of Mr. Rotko—in Estonia **or elsewhere in the course of extradition proceedings**—would significantly harm the Claimant's access to an important witness and greatly complicate the exchange between the Claimant and its counsel." *Id.* ¶ 89.

The Tribunal went on to analyze the three elements for entry of an order suspending extradition—namely, that the order is urgent, necessary, and proportionate. *Id.* ¶ 113. The Tribunal found that the order was urgent and necessary, *id.* ¶¶ 117, 119, 121, but, as the Government notes, did not find that is was proportionate. But the Government omits that the Tribunal reached that conclusion because, at that time, any harm arising from the extradition request was speculative given that Mr. Rotko had **not** been arrested or affected by what appeared to be a stagnant extradition request. *Id.* ¶ 129. Just seven months after the Tribunal's order, Estonia sent a letter to the State Department indicating that it remained intent on pursuing its seven-year-old extradition request. D.E. 1-4 at 44. Yet, Estonia made no mention of the Arbitration or the fact that the Tribunal had, after holding that Mr. Rotko's arrest would undermine the Arbitration, warned Estonia "not to take any action that may aggravate the dispute or affect the integrity of the arbitration proceeding." D.E. 17-9. Shortly after, Mr. Rotko was arrested. As the Tribunal concluded, Mr. Rotko's detention undermines the Arbitration. *Id.* ¶¶ 113, 118, 121. The Arbitration is a special circumstance.

V. **Mr. Rotko is Not a Flight Risk**

The Government argues that Mr. Rotko is a flight risk because the Supreme Court in *Wright* held that courts should presume that a defendant in an extradition proceeding is a flight risk. D.E. 28 at 30. But the relevant question is not whether the *Wright* presumption exists, but whether Mr. Rotko has overcome it. The Government made no attempt to demonstrate he did not. Indeed, the Government did not attempt to distinguish any of the cases showing that Mr.

14

Rotko had overcome the presumption, D.E. 17 at 11 n.4, 13 n.6, or cite any to the contrary.[22]

At most, the Government posits incorrectly that the Court would have to take Mr. Rotko's word for his guarantee that he does not have the means, ability, or desire to skip bail. D.E. 28 at 32-33. But it is undisputed that Mr. Rotko has only a U.S. passport, is not a citizen of any other country except Estonia, and has offered all his substantial assets to guarantee bond. D.E. 17 at 11-14. Those facts constitute objective and substantial evidence that Mr. Rotko lacks the means and ability to leave the United States or enter another country, particularly because there is no evidence suggesting that the 70-year-old Mr. Rotko is a Jason Bourne-style operative with training that would allow him to travel undetected.

Moreover, and in addition to Mr. Rotko's guarantees and willingness to post a significant bond—which is, in and of itself, sufficient to warrant bail in an extradition proceeding, *see* D.E. 17 at 13 n.6—there is no dispute that Mr. Rotko's failure to appear in these proceedings would mean forfeiting ELA USA's $188 million claim against Estonia. *Id.* at 12. And even if more were needed, the Government does not address the myriad other measures Mr. Rotko gladly would accept to guarantee his appearance, including house arrest and electronic monitoring. *Id.* at 14. Mr. Rotko has not been trying to hide from Estonia. He has lived openly in the United States for more than a decade since Estonia expropriated his American company's business. Any flight risk argument is meritless.

## CONCLUSION

The Court should dismiss this matter and release Mr. Rotko or at least release him on bail.

---

[22] The Government admits that the *Wright* presumption is justified by the risk that the United States will suffer diplomatic embarrassment if it releases someone on bail who ultimately flees. *See* D.E. 28 at 29. But Mr. Rotko demonstrated that he is not flight risk and, in any case, the Estonian government could hardly raise a quam against the United States for releasing Mr. Rotko on these minor charges and under these circumstances.

Dated: January 3, 2020

Respectfully submitted,

*/s/ Marcos Daniel Jiménez*
Marcos Daniel Jiménez
Florida Bar No. 441503
**Marcos D. Jiménez, P.A.**
255 Alhambra Circle, Suite 800
Coral Gables, FL 33134
Tel: 305-570-3249
Fax: 305-437-8158
Email: mdj@mdjlegal.com

John R. Byrne
Florida Bar No. 0126294
*jbyrne@leoncosgrove.com*
LEÓN COSGROVE LLC
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
305 570-3233 T
305 437-8158 F

Oliver David Barksdale
Florida Bar No. 0957331
*odb@bedellfirm.com*
Allan F. Brooke II
Florida Bar No. 0994413
*afb@bedellfirm.com*
101 East Adams Street
Jacksonville, FL 32202
904 353-0211 T
904 353-9307 F

*Counsel for Aleksandr Rotko*

## CERTIFICATE OF SERVICE

I hereby certify that on Friday, January 3, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

>Arnold B. Corsmeier
>Assistant United States Attorney
>Office of the United States Attorney
>300 North Hogan Street, Suite 700
>Jacksonville, FL 32202
>*chip.corsmeier@usdoj.gov*

>*/s/ Marcos Daniel Jiménez*
>Marcos Daniel Jiménez