IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Jacksonville, Florida

IN THE MATTER OF THE            Case No. 3:19-mc-27-J-39MCR
EXTRADITION OF ALEKSANDR
ROTKO                           January 7, 2020

                                2:35 p.m.

                                Courtroom 5D
_____

**EXCERPT OF DETENTION HEARING**
**(TESTIMONY OF PAUL KERES)**
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES DISTRICT JUDGE

OFFICIAL COURT REPORTER:

        Shelli Kozachenko, RPR, CRR, CRC
        221 N. Hogan Street, #185
        Jacksonville, FL  32202
        Telephone:  (904) 301-6842

                    (Proceedings reported by stenography;
                        transcript produced by computer.)

---

**A P P E A R A N C E S**

GOVERNMENT COUNSEL:

**Arnold Corsmeier, Esquire**
United States Attorney's Office
300 North Hogan Street, Suite 700
Jacksonville, FL  32202

DEFENSE COUNSEL:

**Marcos Jimenez, Esquire**
Marcos D. Jimenez, P.A.
255 Alhambra Circle, Suite 800
Coral Gables, FL  33134

**David Barksdale, Esquire**
Bedell, Dittmar, DeVault, Pillans & Coxe, PA
101 East Adams Street
Jacksonville, FL  32202

# T A B L E   O F   C O N T E N T S

DEFENSE WITNESS:                                    Page No.

  PAUL KERES

     DIRECT EXAMINATION BY MR. JIMENEZ.........        5

     CROSS-EXAMINATION BY MR. CORSMEIER........       60

     REDIRECT EXAMINATION BY MR. JIMENEZ.......      113

     RECROSS-EXAMINATION BY MR. CORSMEIER......      120

1    P R O C E E D I N G S

2    January 7, 2020                              2:35 p.m.

3                        *   *   *   *   *

4         THE COURT:  Sir, if you'd just approach the witness stand

5    to --

6              THE WITNESS:  Thank you, Your Honor.

7              THE COURT:  -- your right, please -- or my right,

8    your left.

9              THE WITNESS:  Okay.

10             THE COURT:  And if you'd raise your right hand,

11   please.

12             Do you solemnly swear the testimony you're about to

13   give will be the truth, the whole truth, and nothing but the

14   truth, so help you God?

15             THE WITNESS:  Yes.

16             THE COURT:  All right.  You may be seated.

17             THE WITNESS:  Thank you, Your Honor.

18             THE COURT:  If you'd try to be careful with that

19   microphone, not to --

20             THE WITNESS:  Knock it over.

21             THE COURT:  -- not hit it with papers and things.

22             Would you state your first and last name, please.

23             THE WITNESS:  My first name is Paul.  My last name is

24   Keres, K-e-r-e-s.

25             THE COURT:  All right.  Thank you.

1          You may proceed.

2          MR. JIMENEZ:  Thank you.

3          PAUL KERES, DEFENDANT'S WITNESS, SWORN

4                DIRECT EXAMINATION

5  BY MR. JIMENEZ:

6  Q.   Mr. Keres, could you just briefly tell us your educational

7  background.

8  A.   Well, I'm an Estonian advocate, and I trained at the

9  University of Tartu.  I earned my degree in law in 2009.  The

10 degree is an MA, which is *Magister Artium*.  It's a master's

11 degree.

12          And in 2010 I entered the Estonian Bar.  I was

13 admitted into the Estonian Bar, and I've been practicing as an

14 advocate ever since.

15          However, prior to graduating from the university, I

16 started work as an assistant to one of the -- one Estonian

17 advocate already in 2007 because I had already earned my

18 bachelor's degree by then, and so that -- that would be

19 allowed.

20 Q.   And have you been in private practice?

21 A.   I've been in private practice ever since, yes.

22 Q.   What firm are you with?

23 A.   I'm at Glikman Alvin Levin.

24 Q.   And what kind of firm is that?

25 A.   It's a firm that mostly specializes in complex dispute

1   resolution.  We mostly -- some of our staff mostly focus on

2   commercial -- complex commercial litigation.  I focus mostly --

3   as of today, I mostly focus on criminal law and criminal

4   defense work.

5          I also work in the area of commercial arbitration,

6   sports arbitration, and also complex commercial litigation.

7   Q.   And could you please tell Judge Klindt what you did to

8   prepare for your testimony today.

9   A.   For my -- for my testimony, for my evidence today, I

10  reread the expert reports, the expert legal reports that I have

11  drafted for the benefit of this Court, and I have met with the

12  counsel for Mr. Rotko.

13         I have also read some subsequent documents that have

14  been presented by the Estonian government.  And because I've

15  been provided with the U.S. attorney's documents, I've also

16  read that.

17  Q.   And what are the two offenses that Mr. Rotko is charged

18  with -- or, sorry, he's not charged with, that are the subject

19  of this matter?

20  A.   Those are the offenses of embezzlement and destruction of

21  property.

22  Q.   And what type of offenses are those?

23  A.   Those are second-degree offenses punishable by a maximum

24  of five years in prison.

25  Q.   What's the difference between first degree or second

1  degree or whatever other degrees there are?

2  A.    The offenses in the first degree are those that are --

3  that are punishable by more than five years, and second-degree

4  offenses are lesser offenses and punishable by up to five

5  years.

6  Q.    And for these second-degree offenses, when does -- what is

7  the statute of limitations, under Estonian law, for them?

8  A.    It's five years.

9  Q.    Okay.  And when does that statute begin to run?

10  A.    It begins to run as of the commission of the last act.

11  And according to Prosecutor Voronin, the Estonian Prosecutor

12  Voronin, the last act was committed, I believe -- according to

13  him, allegedly, it was committed on the 22nd of September,

14  2006.  And so accordingly, time would have expired on the 22nd

15  of September, 2011.

16  Q.    All right.  And you have reviewed at least a portion of

17  the Estonian file that the government has attached to its

18  filings --

19  A.    Yes.

20  Q.    -- and also the declarations by -- the subsequent

21  declarations by the Estonian prosecutors that were received in

22  mid December of last year, correct?

23  A.    Yes.

24  Q.    Okay.  Is there any -- well, first, let me ask you a

25  general question.

1          Are there acts generally, under Estonian law, that

2    can interrupt the statute of limitations?

3    A.    Yes.  With regard to the limitation period or expiration

4    of the limitation period, the expiration period can be either

5    suspended -- which is the case when a person absconds.  That

6    time stops and then begins again.  There's a pause.  It pauses

7    for the time that the person is deemed to have absconded.

8          And then we also have interruptions of expiration

9    periods or limitation periods.  And an interruption occurs

10   when, for example, a restrictive measure is applied.  Under

11   Estonian law a restrictive measure can, for example, be an

12   arrest warrant issued against the person.

13         I see in the file that there was -- there was an

14   arrest warrant issued on the 25th of August, 2007.  So the

15   limitation period began to run on the 22nd of September, then

16   it was interrupted on the 20th of August, a year later.  And

17   then it began anew, so a new five-year limitation period began

18   to run.

19         And then accordingly, it is my opinion that the

20   limitation period expired on the 25th of August, 2012.

21   Q.    Okay.  And did you see any other interrupting acts or

22   events in the file, other than the arrest warrant?

23   A.    No.

24   Q.    Okay.  Now, you mentioned the arrest warrant.

25         Is that the August 25th, 2007, document that's

1  entitled Court Ruling in this case?

2  A.   That's accurate.

3  Q.   Okay.  And are you familiar with those kinds of documents

4  in Estonian practice?

5  A.   Oh, yes.  I've seen many of them.

6  Q.   All right.  And if you could turn --

7          MR. JIMENEZ:  Your Honor, he's got a -- just to let

8  the Court know, I showed Mr. Corsmeier this notebook he's got

9  up there.  It's just to refresh his memory.  It's got his

10 declarations and the arrest warrant and those things.

11         THE COURT:  All right.

12 BY MR. JIMENEZ:

13 Q.   If you could turn to the arrest warrant, and could you

14 read the Bates number that's attached to the bottom?

15 A.   It's 56.

16 Q.   So it's Rotko 56?

17 A.   Rotko 56, yes.

18 Q.   Attached to the government's complaint?

19 A.   Yes.

20 Q.   Okay.  Is that -- is that the arrest warrant that you're

21 talking about?

22 A.   This is the arrest warrant, yes.

23         THE COURT:  Is there a way to describe that so that I

24 can find it?

25         MR. JIMENEZ:  Yes.  It's -- if you go to the

1  complaint of the government, the initial complaint and the

2  attachments to it, it's -- there's -- there are Bates -- the

3  exhibits are Bates numbered, and it's Rotko 56.

4          THE COURT:  All right.  Thank you.

5          MR. JIMENEZ:  Yes.

6          THE COURT:  I see it.

7  BY MR. JIMENEZ:

8  Q.    And that's approximately four pages?

9  A.    Approximately four pages, yes.

10 Q.    Could you just describe that document and tell us what it

11 consists of.

12 A.    Okay.  I'll tell you.

13        The -- well, at the very top, you have the criminal

14 case number.  Then you have court ruling.  In Estonian it would

15 be *kohtumäärus*.

16        The reason why they say court ruling here is that in

17 Estonia, arrest warrants are issued by ruling, issued by a

18 court, a ruling.

19        Then you have the style of cause or what we call the

20 form data:  the court, the date, and time of making the ruling,

21 etc., etc.

22        You also see persons participating in the hearing,

23 and it appears there are none, but it -- but I believe the

24 prosecutor participated, but it means that there were no other

25 parties.

1    Then you see the resolution.  Resolution is what the

2 Court ordered.  The resolution says to arrest fugitive suspect

3 Aleksandr Rotko, so on and so forth.

4    Then you have the brief explanation of the appeals

5 procedure.

6    And then you have basically the prosecutor's case

7 against Mr. Rotko.  This is what the prosecutor argued.

8 Q.   And how long -- how long does that prosecutor's case go

9 for?

10 A.   It goes -- it goes on, on the second page, the third page,

11 the fourth page.

12    And then on the -- on the fifth page, the final bit

13 of the ruling, the final paragraph --

14 Q.   The last paragraph?

15 A.   The last paragraph is the Court's determination.

16 Q.   And that's --

17 A.   It's what the Court found.

18 Q.   And that's on Rotko 40 -- I'm sorry, 50 -- 60?

19 A.   60.

20 Q.   60.

21 A.   Yes.

22 Q.   Okay.  Now, you used an Estonian word there in your answer

23 for the court ruling.

24 A.   Yes.

25 Q.   Could you spell that?

1    A.    It's k-o-h-t-u-m-ä-ä -- now, these are special As.  Both
2    of these As have dots on them -- r-u-s.
3    Q.    And I forgot to ask you this, but are you fluent in
4    Estonian?
5    A.    I am, yes.
6    Q.    And how is that?
7    A.    Estonian is my first language.
8    Q.    And when did you learn English?
9    A.    I've been speaking English all my life.  I think I started
10   speaking English when I was four.
11   Q.    All right.  And in your practice do you -- back in
12   Estonia, do you primarily speak or deal in Estonian?
13   A.    I suppose it can be -- it can be said I speak 70 percent
14   Estonian, 30 percent English.
15   Q.    Okay.  Got it.
16         All right.  Let's go back to the arrest warrant.
17   A.    Yes, sir.
18   Q.    And there is -- so turning to Rotko 60, where you left
19   off, which is the last paragraph --
20   A.    Yes.
21   Q.    -- there is a -- the -- I think it's the third-to-last
22   sentence begins, "A. Rotko has not responded to summons and has
23   repeatedly failed to appear at the body conducting the
24   proceedings."
25   A.    Yes, I see that.  Yeah.

1    Q.   Do you see a summons anywhere in this file --

2    A.   No.

3    Q.   -- that was directed at Mr. Rotko?

4    A.   No.

5    Q.   All right.  Based on your review of the file, have you

6    seen any attempt to serve a summons on Mr. Rotko?

7    A.   No.

8    Q.   Is there any explanation in this arrest warrant for a

9    summons that was actually served on Mr. Rotko?

10   A.   No.

11   Q.   Okay.  Is there -- is there a statement, any statement by

12   the prosecutor, in this document as to a summons being served

13   or not served on Mr. Rotko?

14   A.   No.  They -- they said that they did -- it's my

15   recollection that they said that they didn't even attempt to

16   serve him a summons.

17   Q.   And where is that in the -- in the document?

18   A.   I'll have to look for it, because I don't -- I don't have

19   any markings here.

20   Q.   Let me direct your attention to page Rotko 58 --

21   A.   Yes.

22   Q.   -- towards the bottom of the page.

23   A.   Yes.

24   Q.   Is -- does that help you?

25   A.   Yes.  That's what I'm -- that's what I'm trying to --

1  trying to read.

2      Yeah, there it is.  The prosecutor says here that "It

3  has not been possible to issue an invitation to him."

4      Now, the reason why they say invitation in this

5  context -- it's not an accurate translation.  What they

6  actually mean here is summons, because in Estonian the summons

7  is *kutse*.  I'll spell that for you.  It's k-u-t-s-e.

8      And it can also mean an invitation.  To invite

9  someone is to *kutsuma*.  So it can also mean an invitation, and

10 the translator here has made a -- it's an inaccurate

11 translation.

12 Q.   All right.

13 A.   So what they're actually saying here is that it has not

14 been possible to summon him, and there is no way to identify

15 the location of Aleksandr Rotko, and Aleksandr Rotko has been

16 declared fugitive.

17 Q.   So do you have -- do you have an explanation, if any, why

18 the judge in this case said that Rotko has not responded to

19 summons?

20 A.   Based on my own experience in criminal procedure, it's a

21 template ruling.  This is what they usually say.

22      So, I mean, usually the prosecutor will tell the

23 judge that "We tried to summon him.  He didn't appear.  Failed

24 to appear several times," and now this is what the judge

25 actually says here, although in this case they have failed to

1  note that the prosecutors didn't actually argue it.

2  Q.    Okay.  So let me turn to the prior page, 59, Rotko 59.

3  A.    Uh-huh.

4  Q.    And there's a statement in this section that has been

5  accorded by the government in its response to Mr. Rotko's

6  motion for bail, and it's at the bottom of page 59, Rotko 59.

7  A.    Uh-huh.

8  Q.    And it says, "On the assessment of the total of the above,

9  it has been proven that Aleksandr Rotko and Olga Kotova are

10 aware of the pending criminal case against them and are

11 deliberately avoiding the criminal proceeding."

12 A.    Uh-huh.

13 Q.    Is that -- is this a finding by the Court in the arrest

14 warrant?

15 A.    No.

16 Q.    Okay.  What is this?

17 A.    This is the -- this is the prosecutor's argument.

18 Q.    Okay.  So this is in the portion where the prosecutor

19 is --

20 A.    Yes.

21 Q.    -- presenting to the --

22 A.    Yes.

23 Q.    -- Court.

24 A.    Yes.

25         THE COURT:  And do you conclude that because of what

1   is stated in the paragraph above where it says, "The

2   prosecutor's office is of the view"?

3        THE WITNESS:  That is -- yeah, that's also one of

4   the -- one of the arguments made by the prosecutor.

5        And it begins by setting out the prosecutor's -- the

6   prosecutor's arguments, and then it concludes, in the final

7   paragraph, with what the Court has determined, what the Court's

8   determination is.

9        So the Court has reviewed all of what was presented

10  to it, and then by saying, "The Court, after hearing the

11  prosecutor's explanations accompanying the request and having

12  reviewed and submitted -- the submitted material considers

13  that . . ."  Right?

14       So anything prior to that would be the prosecutor's

15  argument, and the last paragraph is the Court's determination.

16       It would be useful if they -- if they had formatted

17  the ruling in the way that they mostly do these days, is that

18  they separate them out by bold headings.

19       So usually they separate them out and say, "Well,

20  this is the prosecutor's position," one bold heading, and then

21  it would be followed by another bold heading which is the

22  Court's position.

23       But in this case you have to look for it.

24  Q.   Okay.  And then it -- going back to page 60 where the

25  judge has what you described as a template ruling, what type of

1  ruling is this?  Is this a ruling that he has absconded?  Is it

2  a ruling to issue an arrest warrant?  Is it any other kind of

3  ruling?  What kind of ruling is it?

4  A.   It's a ruling to issue an arrest warrant.

5  Q.   Okay.

6  A.   It is not a final determination by any means of whether or

7  not Mr. Rotko absconded.

8          THE COURT:  An arrest warrant for what?

9          THE WITNESS:  For his arrest.

10          THE COURT:  For what though?  For doing what?  For --

11          THE WITNESS:  Well, he's a suspect, and the -- and

12  the reason why -- why you would arrest someone in Estonia, you

13  have two grounds:

14          Ground No. 1, he might abscond and not make himself

15  available for the proceedings.

16          Ground No. 2 is that he might continue committing

17  additional crimes, right?

18          And in this case what the judge has said, "Such facts

19  provide a basis to assume that the suspect may, while remaining

20  at large, continue avoiding the criminal proceedings."

21          So the arrest warrant has been made for the purpose

22  of avoiding that Mr. Rotko avoids criminal proceedings, so that

23  he's made available for the proceedings, is the reason why the

24  arrest warrant for issued.

25          THE COURT:  So is it for absconding?

1    THE WITNESS:  It's not for absconding.  It's to

2  prevent absconding.

3    THE COURT:  Okay.

4  BY MR. JIMENEZ:

5  Q.   And that -- that sentence, "Such facts provide a basis to

6  assume that the suspect may, while remaining at large, continue

7  avoiding criminal proceedings.  Therefore, the Court considers

8  here," is it your view that that is a forward-looking type of

9  determination?

10  A.   The determination would be based -- under the Estonian

11  law, it would be based on a forward-looking determination.

12  Q.   Okay.

13  A.   That's -- that's the reason why you would want to arrest

14  someone.

15  Q.   All right.  Now, in this case Estonia claims that the

16  statute -- going back to the statute of limitations, that it

17  has been -- that it has been extended from 5 to 15 years.

18    Is that the proper way to look at it?

19  A.   It's not the proper way of looking at it, no.

20  Q.   Okay.

21  A.   The way that the limitation period actually works is that,

22  as I said before, firstly, it starts to run.  Then, if you can

23  justifiably deem a person to have absconded, it pauses.  And it

24  can pause for a great deal of time until it starts to run

25  again.

1    What the 15 years comes from -- what the 15 years

2  comes from is that once 15 years have passed from the

3  commission of the last act, the time won't start to run again.

4  So effectively, it's the maximum.

5    But it doesn't have to be 15 years.  It can be -- it

6  can be shorter --

7  Q.   I understand.

8  A.   -- if the person turns up earlier, for example.

9  Q.   So it's not that there's an extension to 15 years, if I

10  understand your testimony correctly.  It is that the maximum

11  amount of time that can elapse is 15 years.

12  A.   Yes.

13  Q.   Okay.

14    THE COURT:  Can I ask one other question?

15    THE WITNESS:  Yes.

16    THE COURT:  Because it -- I don't know where you're

17  going next.

18    But you said that the Court's finding -- the Court's

19  findings are in the last paragraph, Bates No. 60.

20    THE WITNESS:  Yes.

21    THE COURT:  All right.  What about -- what about this

22  statement on page 58, Bates No. 58, excuse me.

23    Do you see where it says, "Aleksandr Rotko does not

24  have a criminal record"?

25    THE WITNESS:  Yes.

1    THE COURT:  All right.  Then the next sentence says,

2    "The prosecutor seeks permission to arrest the suspect."

3    THE WITNESS:  Uh-huh.

4    THE COURT:  And then it says, "During the

5    proceedings, it appears that Aleksandr Rotko is avoiding the

6    criminal proceedings and hiding his location."

7    THE WITNESS:  Yes.

8    THE COURT:  I read that as the Court summarizing what

9    the proceedings showed prior to providing the prosecutor's

10   point of view.

11   Is that how you read it?

12   THE WITNESS:  No.  No.

13   THE COURT:  All right.  How do you read it?

14   THE WITNESS:  The way I read it is that the

15   prosecutor is making an argument for the -- for seeking

16   permission to arrest Mr. Rotko.  And the basis for that is that

17   the prosecutor has found that it appears that Aleksandr Rotko

18   is avoiding the criminal proceedings and hiding his location.

19   THE COURT:  Okay.  And so --

20   THE WITNESS:  You don't -- you don't mix -- they

21   usually don't mix the Court's findings and the prosecutor's

22   arguments.  The prosecutor's arguments are contained in one

23   block, and then the Court's findings are contained in the other

24   block.

25   This is -- this is how I have always seen and

1  understood Estonian rulings to be.

2          THE COURT:  All right.  What I'm -- and let me ask

3  you another question, then, to follow up on that.

4          If you go back to Bates No. 60 where the Court is

5  making its findings --

6          THE WITNESS:  Yes.

7          THE COURT:  -- you -- it -- four lines down, a

8  sentence starts, "The criminal case materials show . . ."

9          Do you see that sentence?

10         THE WITNESS:  Yes.

11         THE COURT:  ". . . that A. Rotko is aware of the

12 criminal proceedings, but in spite of this he has realized his

13 property located in Estonia and has probably left the Republic

14 of Estonia"?

15         THE WITNESS:  Yes.

16         THE COURT:  And then it says, "In the criminal case

17 has been gathered enough factual material in which there are

18 grounds to deem the suspicion justified"?

19         THE WITNESS:  Yes.

20         THE COURT:  Isn't that a finding that he -- not

21 necessarily looking forward, but at that point in time that the

22 order -- or the hearing was and prior to it, that he had

23 absconded?

24         THE WITNESS:  No.  It means that the Court finds it

25 has been credibly demonstrated, not proven, not finally proven,

1    but credibly demonstrated that this has happened.

2            So when you seek an arrest, there are two elements in

3    Estonia, two elements to what an Estonian court must determine.

4            Firstly, the Estonian court must determine whether

5    the suspicion is justified at all.  You see here the judge

6    says, "In the criminal case, having gathered enough factual

7    material on which there are grounds to deem the suspicion

8    justified."  That's one element.

9            And the second -- the second element is about the

10   risk of absconding, yes.  But he may have already left Estonia,

11   so we -- we need him for the purpose of these proceedings.

12           THE COURT:  So you're drawing a distinction between

13   credibly demonstrated --

14           THE WITNESS:  Yes, yes, and proven.

15           THE COURT:  -- and proven.

16           THE WITNESS:  Yes.

17           THE COURT:  All right.

18           THE WITNESS:  And this is the -- this is a

19   longstanding practice of the Estonian Supreme Court as well,

20   that you don't -- the standard is completely different.

21           The standard in determining a person's guilt, which

22   is the element -- all elements of the crime, is beyond

23   reasonable doubt.  But here the prosecutor only has to make a

24   credible demonstration --

25           THE COURT:  So --

1         THE WITNESS:  -- and it's done ex parte.

2         THE COURT:  -- like probable cause versus having to

3 prove something beyond a reasonable doubt?

4         THE WITNESS:  I only have a layman's understanding of

5 what probable cause is.

6         THE COURT:  Yeah, well, it's probably as good as any.

7         THE WITNESS:  But -- but I suppose -- I suppose yes.

8         So a credible demonstration of the suspicion, why

9 they believe Mr. Rotko has committed these offenses, and then a

10 credible justification or credible demonstration of why they

11 think an arrest is warranted, why they -- why -- whether he

12 would abscond from the proceedings or whether he will continue

13 committing criminal offenses.

14         THE COURT:  And just out of curiosity, if it were

15 proved, not just reasonably demonstrated or proved that he

16 absconded, would that in and of itself -- and this is just -- I

17 think this is outside of what we're doing.  I'm just curious.

18         Would that in and of itself be a crime?

19         THE WITNESS:  No.

20         THE COURT:  Okay.  All right.

21         Go ahead.  I'm sorry.

22         MR. JIMENEZ:  Thank you.

23 BY MR. JIMENEZ:

24 Q.  So going to the absconding point, what is necessary --

25 whose burden would it be to show that Mr. Rotko absconded?

1  A.    It would be the burden of the state, the prosecutor.

2  Q.    Okay.  And are there -- are there different types of

3  absconding?

4  A.    There are, yes.  Actually, if you -- if you look at the --

5  if you look at the Supreme Court decision that I gave you as an

6  exhibit to my first legal opinion -- it's Exhibit 11 -- there

7  are two types.

8         There are -- there's active absconsion, and then

9  there's passive.

10        THE COURT:  Where are we going to find this?

11        THE WITNESS:  It's -- well, it's the same -- it's the

12  same document the U.S. attorney referred to.  It's --

13        MR. JIMENEZ:  The Estonian Supreme Court opinion

14  attached to --

15        THE WITNESS:  Yeah.

16        THE COURT:  So that's in -- for our purposes it's

17  document 17, Exhibit 14?

18        Is that right, Mr. Corsmeier?

19        MR. CORSMEIER:  Yes, Your Honor, page 50 is the

20  English translation.

21        THE COURT:  Yes, page 50 of document -- of the

22  attachments to document 17, 17-14.

23        All right.  Go ahead.

24        THE WITNESS:  And -- if you look at Article 8(2),

25  here the Supreme Court says, second sentence, "Absconding from

criminal proceedings may, in principle, lay in both acts and

omissions."

BY MR. JIMENEZ:

Q.    Okay.

A.    And they also go on to say that "If the body conducting

proceedings finds that absconding from criminal proceedings

lies in omissions, the omitted acts of conduct that are

required from the person and that can be considered as

absconding must be indicated."

Q.    Okay.

A.    Right?

Now, in the case of active absconsion, for example,

it would -- active absconsion can mean, for example, that

you -- you're at your house and you observe from the window

that the police are coming, and then you run out the back door

and you run away.  That is active absconsion.

Living under a fake ID would be -- would be active

absconsion.

But passive absconsion or absconding by omission can

only be the case when a person fails to do something that is

required of them.  And under the Estonian Code of Criminal

Procedure, there are only two things -- there are only two

things that a suspect is required to do.

They have a duty to appear once summoned and then

subject themselves to the procedural acts, for example, be

1    interrogated.

2            These are the only two things that a suspect, under

3    Estonian criminal procedure law, must do, and an omission can

4    lie in either -- in failing to do either of those.

5    Q.    So going -- going back to a different document now, which

6    I mentioned earlier, which is the subsequent letters or

7    responses by the Estonian prosecutor's office that were filed

8    by the government in this case -- one is dated December 16th,

9    and the second is dated December 17th, 2009.

10   A.    Yes.

11   Q.    I'm going to direct your attention to the first one, which

12   is December 16th, which is the letter that's addressed -- or

13   that generally covers this topic that we're on now, the statute

14   of limitations.

15           Does -- does the Estonian prosecutor take the

16   position in this letter as to what type of absconding they

17   believe Mr. Rotko committed --

18   A.    Yes.

19   Q.    -- whether it's active or passive?

20   A.    Yes.  It's absolutely clear here that in the -- in this

21   case the prosecutor's position is that it's absconding by

22   omission.

23   Q.    And what leads you to say that?

24   A.    I'm trying to turn to the English-language version of

25   the --

```
1              THE COURT:  Yeah.  Is there a Bates number for that?
2              MR. JIMENEZ:  Your Honor, it's not Bates numbered,
3   but it is part of --
4              MR. MULLINS:  It's document 27.
5              MR. JIMENEZ:  Document 27, which were the letters
6   that -- I believe there was a notice of filing by the U.S.
7   Attorney's Office of the Estonian prosecutor's letters.
8              THE COURT:  Let me just find that.
9              THE WITNESS:  There are -- there are two places here,
10  if you look at page 2, that --
11             MR. JIMENEZ:  Wait.  Hold on.  Hold on.
12             THE WITNESS:  Yes.  Sorry.
13             THE COURT:  Do you see some -- page 2 of which
14  letter?
15             I have it now.
16             MR. JIMENEZ:  The December 16th letter, Your Honor.
17             THE WITNESS:  December 16th.
18             THE COURT:  December 16th?
19             THE WITNESS:  On page 2, the first and second
20  paragraphs.  First paragraph:  "Various measures have been
21  taken to capture him but have so far failed to produce
22  results."
23             I don't understand what this means because I don't
24  know what measures have been used to capture him.
25             But then he follows:  "In addition, Aleksandr Rotko
```

1  himself has not volunteered to appear before the body

2  conducting the proceedings in order to perform procedural

3  acts."

4          Now, that's omission.

5  BY MR. JIMENEZ:

6  Q.   Okay.

7  A.   However, Mr. Rotko wasn't required to do that.

8  Q.   Why do you say that he was not required to do that?

9  A.   Because there was no summons.

10 Q.   Okay.

11 A.   There would have had to be a summons in order for

12 Mr. Rotko to be compelled to appear.

13 Q.   If you are a suspect in Estonia or -- well, under Estonian

14 law or in an Estonian criminal investigation, if you are a

15 suspect, do you have an obligation to voluntarily appear?

16 A.   No.  I mean, that -- and this has been explained, again,

17 by the Estonian Supreme Court in Case No. 3-1-1-43-10

18 [verbatim], which I also referred to in my -- in my legal

19 opinion, that you are not under obligation to cooperate in

20 respect of your own prosecution.  You're only required to do

21 what you're told to do.

22          So essentially -- I'll give you another example.  If

23 you're at your house and you know that there are criminal

24 proceedings against you and you see the police going to your

25 neighbor house every day looking for you -- you simply look out

1  the window, do nothing -- then that's not absconding,

2  basically.  This is what it is.

3  Q.    So why would you be legally obligated to appear -- or what

4  would be required for you to appear?

5  A.    If they issue a summons.

6  Q.    And how is that done?

7  A.    And in the case of -- in the case of suspects who the

8  police believe might be a flight risk or might be a risk for --

9  might be at risk of absconding, it would have to be a written

10  summons.

11  Q.    Okay.

12        THE COURT:  Let me ask you a question about this.

13  Going back to the letter --

14        THE WITNESS:  Yeah --

15        THE COURT:  I think, if I had the right letter -- I

16  may have the December 12th letter.  It has the --

17        MR. JIMENEZ:  Oh, Your Honor, it has two dates on it.

18        THE COURT:  Oh, I see.  16 -- ours and yours.  Okay.

19        MR. JIMENEZ:  Yeah.

20        THE COURT:  Well, that's the same letter then.

21        MR. JIMENEZ:  Yeah.

22        THE COURT:  But if you -- if you look at the second

23  page of that letter that you were referring to earlier --

24        THE WITNESS:  Yes.

25        THE COURT:  -- do you see -- it would be the second

1 full paragraph: "In a situation where the suspect begins

2 absconding from criminal proceedings, the limitation period is

3 interrupted."

4             THE WITNESS: Yes.

5             THE COURT: All right.

6             THE WITNESS: Interrupted? No, that's wrong. It

7 would suspend.

8             THE COURT: All right. ". . . until the person is

9 captured or appears . . ."

10             If I'm -- if I'm understanding what you're saying, if

11 someone absconds by omission, then that has to be proved with a

12 summons, that they were summonsed; in other words, they knew

13 about the proceedings and were required to be somewhere.

14             THE WITNESS: Not only knew but knew that they were

15 required to be somewhere and then failed to appear.

16             THE COURT: All right. And so when this letter is

17 being written, is -- does the person who's writing this letter

18 disagree with your view of that or have a different

19 interpretation of that?

20             Because they're saying that this -- what has happened

21 and what Mr. Rotko has done is -- they're saying interrupted.

22 You're saying -- you said it should have said suspended.

23             But do you see what I'm getting at? In other words,

24 from what I'm hearing you say, what happened here would not

25 interrupt or suspend the statute of limitations.

1          Am I right about that?

2          THE WITNESS:  This is -- this is only a general

3   statement as to what the law says.

4          THE COURT:  Well, it says, "In a situation where" --

5   I read it as it's following the paragraph prior to it.

6          THE WITNESS:  Yes.

7          What the prosecutor says here is, "In a situation

8   where the suspect begins absconding from criminal proceedings,

9   the limitation of the offense -- the limitation period of the

10  offense is interrupted until the person is captured or appears

11  before the body conducting the proceedings."

12         THE COURT:  Right.  And then two sentences down it

13  says, "Therefore, in this case the limitation period should be

14  calculated starting from the date of the completion of the

15  acts, which according to the suspicion was no later than six

16  months [verbatim] by adding 15 years thereto."

17         Do you see --

18         THE WITNESS:  Yes, but that is wrong.  It won't be 15

19  years.

20         THE COURT:  Well, that's my -- that's my point.  You

21  disagree with that statement.

22         THE WITNESS:  It's 15 years -- 15 years is wrong

23  because it's 5 years.

24         THE COURT:  Yeah.  I'm not asking my question well.

25         I'm thinking that you and the prosecutor are looking

1  at the same thing that happened --

2          THE WITNESS:  Yes.

3          THE COURT:  -- and the prosecutor's saying that

4  should extend the limitation --

5          THE WITNESS:  Yes.

6          THE COURT:  -- and you're saying it doesn't.

7          Am I right?

8          THE WITNESS:  It doesn't.  Yes.

9          THE COURT:  Are you and the prosecutor interpreting

10 that differently?

11         THE WITNESS:  We're interpreting the -- Mr. Rotko's

12 absconsion differently.

13         THE COURT:  Yeah.  That's what I --

14         THE WITNESS:  They --

15         THE COURT:  That's what I'm asking.

16         THE WITNESS:  They consider -- they consider

17 Mr. Rotko to have absconded.  It is my firm belief that he

18 didn't.

19         THE COURT:  All right.

20 BY MR. JIMENEZ:

21 Q.  Let me ask you about that paragraph that Judge Klindt was

22 just asking you about.

23         In the -- in the -- towards the end of -- or the

24 middle of the paragraph, do you see where it says, "A. Rotko

25 was aware of the criminal proceedings against him, but instead

1  of contacting the body conducting the proceedings, he absconded

2  from the proceedings"?

3  A.   Yes.  Yes.

4  Q.   If Mr. Rotko was a suspect and if he was aware of the

5  criminal proceedings against him, did he have an obligation to

6  contact the body conducting --

7  A.   Absolutely not.

8  Q.   -- the proceedings?

9  A.   Absolutely not.

10  Q.   Okay.

11  A.   What it says here, it makes absolutely no sense because

12  they're sort of saying that absconding and contacting the

13  police voluntarily are the opposite ends of the same thing --

14  right? -- but that's not true.

15        Knowing that you're being summoned and then not

16  appearing, that's absconding.

17  Q.   Okay.

18  A.   But knowing that there are criminal proceedings, even if

19  that's -- that were proven, and not contacting the police is

20  not absconding.

21  Q.   Okay.

22        THE COURT:  But the prosecutor's taking a different

23  view here, it looks to me like --

24        MR. JIMENEZ:  Uh-huh.

25        THE COURT:  -- than you're taking.

```
 1            THE WITNESS:  It seems so, yes, but the
 2   prosecutor's -- the prosecutor's view is, again, different from
 3   the view of the Supreme Court --
 4            THE COURT:  All right.
 5            THE WITNESS:  -- and I refer to the opinion of the
 6   Supreme Court.
 7            THE COURT:  All right.
 8   BY MR. JIMENEZ:
 9   Q.   So then the next sentence says, "Thus, the limitation
10   proceeding" -- no.  I'm sorry.
11            "Thus, the limitation period of the criminal offenses
12   was suspended, and it cannot be argued that in the meantime, he
13   has made any efforts of his own to interrupt the suspension."
14   A.   Uh-huh.
15   Q.   What does -- does -- what does that indicate to you, the
16   "Thus, the limitation was suspended" in the -- in other words,
17   what is the prosecutor --
18   A.   The prosecutor is saying --
19   Q.   -- saying in this letter?
20   A.   -- that because Mr. Rotko didn't contact the body
21   conducting the proceedings, that is, the police --
22   Q.   Yes.
23   A.   -- the limitation period was suspended.
24   Q.   Got it.
25   A.   That's what he's saying.
```

1  Q.   All right.

2           THE COURT:  And you're saying that's not the law.

3           THE WITNESS:  That's wrong as a matter of the law.

4           THE COURT:  All right.

5           THE WITNESS:  Patently wrong.

6  BY MR. JIMENEZ:

7  Q.   So let me ask you some general questions about absconding.

8           Is being outside of the -- of Estonia itself an act

9  of absconding --

10 A.   No.

11 Q.   -- if you're a suspect?

12 A.   No.

13 Q.   Is selling your house an act of absconding?

14 A.   No.

15 Q.   Okay.  Is -- if there's a summons -- if there's an attempt

16 to serve a summons on your wife or a friend, is -- does that

17 contact -- and not on the suspect, Mr. Rotko, is that

18 absconding --

19 A.   No.

20 Q.   -- by Mr. Rotko?

21 A.   No.

22 Q.   Okay.  Now, going back to the same paragraph we were just

23 on, the prosecutor notes -- and this -- this we do have a

24 docket entry cite for.  "It is important to note that the

25 Tallinn Circuit Court's ruling of 10 October 2016 (Rotko

1  attachments docket entry 17-14 at page 73) contains a reference

2  to the fact that O. Kotova, A. Rotko's wife, has signed a

3  document on December 2nd, 2007, in which she explicitly states

4  that every measure has been taken against them as defendants,

5  including such pertaining to criminal proceedings."

6  A.    Uh-huh.

7  Q.    Have you reviewed that -- page 73 of that document that's

8  referenced there?

9  A.    The Tallinn Circuit Court's ruling, yes, I have.

10  Q.    Okay.  Could you explain what that ruling was about?

11  A.    That ruling was about the arrest of Ms. Kotova.

12  Q.    Okay.  And what happened to Ms. Kotova, generally?

13  A.    Generally, as far as I know, Ms. Kotova left Estonia at

14  the end of 2006, or in the autumn of 2006, and left to Russia.

15  Q.    Okay.

16  A.    Then stayed in Russia for a wee while, then traveled to

17  Canada and subsequently to the United States, I believe.

18        And then in 2016 she traveled to Helsinki, Finland,

19  where she was apprehended at the airport, detained by the -- by

20  Finnish police, extradited to Estonia, held by the Estonian

21  police, interrogated, and then the criminal proceedings were

22  terminated in exchange for the payment of 20 -- 32,000 euros.

23  Q.    Okay.  So is it accurate to say that she settled or came

24  to an agreement with the prosecutor's office to terminate the

25  criminal proceedings?

1   A.    It's not a settlement.  It's not correct to use the word

2   "settlement."

3           But what it means is that the prosecutor has formed a

4   view on the -- on the activities of Olga Kotova, and the

5   prosecutor himself finds the crimes have been committed, or

6   rather, the prosecutor finds that the facts of the case are

7   clear.

8           And then, in return for payment of the money and in

9   return for Olga Kotova's agreement not to proceed to court, not

10  to have the case tried in court, the case would simply be

11  terminated.

12          It's not a conviction, and it's not an acquittal.

13  It's simply a termination of the case based on the fact that

14  the prosecutor finds the case to be clear.  There's no public

15  interest -- that's also another aspect.  There's no public

16  interest in pursuing the case any further, and the payment of

17  the money.

18  Q.    All right.  And this court ruling was in her case in

19  Estonia.

20  A.    Yes.

21  Q.    Okay.  And could you turn to that page and describe to us

22  what is referred to there?

23  A.    I don't -- I don't believe I have this -- this ruling with

24  me.

25          MR. JIMENEZ:  Your Honor, if I could just have a

1   moment to find it?

2      (Brief pause.)

3        THE COURT:  Mr. Jimenez, can you take those papers

4   off the microphone?  It's right there.  It blasts the court

5   reporter's --

6        MR. JIMENEZ:  Sorry.

7      (Brief pause.)

8        MR. JIMENEZ:  I believe it's Rotko 194 is where --

9   where I'm at.

10      (Brief pause.)

11        MR. JIMENEZ:  Your Honor, I can't find this -- I

12   can't find it right now for the moment, but I will come back to

13   that because --

14        THE WITNESS:  Wait.  I just remembered it might be --

15   it might be appended to my -- to my legal opinion.

16        MR. JIMENEZ:  I was trying to find the actual portion

17   of the exhibit to the government's complaint, but I can't find

18   that particular page right now.

19        THE WITNESS:  Hang on.  I might -- I might find it.

20      (Brief pause.)

21        THE WITNESS:  I'm terribly sorry.  I found it.  It's

22   an exhibit to my legal opinion, yes.

23   BY MR. JIMENEZ:

24   Q.   Okay.  And what exhibit number is that and which -- is

25   that your first legal opinion?

1   A.   It's my first legal opinion, Exhibit 14.

2   Q.   Oh, yes.

3        And what -- what page are you on?

4   A.   It contains no page numbers, but I'm at -- well, say, for

5   example, I'm at paragraph 7, The Position of the Circuit Court.

6   Q.   Okay.  That paragraph 7 is on Rotko 192.

7        And is there a reference in this proceeding -- or,

8   I'm sorry, in this ruling, to -- and I'm directing your

9   attention to 194, which I had before.  I just wasn't focusing

10  on it.

11       In the middle of the page it says, "The Republic of

12  Estonia is currently using all coercive measures to eliminate

13  defendants."

14       And then it says, "Thus, O. Kotova specifically

15  stated that she is aware of the ongoing criminal proceedings

16  and the fact that the investigator has tried to contact her two

17  relatives."

18  A.   I see that, yes.

19  Q.   Yeah.  What is that referring to?  Which is the same thing

20  that the prosecutor refers to here in his December 16th letter.

21  A.   What is that referring to, which proceedings, or what is

22  the --

23  Q.   Yes.  When it says that "The circuit court attaches great

24  importance to a copy of an additional request submitted by

25  Verest AS, Agrin, and BPV."

1  A.    Uh-huh.

2  Q.    Are you familiar with that?

3  A.    I'm familiar with those companies, yes.

4  Q.    Okay.  How are you familiar with those companies?

5  A.    Because they are relevant to the other legal opinions that

6  I have been giving to the counsel for ELA USA.

7  Q.    Okay.  And that's in the international arbitration?

8  A.    That's in the international arbitration case, yes.

9  Q.    Okay.  So you're also assisting those entities?

10 A.    Yes, as I have outlined in my opinion.

11 Q.    Okay.  So when it says Point II, and it talks about --

12 that Rotko's wife signed a document in which she explicitly

13 states that every measure has been taken against them as

14 defendants --

15 A.    Uh-huh.

16 Q.    -- what is your understanding of what that is referring

17 to?

18 A.    It refers to the companies Verest, Agrin Partion, BPV,

19 Defendants I, II, and III.

20 Q.    So it's not a reference to Mr. Rotko or to Ms. Kotova.

21 A.    No.

22 Q.    It's a reference to Verest, Agrin, and BPV, which are

23 referred to as Defendants I, II, and III.

24 A.    Yes.  And the reason why I think that is you always have

25 to look at -- in order to determine what something means, you

1   have to also look at the Estonian version of the ruling.

2          And by defendants here, Olga Kotova refers to --

3   refers to an Estonian word *kostji*.  It's k-o-s-t-j-i.  And

4   that's not a criminal defendant.  That's a civil defendant.

5   Q.   Okay.  So --

6   A.   And they were.  These companies were civil defendants in a

7   civil case between those companies and the Republic of Estonia.

8   Q.   Okay.  So looking at this court -- the -- looking at page

9   73 of your -- of the exhibits to your declaration, "The Court

10  attached great importance to a copy of an additional request

11  submitted by those three companies in the civil case against

12  them as defendants," correct?

13  A.   Yes.

14  Q.   And does -- does that refer in any way to Mr. Rotko?

15  A.   No.

16  Q.   Okay.  Does that -- does that have anything to do with

17  Mr. Rotko?

18  A.   No, it didn't because it wasn't -- it wasn't an

19  application submitted by Mr. Rotko.

20  Q.   Okay.  Got it.

21         Now, is -- in your view, is there anything in this

22  record showing that Mr. Rotko was -- we talked about the

23  Estonians -- let me start again.

24         We talked about the fact that the Estonian December

25  16th letter focuses on absconding by omission, by not

1  volunteering to appear.

2  A.   Yes.

3  Q.   Is there anything in the record that shows you that there

4  was an active absconding by Mr. Rotko that either interrupted

5  or suspended the --

6  A.   No.  No.  I don't see any of it.

7       And the reason why I don't -- why I have formed the

8  expert opinion that I don't see any of it is that, according to

9  my understanding, Mr. Rotko came to the United States, where he

10  was a permanent resident, and he lived here openly all the

11  time.

12       He didn't attempt to hide himself.  He was living

13  openly.  He was paying his taxes.  He had -- he had his -- he

14  had disclosed his address, as required under your laws, I

15  believe.

16  Q.   Is there anything in the record showing that the Estonian

17  government knew that Mr. Rotko was in the United States?

18  A.   Certainly.

19  Q.   Okay.

20  A.   There is -- there is -- there is an interrogation report

21  of Ms. Olga Kotova -- oh, sorry, Olga Novoseltseva --

22  Q.   How do you spell Novoseltseva?

23  A.   Novoseltseva is N-o-v -- no.  It's a Russian name.  I'm

24  sorry.  N-o-v-o-s-e-l-t-s-e-v-a, Novoseltseva.

25  Q.   Okay.  Can we call her Olga N. for short?

1  A.   That would make it easier, yes.

2  Q.   Okay.  So you said there was a witness statement by -- or

3  an interrogation statement by Olga N.?

4  A.   Yes, on the 20th of February.  And on the 20th of

5  February, Olga N. told the police that according to her

6  knowledge, the -- Mr. Rotko was probably living in the United

7  States.

8  Q.   Is there anything in the record showing that the Estonian

9  government did anything --

10  A.   No.

11  Q.   -- in response to that information?

12  A.   No.

13  Q.   Is there anything in the record you've read -- well, let

14  me ask a different question.

15        What is -- was there a mechanism to serve Mr. Rotko

16  while he was living in the U.S.?

17  A.   Yes.  It is my opinion that the Estonian government, the

18  Republic of Estonia, might have availed itself of the

19  provisions contained in the Mutual Assistance Treaty to serve a

20  summons, for example, on Mr. Rotko under that treaty.

21  Q.   And is there any indication in the file you've read that

22  between August 25, 2007, when the arrest warrant was issued,

23  and August 25, 2012, five years later, that Estonia tried to

24  serve a summons?

25  A.   No.

1  Q.   Is there any indication in the file that between the date

2  of the arrest warrant, August 25, 2007, and five years later,

3  August 25, 2012, that Estonia did anything at all --

4  A.   No.

5  Q.   -- to further this criminal case?

6  A.   No.

7  Q.   Is it unusual that there would be -- that there would be

8  nothing done for five years after an arrest warrant is issued?

9       MR. CORSMEIER:  Your Honor, I object to the form of

10  the question, unusual.

11       And is he an expert in extradition law, and what --

12  how many extraditions has he handled?

13       MR. JIMENEZ:  Your Honor, I'm not asking about

14  extradition.  I'm asking if it's unusual for the Estonian

15  authorities to do nothing after five years.  He's an expert in

16  Estonian law.

17       THE COURT:  Overruled.  Go ahead.

18       THE WITNESS:  The -- that would be very unusual

19  because, you see, the Estonian government let the case lay

20  dormant for more than five years in between the issuance of the

21  arrest warrant and when they actually -- and until when they

22  actually filed the extradition request.

23       That's more than five years.  That's more than the

24  entire duration of the -- of the limitation period.  It's very

25  unusual.

1  BY MR. JIMENEZ:

2  Q.   All right.  Let's -- let's turn -- let's leave the statute

3  of limitations and turn to the other issue that I would like to

4  talk to you about, which is the requirement of a charging

5  document.

6          THE COURT:  Can I ask one other question --

7          MR. JIMENEZ:  Yes, Your Honor.

8          THE COURT:  -- prior to that, please?

9          Going back to the court ruling -- I think that we

10  might have almost started with that.  That's Rotko 56, the

11  court ruling where you said it was forward looking -- a

12  forward-looking ruling regarding absconding?

13          THE WITNESS:  Yeah.

14          THE COURT:  I'm curious.  Given your testimony about

15  whether there was any active or -- any -- I think you said that

16  there was no evidence of any active absconding or absconding by

17  omission --

18          THE WITNESS:  Yes.

19          THE COURT:  -- that you saw in the file.

20          THE WITNESS:  Yes.

21          THE COURT:  Is that right?

22          So is this ruling by the Court completely erroneous,

23  then?  Because if there has been no absconding, either active

24  or by omission, then what basis would there be to find that

25  there would be -- that Mr. Rotko would be absconding in the

1  future?

2         THE WITNESS:  In my -- well, simply because he's

3  living in a different country and might probably -- might

4  probably not respond to a summons.

5         Courts do that all the time, because it's more

6  convenient for Estonian authorities to have a suspect in

7  Estonia to conduct the criminal proceedings rather than --

8  rather than have them live in the United States, where he may

9  or may not be reached.

10         THE COURT:  Well, I understand that.  I guess I'm

11  looking at, though, what the basis was for -- for finding -- if

12  he hadn't absconded under Estonian law at all, what the basis

13  was for finding that in the future he's going to, I guess.  It

14  doesn't make sense to me.

15         THE WITNESS:  Well, this is a -- it's entirely

16  possible.

17         A person -- a person might be living a normal life,

18  and then he becomes a suspect.  The police and the prosecutor

19  are able to make a case that "We believe that he might abscond

20  or we believe that he might continue in his criminal activity,

21  so therefore we ask the Court to arrest him," and the Court

22  does so.

23         And especially in an ex parte case where the suspect

24  has no say, they're unable to present any evidence, they're

25  unable to review any of the evidence, the courts will usually

1    simply take the prosecutor's word for it.

2           But in the -- in the case of that 25th of August

3    ruling, many things that we see there would not be

4    absconding -- all of the things we see here would not be

5    absconding because --

6           THE COURT:  Because you said -- you said there's

7    absolutely no evidence of active or absconding by omission in

8    the record --

9           THE WITNESS:  Yes.

10          THE COURT:  -- so I'm assuming you didn't see any in

11   what the prosecutor proffered here.

12          THE WITNESS:  No.  No.

13          THE COURT:  You saw none.

14          THE WITNESS:  Because -- because selling his house,

15   for example, unless the house was sold for the purpose of not

16   being available for the criminal proceedings, that's not

17   absconding.

18          Leaving Estonia -- I believe Mr. Rotko left Estonia

19   in the autumn of 2006, which is approximately the same time

20   when the criminal proceedings were started.  But nobody would

21   have known about it, so he wouldn't have been aware of the

22   conduct of the criminal proceedings.

23          Or simply -- you know, even if he were but he didn't

24   know what was expected of him, he would not have absconded

25   under the text set out by the Supreme Court in case 78-10.

1          Deliberate evasion -- or deliberate activity or

2     inactivity in order to not make oneself available to the

3     authorities, that's the test.

4          THE COURT:  No.  I understand.  I guess what I'm

5     getting at is would you have been surprised if the judge said,

6     "Look, you haven't offered any evidence of active absconding or

7     absconding by omission, so I'm not going to give you a

8     warrant -- I'm not going to give you a court ruling or a

9     warrant to go arrest someone who hasn't -- hasn't absconded

10    either actively or by omission."

11         Would that have surprised you if the judge had

12    rejected the warrant for arrest?

13         THE WITNESS:  It wouldn't have surprised me.

14         THE COURT:  It wouldn't have?

15         THE WITNESS:  No.

16         THE COURT:  Okay.

17         THE WITNESS:  But, of course, in 2007 we didn't have

18    the -- we didn't have the Supreme Court decision yet --

19         THE COURT:  I understand.

20         THE WITNESS:  -- where they made it very clear.

21         THE COURT:  All right.

22         All right.  You were going to shift gears now?

23         MR. JIMENEZ:  Yes, Your Honor.

24    BY MR. JIMENEZ:

25    Q.   Have you reviewed both the Estonian-language version and

1  the U.S.-language version of the extradition treaty?

2  A.   Yes, I have.

3  Q.   Okay.  And directing your attention to Articles 1 and 8,

4  is there any difference in the language between the two?

5  A.   Articles 1 and 8.

6  Q.   Yes.

7  A.   Yes, there is a -- there is a -- and I'm trying to find it

8  to refresh my memory.

9        A difference between 1 and 8, both -- sorry.  The

10 difference between 1 and 1 of the English- and

11 Estonian-language versions of the treaty is that in the

12 Estonian-language version, the definition of extraditable

13 persons are "those that the state party suspects, accuses, or

14 has convicted of an offense."

15 Q.   That's in the Estonian --

16 A.   That's the Estonian.

17 Q.   Okay.

18 A.   The English-language version says "whom the authorities in

19 the requesting state have charged with or convicted of an

20 extraditable defense," so there's one difference there.

21        And Article 8 --

22 Q.   So just turning to the English-language version for a

23 minute --

24 A.   Yes.

25 Q.   -- Article 1 is contained on Rotko 19, Bates No. 19, just

1    for the record.

2           And it states that "The parties agree to extradite to

3    each other, pursuant to the provisions of the treaty, persons

4    whom the authorities in the requested state have charged with

5    or convicted of an extraditable offense."

6    A.    Yes.

7    Q.    So if I understand your testimony correctly, that the only

8    difference is that in the Estonian-language version, they add

9    the word "suspected of an offense."

10   A.    Yes.

11   Q.    Is that correct?

12   A.    That is correct.

13   Q.    Okay.  Any difference in Article 8 between the two

14   treaties?

15   A.    There is a difference in Article 8 as well.  The

16   English-language version of Article 8(3)(b) requires the

17   production of a charging document, whereas the Estonian version

18   of Article 8(3)(b) requires a suspicion order.  In Estonian

19   it's *kahtlustatavaks tunnistamise määrus*.

20           THE COURT:  You'll have to spell that later --

21           THE WITNESS:  Later.

22           THE COURT:  -- for the court reporter.

23           THE WITNESS:  Yeah.

24   BY MR. JIMENEZ:

25   Q.    Okay.  So if I could summarize, for Article 8(3)(b), the

1    English-language version uses the word "charging document."

2    A.    Yes.

3    Q.    And the Estonian-language version uses the phrase that you

4    just read, that you will later spell --

5    A.    Yeah.

6    Q.    -- that is translated as?

7    A.    A suspicion order.

8    Q.    A suspicion order.

9    A.    Yes.  It can also be translated as a ruling, a suspicion

10   ruling.

11   Q.    Okay.

12   A.    Suspicion order, suspicion ruling.

13   Q.    Okay.  So are you familiar with what a suspicion order is

14   or was under Estonian criminal law procedure?

15   A.    I am, and this is the subject matter of my third legal

16   opinion.

17          A suspicion order, as it was, was an order or a

18   ruling issued by an investigator, by the investigator

19   conducting the proceedings, for the purposes of attributing

20   suspect status to a person.

21   Q.    So was it issued by a court or --

22   A.    No.  No, no, no, no.  No.  It can't be issued by a Court.

23   The court only determines allegations -- makes the

24   determinations based on allegations presented by the

25   prosecutor.  A court never suspects or charges anyone in

1  Estonia.  We have a -- we have an adversarial proceeding.

2  Q.    So even though it uses the word "order" --

3  A.    Yeah.

4  Q.    -- it was issued by the prosecutor.

5  A.    Or the investigative -- or the police.

6  Q.    Or the police.

7  A.    It would have -- it would have been issued by the police.

8  Q.    All right.

9  A.    And this -- this is -- no such instrument exists under

10  Estonian law anymore.  It was contained in the old Code of

11  Criminal Procedure, and it was abolished in 2002, 28th of July,

12  2002.  It no longer exists.  There's no such document under --

13  in the Estonian Code of Criminal Procedure.

14  Q.    And that's as of 2002?

15  A.    Yes.

16  Q.    So that's before the offenses in this case that are the

17  subject of this case --

18  A.    Yes.

19  Q.    -- before anything.

20  A.    Yes.

21  Q.    What is the date of this treaty?

22  A.    2006.

23  Q.    So four years before the treaty was -- the date of the

24  treaty was ratified --

25  A.    Yes.

1  Q.   -- the Estonian criminal procedure eliminated the order of

2  suspicion or the suspicion order.

3  A.   Yes.

4  Q.   Do I have that right?

5  A.   Yes.

6  Q.   Okay.  And what was the purpose of that document again?

7  A.   The purpose of that document was to officially attribute

8  suspect status to a person suspected of an offense --

9  Q.   Okay.

10 A.   -- of committing an offense.

11 Q.   So it -- turning now to "charging document," the word

12 that's used in the English-language version --

13 A.   Yes.

14 Q.   -- in the United States, in federal court, for example, we

15 have an indictment or an information.  That's the charging

16 document.

17 A.   Yes.

18 Q.   Is there an equivalent or a charging document in Estonia?

19 A.   Yes.  I have reviewed your definitions of the indictment

20 or information, and we have an equivalent under Estonian law,

21 and that would be a statement of charges.

22 Q.   Okay.  And is there a statement of charges in this record

23 with respect to Mr. Rotko?

24 A.   No.

25 Q.   Okay.  And does the Estonian criminal code have a section

1  dealing with statement of charges?

2  A.   Yes, it does.  It's 154.

3  Q.   Is the -- is the suspicion order that's referred to in the

4  English -- I'm sorry, the Estonian-language version of the

5  treaty the same as a statement of charges under Section 154?

6  A.   No, it's not.

7  Q.   Okay.  Now, in the memorandum that the government

8  submitted in this case, it says that the suspicion order --

9  that they, I believe, argue that the suspicion order is

10  equivalent to a charging document.

11        Is that correct in your view?

12  A.   It's not equivalent to a statement of charges under

13  Estonian law.  Certainly not.

14  Q.   And do you see either a charging document or a suspicion

15  order against Mr. Rotko in the file?

16  A.   No.

17  Q.   Okay.  Is the arrest warrant an order of suspicion?

18  A.   No.

19  Q.   Okay.  The one that we've been talking about, the August

20  25th, 2007.

21  A.   It's not an order of suspicion because, first of all, it's

22  been issued by the wrong entity.  The Court is not the

23  investigator.  And -- well, secondly, there wouldn't have been

24  a suspicion order set out in the law at the time the ruling was

25  issued.

1       Secondly, the entity is wrong.

2       And, thirdly, in order to arrest the suspect, the

3   person would already have to be a suspect.  Whereas the purpose

4   of the suspicion order -- the purpose of a suspicion order was

5   to officially attribute suspect status.  So they're entirely

6   different things.

7   Q.    Now, turning to the Estonian-language version, did you

8   perform any research in Estonia as to that version, the

9   Estonian-language version, of the treaty?

10  A.    Yes, I did.

11  Q.    What research did you perform?

12  A.    Well, I did some research in the Estonian -- on the

13  website of the Estonian parliament, where we have drafting

14  materials.  And I also called the -- or rang the Estonian

15  Ministry of Justice, the person who specializes in

16  international relations and treaties, and I asked them --

17  Q.    Time out.

18        What is the Ministry of Justice?

19  A.    The Ministry of Justice is a governmental body, much --

20  very similar to your Department of Justice, which it is in

21  charge of governmental activity in the judicial sphere --

22  Q.    Okay.

23  A.    -- so courts, prosecutors, criminal law, that sort of

24  stuff.

25  Q.    Okay.  So I interrupted you.

1    You said you called the Ministry of Justice?

2 A.   Yes, I did.  Yes.  I rang them, and I asked them whether

3 there were any documents issued in connection with the

4 conclusion of the treaty.

5    And they said -- well, the person didn't know by

6 heart, but she directed me back to the website of the Estonian

7 parliament where the drafting materials were and instructed me

8 how to find them.

9    And so I did.  And what I -- what I found there was

10 an explanatory note that was issued by the Ministry of Justice

11 and the -- and the Foreign Ministry in connection with this

12 treaty.

13    And it set out the reasons why the treaty was

14 concluded in the first place, the necessity for ratification of

15 the treaty, and also a brief description of each of the

16 treaty's articles.

17    And this material, along with the treaty itself and

18 the ratification law, was then passed to the parliament to see

19 whether the parliament might be willing to ratify it by

20 adopting the specific law for that purpose.

21 Q.   So is the parliament the legislative body for Estonia?

22 A.   The parliament is the legislative body for Estonia.

23    And in order for international treaties to become

24 effective, they would have to be ratified by the parliament

25 following the conclusion or following the signing.

1  Q.   And this note was submitted by the Ministry of Justice to

2  the parliament, you said?

3  A.   The note was first passed by the Ministry of Justice to

4  the government, the general government, and then the general

5  government passed it to the parliament, yes.

6  Q.   Okay.  And did you attach that note to any of your

7  declarations?

8  A.   Yes, my third legal opinion.  I think it was Exhibit 2 of

9  my third legal opinion.

10  Q.   And does that note have any explanation about the articles

11  that we've been talking about here, Articles 1 and Articles 8

12  of the treaty?

13  A.   It has a -- it has a brief description of both.

14       Now, I have to -- I have to apologize.  I only had

15  this in Estonian, and I was only able to attach it in Estonian,

16  because we simply -- I didn't -- I didn't have time to get

17  the -- to commission the translation of it.

18       But Article 1 -- so the relevant articles here that

19  we've been talking about are Article 1 and Article 8.

20       And what I was specifically looking for with regard

21  to Article 8 is why they would have used the language

22  "suspicion order" or *kahtlustatavaks tunnistamise määrus*.

23       They say nothing here about why the language was

24  used.  It simply states here that, "Article 8 lists or sets out

25  the documents that must be appended to an extradition request."

1    It doesn't detail what those documents are or why they chose

2    those documents or why it reads that those documents would be

3    required.

4    Q.   What about Article 1?  What does it say about --

5    A.   And Article 1 --

6    Q.   -- that?

7    A.   Article 1 says that -- or they explain that "This article

8    sets out the reciprocal obligation to extradite persons who the

9    requesting state" -- "or whom the requesting state charges or

10   has convicted of an offense" -- "of an extraditable offense."

11   Q.   And -- and that's similar to the U.S.-language version,

12   not to the Estonian-language version, correct?

13   A.   That is correct, because -- because in the

14   Estonian-language version, there's also -- they also said --

15   they talked about a suspect.

16   Q.   Yeah.

17   A.   But the explanatory note makes no reference to a suspect

18   at all.

19   Q.   Okay.

20        MR. JIMENEZ:  I don't have any further questions,

21   Your Honor.

22        THE COURT:  All right.  Well, let's do this.

23   Let's -- why don't we take a lunch break.  If it works for

24   everyone, we'll be in recess till 1 o'clock, and then we'll

25   resume with Mr. Corsmeier asking questions.

1           I wanted to ask one thing, though, before I forget.

2           Could you describe what is in a summons, exactly what

3    would be contained in a summons?

4           THE WITNESS:  In a summons?

5           THE COURT:  Yes.  Well, going back to the first --

6           THE WITNESS:  The summons is a document.  It contains

7    information about -- information about the authority issuing

8    the summons, so police, for example, the address of the

9    institution.

10          It contains the name of the person being summoned.

11   It would contain the name of the officer issuing the summons.

12   And it would contain the reasons why the person is being

13   summoned and also whether -- what is the -- what is the

14   procedural status of that person, so, for example, whether

15   they're being summoned as a witness, whether they're being

16   summoned as -- as a suspect, whether they're being summoned as

17   a -- as a victim.

18          But those are all the -- all the required data that a

19   summons must -- must include.

20          THE COURT:  Would it include a direction to appear --

21          THE WITNESS:  Yes.

22          THE COURT:  -- at some proceeding?

23          THE WITNESS:  Yes.  Oh, yes.  Absolutely.  The date

24   and time and place where they would have to appear, and the

25   summons would also set out, or outline, rather, the

1    consequences of not appearing or failing to appear.

2             THE COURT:  All right.  Thank you.

3             Let's -- we'll be in recess.

4             COURT SECURITY OFFICER:  All rise.

5        (Recess from 12:17 p.m. until 1:07 p.m.; all parties

6    present.)

7             COURT SECURITY OFFICER:  All rise.  This Honorable

8    Court is now in session.

9             Please be seated.

10            THE COURT:  All right.  Mr. Corsmeier, are you ready

11   to proceed?

12            MR. CORSMEIER:  Yes, Your Honor.

13            THE COURT:  Sir, I'll remind you you're still under

14   oath.

15            You understand that?

16            THE WITNESS:  I do, yes.

17            THE COURT:  Okay.  Thank you.

18            You may proceed.

19            MR. CORSMEIER:  Thank you, Your Honor.

20                        CROSS-EXAMINATION

21   BY MR. CORSMEIER:

22   Q.   Good afternoon, Mr. Keres.  I want to start -- I'm going

23   to go backwards.

24            I'm going to start with the language of the

25   extradition treaty that you were asked about toward the end of

1  your testimony.

2          And I guess the last thing you were asked about was

3  the explanatory note that was sent with the treaty when it was

4  ratified by the Estonian parliament --

5  A.    Uh-huh.

6  Q.    -- and that it, I guess, conflicts with the actual

7  language of the treaty.

8          In your view, if there's a conflict, doesn't the

9  actual language of the treaty control?

10 A.    Well, one thing I would like -- I would like to make clear

11 is I'm not a treaty lawyer, so I'm not a specialist in

12 international law.

13         What I can tell you is what does the treaty contain

14 and what we understand that to mean under Estonian law.

15 Q.    Okay.  And -- well, let me just, on that topic -- and I'll

16 get to what the treaty contains.

17         But when the members of parliament were ratifying

18 this treaty, they weren't ratifying the explanatory note.  They

19 were ratifying the treaty itself.

20 A.    That's true.

21 Q.    And the treaty itself, in the Estonian language, as you

22 put in your most recent declaration, on -- and I'm looking

23 at -- I don't know what it is for you there, but it's document

24 33-2 in the record, and it's page 3 of 74 of the attachments.

25         But it's page 2 of 6 of your June -- I'm sorry,

1  January 2nd, 2020, declaration.

2  A.   Page 2.

3  Q.   Yes.

4  A.   Yes.

5  Q.   Where paragraph 8 gives your Estonian translation of the

6  English text, and you talked about this in your direct

7  examination, that the people -- and I'm paraphrasing at the

8  beginning.  People to be extradited are "persons who are

9  suspected, accused, or convicted in the requesting state of an

10  offense subject to extradition."

11       And that's -- in Estonian -- that's an accurate

12  translation of what the treaty says in Estonian.

13  A.   Yes, I believe so.

14  Q.   And -- and you talked about Article 8(3)(b) also on that

15  same page, and you talked about the suspicion order, and you

16  give the Estonian words for that in paragraph 6 there of your

17  declaration.

18       But does anything -- is there any language in Article

19  8(3)(b) that refers to this statement of charges that you're

20  talking about?

21  A.   The Estonian-language version?

22  Q.   Yes.

23  A.   No.

24  Q.   Okay.  And -- because -- well, I'll leave it at that.

25       And so an Estonian prosecutor looking at the Estonian

1    treaty -- maybe does or doesn't know English or read it or

2    speak it -- is looking at the treaty and saying, "Okay, Article

3    1 says that the United States agrees to extradite people who

4    are suspected, accused, or convicted of an offense in Estonia."

5         Wouldn't you agree with me that that prosecutor would

6    say, "Okay.  We can -- we can seek to extradite Mr. Rotko

7    because he's suspected of an offense"?

8    A.    I think an Estonian prosecutor would know who a suspect

9    is, and in the Estonian prosecutor's view, Mr. Rotko would be a

10   suspect.

11   Q.    Okay.

12         THE COURT:  So does that mean -- does that mean you

13   agree with him that that would be a fair interpretation of the

14   treaty, then, by the prosecutor?

15         THE WITNESS:  As I said, Your Honor, I don't want to

16   get into the interpretation of the treaty because that's a

17   matter of international law.  I wouldn't go there.

18         But I would -- I would say that if I were the

19   Estonian prosecutor, I would be reading the treaty.  It says

20   suspect.  And I would look at Mr. Rotko, whether he's a

21   suspect, and I would say, yes, he's a suspect.

22         THE COURT:  All right.

23   BY MR. CORSMEIER:

24   Q.    And the English version has this -- the language "have

25   been charged with or convicted of an extraditable offense" --

1    well, strike that.

2              I want to look at Article 8(3)(b) first.

3    A.    Uh-huh.

4    Q.    It talks about a charging document -- or -- yes.

5    A.    The English-language version.

6    Q.    The English-language version.

7    A.    Yes, yes.  Charging document, yes.

8    Q.    And if -- if, in the Estonian-language version, they

9    wanted to include a requirement of a charging document,

10   wouldn't that state "statement of charges" that you mentioned

11   before in Estonian?

12   A.    If they wanted to -- if they wanted to use the words

13   "statement of charges," they would use the statement of

14   charges.

15             If they wanted to -- if they wanted to use

16   indictment, they would use statement of charges.

17   Q.    Okay.  Well, then I guess my question -- so the best word

18   to use, if they meant -- if they intended to say "charging

19   document," that in Estonian, a statement of charges would be

20   the charging document.

21   A.    As the charging document is an English term -- it's an

22   English term understood by American lawyers.

23             If you wanted an indictment, you would use statement

24   of charges.

25   Q.    All right.  And that is -- and then I'll spell it, in

1 Estonian, S-ü-ü, each with what I would call an umlaut; it may

2 be called the same thing.  S-ü-ü, each with two dots over them,

3 d-i-s-t-u-s-a-k-t.

4 A.    Yes.

5 Q.    That's the statement of charges.

6 A.    Yes.

7 Q.    And nowhere in the Estonian version of the treaty does it

8 use that word.

9 A.    No.

10 Q.    Okay.  You say you're not -- you're not an expert, I

11 guess, on treaties or things like that, but let me just ask

12 you, and you can say that you're not -- you don't have the --

13 the background to answer this.

14        But can't Estonia or an Estonian prosecutor rely on

15 that Estonian version of the treaty without looking to the

16 English version?

17 A.    I believe an Estonian prosecutor, in seeking extradition,

18 would be looking at the Estonian-language version, yes.

19 Q.    All right.  And the Estonian-language version of the

20 treaty is just as valid as the English-language version.

21 A.    Well, that's something I can't answer.

22 Q.    Okay.  And let me ask you about something that was

23 included in the most recent filing by Mr. Rotko, which is

24 document 34, and it has an attachment -- or has attachments --

25 or an attachment.

1    And as you may have heard when I was up here arguing
2 before -- and you were in the courtroom the whole time, right?
3 A.   I was, yes.  I was sitting over there.
4 Q.   That in this tribunal -- are you -- so you're involved
5 with the arbitration proceeding?
6 A.   No.
7 Q.   Oh, you're not?  Okay.
8    But you have been involved in similar arbitration
9 proceedings.
10 A.   Investor state arbitration proceedings, no, I am not.
11 Q.   Okay.  I misunderstood.  I'm sorry.
12 A.   I'm -- I have been asked to give a legal opinion on
13 Estonian law for ELA also in the arbitration proceeding.
14 Q.   Okay.
15 A.   That's what I meant, but I'm not involved --
16 Q.   Right.
17 A.   -- in the proceedings --
18 Q.   You're not a part of it, a representative part.
19 A.   I'm not a --
20 Q.   You're not a representative part.
21 A.   No, I'm not.
22 Q.   Okay.  And of the -- did you read the -- the response by
23 the Estonian government that was submitted on January 6th of
24 this year?
25 A.   Yes, I did.  Yeah.

1    Q.    Okay.

2    A.    Yes, I did.

3    Q.    And did you see what I mentioned earlier where the

4    Estonian government -- and I have to find it, I'm sorry --

5    says, on page 4 of 54 in document 34-1 -- in other words, page

6    4 of the Estonian response, in paragraph -- I'm sorry.  It

7    starts on the previous page.

8          Paragraph 11 at the bottom of page 3, where it says,

9    "A statement of charges is also not required before requesting

10   extradition.  Pursuant to Section 457 of the Code of Criminal

11   Procedure, extradition may be requested if a suspect is located

12   abroad and is evading criminal proceedings due to which the

13   continuation of the proceedings is impeded"?

14   A.    Yes, I see that.

15   Q.    Do you have any -- do you agree or disagree -- well, let

16   me ask you first about the second sentence, pursuant to Section

17   457.

18   A.    Uh-huh.

19   Q.    Do you agree or disagree with that statement?

20   A.    Can I -- can I use my phone to look up Section 457?

21   Q.    Let me show you -- and on page 54 of 54 in that

22   attachment, there is the Estonian-language version, I believe,

23   of -- they've attached it, the Estonian government has, of

24   Section 457.

25   A.    I only have -- I only have the brief.

1  Q.    Right.  I was going to bring it to you, show it to you,

2  and ask you to translate it for the Court.

3  A.    Okay.

4         MR. CORSMEIER:  May I approach, Your Honor?

5         THE COURT:  Yes.

6         THE WITNESS:  Thank you.

7         So you want me to translate this.

8  BY MR. CORSMEIER:

9  Q.    Yeah, the provision, including the heading, and the

10 provision.

11 A.    All right.  I'll do my best.

12        Commencement -- so the title reads Commencement of

13 the Extradition Proceedings of a Person From a Foreign State,

14 title.

15 Q.    Okay.

16 A.    Okay.  Then we have Section 1 of paragraph -- of 457.  It

17 says here that extradition shall be sought if a suspect or a

18 defendant is in a foreign state and is evading criminal

19 proceedings, and further conduct of the criminal proceedings is

20 significantly impeded or ruled out -- or impossible without the

21 presence of the suspect or the defendant, or if a decision

22 issued in respect of a convicted person requires his --

23 requires that he be extradited or requires his extradition.

24 Q.    All right.  So at least with regard to that provision of

25 Estonian law, extradition can be sought for someone who's just

1  suspected of an offense.

2  A.    Yes, and has absconded.

3  Q.    Right.  All right.  Thank you.

4         Can I get that back from you?

5  A.    Yes, yes.

6  Q.    Let me ask you now about, since -- since you just

7  mentioned absconded and that statute mentions that, in your --

8  one of your declarations, I believe it's the first one --

9  A.    Uh-huh.

10  Q.    -- you give the opinion that -- and you talked about it on

11  your direct examination, that before a person can be found to

12  have absconded, it has to be shown that they've actually been

13  served with a summons to appear.

14  A.    If the allegation is that they absconded by omission, yes.

15  Q.    Right.  Okay.  So let's assume that's the allegation, and

16  that's the case we're talking about.

17  A.    Uh-huh.

18  Q.    What is -- and in your -- in your declaration you cite to

19  this Supreme Court case, Estonian Supreme Court case.

20  A.    Yes.

21  Q.    And there's no other authority for the proposition that a

22  summons is required other than that Supreme Court case.

23  A.    There is -- there is really very little to go on because I

24  read the commentary on the penal code with respect to paragraph

25  81, and that simply reads what's stated in the -- in the

1  provision itself.

2          And that was, in my recollection, when I wrote,

3  the -- the only Supreme Court decision I could find on the

4  subject of absconding by omission.

5  Q.   Okay.  So -- so there's no other authority other than the

6  Supreme Court that a summons is required to establish -- a

7  summons has to be served before you can establish that someone

8  absconded.

9  A.   No, but that's a very good authority.

10  Q.   All right.  Well, let's look at -- let's look at that

11  authority.

12  A.   Okay.

13          THE COURT:  What is that page again, Mr. Corsmeier?

14          MR. CORSMEIER:  It's in document 17-14 --

15          THE COURT:  Yes.

16          MR. CORSMEIER:  -- page 50 of 86.

17          THE COURT:  Thank you.

18          MR. CORSMEIER:  And I'm not sure -- let's see.

19  BY MR. CORSMEIER:

20  Q.   That's your declaration of December 9th, 2019, and it

21  is -- do you have that before you?

22  A.   The --

23  Q.   Do you have the English-translation version?

24  A.   Yes, I do.  Yes.

25  Q.   Okay.  I wanted to make sure we were looking at the same

1   thing.

2        All right. And in that -- in that case, as I

3   mentioned before when I was discussing it with the Court, the

4   Court does talk about this purported defendant or suspect, T.

5   Koit, and talks about how the lower court erroneously found

6   that he was -- he was aware of the proceedings because, kind of

7   about in the middle, it says that, "Although the circuit court

8   stated that T. Koit was summoned to the interrogation at the

9   Pärnu," if I'm pronouncing that correctly --

10   A.   Perfect.

11   Q.   -- "Police Station for several times" -- "for several

12   times," while the translation just means several times.

13   A.   Yeah.

14   Q.   -- "the judgment of the circuit court did not reveal

15   whether T. Koit actually received the summons."

16        And then they go on, in paragraph 8.4, to conclude

17   that "The materials in the criminal case do not include

18   information that serves as a basis for a firm conclusion that,

19   being aware of the criminal proceedings conducted with respect

20   to him, T. Koit absconded from precourt proceedings, and that

21   would preclude" -- essentially, the -- I'll call it the

22   extension of the statute of limitations, even though that's not

23   really what it is. I understand that.

24   A.   Uh-huh.

25   Q.   And then the last two sentences say, "The county court

must ascertain at the new hearing of the criminal case whether
T. Koit was aware of the criminal proceedings conducted with
respect to him and, nevertheless, acted in a manner that can be
considered as absconding from criminal proceedings.

"Only after the adjudication of these matters, a
decision can be made on the expiry of the limitation period of
criminal offenses attributed to T. Koit."

So where in this opinion does the Court say that a
summons must be issued -- actually issued to a person before
they can be found to have absconded?

A.   Let me explain.  So 8.4 must be read with the other
subsections where the Supreme Court discusses the issue, and
especially together with 8.2.

And, you see, at 8.2, the Supreme Court gives you the
general rule, which is that "Absconding from criminal
proceedings may, in principle, lie both in acts and omissions,
and if the body conducting proceedings finds that absconding
from criminal proceedings lies in omissions, the admitted acts
of conduct that are required from a person and that can be
considered as absconding must be indicated," right?

And then at 8.4 the Court says to the lower courts --
the Supreme Court says to the lower courts, "The county court
must ascertain whether he was aware of the criminal proceedings
with respect to him and, nevertheless, acted in a manner that
can be considered as absconding from criminal proceedings."

1          So, now, if the test is that absconding is the
2    deliberate evasion of proceedings and absconding by omission
3    means the failure to do what is required from that person, then
4    that obviously leads to the summons.
5          The reason for that is, as I indicated in my direct
6    examination, there are only two things that an Estonian suspect
7    is duty-bound to do.  Firstly, they are duty-bound to appear
8    when summoned, and secondly, as they appear, do what is told.
9    Q.   Okay.
10   A.   Otherwise, I mean, simply being aware of proceedings does
11   not require anyone to appear, "Here I am."
12   Q.   What if you're aware of the proceedings and the
13   prosecutor's office, the police, or whoever attempts a few
14   times to serve you with a summons and can't, and in their view
15   you're evading that --
16   A.   Well, if you don't serve the summons, then you don't make
17   the person aware of what is required of them.  That's -- that's
18   the thing.
19   Q.   Even if you prove that they're aware of the criminal
20   proceedings.
21   A.   Well, are you -- are they aware of the summons being
22   served, and are they aware of the contents of the summons?
23   Q.   Okay.
24   A.   That's the crucial issue here.
25   Q.   So even if they're aware of the criminal proceedings, if

1  they're not aware of the summons --

2  A.    No.

3  Q.    -- then they haven't absconded.

4  A.    No.

5  Q.    All right.  And you're saying that's obvious from that

6  opinion?

7  A.    Yes.

8  Q.    And the Court can decide on its own, but I don't know --

9  and I don't -- I don't know what the international -- or other

10  countries' legal training involves or what words they use.

11        But do you use the word "holding," the holding of the

12  case in your practice as we do in America?

13  A.    We don't use the word.

14  Q.    Okay.  And we can just assume -- I'll try to explain it.

15  I may not get it right, but just for the purpose of this

16  question, assume this, that it's the essential finding of the

17  Court that's necessary to the resolution of the case.

18  A.    We call it a statement of reasons.

19  Q.    Okay.

20  A.    Yeah.

21  Q.    Okay.  And isn't the -- the essential conclusions or what

22  I would call the holding in paragraph 8.4 that the -- this T.

23  Koit, in order to be found to have absconded, must have been

24  aware of the proceedings and, nevertheless, acted in a manner

25  that can be considered as absconding from the criminal

1  proceedings?

2  A.    Yes.

3  Q.    Okay.

4  A.    And --

5  Q.    And there's no requirement that he be served with a

6  summons.

7  A.    There is a requirement.  There is a requirement,

8  precisely --

9  Q.    Okay.  Where in there does it say that there's a

10  requirement that he be served with a summons?

11  A.    Because absconding -- according to what the Supreme Court

12  says here -- it's set out in black and white at 8.2 -- you need

13  to deliberately evade proceedings conducted with respect to you

14  in order to be deemed to have absconded.  That's the rule.

15  Q.    Okay.

16  A.    If you're aware of proceedings and do nothing, which you

17  is well within your rights to do, then you haven't necessarily

18  absconded --

19  Q.    Okay.

20  A.    -- as the Supreme Court says here.

21        Simply not residing at your residence -- place of

22  address or residence, that's not absconding.  Your relatives

23  not being aware of where you are, that's not absconding.  Only

24  if you know exactly what is required of you and you fail to do

25  that have you absconded.

1    THE COURT:  Is -- and that statement that you just

2  made, is that in this opinion, or are you --

3    THE WITNESS:  It's in the opinion.

4    THE COURT:  All right.  And point that to me -- out

5  to me, then.

6    THE WITNESS:  8.2 --

7    THE COURT:  Okay.

8    THE WITNESS:  -- third sentence:  "If the body

9  conducting proceedings finds that absconding from criminal

10  proceedings lies in omissions, the omitted acts of conduct that

11  are required from the person and that can be considered as

12  absconding must be indicated."

13    So if, under -- if, under criminal procedure law, you

14  would be required to tell your relatives where you are and you

15  haven't, then that might be absconding, but that would be

16  absurd because there is no such requirement under the Estonian

17  Code of Criminal Procedure.

18    THE COURT:  And as to the requirements, what is

19  required and what's not required, are you reading on into 8.3?

20    THE WITNESS:  Well, this is -- this is in the -- in

21  the present case here, in the case of Thomas Koit, the police

22  thought that if they simply told the -- if they simply

23  established that Mr. Koit wasn't residing at his registered

24  address, then that might be absconding, and if his relatives

25  don't know where Mr. Koit was, that might also be absconding.

1    But then the Supreme Court said, no, that's not,

2 because drawing -- coming back to 8.2, it has to be deliberate,

3 deliberate evasion of proceedings.

4    THE COURT:  All right.

5    THE WITNESS:  And in the -- in the failure -- in the

6 case of a failure to appear, the person must be aware where he

7 needs to appear and when.

8    THE COURT:  All right.  Because the facts that are

9 alleged by the Estonian government here go beyond the person

10 just not residing where he should reside and just not being

11 somewhere where he should be.  It's that Mr. Rotko actually

12 knew he was suspected of the crime and that he fled.

13    That's -- that's what's alleged here, which goes

14 beyond a little bit what's discussed in this case.

15    But you're saying even in that event, unless there

16 was some place -- some time, some place that Mr. Rotko needed

17 to be and had been advised of that via -- it would be a

18 summons, absent that, he can -- he did not abscond.

19    THE WITNESS:  Fleeing would be active.  That would be

20 actively absconding.  I'm taking deliberate steps to get away

21 from the police, for example, that is, if you see them coming

22 and you run.

23    THE COURT:  Well, what if -- what if you know that

24 they're investigating you -- not necessarily coming at you, but

25 you know they suspect you.  You know the police are asking

1    questions.  You know they think you committed a crime and then

2    you knowingly decide to take off, to run.  Is that active?

3              THE WITNESS:  For the purpose -- yes, for the

4    purpose -- for the purpose of absconding.  So the -- the

5    fleeing, the action -- the act to flee must be based on the

6    deliberation, the intent not to be made available or not to

7    make oneself available to the police.

8              That is the -- it's intent.

9              THE COURT:  Yes.  All right.  All right.

10             THE WITNESS:  It depends on the intent.

11             THE COURT:  But for purposes of either -- whether

12   it's interrupting or suspending the statute of limitations,

13   then, if it can be proved that someone had the intent to flee,

14   knowing an investigation was going on, would that then suspend

15   the statute of limitations or the period?

16             THE WITNESS:  If it were proven that they fled --

17             THE COURT:  Yes.

18             THE WITNESS:  -- for the purpose of, yes, fleeing the

19   proceedings, yes, that would be active --

20             THE COURT:  All right.

21             THE WITNESS:  -- active absconsion.

22             THE COURT:  All right.

23             THE WITNESS:  This is not what is -- what is alleged

24   here.

25             THE COURT:  All right.

1  BY MR. CORSMEIER:

2  Q.   All right.  And I guess the last thing I'll ask you about

3  this Supreme Court opinion, so an important -- what the county

4  court in this case needed to understand was T. Koit had to have

5  been served with a summons in order for the Court to find him

6  having absconded, and the record didn't show he had been served

7  with a summons, so therefore the county court was wrong.

8  A.   Yes.

9  Q.   All right.  So -- and can you give me a reason why those

10  final couple sentences, the Court wouldn't have -- if that's

11  true, the Court wouldn't have said, "The county court must

12  ascertain at the new hearing in the criminal case whether T.

13  Koit was aware of the criminal proceedings conducted with

14  respect to him and was served with a summons and, nevertheless,

15  acted in a manner that could be considered absconding"?

16        Why didn't they say that if that was important?

17  A.   Because if he -- if he was served with a summons, then the

18  act of -- then acting -- that acting in a way that could be

19  considered as absconding would be a failure to appear as

20  summoned.

21  Q.   So a summons didn't need to be served on him for him to --

22  A.   I don't understand.

23  Q.   Why -- why don't they say, "You need to make sure he was

24  served with a summons before you find that he absconded," if

25  that's what you're saying the requirement is?

A.    Because otherwise, if you don't prove that he was served

with a summons, you cannot prove conclusively that he knew what

was expected of him and what he had to do.

Q.    Exactly.

So why don't they tell the county court, "You need to

find that he was served with a summons before you can find him

absconding"?

A.    This is what they're saying, isn't it?

Q.    Okay.  Okay.

THE COURT:  Let me ask you this, though, and I guess

I'm going to have to read this a few more times.

But the Court, in the opinion we're talking about, in

paragraph 8.2, it discusses both acts and omissions, right?

THE WITNESS:  Yes.

THE COURT:  All right.  And could you read this

opinion, especially the part that Mr. Corsmeier is focusing on,

where it says that, in paragraph 8.4, "The county court must

ascertain at a new hearing in the criminal case whether he was

aware of the criminal proceedings conducted and, nevertheless,

acted in a manner to be considered absconding" -- could they be

saying there, "All right.  You haven't -- you haven't proved

and you can't prove absconding by omission, because there

hasn't been a summons, but you need to determine and look to

see if there's active absconding?"

Could that be what the Court's saying?

1          THE WITNESS:  It could be.

2          THE COURT:  Because they're saying, "Go back and look

3    at something," and if we already know there's no summons, then

4    can they be directing the lower court to go back and look for

5    absconding by omission or must they be telling the Court,

6    "You've got to -- you've got to see if there's any evidence of

7    absconding actively."

8          THE WITNESS:  Well, of course.  The state is free to

9    present their case as they wish.  They can say that he has

10   actively absconded, which is to say, for example, he lived

11   under a fake ID, he tried to hide himself, and so on and so

12   forth.  He fled the police.  That would be active absconding.

13   You can look at that.

14         Or you can say that he absconded by omission, which

15   is basically not -- which is basically to -- failure to appear

16   when summoned.

17         THE COURT:  Okay.

18   BY MR. CORSMEIER:

19   Q.   All right.  So if a suspect -- the police or the

20   prosecutor, however it works, want to summon him -- well,

21   first, let me ask you this.

22         Is the Estonian prosecutor correct that before a

23   statement of charges can be filed, the suspect has to be

24   interrogated, under Estonian law?

25   A.   Yes.

Q.   Okay.  If -- if I'm a suspect in Estonia and the police
think I've committed a crime and they try to summons me in for
that interrogation but they can't reach me -- turns out I'm in
the United States, and so they can't reach me there, and so
they can never interrogate me, and so no charges can ever be
brought -- I can escape liability for a criminal offense just
by that action.

A.   I wouldn't call it escaping --

Q.   Okay.

A.   -- because if you're simply -- if you simply live in a
different country, that's no fault of yours, is it?  You live
in a different country.

        And if the police are incapable -- and this is --
this is what I said in my opinion.  If the police are incapable
or disinterested in seeking you out under the respective Mutual
Assistance Treaties, the case will go stale and will become
time-barred.

Q.   All right.  Well, let's talk about that, a mutual legal
assistance treaty request.

        So Estonia requests the United States to serve a
summons on Mr. Rotko arising out of this case, under an MLAT.
They serve the summons.  He ignores it.

        How is he brought to justice for a criminal offense
that Estonia believes he committed?

A.   Well, in that case, first of all, you would have

1  absconding, wouldn't you?  That would be absconding by

2  omission, and that would give you the benefit of a paused

3  limitation period.

4  Q.   Right.  But the 15 years runs out during that pause, and

5  now he can't be brought to justice, right?

6  A.   Well, in -- if the 15 years run -- if the 15 years runs,

7  then, yes, that's true.

8  Q.   And there's nothing Estonia can do about that but seek his

9  extradition.

10  A.   True, yes.

11  Q.   Okay.  So an MLAT doesn't really help at all, does it, to

12  bring him before the Estonian authorities?

13  A.   Well, are we talking about practical matters, or are we

14  discussing the law?

15  Q.   Well --

16  A.   If we're talking about --

17  Q.   -- as a practical matter, he's never going to be brought

18  before the Estonians if he just stays away for 15 years.

19  A.   I cannot opine on that.

20  Q.   Okay.

21  A.   But I can tell you when a person is deemed to have

22  absconded and when he's not.

23  Q.   All right.  Let's go to that Harju County Court ruling of

24  August 25th, 2007.

25  A.   Okay.

1    Q.    I'm looking at your December 9th, 2019, declaration.  It's

2    document 17-13, and it's -- begins on page 16 of, looks like,

3    72 of document 17-13.  But it's Exhibit M, your declaration's

4    Exhibit M.

5    A.    Is that the 9th of December?

6    Q.    Yes.  I'm sorry.  It's Exhibit 1 of your declaration.

7    A.    Uh-huh.  Okay.

8              THE COURT:  What page did you say?

9              MR. CORSMEIER:  Page 16, Your Honor, of 17-13.

10             THE COURT:  Thank you.

11   BY MR. CORSMEIER:

12   Q.    And you said that everything in -- well, not the

13   procedural stuff at the beginning, but then everything in here

14   until the last paragraph is merely a statement of the

15   prosecutor.

16   A.    Yes.

17   Q.    What does it mean, then, by -- on page 1, after the advice

18   of an appeals procedure, where it says, "The preliminary

19   investigation judge found out, on hearing of the application of

20   arrest, colon" -- what does that mean?

21   A.    This is where the judge is referring to the -- to the

22   application.

23   Q.    Who is the preliminary investigation judge?

24   A.    Eha Popova.

25   Q.    Pardon me?

1  A.    Eha Popova, E-h-a, P-o-p-o-v-a.

2  Q.    Okay.  So isn't -- doesn't that say that, "Here follow my

3  findings upon hearing the application"?

4  A.    No.

5  Q.    Okay.

6  A.    Because in that case where would the -- where would the

7  application be?

8  Q.    It would be in what the prosecutor provided her.

9  A.    Yeah, but that also has to be referenced.

10 Q.    Has to be referenced?

11 A.    It has to be.  It always is referenced --

12 Q.    Okay.

13 A.    -- and this is what is referenced.

14 Q.    All right.

15 A.    Because if you -- if you -- if you read the -- if you read

16 the ruling -- I would also say that it would be -- it would be

17 entirely illogical for all of this to be a judge's finding,

18 because then on one page the judge says that "It was impossible

19 to summons Mr. Rotko," and then on the final page, she goes on

20 to say that -- that "Mr. Rotko hasn't responded to a summons

21 and has failed to appear several times," diametrically opposed

22 statements.  It wouldn't make any sense.

23 Q.    All right.

24 A.    Now, the first bit of this ruling is a reference to what

25 the prosecutor said, and then the final -- the final paragraph,

1    "The Court having," da, da, da, da, da, that's the Court's

2    assessment.  That's the Court's determination.

3    Q.   Okay.  Based on everything that comes before it.

4    A.   Yes.

5    Q.   And that Court's determination was that "The criminal case

6    materials show that A. Rotko is aware of the criminal

7    proceedings, but in spite of this has realized" -- and that

8    probably means liquidated or something like that -- "his

9    property located in Estonia and has probably left the Republic

10   of Estonia"?

11   A.   Once again, please?

12   Q.   Well, it's on page -- it's on the last page, and I don't

13   need to read it again.  I think we've already read it a couple

14   times.

15          The last page, the last paragraph, you said, are the

16   Court's findings.

17   A.   And which finding is that exactly that you were --

18   Q.   "The criminal case materials show that A. Rotko is aware

19   of the criminal proceedings," and then it goes on.

20   A.   Uh-huh.  Okay.

21          Well, that doesn't make any sense either because the

22   criminal case was started -- the case commenced in September

23   2006 -- didn't it? -- and Mr. Rotko also left Estonia in

24   September 2006.

25          But the first time that anyone was ever contacted

1 about the case, whether it be Ms. Kotova, whether it was a --

2 whether it was an attempted summons or the witnesses, all of

3 that occurred at the end of the year after Mr. Rotko had left

4 or in the beginning of the next year.

5 Q. As far as you know.

6 A. Well, as per the documents in the file.

7 Q. Okay. So as far as you know from the documents in the

8 file.

9 A. As far as I know from the documents in the file.

10 Q. So you just disagree with what the judge found.

11 A. With that statement, yes, I disagree.

12 Q. Okay.

13 A. It's inaccurate.

14 Q. And in your view -- I was going to get to this later --

15 but the statute of limitations ran long ago.

16 A. 2012.

17 Q. Okay. And you said that -- that this was not a final

18 determination of absconding for statute of limitation purposes,

19 and that will be made when he's -- when he -- that would be

20 made later in the case.

21 A. That would be made at trial.

22 Q. Okay. And the only way that can be made is if Mr. Rotko

23 is either taken to Estonia or makes himself available in

24 Estonia.

25 A. In Estonian court proceedings, yes --

1  Q.   Yes.

2  A.   -- that would be -- that would be it.

3  Q.   And if it's as clear as you say, the case would just be

4  dismissed pretty quickly, correct?

5  A.   I cannot say.

6  Q.   Well --

7  A.   You're asking me to hypothesize.

8  Q.   Well, even hypothesizing, most of this -- you're an

9  expert -- you're an expert witness.  You've been hypothesizing

10  for most of this testimony.

11        And I think you're saying that it's crystal clear

12  that the statute of limitations has run.

13  A.   In my expert opinion --

14  Q.   Okay.

15  A.   -- that is -- that is my assessment.

16  Q.   So in -- then in your opinion, then, a court could

17  disagree.

18  A.   They very well might.

19  Q.   And in this case this Court disagrees.

20  A.   This Court didn't disagree because the -- at the time when

21  the -- when the ruling was made on the 25th of August, 2007,

22  the expiration period had only run for less than a year.

23  Q.   Okay.  But this Court disagrees and found that he did

24  flee.  He was absconding.

25  A.   He didn't say that.  The Court didn't say that.

1  Q.   Okay.  Well, maybe they're not using the words -- those

2  words, but what the Court says is that he was aware of the

3  criminal proceedings, and it also -- and in spite of that, has

4  left Estonia and that he may remain at large and continue

5  avoiding the criminal proceedings.

6         That's not absconding, in your view?

7  A.   In the future, avoid criminal proceedings, yes, that would

8  be absconding --

9  Q.   Then that would be --

10  A.   -- and that's exactly the point why you would issue an

11  arrest warrant.

12         THE COURT:  That would be active absconding.

13  Knowing -- knowing that there's a proceeding, a criminal

14  proceeding, and you -- purposely, to avoid the proceeding, you

15  flee, that's active absconding.  You told me that a minute ago.

16         THE WITNESS:  Yes.

17         THE COURT:  And you say here the Court's not finding

18  that that's happened already.  It's just that it could happen

19  in the future.  That's your opinion.

20         THE WITNESS:  The -- what I said was that the purpose

21  of this ruling is to prevent the person from absconding, right?

22  Now, if he has already absconded . . .

23         THE COURT:  What -- okay.  So let's say the judge

24  found here, "I find he's already absconded."

25         Are you saying he wouldn't have issued an arrest

```
1   warrant?

2             THE WITNESS:  She might have.  It's a she.

3             THE COURT:  A she.  I'm sorry.

4             She wouldn't have --

5             THE WITNESS:  She might have but perhaps for the

6   purposes of bringing -- bringing Mr. Rotko in.

7             THE COURT:  Well, if he had already absconded, he's

8   likely to continue absconding.

9             THE WITNESS:  Yes, true.

10            THE COURT:  Right?

11            THE WITNESS:  Yeah, true.

12            THE COURT:  That -- it seems like it's a fine line

13  you're drawing between her finding that whether he's -- because

14  it would be like this.  It would be like here we are on -- what

15  is today?  Is today Tuesday?

16            Here we are on Tuesday.

17            THE WITNESS:  Yes.

18            THE COURT:  I'm not finding that he absconded based

19  on this, but as soon as I sign this two seconds later, I find

20  that -- what were your words, that there's -- I'm making a

21  determination that he's going to.  Well, that determination's

22  made on me thinking he's absconded now.

23            THE WITNESS:  Yes.  The reason why I say it's a

24  forward-looking statement --

25            THE COURT:  Yes.
```

1        THE WITNESS:  -- is because under the Estonian Code

2   of Criminal Procedure, you don't arrest someone because they

3   have absconded.  You arrest someone for the purpose of avoiding

4   their absconsion or avoiding that they might continue

5   committing crimes in the future.

6        That's on black and white.  That's the legal

7   requirement.  You're not --

8        THE COURT:  Okay.

9        THE WITNESS:  An Estonian court does not have to make

10  the determination that you have absconded in order to issue an

11  arrest warrant.

12       THE COURT:  All right.

13       THE WITNESS:  That's based on, I believe, paragraph

14  130 of the Estonian Code of Criminal Procedure.

15       THE COURT:  You know, I don't know if everybody does,

16  but all I can do is try to relate that to what I know about our

17  legal system.

18       THE WITNESS:  Yes, sir.

19       THE COURT:  And some of what you're saying, to me at

20  least, is counterintuitive to it.  But that's -- that's

21  something -- because what you're -- what you're talking about

22  is what we call anticipatory warrants.

23       You think a crime is going to be committed sometime

24  down the road --

25       THE WITNESS:  Yeah.

1    THE COURT:  -- and then you issue a warrant.  If

2    certain things happen, then you have the warrant, and you

3    execute the warrant.

4         But -- but the way you're teeing it up, it almost

5    seems to me like this judge who issued that would have had to

6    have thought that all of the, I don't know, elements were in

7    place to think that he had absconded.  But --

8         THE WITNESS:  Well --

9         THE COURT:  -- but I see what you're saying.

10        THE WITNESS:  -- let me explain it in a different

11   way.

12        THE COURT:  Okay.

13        THE WITNESS:  Say, for example, that we're in

14   Estonia -- that's a bad example.

15        Say, for example, that we're here in the United

16   States.  We have criminal proceedings ongoing here in the

17   United States under the Estonian Code of Criminal Procedure.

18   The suspect lives in Canada -- or lives in Canada and the

19   United States, goes back and forth between Canada and the

20   United States.

21        And the prosecutor is able to establish to this Court

22   that it might very well be that if the suspect finds out, while

23   being in Canada, that there are criminal proceedings against

24   them, that they might not return.

25        So we need your arrest warrant in order to take him

1  in, put him in -- put him in custody and keep him there for the

2  duration of the proceedings.

3          This is what I mean when I say it's a

4  forward-looking -- forward-looking arrest warrant.  This is --

5  this is -- and all of the -- all of the information contained

6  therein, what are the reasons why I think that this person

7  might not return?  Those are the reasons.

8          THE COURT:  Because he's already gone.

9          THE WITNESS:  Yeah.

10         THE COURT:  Okay.

11         Go ahead.

12         THE WITNESS:  Basically it, yeah.  But, again, as I

13  say, this is not a final determination.  It's been done ex

14  parte.

15         THE COURT:  I understand.

16  BY MR. CORSMEIER:

17  Q.   And in your -- in your direct testimony -- and correct me

18  if I'm wrong, but didn't you say that what the judge is finding

19  here is that -- and the words you used were "credibly

20  demonstrated," that it has been credibly demonstrated that

21  Mr. Rotko is avoiding criminal proceedings.

22  A.   Let's see.  Well, it's been credibly demonstrated what the

23  judge says here.  Has left Estonia, has sold his -- has sold

24  his apartment.  Realized his property is what they say.

25  That's -- again, it's -- realized his property means sold

1  his -- sold his apartment.

2  Q.    Now, the last sentence says, "Such facts provide a basis

3  to assume that suspect may, while remaining at large, continue

4  avoiding criminal proceedings."

5        Doesn't that imply that he already was avoiding

6  criminal proceedings?

7  A.    Might imply that.

8  Q.    It might.

9        You can't answer yes or no to that?

10 A.    So what the Court has found -- as I said before, what the

11 Court has found here -- what the criminal case materials tell

12 the Court is that he's aware of the criminal proceedings.  In

13 spite of this, he has realized his property located in Estonia

14 and has probably left the Republic of Estonia.

15       In the criminal case, there has been gathered enough

16 material, factual material, on which there are grounds to deem

17 the suspicion justified.  Aleksandr Rotko has not responded to

18 summons and has repeatedly failed to appear at the body

19 conducting the proceedings.

20       So, yeah, I mean, if Aleksandr Rotko has not

21 responded to summons and has repeatedly failed to appear at the

22 body conducting the proceedings, such facts provide the basis

23 to assume that the suspect may, while remaining at large,

24 continue avoiding the criminal proceedings.

25       Not responding to a summons and repeatedly failing to

1  appear would be to avoid criminal proceedings.

2  Q.   All right.  But the statement of the prosecutor doesn't

3  say that he did that, right?  It just says they attempted to

4  serve him and couldn't.

5  A.   Which is -- which is why it's surprising that the Court

6  has taken this view.

7  Q.   Right.  Could that be a mistake?

8  A.   The fundamental part of the ruling -- if the fundamental

9  part of the ruling is a mistake, then the whole ruling is a

10 mistake.

11 Q.   Okay.  Let me ask you about the -- you were asked about

12 Olga Kotova's case, and -- I think you were asked about it, but

13 even if you weren't, I'm going to ask you about it.

14       The -- her -- and I would call it -- correct me if

15 I'm wrong.  Her appeal of the August 25th, 2007, order that she

16 should essentially be detained --

17 A.   Yes.

18 Q.   Do you recall that circuit court ruling?

19 A.   (Nods head up and down.)

20 Q.   All right.  And in that ruling the Court -- do you have

21 that in front of you?

22 A.   Yes.

23 Q.   Okay.

24       THE COURT:  Which one is that, Mr. Corsmeier?

25       MR. CORSMEIER:  Your Honor, it's document 17-14.  The

1  order begins on page 68 of 86 --

2           THE COURT:  Thank you.

3           MR. CORSMEIER:  -- and I'm looking at page 71 of 86,

4  paragraph 6.1.

5           THE COURT:  Thank you.

6  BY MR. CORSMEIER:

7  Q.   And where the -- her defense attorney, apparently, says --

8  is arguing that she didn't really abscond because of those

9  facts that are listed there, and I'm not going to -- to repeat

10 them.

11          And then saying, "There weren't any indications that

12 she would have been aware of the criminal proceeding initiated

13 against her."  That's the next paragraph down.

14          And that therefore --

15 A.   Which -- what's the number of the paragraph?

16 Q.   It's paragraph 6.1, I'm sorry --

17 A.   6.1.

18 Q.   Yes.

19 A.   Okay.

20 Q.   The first paragraph was essentially the facts that her

21 attorney was arguing showed that she didn't abscond.

22 A.   Uh-huh.

23 Q.   So is the second paragraph, but it says that he or she

24 argued that there's no indication that she would be aware of

25 the criminal proceedings, filed some documents to support that,

1  and therefore the defense attorney argued that the county court

2  was wrong.

3        But the circuit court, reviewing those materials,

4  rules against her and orders that she should still be detained.

5  In paragraph 8, the second paragraph of paragraph 8, it says,

6  "There's no dispute that the attempt to serve O. Kotova with a

7  summons to the investigator failed"?

8  A.    Uh-huh.

9  Q.    So she was never served with a summons.

10  A.    Uh-huh.

11  Q.    And then they go through the facts that show that she did

12  deliberately abscond.

13        And if you go to paragraph 9 on -- in the exhibits,

14  it's -- I mean, I'm sorry, in document 17-14 it's page 73, but

15  paragraph 9.  It says, "In view of the above circumstances, the

16  circuit court agrees with the county court that O. Kotova was

17  aware of the criminal proceedings but deliberately absconded

18  from it."

19  A.    Uh-huh.

20  Q.    But there was never a summons served in that case, so how

21  could they find that she deliberately absconded?

22  A.    Because I think what the Supreme Court actually -- not the

23  Supreme Court, sorry, the district court.  I think it's been

24  translated circuit court.  They actually call them district

25  courts.

1    I think the -- the main bit here, which shows why the

2  Court arrived at the -- at the conclusion that it did, is

3  paragraph 8.  So paragraph 8 starts at the very bottom of the

4  page, so you turn to the next page.

5    And then at the bottom, second to last paragraph,

6  "Thus, according to the surveillance file, Olga Kotova actively

7  interacted with her relatives who had been asked to give her

8  information that Olga Kotova was subjected to criminal

9  proceedings.  So there is a reason to believe that this

10 information was known to Olga Kotova.

11   "However, the behavior of Kotova's relatives show

12 that Olga Kotova absconded from criminal proceedings.  Although

13 they interacted with Olga Kotova, they told the police that

14 they did not know the exact location of the suspect.

15   "According to the Court, the aforementioned" -- "the

16 aforementioned suggests two alternative possibilities:  whether

17 Olga Kotova lied to her relatives about her whereabouts (for

18 example, claiming to be staying in Russia) or her relatives

19 knew her whereabouts, but, in agreement with Olga Kotova,

20 provided false information to the police about her location."

21   So what this is is actually active absconding,

22 absconding actively by conspiring to give false information, by

23 conspiring to hide your whereabouts, and so on and so forth, so

24 this is active.

25   And, indeed, there is -- and this indicates that Olga

1  Kotova -- the prosecutor wouldn't be able to establish that she

2  absconded by omission because she wasn't served a summons.

3  Q.   All right.   So the -- and I may not be using the technical

4  term.   The 15-year statute of limitations -- well, first of

5  all, let me ask you this.

6          So somebody can abscond without being summonsed if

7  it's active absconding, if they know of a criminal proceedings

8  and intentionally leave to avoid the criminal proceedings.

9  A.   Yes.

10 Q.   Okay.   And that type of absconding does the same thing as

11 the active absconding.   It can -- and I'll use the word extend

12 or take the statute of limitations out further.

13 A.   Yes.

14         THE COURT:   The active and the passive.

15         THE WITNESS:   Yes.   You have one coin, and there are

16 different sides of the same coin.

17         THE COURT:   Yes.   But either one --

18         THE WITNESS:   Yes.

19         THE COURT:   -- can have the effect on the statute of

20 limitations.

21         THE WITNESS:   Yes.

22         THE COURT:   All right.

23         THE WITNESS:   Absconding has the effect.

24         THE COURT:   Yes.

25         THE WITNESS:   And absconding can be done in two ways,

1 either by actively absconding or --

2        THE COURT: Passively.

3        THE WITNESS: -- passively.

4        THE COURT: All right.

5 BY MR. CORSMEIER:

6 Q. All right. So if, in fact, Mr. Rotko actively absconded,

7 then the statute of limitations would not expire until 15 years

8 after the -- and I know it's not exactly that. If he's brought

9 back before the expiration, then the continued five years would

10 still apply.

11        But if he's not brought back before the 15 years and

12 he actively -- it's shown he's actively absconded, then it

13 would expire, the statute of limitations. He couldn't be

14 charged.

15 A. Yes.

16 Q. Okay. All right. And you said earlier in your

17 cross-examination that you're not an expert -- and I'm not sure

18 exactly how you put it, but essentially in extradition law or

19 in treaty law?

20 A. Treaty law.

21 Q. Okay.

22 A. So I don't want to go into the interpretation of treaties

23 because I'm not equipped to do that.

24 Q. Have you been involved, either as an advocate or an

25 expert, in other cases involving extradition of persons from

1   the United States to Estonia?

2   A.   Our firm has been engaged in a proceeding involving the

3   extradition of a person from Estonia to the U.S.

4   Q.   Okay.  But not the other way around.

5   A.   Not the other way around.

6   Q.   Have you been personally involved in that matter that your

7   firm's been involved with?

8   A.   No.

9   Q.   Okay.  So when you testify that it's very unusual for

10  Estonia to wait five years to seek an extradition after the

11  arrest warrant, you don't have any basis for that, do you?

12  A.   I absolutely do.

13  Q.   What is that?

14  A.   Because an Estonian prosecutor, upon obtaining an arrest

15  warrant, would not let it sit on the shelf for another five

16  years.

17  Q.   Okay.  And on what do you base that?

18  A.   Because there would be a five-year limitation period.

19          As I explained before, upon obtaining the arrest

20  warrant, the initial limitation period was interrupted and

21  began anew.

22          A prosecutor would do anything in their power to get

23  the suspect to appear, to go through the motions, to do the

24  procedural acts that they need to do in order to put the file

25  together and to then file the charges with the court because

1 there's not a lot of time, is there?

2        To simply let it sit means that you're either

3 disinterested in the case -- it's not important -- or that you

4 feel that you don't have a lot to go on.

5 Q.   All right.  And all of that is based on pure speculation?

6 A.   It's based on my experience.

7 Q.   Okay.  What experience?  Explain the exact experience

8 you're talking about.

9 A.   So usually -- usually prosecutors in Estonia don't find

10 white-collar cases, unless it's a major case of corruption --

11 they don't find it very important.

12 Q.   All right.  So would that be a reason that a prosecutor

13 might wait to seek extradition?

14 A.   It would -- it would -- it would go more slowly --

15 Q.   Okay.

16 A.   -- right, because you don't find it to be -- you don't

17 find it to be very important.

18        But in a case where you think -- I mean, in a case

19 where you think that you're not able to catch the guy, the

20 suspect; the suspect is somewhere at large; you have an arrest

21 warrant -- usually in white-collar cases you don't even issue

22 arrest warrants.  It's also very -- very unusual.

23        As I said, in cases of bribery, corruption,

24 high-level corruption, there might be.  But then it's not for

25 the purpose of absconding because people don't usually abscond.

1  It's for the purpose of having them -- preventing them from

2  committing further crimes in the sense that -- destruction of

3  evidence, instructing witnesses what to say, etc., etc.  That's

4  the purpose of those arrest warrants.

5           But usually you wouldn't.

6  Q.    All right.  You've never been an Estonian prosecutor.

7  A.    I have never been an Estonian prosecutor, but this summer

8  I was asked -- or I was offered the position of the general

9  prosecutor of Estonia.

10 Q.    Okay.  And you didn't take it?

11 A.    I didn't.

12 Q.    And so you have no experience with prosecution.

13 A.    With prosecution, no.

14 Q.    Okay.  And you have no idea what was going through this

15 prosecutor's mind.

16 A.    I wouldn't have any idea what's going through his mind,

17 no.

18 Q.    Right.  And so you don't have any idea whether this was

19 unusual or not in seeking extradition because you've never

20 dealt with extradition to the -- from the United States?

21 A.    What I would say is that in Estonian criminal court

22 proceedings, in criminal proceedings in Estonia, if you have

23 some -- if you obtain an arrest warrant in respect of someone

24 and then don't do anything for more than five years, for more

25 than the entire length of the limitation period, then that

 1    would be very unusual.

 2    Q.    Okay.  And, again, that's just based on what you believe.

 3    A.    That is based on what I believe based on my experience as

 4    an advocate involved in criminal proceedings.

 5    Q.    Okay.

 6    A.    I have never seen -- I have never seen such delays, as a

 7    defense advocate.

 8    Q.    Did you review other cases where Estonia requested

 9    extradition from the United States?

10    A.    As I said, no.

11    Q.    So you have no idea how long those took.

12    A.    No.

13    Q.    Okay.

14          MR. CORSMEIER:  I believe that's all I have, Your

15    Honor.

16          THE COURT:  Did you ask about the charging document

17    situation?  I didn't remember if you -- if you had -- if you

18    started with that.

19          MR. CORSMEIER:  I asked about -- yes, Your Honor,

20    the -- what the -- I asked about the Estonian treaty, what it

21    said in the Estonian language, that it doesn't include a

22    charging document.  It's just people suspected of the crime.

23          I didn't -- I guess I didn't ask about the suspicion

24    order, but -- well, let me ask about that.

25    BY MR. CORSMEIER:

1  Q.   You said that could be translated as suspicion order or
2  suspicion ruling?
3  A.   Yes.
4  Q.   And you said that's not a ruling by the Court?
5  A.   No.  It's a ruling -- we have rulings by the
6  investigative -- rulings that are made by the investigative
7  authorities and rulings that are made by the Court.
8  Q.   Okay.  So it would be a ruling by the investigative
9  authorities that a person is suspected of a crime.
10 A.   A ruling -- a ruling and an order are the same thing.  In
11 Estonian we use the word *määrus*, m-a-a-r-u-s, and that word can
12 be translated into English as either a ruling or an order.
13 Q.   Okay.  And it can mean the same in the United States.
14      But it is a finding or a -- I don't know what to call
15 it, a conclusion by the investigating authorities that we
16 suspect this person of a crime.
17 A.   It's a procedural -- a procedural finding, a procedural
18 order, yes.
19 Q.   Okay.  That we suspect this person of committing a crime.
20 A.   As I -- the suspicion order, as it existed until 2002,
21 28th of July -- suspicion order had the very specific purpose
22 of attributing suspect status to someone, right?
23      Prior to the issuance of that order, the person
24 wouldn't have been a suspect.  After the issuance of that
25 order, he would have been a suspect.

1    And that suspicion order would have been issued in

2    the case that the person hasn't been detained and hasn't been

3    interrogated, meaning that they're at large.  In that case that

4    suspicion order would have been issued.

5    Q.    Okay.

6         THE COURT:  And you said, I believe, earlier that no

7    such order or ruling exists anymore.

8         THE WITNESS:  No.

9         THE COURT:  Is that correct?

10        THE WITNESS:  That is correct.

11        THE COURT:  All right.  And did you say why you

12   think, though, the Estonian version or translation of the

13   treaty still has scheduling order in it?

14        THE WITNESS:  A suspect --

15        THE COURT:  A suspect -- excuse me, a suspicion order

16   in it as a basis for extradition?

17        THE WITNESS:  I don't know why it's in there.

18   BY MR. CORSMEIER:

19   Q.    And I know technically it wasn't a suspicion order or a

20   suspicion ruling, but doesn't the Harju County Court ruling do

21   the -- do the same thing?

22        In other words, it lays out the reasons why somebody

23   is suspected, and the Court kind of ratifies it, "I see what

24   you're saying"?

25        And it's one-sided, but -- and so therefore it was

1  shown that he is a suspect.

2  A.    It's not the same thing.

3  Q.    It's not the same thing?

4  A.    We separate them very distinctly.

5        I mean, now, if you're an Estonian lawyer and you

6  have been asked to draft something, you would make a very clear

7  distinction between something that is issued by the court and

8  what is issued by the investigators.

9  Q.    Okay.

10  A.    There is no way that you can conflate those two.

11  Q.    You said most of this ruling, though, was the prosecutor's

12  statement.

13  A.    Well, they would have to refer to the prosecutor's

14  statements in making a ruling.

15  Q.    Right.  And I'm not saying this is technically a suspicion

16  order under Estonian law, but wouldn't a suspicion order have

17  laid out the same sorts of things by the investigating --

18  A.    Well, the suspicion order would have -- would have laid

19  out several things, as I have indicated in my -- in my report

20  made on the -- on the 2nd of January.

21        It's at paragraph 13 of my opinion.

22        THE COURT:  Just one minute.  Let me find that.

23        THE WITNESS:  Uh-huh.

24        THE COURT:  What paragraph did you say?

25        THE WITNESS:  13.

1    THE COURT:  All right.  Go ahead.

2    THE WITNESS:  So I have -- I have copied the --

3    copied the text.  And a suspicion order shall set out the

4    official title, given name, and surname of the person who

5    prepared the suspicion order.  Well, we don't know that.

6    BY MR. CORSMEIER:

7    Q.   Well, does it say who's submitting the application,

8    Prosecutor Maria Sutt-Tehver, or however you pronounce that?

9    A.   Well, that wouldn't be an order.  That would be an

10   application.

11   Q.   All I'm asking is --

12   A.   That would be a petition.  That's an entirely different

13   thing altogether, again.

14   Q.   So --

15   A.   Then there's the time and place of preparation.

16   Q.   So a prosecutor wouldn't prepare a suspicion order?

17   A.   It can be -- no.  It's an investigator.

18   Q.   Okay.  And who's -- and so -- well, this says -- I know it

19   doesn't have the name and a surname, but the preliminary

20   investigation found out on hearing the application of arrest --

21   is that Judge Popova or someone else?

22   A.   The --

23   Q.   Where the order says -- is she the preliminary

24   investigation judge?

25   A.   She's the --

1  Q.   Okay.

2  A.   She's the judge, yes.

3  Q.   So we don't have the name of the person who prepared the

4  suspicion order.  Okay.

5  A.   And we don't know when it was -- when it -- when the

6  document that you consider to be a suspicion order -- when it

7  was entered, because, as I said before, the suspicion order had

8  the effect of attributing official witness -- oh, sorry,

9  suspect status to a person.

10       So it would have to have the time and place.  The

11  name and surname of the suspect, well, we have that.  Criminal

12  offense of which the person is suspected.  We have some of

13  that.  Qualification, which is the paragraphs.  We have that.

14       We have some of it, but this is not the same

15  document.  This is not it.

16       MR. CORSMEIER:  Okay.  That's all I have, Your Honor.

17       THE COURT:  Let me ask you this.  Are there some

18  crimes in Estonia for which there's no statute of limitations?

19       THE WITNESS:  Yes, there are.  Off the top of my

20  head, I can -- I think genocide, crimes against humanity,

21  terrorism, I believe.

22       THE COURT:  All right.  So is it -- I guess it's

23  possible that someone could have been the subject of a

24  suspicion order when those were still in effect --

25       THE WITNESS:  Yes.

1        THE COURT:  -- and that person could have fled and so

2    could -- in your opinion, is it possible that's why a suspicion

3    order would still carry over here, to cover those kinds of

4    persons, rather than going forward since there isn't one?

5        THE WITNESS:  I think so, yes.

6        I mean, for example, unfortunately, the --

7    unfortunately, Estonia was also involved in the Second World

8    War.  We weren't the -- we weren't the actors, but we were --

9    our country were where some of the battles took place, and we

10   were also under German occupation, and there were Nazi

11   concentration camps also in Estonia.  And there were Estonian

12   nationals who participated in those atrocities.

13       And if someone, for example, for those crimes would

14   have been declared a suspect under the suspicion order, there

15   would be no limitation for that.  Then that would be applicable

16   here.

17       THE COURT:  All right.  Okay.

18       Anything else?

19       MR. CORSMEIER:  Your Honor, just quickly, because I

20   couldn't find it quickly.

21   BY MR. CORSMEIER:

22   Q.   Anywhere in your -- any of your three declarations, did

23   you provide a translation of Section 8(3)(b) of the treaty?

24   A.   I don't believe I did.

25   Q.   Do you happen to have the Estonian-language version of

1  Section 8(3)(b)?

2  A.   Yes, I do.

3  Q.   Can you translate it for us?  Because the prosecutor did

4  in a document, but I want to make sure that there's no

5  disagreement between you and him about what that says.

6  A.   So you want me to translate suspicion order.

7  Q.   Well, is that -- is that the only thing in 8(3)(b)?  Is

8  that the only --

9  A.   "Suspicion order and."

10  Q.   Okay.

11  A.   "Suspicion order and."

12  Q.   Okay.

13  A.   Actually, it's suspicion order, semicolon, and.

14  Q.   And what comes after the "and"?

15  A.   I'm trying to find it.

16       MR. JIMENEZ:  Your Honor, I have a chart that I'm

17  happy to show Mr. Corsmeier.

18  BY MR. CORSMEIER:

19  Q.   All right.  And so this chart, I assume, comes from your

20  providing the translation.

21  A.   What comes after "and" is (c), which in my opinion, is

22  identical to the English-language version.

23  Q.   Okay.

24       MR. CORSMEIER:  Your Honor, Mr. Jimenez provided me

25  with other copies.

1          Can I provide them to the Court?

2          THE COURT:  May I look at one?  Thank you.

3          MR. CORSMEIER:  And may I approach the witness, Your

4    Honor?

5          THE COURT:  Yes.

6          THE WITNESS:  Thank you.

7    BY MR. CORSMEIER:

8    Q.   So that translation of Article 8, the Estonian-language

9    text, did you prepare that?

10   A.   (No response.)

11   Q.   If you didn't, is that correct, if you look at the

12   Estonian-language version and compare it with the English

13   translation?

14   A.   I'll pull up the Estonian-language version of 8, Article

15   8, and then compare the translation.

16          Article 8(3).

17   Q.   And I don't want to belabor this, because it looks like

18   (a) and (b) are pretty much -- or (a) and (c) are pretty much

19   identical so we're only talking about (b), now that I look at

20   it.

21          And I guess my only question is, where it says, "A

22   copy of the," that doesn't include the word for "statement of

23   charges" that we talked about yesterday.

24   A.   You are correct, yes.  That is accurate.  It only says

25   "suspicion order."

1    MR. CORSMEIER:  Okay.  That's all I have, Your Honor.

2    THE COURT:  All right.  Thank you.

3    Mr. Jimenez?

4    MR. JIMENEZ:  A few questions, Your Honor.

5    THE COURT:  Yes, of course.

6                    REDIRECT EXAMINATION

7    BY MR. JIMENEZ:

8    Q.   Mr. Keres, you don't have this document, but I'm going to

9    direct your attention to document 12 at page 23, which is the

10   government's memorandum of law regarding detention pending

11   extradition proceedings filed December 6th of 2019.

12           And in there the government represented the following

13   at page 23:  "Estonian authorities have determined that Rotko

14   left Estonia at least as of the fall of 2006, after

15   Novoseltseva informed him of the criminal proceedings against

16   him."

17           And then it says -- it cites to, "Request at 48 and

18   70," which are the Bates numbers.

19           Do you see any evidence in the record that Mr. Rotko

20   left Estonia after Olga Novoseltseva informed him of the

21   criminal proceedings against him?

22   A.   I see conclusive evidence to the contrary.

23   Q.   Okay.  And the cited pages I'm going to show you, because

24   you may not have them, the first page is 48, which is entitled

25   Northern District Prosecutor's Office Request for Extradition

1  of Aleksandr Rotko dated January 30th of 2013.

2          And showing you page 48, is there anything in that

3  page that says that Novoseltseva informed Mr. Rotko of the

4  criminal proceedings before he left Estonia?

5  A.   No.

6  Q.   And if you could turn to page 70, the Bates numbers at the

7  bottom.

8          THE COURT:  What was that page he was just on?

9          MR. JIMENEZ:  48, Your Honor.

10         THE COURT:  48.  Thank you.

11 BY MR. JIMENEZ:

12 Q.   If you could turn to -- the other page the government

13 cited in this memo is page 70, Bates No. 70.

14         Is there any indication in there that Olga

15 Novoseltseva told Mr. Rotko that there was a criminal

16 proceeding against him before he left Estonia?

17 A.   No, sir.

18 Q.   Okay.  And just to save time, I'm going to read or

19 represent to you that document 24-1, which is a copy of

20 Mr. Rotko's Estonian passport, has an entry date into the

21 United States of October 8th of 2006, and there are no entries

22 after that.

23         If the -- when did the criminal proceedings commence,

24 according to the Estonian authorities in this case?

25 A.   22nd of September.

1  Q.   So that was about two weeks before October 8th --

2  A.   Yes.

3  Q.   -- give or take?

4  A.   Yes.

5  Q.   Okay.  Is there any indication in the file that any --

6  anyone in the world knew that there was a criminal proceeding

7  before October 8th of 2006?

8  A.   There is some.  I believe the investigators knew, but no

9  one outside of the --

10 Q.   Okay.

11 A.   -- of that.

12 Q.   And if you are a permanent resident, like Mr. Rotko was,

13 since 1999, is leaving Estonia to go to the United -- to a

14 country where you're the permanent resident of, is that active

15 absconding?

16 A.   No.

17 Q.   Is it active absconding to sell your house?

18 A.   No.

19 Q.   Okay.  Let's turn again to page 60, which is the --

20 A.   Where is 60?

21 Q.   -- the August 27th ruling.  I'm going to have you look

22 at Judge Popova's --

23 A.   Uh-huh.  Yeah.

24 Q.   You were asked some questions about the final paragraph, I

25 think, by Judge Klindt and Mr. Corsmeier.

1    In there it says Alex Rotko or, "A. Rotko has not

2  responded to summons and has repeatedly failed to appear at the

3  body conducting proceedings."

4    Is there a credible demonstration that that is true?

5  A.    No.

6  Q.    Okay.

7  A.    No, there is none, because no summons was ever issued.

8  Q.    Okay.  And does being -- and I'm referring to the prior

9  sentence, being aware of the criminal proceedings.  We've

10 covered this.

11    That -- simply being aware is not active absconding,

12 correct?

13 A.    No, it's not.

14 Q.    And realizing your property, or selling your apartment I

15 just asked you about, that's -- that's not --

16 A.    No.

17 Q.    You've already answered that.

18    And leaving the republic alone to go to the United

19 States is not active absconding.

20 A.    No.

21 Q.    Is there anything else in this paragraph, above the words

22 "continue avoiding" that the judge refers to when it comes to

23 anything that could possibly be interpreted as active

24 absconding?

25 A.    Active absconding --

1  Q.    Yes.

2  A.    -- no.

3  Q.    Okay.

4  A.    The only -- the only indication of absconding is the -- to

5  repeatedly fail to appear at the body conducting the

6  proceedings and not responding to summons.

7  Q.    Okay.

8  A.    That's an indication of absconding.

9  Q.    Right.  And you were asked about the summons.

10        Is there a section of the Estonian Code of Criminal

11 Procedure that deals with a procedure for service of a summons?

12 A.    Yes.

13 Q.    What section is that?

14 A.    It's -- I believe it's somewhere 162, -3, or -4.

15 Q.    Okay.  And what is that procedure?  How is it -- how would

16 a summons be served?

17 A.    By registered post, ordinary post, e-mail, electronically.

18 Q.    How about in person?

19 A.    In person.

20 Q.    Okay.  Is there any indication that that was done in any

21 of those forms when it comes to Mr. Rotko?

22 A.    No.

23 Q.    So a -- you could do it by an e-mail?

24 A.    Yes.

25 Q.    Or by just regular mail?

1  A.    By ordinary post, yes.  But in that case it would be

2  difficult to prove that you served him, right?  Because with

3  registered mail you get a return slip.

4  Q.    I see.

5  A.    Yeah.

6  Q.    So you would not need an MLAT.  Your could do it by e-mail

7  or by --

8  A.    Yes.

9  Q.    -- registered mail.

10  A.    Or e-mail -- or e-mail is also quite secure or quite

11  reliable because you can determine whether someone has received

12  the e-mail and whether they've opened it.

13  Q.    Okay.  Judge Klindt asked you about -- or said that we --

14  you know, we tend to relate other countries to our procedures.

15  A.    Yes.

16  Q.    And I will represent to you that in the United States, we

17  first -- at least in federal court, unless it's an unusual

18  warrant, we first charge somebody, either by indictment or

19  information, and then the judge signs the arrest warrant, okay?

20  And if a person is just outside the country, they can be

21  considered a fugitive for that reason.

22        In Estonia, is there a concept of being a fugitive?

23  A.    It would not be -- the word "fugitive" in that sense would

24  not be used.

25  Q.    Okay.

1   A.   It has a very negative connotation to it, the way that you

2   put it.

3        In Estonian what we use is -- well, I suppose you can

4   translate it into being a fugitive, but the more correct term

5   is "a sought-after person."

6   Q.   Okay.

7   A.   Right?  And that you do.  You declare someone "a person

8   sought," where you're unable to reach them.  And this can be --

9   this can be a suspect, so a suspect can be a person sought.  It

10  can be a witness.  A victim can be a person sought.  The civil

11  defendant can be a person sought.

12       And if they've been declared a person sought and on

13  that basis, the -- they're -- an order for their arrest or a

14  warrant for their arrest has been issued, then upon their

15  apprehension, they would be taken to the nearest police station

16  for the purpose of why they were sought after.

17  Q.   All right.  But do you use the word "fugitive" in Estonian

18  criminal practice?

19  A.   In Estonian criminal practice we speak Estonian --

20  Q.   Okay.

21       MR. JIMENEZ:  I think I should stop there Your Honor.

22       THE WITNESS:  -- and we say "a person sought."

23  BY MR. JIMENEZ:

24  Q.   "A person sought."

25  A.   Yeah.  I'm directly translating from Estonian, but I think

1  it conveys the essence of what it is.

2  Q.   A person who's being sought.

3  A.   A person who's being sought.

4  Q.   And if -- but if you are -- if you happen to be outside of

5  Estonia because you are a U.S. permanent resident, does that

6  automatically make you a person sought?

7  A.   It doesn't automatically make you a person sought, but, of

8  course, if you're unable to determine where this person is, who

9  he is, where is he, then you may declare him as a person

10 sought.

11 Q.   Okay.

12 A.   And that might be a suspect.  It might be a witness.  A

13 representative of the government of Estonia, for example, can

14 be declared a person sought if they fail to appear once

15 summoned --

16 Q.   Okay.  All right.

17 A.   -- and arrested on that basis.

18         MR. JIMENEZ:  No further questions, Your Honor.

19         THE COURT:  Mr. Corsmeier, do you have anything else?

20 I need to take a brief recess.

21         MR. CORSMEIER:  I just have one question, Your Honor.

22         THE COURT:  All right.  Go ahead.

23                    RECROSS-EXAMINATION

24 BY MR. CORSMEIER:

25 Q.   Mr. Keres, you testified that there's no evidence that

1  Mr. Rotko was aware of the criminal proceedings before he left

2  Estonia, in your opinion; is that right?

3  A.    Yes.

4  Q.    Whether that was correct or not, that statement, there was

5  a finding in the county court order of August 25th, 2007, that

6  he was aware of the criminal proceedings and that he may

7  continue avoiding criminal proceedings, right?

8  A.    Uh --

9  Q.    As of that date at least, August 25th, 2007, the Court

10  found that there was evidence that he was aware of the criminal

11  proceedings.

12  A.    That would -- that would be very unlikely, and there is

13  nothing in the --

14        THE COURT:  Unlikely -- excuse me, sir.  Unlikely

15  that he knew or unlikely that it's in the order?

16        THE WITNESS:  Unlikely that he knew.

17        THE COURT:  Because he's asking --

18        THE WITNESS:  That determination cannot be made on

19  the basis of the application.

20        THE COURT:  But he's just asking you what was in the

21  order.  That was his question.

22        THE WITNESS:  Okay.  That was in order --

23        THE COURT:  All right.

24        THE WITNESS:  -- yes.

25  BY MR. CORSMEIER:

1  Q.   And you just disagree with the judge's conclusion.

2  A.   Well, I disagree with the judge's conclusion on the basis

3  of they're talking about whether Mr. Rotko knew of the criminal

4  proceedings from Olga N., Novoseltseva, right?

5        Now, the allegation is that Olga Novoseltseva told

6  him about the criminal proceedings, and thereupon, Mr. Rotko

7  decided to leave.

8        Mr. Rotko left in September/October 2006.  Olga

9  Novoseltseva learned of these proceedings upon being

10  interrogated as a witness.  Ms. Novoseltseva was first

11  interrogated as a witness in January and then in February.  And

12  in February, Ms. Novoseltseva told the police that she believed

13  Mr. Rotko was in the United States.

14  Q.   Okay.  So in your opinion, you're right; the judge is

15  wrong.

16  A.   Unless there's some sort of temporal flux.

17  Q.   Okay.  So you're right and the judge is wrong, yes or no?

18  A.   Based on this evidence, yes.

19        MR. CORSMEIER:  That's all I have, Your Honor.

20        THE COURT:  All right.  Anything else, Mr. Jimenez?

21        MR. JIMENEZ:  No, Your Honor.

22                    *   *   *   *   *

23

24

25

1               CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4  UNITED STATES DISTRICT COURT )

5  MIDDLE DISTRICT OF FLORIDA   )

6

7         I hereby certify that the foregoing transcript is a

8  true and correct computer-aided transcription of my stenotype

9  notes taken at the time and place indicated therein.

10

11        DATED this 13th day of January, 2020.

12

13                      s/Shelli Kozachenko_____
                      Shelli Kozachenko, RPR, CRR, CRC
14                      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25