1       IN THE UNITED STATES DISTRICT COURT
        MIDDLE DISTRICT OF FLORIDA
2           JACKSONVILLE DIVISION

3
                            Jacksonville, Florida
4
IN THE MATTER OF THE        Case No. 3:19-mc-27-J-39MCR
5  EXTRADITION OF ALEKSANDR
ROTKO                       January 7, 2020
6
                            10:16 a.m.
7
                            Courtroom 5D
8  _____

9
              **TRANSCRIPT OF DETENTION HEARING**
10      BEFORE THE HONORABLE JAMES R. KLINDT
              UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21
OFFICIAL COURT REPORTER:
22
        Shelli Kozachenko, RPR, CRR, CRC
23      221 N. Hogan Street, #185
        Jacksonville, FL  32202
24      Telephone:  (904) 301-6842

25                  (Proceedings reported by stenography;
                      transcript produced by computer.)

1                    <u>A P P E A R A N C E S</u>

2

GOVERNMENT COUNSEL:

3

4        **Arnold Corsmeier, Esquire**
         United States Attorney's Office
         300 North Hogan Street, Suite 700
5        Jacksonville, FL  32202

6

7   DEFENSE COUNSEL:

8        **Marcos Jimenez, Esquire**
         Marcos D. Jimenez, P.A.
9        255 Alhambra Circle, Suite 800
         Coral Gables, FL  33134

10

         **David Barksdale, Esquire**
11       Bedell, Dittmar, DeVault, Pillans & Coxe, PA
         101 East Adams Street
12       Jacksonville, FL  32202

13

14

15

16

17

18

19

20

21

22

23

24

25

# T A B L E   O F   C O N T E N T S

DEFENSE WITNESS:                                      Page No.

  PAUL KERES

    DIRECT EXAMINATION BY MR. JIMENEZ.........        33

    CROSS-EXAMINATION BY MR. CORSMEIER........        89

    REDIRECT EXAMINATION BY MR. JIMENEZ.......       141

    RECROSS-EXAMINATION BY MR. CORSMEIER......       149

1          P R O C E E D I N G S

2    January 7, 2020                                    10:16 a.m.

3

4          COURT SECURITY OFFICER:  All rise.  United States

5    District Court in and for the Middle District of Florida is now

6    in session, the Honorable James R. Klindt presiding.

7          Please be seated.

8          THE COURT:  This is in the matter of the extradition

9    of Aleksandr Rotko, Case No. 3:19-mc-27-J-39JRK.

10         Chip Corsmeier represents the United States.  Marcos

11   Jimenez and David Barksdale represent Mr. Rotko.  Mr. Rotko is

12   present in the courtroom.

13         And Nataliia Worrell is here as the Russian

14   interpreter.

15         And she's serving as a standby interpreter, Mr.

16   Jimenez; is that right?

17         MR. JIMENEZ:  Yes.

18         THE COURT:  All right.  So, Mr. Rotko, if you -- and

19   Ms. Worrell was previously sworn at the last hearing that we

20   had.

21         So, Mr. Rotko, if you need something interpreted,

22   Ms. Worrell will do that, but it's not a situation where you

23   can have a conversation back and forth with her for her to

24   explain the meaning of things.

25         She'll just -- just retrans- -- she'll just translate

1  what it is I'm saying.  And then if you don't understand that,

2  you can ask me to try to explain it more effectively or better,

3  whatever it is you're not understanding.

4       And that way Ms. Worrell won't be put in the position

5  of trying to interpret or, I guess, figure out what it is I'm

6  trying to say.  She'll just repeat what I'm saying.

7       Do you understand that, sir?

8       THE DEFENDANT:  Yes.  Yes, sir.

9       THE COURT:  All right.  Thank you.

10      All right.  We're set for the detention hearing, and

11  I just -- before we do that, I just want to review what has

12  happened in the case so far and what filings have been made to

13  make sure that I haven't missed anything with regard to the

14  filings.

15      Of course, document No. 1 in the case is the

16  complaint for provisional arrest with a view toward

17  extradition.  That was filed on November 19th, 2019.

18      The defendant was arrested and made his initial

19  appearance on December 3rd, 2019, and at the initial appearance

20  the government moved for detention.  The case was set over for

21  a status regarding counsel and a detention hearing, and the

22  date of that hearing was December 11th, 2019.

23      Prior to the hearing, on December 12th -- excuse me,

24  on December 6th, 2019, document 12, the government filed

25  memorandum of law regarding detention pending extradition

1  proceedings.

2       And prior to the hearing, of course, counsel made an

3  appearance, and on December 10th, 2019, document 17, counsel

4  for Mr. Rotko filed Aleksandr Rotko's motion for release on

5  bail and accompanying memorandum of law.

6       Then on the 11th of December 2019, we did convene for

7  the detention hearing, and eventually the detention hearing was

8  continued and set for today.

9       Now, between the December 11th, 2019, hearing and

10 today, there have been a number of filings.

11      On December 13th, 2019, document 24 was filed.  This

12 was Mr. Rotko's supplemental memorandum of law in support of

13 his motion for release on bond.  And this memorandum,

14 essentially, for the most part, addressed the treaty request

15 and the necessity, in Mr. Rotko's view, that a charging

16 document be presented.

17      Then document 27 was filed on December 22nd, 2019.

18 That is United States' notice of filing additional materials in

19 support of extradition.

20      Then the following day, December 23rd, 2019, document

21 28 was filed by the United States, and that was the United

22 States' response to motion for release on bail.

23      Then with leave of Court -- well, no, prior to that,

24 excuse me, on -- on the same day but prior to the filing of a

25 reply, document 32 was filed.  That was January 3rd, 2020.

That was the notice of procedure regarding the posting of real property that was filed by Mr. Barksdale.

Then, as I said, on that same date, January 3rd, 2020, document 33 was Mr. Rotko's reply memorandum in support of his motion for release on bail, and that reply was filed with leave of Court.

And then yesterday, January 6th, 2020, document 34 was filed by Mr. Rotko, notice of filing, and it was the submission of the arbitration response that was filed by the Republic of Estonia that was attached to the notice. That's document 34.

So I think that's everything. The document -- the docket consists of 1,324 pages. Some of those pages are orders and motions, procedural orders and motions. But for the most part, those pages make up the memoranda that have been filed by the parties and the exhibits attached to them.

And I have -- I have reviewed all of the filings in the case. I've done my best to boil it down to about -- about six pages of a timeline and of the essential arguments that you-all are making.

And I have a number of questions, but I think it will be best if I ask whatever questions I have in the context of you-all making your arguments. I think I understand the positions.

And, of course, I think on almost every single issue,

1   the parties are diametrically opposed to each other in terms of

2   how they view the issues of whether -- related to whether there

3   are special circumstances in the case and whether Mr. Rotko is

4   a flight risk.

5          So even though there is a presumption of detention in

6   extradition cases, Mr. Corsmeier, I'll look to you first, and

7   you can present anything that you wish to present or make any

8   response that you wish to anything that's been filed by

9   Mr. Rotko, or you can just -- you can do whatever you deem

10  appropriate.

11         MR. CORSMEIER:  Your Honor, I wouldn't have a whole

12  lot more to say than what's already been said in the written

13  documents that have been filed.

14         I wanted to -- well, first of all, I guess I'll start

15  with responding a little bit to the notice of filing that was

16  submitted yesterday with the arbitration letter response filed

17  by the Republic of Estonia.

18         And in the notice Mr. Rotko quotes a couple of

19  passages, the first being a paragraph about the issue of

20  detention and this extradition proceeding and with highlighted

21  "There is nothing to suggest that Mr. Rotko will not be

22  released on bail during that time."

23         And then the second paragraph has to do with the

24  likelihood of his success, and highlighted, "The alleged" --

25  "allegedly high likelihood of Mr. Rotko being extradited has

not yet been proven," and then the last sentence, "The
likelihood of extradition is thus low, even in the words of the
claimant, and should not warrant any preemptive orders from the
tribunal on this issue."

First of all, I guess a general observation is, you
know, as far as we know, the lawyers in this case have nothing
to do with the prosecutor in Estonia or the people that are
handling the extradition in Estonia.

Second, we definitely know that those lawyers have
nothing to do with this proceeding in the United States or this
process and, I think, really have no basis to give an opinion
about either the likelihood of the success of the extradition
or the likelihood of detention.

And another point is that what I believe is really
happening here is that these attorneys are merely taking
Mr. Rotko's arguments and saying that those, at this point,
don't -- don't warrant the arbitration tribunal making any
order with regard to the extradition proceeding, because
Mr. Rotko himself says that -- that he's -- the likelihood of
the extradition is not great.  I mean, that's his view.

And the one sentence about, "There is nothing to
suggest that Mr. Rotko would not be released on bail during
that time," well, there's nothing yet because that -- because
today's detention hearing hadn't happened.

So those are observations about those quotes, but I

1  think there are things in this response that are really more

2  directly relevant to the extradition proceeding.

3         And the first is -- and I'm looking at page 3 of the

4  attachment to the notice of filing, that is, page 3 of the

5  letter or response by the Republic of Estonia.

6         THE COURT:  You said page 3?

7         MR. CORSMEIER:  Page 3 of 54 is what it says at the

8  top.

9         And in paragraph 9 it says, "The lack of an official

10  charging document does not prevent Mr. Rotko from exercising

11  his rights as a suspect nor prevent the prosecutor from seeking

12  extradition."

13         So now we have a statement by a lawyer for Estonia,

14  apparently very well versed in Estonian law, who is saying that

15  the lack of a charging document does not prevent the prosecutor

16  from seeking extradition.

17         THE COURT:  Well, I mean, aren't you wanting it both

18  ways, that these lawyers don't really have anything to do with

19  this process and that they're -- you know, they're dealing with

20  the arbitration, so, you know, don't -- don't really consider

21  what they're saying, but if it -- if it helps me, do?

22         MR. CORSMEIER:  Well, Your Honor, not really because

23  the other arguments are factual in nature.  I mean, they're

24  making a conclusion based on facts they have no knowledge

25  about.

1          THE COURT:  But these are civil lawyers, right?  I
2    mean, how do you --
3          MR. CORSMEIER:  Right.
4          THE COURT:  I mean, how do we know what they know
5    about extradition?
6          MR. CORSMEIER:  Right.  Right.
7          And so I guess, Your Honor -- and I'll point out a
8    couple other points.  But I guess, then, that would mean that
9    this should just be disregarded.  But I'll just point out, just
10   for the record, a couple other things.
11         Paragraph 11 on that same page, again, says, "A
12   statement of charges is also not required before requesting
13   extradition."
14         And then this is important, and whether you -- you go
15   by what they say -- but it says, "Pursuant to Section 457 of
16   the Code of Criminal Procedure, extradition may be requested if
17   the suspect is located abroad and is evading criminal
18   proceedings due to which the continuation of the proceedings is
19   impeded."
20         And then if you look at -- on the page -- the last
21   page of that attachment, page 54 of 54, they quote Section 457
22   in Estonian, and if necessary, I guess, for the extradition
23   proceeding, we will get an official translation of that.
24         But they say that what it means is that if they -- if
25   they're avoiding criminal proceedings, essentially -- and,

1    again, it's not an official translation but Google Translate

2    translates that into, "The extradition of a person is requested

3    from a foreign state if that person staying abroad is a suspect

4    or accused person, and further prosecution of criminal

5    proceedings is significantly hampered or excluded without the

6    presence of the suspected or accused person, or where the

7    extradition of the sentenced person" -- and then it just says

8    "enforcement of judgment," so there's something missing there.

9         So that section -- section of Estonian law says that

10    extradition can be had for a person who is merely a suspect.

11    Not accused, suspect or accused.

12         So another provision of Estonian law on extradition

13    that would comport with the version of the treaty in Estonian

14    that says that a suspected person can be extradited, a

15    provision of the Estonian treaty that now the defendant agrees

16    with -- his own expert, in his most recent, I believe,

17    affidavit gives a translation of Article 1 of the Estonian

18    treaty.  And it's pretty much the same as the translation

19    provided by the prosecutor, that someone who's suspected -- not

20    charged but just suspected -- in an offense can be extradited.

21         And then, I guess, also related -- and this is

22    something that these lawyers could make a statement about.  On

23    page 4 of 54, paragraph 14 -- and this is something that the

24    government said in its response to the motion for bail.

25         The last sentence says, "Both the arbitration and

criminal proceedings can continue in parallel, and if any

proceeding should be suspended to avoiding -- for avoiding

irreparable harm, it should be the arbitration proceeding,"

which is exactly what the government said.

And what the government of Estonia, the lawyers for

Estonia, say on page 7 of 54, paragraph 31, the last sentence:

"The claimant is at liberty to request the suspension of these

arbitration proceedings until Mr. Rotko is acquitted or has

served his sentence (if any), and, given sufficient evidence

and justification, the respondent would seriously consider

supporting the request."

So the lawyers for Estonia here are saying, "If

anything should be suspended, it should be this -- this

arbitration proceeding.  And we're willing to" -- "we may" --

and it almost sounds to me like "likely would agree to that

suspension pending the outcome of the extradition case."

So those are some of the points I wanted to make

about that -- that notice of filing.

And I guess I'll address now, Your Honor, that

Mr. Rotko intends to call today Mr. Keres, his -- Paul Keres,

his expert on Estonian law.

The government objects to that testimony.  These

extradition proceedings are not intended to be something where

the sides call witnesses to dispute these facts or to give

different presentations about what the law particularly is.

1    I mean, I guess it would mean, if that's allowed,

2  especially if it's allowed at the actual extradition hearing,

3  we would -- I guess we'd need to get the prosecutor over here

4  from Estonia to give his opposite view of that, and that's just

5  not what's contemplated in these things.

6    They're generally decided on the papers.  And the

7  prosecutor has given his view in the papers.  In the

8  government's view, the judges have given their view in their

9  orders.  And the Court should rule on the papers, not on what

10  somebody else -- some other law -- lawyer -- legal expert says

11  about what the law is or what the facts are or what the facts,

12  you know, could lead to.  They should lead to a different

13  conclusion, when the government of Estonia, the prosecutor, the

14  judges, have already reached their conclusions.

15    THE COURT:  Well, I mean, that's -- but that's -- I

16  mean, that's really the crux of what we're going to have to at

17  least get into or discuss, because the defense suggests that

18  if -- if this -- if this charge for which Mr. Rotko is being

19  extradited is time-barred, then he can't be extradited under

20  the treaty.

21    And so it -- it -- and that's what their point is.

22  And so if the Court has to decide whether the -- whether the

23  charge is time-barred because of the whole issue involving

24  whether Mr. Rotko absconded, and if that's an appropriate

25  consideration, then it seems like they would be entitled to

1   present something.

2          MR. CORSMEIER:  Your Honor, that's all arguments for

3   the Estonian judges.  It may be arguments for --

4          THE COURT:  So wait.  So you disagree -- do you

5   disagree that the extradition treaty says that you can only be

6   extradited if the -- I'm not quoting the treaty, but I'm

7   reading from what the defense is saying.

8          They're saying if it's time-barred, that you can't be

9   extradited.  So don't you have to make a determination, in the

10  first instance, if it's time-barred?  Doesn't --

11         MR. CORSMEIER:  Your Honor, yes, but the prosecutor's

12  already said it is not.  There is a -- an order from a judge

13  that says he did abscond.

14         THE COURT:  Well, that's what I'm saying.  You-all

15  have the complete opposite view of this, and I don't -- I'm not

16  saying I agree with you or I don't agree with you.  The defense

17  says that the cases you cite on this are old cases prior to

18  this treaty.

19         So I'm going to overrule any objection to the

20  testimony.  Now, what weight I give it and what I decide to do

21  with it are one thing --

22         MR. CORSMEIER:  Well, that's what I was about to say,

23  Your Honor, that given that this is just before a judge and

24  this is a detention hearing, then I'd understand if the judge

25  wanted -- if you, Your Honor, wanted to hear it.  That's what I

1   was about to say.

2         THE COURT:  Well, I would -- I would -- I really

3   think that, in terms of their supplemental memorandum, that it

4   would be helpful to me at some point, and it may be after they

5   make their argument, that you go point by point arguing their

6   counterpoint to what you say.

7         For instance, I was -- I was looking at your filing

8   where you say it would make no sense -- I'm trying to -- let me

9   see if I can find that.  Where you say -- let me see.  I think

10  I have it right here.

11        You say -- and I think it goes to the point that

12  we're discussing -- that "Given the requirement that a suspect

13  be interrogated before he can be formally charged" -- this is

14  on page 14 of document 28 -- "not only would it make no sense

15  for the extradition treaty to require a formal charge before an

16  extradition could be undertaken, but it would also render the

17  treaty nugatory as suspects could insulate themselves from

18  extradition simply by fleeing the country before the

19  extradition required under Estonian law."

20        And then when Mr. Rotko comes back and addresses

21  that, he addresses the whole idea that absconding and a

22  prosecutor getting a warrant for absconding is totally

23  different than proving the extension of the statute of

24  limitations and makes a very intricate argument regarding that.

25        And that's one instance that I think -- and it may be

1 best if you do that after the argument is made, to address

2 those kinds of things, because that's -- that's where I'm going

3 to need some help, because you say a judge has already found

4 it.  A judge already found he absconded.

5    And Mr. Rotko's coming back saying, yeah, that's

6 true.  He found he absconded, but that's like a prosecutor

7 going in and getting a warrant without any type of adversarial

8 proceeding, if you will.  And so -- and that's not even the

9 right standard.  It's more like an element of the offense on

10 the statute of limitations, and, you know, that -- that hasn't

11 been done.

12    So there are a number of those that I think it would

13 be very helpful for you to address in that regard because I --

14 I have to tell you, I'm in a bit of a quandary about how far

15 that I should go, how far I'm required to go, and how limited I

16 am in the considerations that I can make in regard to the

17 extradition.

18    But if it's as simple as there's a warrant, a judge

19 has already found he absconded, and it's that simple, then I

20 guess we could just have the extradition hearing right now.  We

21 wouldn't even need the hearing.  It's done.  It's over.

22    So I understand what you're saying, that --

23 whether -- whether he -- the substantive aspect of whether

24 he -- Mr. Rotko committed these crimes and all of those things,

25 I understand that I'm not getting anywhere near that.

1        But it seems to me that based on -- your position is

2   in one place and Mr. Rotko's -- and the -- and what I know I

3   can't do is another place, and I'm not sure, in that continuum,

4   where I land.

5        But I appreciate what you think I can do, but --

6        MR. CORSMEIER:  Your Honor, just a couple of points.

7   I mean, I think if we hear from Mr. Keres and then the Court

8   has what the prosecutor has said, then the Court is going to be

9   interpreting Estonian law to decide something that it shouldn't

10  be doing.

11       I mean, I think it's pretty clear, and the courts

12  have made pretty clear, we're not -- courts in the U.S. are

13  not -- you know, obviously could interpret Estonian law, but

14  they're -- they're not -- they're not situated in a position

15  where they could -- they could do that well.  And so you have

16  this fight over -- over what Estonian law is.

17       And, again, I guess I could bring the prosecutor from

18  Estonia, then this Court interprets the law and decides what it

19  is, when the government in Estonia is saying, no, this is what

20  the law is and then this is what the court --

21       THE COURT:  So I have to accept the prosecutor's --

22  in your mind, I have to accept what the prosecutor says the law

23  is.

24       MR. CORSMEIER:  I think so, Your Honor, in this

25  extradition proceeding.  This is a --

1        THE COURT:  Have you seen any --

2        MR. CORSMEIER:  -- criminal proceeding --

3        THE COURT:  Have you seen any court in any of these

4    cases you've read or cited by the defense where a court does

5    look to try to make a determination with regard to what the law

6    is to see, for instance, if a charge is time-barred?

7        MR. CORSMEIER:  I haven't, Your Honor, but I can --

8        THE COURT:  Okay.

9        MR. CORSMEIER:  I can -- we can do more research on

10   that.

11       THE COURT:  No.  I'm just asking because I --

12   because, I mean, we're -- I'll tell you what.  This is a huge

13   unbelievable waste of time for the Court and money for

14   Mr. Rotko and for every one of these people who's sitting in

15   this courtroom if the -- if it's as simple as the Estonian

16   prosecutor said he's absconded, and that's because a judge

17   found that -- even though there aren't any real factual

18   findings based on how the judge found that.

19       I suppose you can read the filings and interpret that

20   he -- he must have known because the bookkeeper knew and all

21   those kinds of things.  But there's really -- there's really no

22   specific finding.  So -- but a Court does issue a --

23       MR. CORSMEIER:  Your Honor, there are many findings

24   in that county court order.

25       THE COURT:  No.  I found -- I've heard the findings,

1    but they say that "Based on what we know about Mr. Rotko, we're

2    detaining so-and-so."

3          We know he knew, but --

4          MR. CORSMEIER:  And I'm talking about the order

5    before that, Your Honor.  The county court order relates to

6    Mr. Rotko and Ms. --

7          THE COURT:  Right.  And if I -- if I recall that,

8    that's circumstantial evidence of his -- of his absconding.

9          MR. CORSMEIER:  Whatever evidence it is, Your Honor,

10   a judge made a finding based on that.

11         THE COURT:  Okay.  Well, here's my point, that if

12   you're right, and that's all we have to do, then what are we

13   doing here?

14         MR. CORSMEIER:  I --

15         THE COURT:  And I want to make sure -- I want to make

16   sure that when -- when the -- if the treaty says -- and you

17   tell me what the treaty says.  You're the defender of it here.

18         If the treaty says that he cannot be extradited if

19   the charge is time-barred, then I need to know what I can take

20   into account.  And just because a prosecutor in Estonia says

21   it's not time-barred, if that's all I can consider, then that's

22   all I'll consider.

23         But I think the defense has cited some authority to

24   suggest that I might be able to consider something beyond that,

25   and that's what I'm trying to find today.

1    I've got to tell you, when you look at this whole

2  record, there are a lot of questions.  And I'd like nothing

3  more than to have the prosecutor from Estonia in here and

4  someone from the Department of State and someone from the

5  Department of Justice and figure out what the heck went on

6  here.

7    But I don't think that that's probably something that

8  I need or can or should consider, except to the extent the

9  defense suggests I should.  I'll listen to what they say.

10    So there are a lot of things I'd like to know and a

11  lot of things that I think would be interesting to know,

12  because it -- some of this amazes me, how long this has taken.

13    And I think -- I don't know, maybe you have the

14  explanation for it.  Maybe you know why this has been dragging

15  on forever.  Maybe you can answer the questions of whether

16  there's a retaliation because of the arbitration.

17    But at this point, without more from Mr. Rotko, I

18  don't think those are appropriate for me to consider.  So I'm

19  trying to focus very, very narrowly on what I can consider and

20  what I can't.

21    And when -- when I look at your memo, which is very

22  well written -- but there are a lot of statements like -- that

23  are made in there that there's no authority for.

24    It's just like, okay, some guru up at OIA decided to

25  take a draft from something else where it was similar and then

1  fit in the Estonian law and tell me what I can and can't do,

2  what I can consider, what makes sense and what doesn't.

3  I'm trying to be very narrow in what I do because I'm

4  very sensitive to what you're saying, that I'm not here to --

5  to be the end-all and be-all of the whole case for Mr. Rotko.

6  I'm just trying to figure out that, if he cannot be extradited

7  for something that's time-barred, how far can I go in

8  determining whether something's time-barred?

9  You are over here saying the prosecutor said it.  The

10  prosecutor went to a judge, and a judge said he absconded.

11  The defense is over here saying that's a totally

12  separate question in terms of the extension of this -- of this

13  5-year-to-15 issue, because to me that's -- that's at the nub

14  of this.

15  And if -- and if I read what authority you present to

16  me, that I can't -- I can't do it, I'm going to follow -- I'm

17  going to follow the law, if I -- if I think that's the

18  authority that is what I have to follow.  So I'm not going to

19  make something up here.

20  And I'd like nothing more than for it to be so easy

21  as to look at it and the Estonian prosecutor says, "No, it's 15

22  years now," and then they can decide that in Estonia.  And

23  maybe that's right, but we've got -- we've got Mr. Rotko, as

24  you can tell, claiming the exact opposite.

25  So -- but -- I appreciate what you're saying, but --

1    and when you look at some of the -- and I haven't read all the

2    cases that have been cited.  I haven't had time to read all the

3    cases that have been cited, but if somebody cited a case, it's

4    going to be read.

5           And so, for instance, in -- I don't know what

6    footnote it is in the latest filing by the defense where the

7    footnote cites the Western District of Oklahoma case, and they

8    say that the Western District of Oklahoma case that the

9    government cites is outdated.

10          Well, I want the government's opinion on that at some

11   point.  I want the government's opinion on whether that's

12   outdated and whether that was an interpretation of a treaty

13   that is now outdated because of the more recent treaties.

14          That's the kind of input I want, because I'm -- I'm

15   going to -- if I agree with you, I'm going to have to support

16   that.  I'm going to have to support that.

17          I'm not going to just be able to say, you know,

18   "General law on extradition is that all you do here is send it

19   back if a prosecutor says X happens," because I don't -- this

20   is going to be reviewed, no matter what's done here.

21          And so I'm going to need more than -- I'm going to

22   need authority that I hope focuses in on, instead of a broader

23   lens, a more narrow lens on what the specific issue here that's

24   raised.  But I think it will be better with regard to you

25   responding when they do.

1       The Western District of Oklahoma case was the one I

2  think you-all cited that held that an arrest warrant alone

3  sufficed as a charging document, which isn't -- isn't -- that's

4  the second -- the second issue here.

5       MR. CORSMEIER:  Yes, Your Honor.

6       THE COURT:  Which, by the way, is interesting too

7  because of the case that's pending in the First Circuit, you

8  know.  So to me, those two issues are ones that I'm going to

9  appreciate whatever help you can give me on what the limitation

10 is of what I can consider with respect to those things.

11      But go ahead.  I interrupted you three times now.

12      MR. CORSMEIER:  And, Your Honor, I was mostly going

13 to wait and listen to what they have to say and then respond at

14 that time.  But since we're talking about the statute of

15 limitations, let me just make one other point.

16      The crux of their argument is that there has to be a

17 summons issued to a defendant for them to have absconded, and

18 they cite -- their expert cites a Supreme Court case which is

19 included in the materials.

20      And I just wanted to point out, and I'll ask him

21 about this when he testifies, but -- and I'm looking at the

22 attachment to document 17 --

23      THE COURT:  Document 17?

24      MR. CORSMEIER:  Yeah.  And I just have the

25 attachments.  I don't have the actual document.  Oh, it's their

1 motion, the original motion.

2 And --

3 THE COURT: This is -- this is the memorandum, their

4 memorandum.

5 MR. CORSMEIER: Yes. Yes, Your Honor.

6 THE COURT: Okay.

7 MR. CORSMEIER: It's the motion for bail with

8 accompanying memorandum.

9 THE COURT: Yes.

10 MR. CORSMEIER: And there are lots of attachments.

11 Exhibit M was the affidavit of Mr. Keres.

12 And then he attached to his affidavit the -- an

13 English translation of a portion of the Supreme Court case on

14 which he relies, and that is at page 50 of document 17-14.

15 THE COURT: 17-14?

16 MR. CORSMEIER: Yes, Your Honor, page 50 of 86.

17 THE COURT: Just one second.

18 All right. What page did you say?

19 MR. CORSMEIER: Page 50 of 86.

20 THE COURT: All right.

21 MR. CORSMEIER: And I believe it's just one page, one

22 page except for the translation --

23 THE COURT: Yes.

24 MR. CORSMEIER: -- certification.

25 THE COURT: Yes.

1    MR. CORSMEIER:  And what the Court does is it goes

2  through kind of the -- what the circuit court said in paragraph

3  8.3.  It says that he was searched for, did not live in his

4  place of residence.  He failed to appear.  Was declared a

5  fugitive.

6    The Supreme Court disagreed and said, "It cannot be

7  concluded that the person absconds from criminal

8  proceedings" -- about in the middle of paragraph 8.3 -- "by

9  relying on the mere fact that the person does not reside at the

10 address entered in the Population Register."

11   I'm not going to read it all, but it talks about, a

12 little further down, "Although the circuit court stated that T.

13 Koit was summoned to the interrogation at the Pärnu Police

14 Station for several times, the judgment of the circuit court

15 did not reveal whether T. Koit actually received the summons.

16   "The Chamber notes that according to the materials of

17 the criminal case, T. Koit has not received the summons dated 2

18 December 2002, 14 April 2003, and 5 May 2003 requiring that

19 T. Koit appear at the investigator's office," and that the

20 materials don't include the summons.

21   So -- so I think that's what they're basing it on is

22 that this person couldn't be served with a summons.  Therefore,

23 in -- in order to abscond, he had to be served with a summons,

24 but that's not what the Court says.

25   If you then look at paragraph 8.4, it says, "Thus,

the materials of the criminal case do not include information

that serves as a basis for a firm conclusion that, being aware

of the criminal proceedings conducted with respect to him,

T. Koit absconded from precourt proceedings, and that would

preclude the expiry of the limitation period concerning the

fraud and embezzlement," and I won't go on.

Nothing in there about that there has to be a

summons.

And then probably most importantly, the final two

sentences of paragraph 8.4 is what it's telling the court below

to do in the -- in -- when the case is remanded, essentially.

"The county court must ascertain at the new hearing

of the criminal case whether T. Koit was aware of the criminal

proceedings conducted with respect to him and, nevertheless,

acted in a manner that could be considered as absconding from

criminal proceedings.

"Only after the adjudication of these matters, a

decision can be made on the expiry of the limitation period of

criminal offenses attributed to T. Koit."

So they don't say, "Determine whether a summons was

actually served on him before they can say he's absconded."

Just, "Determine whether he was aware of the criminal

proceedings."

And that's exactly what the county court did in this

case.  They determined that he was aware of the criminal

1   proceedings and absconded.  So that whole argument falls away

2   if what they're relying on is this single Supreme Court case

3   that says that a summons had to be served before somebody can

4   be found to have absconded.

5           And I think that's all I'll say for now, Your Honor.

6           THE COURT:  All right.  Thank you.

7           All right.  Mr. Jimenez?

8           MR. JIMENEZ:  Thank you, Your Honor.

9           If I may, what I would like to do, if it pleases the

10  Court, is just to make a couple of quick points now in response

11  and then have Mr. Keres come up.

12          THE COURT:  Yeah, whatever you'd like to do.

13          MR. JIMENEZ:  I'm sure you have a lot of questions.

14  I've been working on this case for a month, and I still have

15  questions.  But a couple of quick things about, first, the

16  notice of filing.

17          We filed it, Your Honor, because it shows that

18  Estonia is telling the arbitration panel one thing and trying

19  not to get the arbitration panel to protect its proceeding, and

20  through the U.S., Estonia is telling this Court another thing,

21  on bond, for example, which is what we're on today.

22          The Section 457 of the Estonian criminal procedure

23  that Mr. Corsmeier mentioned is an Estonian law, and what the

24  Court has to decide in this case is what the treaty provides,

25  not what Estonian law is on whether or not something is

1   extraditable.

2        Whether Mr. Rotko is extraditable and whether he has

3   a likelihood of success on defeating extradition is governed by

4   the treaty, and as the Court knows, the treaty does require

5   that the Court examine the law of the requesting state.

6        Article 6 of the treaty states that "Extradition

7   shall not be granted when the prosecution or the enforcement of

8   the penalty of the offense for which the extradition has been

9   sought has become barred by length of time according to the law

10   of the requesting state."

11        And even one of the cases that the government cites,

12   which is the Second Circuit case *Skaftouros versus U.S.*,

13   which --

14        THE COURT:  Can you spell that?

15        MR. JIMENEZ:  Skaftouros?  It's on page 6 of docket

16   No. 28, Your Honor.  It's the government's response to the

17   motion for release on bail, S-k-a-f-t-o-u-r-o-s.

18        So that case was at the Second Circuit because, at

19   the magistrate level, if I recall correctly, extradition was

20   granted.  The extraditee then -- or person, the subject, then

21   filed a petition for writ of habeas corpus, which is the way

22   that you indirectly appeal orders -- and by the way, if I can

23   make a side note here, Your Honor -- I had the case but I'll

24   give it to you, Your Honor.

25        There's an Eleventh Circuit case out there which says

1    that your decision on bail today, or when the Court rules, is

2    not reviewable by the district court.  And the case -- I'll

3    cite the case to Your Honor, but since we're talking about the

4    procedural posture of this case, I thought I would make this

5    note.

6              And the only way for the government to review bond

7    determinations is, according to the Eleventh Circuit, by writ

8    of mandamus directly to the Eleventh Circuit, and it's a very

9    limited scope of review because it's an extraordinary writ.

10             But in the *Skaftouros* case, the person filed a writ

11   of habeas corpus, so it was his burden to show that he was --

12   his body was being improperly held in a federal facility.

13             The district court granted -- or ruled in his favor,

14   then he appealed to the Second Circuit.  And the Second Circuit

15   said all the things that you read in these cases, such as the

16   limited scope of review.

17             But it said -- and this is not what the government

18   cites it for.  The government cited a different thing.  It

19   says, "Because the treaty itself" -- and I'm reading from page

20   12 -- I'm sorry, page 161 of the opinion.

21             "Because the treaty itself requires an examination of

22   whether the statute of limitations of either the demanding or

23   asylum country has expired and because the U.S. does not have a

24   statute of limitations for first-degree murder, it was proper

25   for the district court to examine Greek law for the limited

purpose of determining whether the statute of limitations had expired."

So I don't think that the Court should, and it would not be proper for it just to take anybody's word on a piece of paper that the statute of limitations has not run. In fact, I don't think that's even Estonia's position. I think Estonia's position is that the five-year statute of limitations has run. And Mr. Keres is going to basically detail that for you.

What they're saying is that the statute has been extended because of absconding, and our position is that that's Estonia's burden to show absconding.

And so that's their burden at this point. It's not Mr. Rotko filing a habeas petition saying he's being improperly detained. It's not him saying so much, "I've got an affirmative defense." He's saying that "If -- if Estonia wants to prove that this 15-year statute applies, it's its burden to show us that." So that's the legal position.

With that, I think it would be -- I think if it's okay with the Court, I'll have Mr. Keres get up now and just answer a few questions. I don't plan to go on very long with him. I'll be as brief as I can.

THE COURT: All right. Well, I've set aside all day, so you take whatever time you want.

MR. JIMENEZ: Okay. Yes, Your Honor.

I've got the cite just for the -- for the benefit of

1  the Court, and it's called *In Re Extradition of Ghandtchi*,

2  G-h-a-n-d-t-c-h-i, *U.S. versus Ghandtchi*.  It's 697 F.2d 1037.

3  It's a 1983 Eleventh Circuit case where the Court held the

4  district court lacked jurisdiction to review the magistrate's

5  decision ordering the release of defendant on bond pending the

6  extradition hearing.  And mandamus is appropriate only in

7  extraordinary cases to remedy a clear usurpation of power or

8  abuse of discretion.

9       THE COURT:  Mr. Jimenez, you may want to turn the

10  podium a little bit.  If you'd keep it slightly angled so the

11  court reporter can still see you.

12       MR. JIMENEZ:  All right.

13       THE COURT:  Sir, if you'd just approach the witness

14  stand to --

15       THE WITNESS:  Thank you, Your Honor.

16       THE COURT:  -- your right, please -- or my right,

17  your left.

18       THE WITNESS:  Okay.

19       THE COURT:  And if you'd raise your right hand,

20  please.

21       Do you solemnly swear the testimony you're about to

22  give will be the truth, the whole truth, and nothing but the

23  truth, so help you God?

24       THE WITNESS:  Yes.

25       THE COURT:  All right.  You may be seated.

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  If you'd try to be careful with that

3   microphone, not to --

4          THE WITNESS:  Knock it over.

5          THE COURT:  -- not hit it with papers and things.

6          Would you state your first and last name, please.

7          THE WITNESS:  My first name is Paul.  My last name is

8   Keres, K-e-r-e-s.

9          THE COURT:  All right.  Thank you.

10         You may proceed.

11         MR. JIMENEZ:  Thank you.

12            PAUL KERES, DEFENDANT'S WITNESS, SWORN

13                    DIRECT EXAMINATION

14  BY MR. JIMENEZ:

15  Q.   Mr. Keres, could you just briefly tell us your educational

16  background.

17  A.   Well, I'm an Estonian advocate, and I trained at the

18  University of Tartu.  I earned my degree in law in 2009.  The

19  degree is an MA, which is *Magister Artium*.  It's a master's

20  degree.

21         And in 2010 I entered the Estonian Bar.  I was

22  admitted into the Estonian Bar, and I've been practicing as an

23  advocate ever since.

24         However, prior to graduating from the university, I

25  started work as an assistant to one of the -- one Estonian

1   advocate already in 2007 because I had already earned my

2   bachelor's degree by then, and so that -- that would be

3   allowed.

4   Q.   And have you been in private practice?

5   A.   I've been in private practice ever since, yes.

6   Q.   What firm are you with?

7   A.   I'm at Glikman Alvin Levin.

8   Q.   And what kind of firm is that?

9   A.   It's a firm that mostly specializes in complex dispute

10  resolution.  We mostly -- some of our staff mostly focus on

11  commercial -- complex commercial litigation.  I focus mostly --

12  as of today, I mostly focus on criminal law and criminal

13  defense work.

14         I also work in the area of commercial arbitration,

15  sports arbitration, and also complex commercial litigation.

16  Q.   And could you please tell Judge Klindt what you did to

17  prepare for your testimony today.

18  A.   For my -- for my testimony, for my evidence today, I

19  reread the expert reports, the expert legal reports that I have

20  drafted for the benefit of this Court, and I have met with the

21  counsel for Mr. Rotko.

22         I have also read some subsequent documents that have

23  been presented by the Estonian government.  And because I've

24  been provided with the U.S. attorney's documents, I've also

25  read that.

1 Q. And what are the two offenses that Mr. Rotko is charged

2 with -- or, sorry, he's not charged with, that are the subject

3 of this matter?

4 A. Those are the offenses of embezzlement and destruction of

5 property.

6 Q. And what type of offenses are those?

7 A. Those are second-degree offenses punishable by a maximum

8 of five years in prison.

9 Q. What's the difference between first degree or second

10 degree or whatever other degrees there are?

11 A. The offenses in the first degree are those that are --

12 that are punishable by more than five years, and second-degree

13 offenses are lesser offenses and punishable by up to five

14 years.

15 Q. And for these second-degree offenses, when does -- what is

16 the statute of limitations, under Estonian law, for them?

17 A. It's five years.

18 Q. Okay. And when does that statute begin to run?

19 A. It begins to run as of the commission of the last act.

20 And according to Prosecutor Voronin, the Estonian Prosecutor

21 Voronin, the last act was committed, I believe -- according to

22 him, allegedly, it was committed on the 22nd of September,

23 2006. And so accordingly, time would have expired on the 22nd

24 of September, 2011.

25 Q. All right. And you have reviewed at least a portion of

1  the Estonian file that the government has attached to its

2  filings --

3  A.   Yes.

4  Q.   -- and also the declarations by -- the subsequent

5  declarations by the Estonian prosecutors that were received in

6  mid December of last year, correct?

7  A.   Yes.

8  Q.   Okay.  Is there any -- well, first, let me ask you a

9  general question.

10          Are there acts generally, under Estonian law, that

11  can interrupt the statute of limitations?

12  A.   Yes.  With regard to the limitation period or expiration

13  of the limitation period, the expiration period can be either

14  suspended -- which is the case when a person absconds.  That

15  time stops and then begins again.  There's a pause.  It pauses

16  for the time that the person is deemed to have absconded.

17          And then we also have interruptions of expiration

18  periods or limitation periods.  And an interruption occurs

19  when, for example, a restrictive measure is applied.  Under

20  Estonian law a restrictive measure can, for example, be an

21  arrest warrant issued against the person.

22          I see in the file that there was -- there was an

23  arrest warrant issued on the 25th of August, 2007.  So the

24  limitation period began to run on the 22nd of September, then

25  it was interrupted on the 20th of August, a year later.  And

1  then it began anew, so a new five-year limitation period began

2  to run.

3       And then accordingly, it is my opinion that the

4  limitation period expired on the 25th of August, 2012.

5  Q.  Okay.  And did you see any other interrupting acts or

6  events in the file, other than the arrest warrant?

7  A.  No.

8  Q.  Okay.  Now, you mentioned the arrest warrant.

9       Is that the August 25th, 2007, document that's

10  entitled Court Ruling in this case?

11  A.  That's accurate.

12  Q.  Okay.  And are you familiar with those kinds of documents

13  in Estonian practice?

14  A.  Oh, yes.  I've seen many of them.

15  Q.  All right.  And if you could turn --

16       MR. JIMENEZ:  Your Honor, he's got a -- just to let

17  the Court know, I showed Mr. Corsmeier this notebook he's got

18  up there.  It's just to refresh his memory.  It's got his

19  declarations and the arrest warrant and those things.

20       THE COURT:  All right.

21  BY MR. JIMENEZ:

22  Q.  If you could turn to the arrest warrant, and could you

23  read the Bates number that's attached to the bottom?

24  A.  It's 56.

25  Q.  So it's Rotko 56?

1  A.    Rotko 56, yes.

2  Q.    Attached to the government's complaint?

3  A.    Yes.

4  Q.    Okay.  Is that -- is that the arrest warrant that you're

5  talking about?

6  A.    This is the arrest warrant, yes.

7        THE COURT:  Is there a way to describe that so that I

8  can find it?

9        MR. JIMENEZ:  Yes.  It's -- if you go to the

10 complaint of the government, the initial complaint and the

11 attachments to it, it's -- there's -- there are Bates -- the

12 exhibits are Bates numbered, and it's Rotko 56.

13       THE COURT:  All right.  Thank you.

14       MR. JIMENEZ:  Yes.

15       THE COURT:  I see it.

16 BY MR. JIMENEZ:

17 Q.    And that's approximately four pages?

18 A.    Approximately four pages, yes.

19 Q.    Could you just describe that document and tell us what it

20 consists of.

21 A.    Okay.  I'll tell you.

22       The -- well, at the very top, you have the criminal

23 case number.  Then you have court ruling.  In Estonian it would

24 be *kohtumäärus*.

25       The reason why they say court ruling here is that in

Estonia, arrest warrants are issued by ruling, issued by a
court, a ruling.

        Then you have the style of cause or what we call the
form data:  the court, the date, and time of making the ruling,
etc., etc.

        You also see persons participating in the hearing,
and it appears there are none, but it -- but I believe the
prosecutor participated, but it means that there were no other
parties.

        Then you see the resolution.  Resolution is what the
Court ordered.  The resolution says to arrest fugitive suspect
Aleksandr Rotko, so on and so forth.

        Then you have the brief explanation of the appeals
procedure.

        And then you have basically the prosecutor's case
against Mr. Rotko.  This is what the prosecutor argued.

Q.   And how long -- how long does that prosecutor's case go
for?

A.   It goes -- it goes on, on the second page, the third page,
the fourth page.

        And then on the -- on the fifth page, the final bit
of the ruling, the final paragraph --

Q.   The last paragraph?

A.   The last paragraph is the Court's determination.

Q.   And that's --

1  A.   It's what the Court found.

2  Q.   And that's on Rotko 40 -- I'm sorry, 50 -- 60?

3  A.   60.

4  Q.   60.

5  A.   Yes.

6  Q.   Okay.  Now, you used an Estonian word there in your answer

7  for the court ruling.

8  A.   Yes.

9  Q.   Could you spell that?

10 A.   It's k-o-h-t-u-m-ä-ä -- now, these are special As.  Both

11 of these As have dots on them -- r-u-s.

12 Q.   And I forgot to ask you this, but are you fluent in

13 Estonian?

14 A.   I am, yes.

15 Q.   And how is that?

16 A.   Estonian is my first language.

17 Q.   And when did you learn English?

18 A.   I've been speaking English all my life.  I think I started

19 speaking English when I was four.

20 Q.   All right.  And in your practice do you -- back in

21 Estonia, do you primarily speak or deal in Estonian?

22 A.   I suppose it can be -- it can be said I speak 70 percent

23 Estonian, 30 percent English.

24 Q.   Okay.  Got it.

25       All right.  Let's go back to the arrest warrant.

1  A.   Yes, sir.

2  Q.   And there is -- so turning to Rotko 60, where you left

3  off, which is the last paragraph --

4  A.   Yes.

5  Q.   -- there is a -- the -- I think it's the third-to-last

6  sentence begins, "A. Rotko has not responded to summons and has

7  repeatedly failed to appear at the body conducting the

8  proceedings."

9  A.   Yes, I see that.  Yeah.

10 Q.   Do you see a summons anywhere in this file --

11 A.   No.

12 Q.   -- that was directed at Mr. Rotko?

13 A.   No.

14 Q.   All right.  Based on your review of the file, have you

15 seen any attempt to serve a summons on Mr. Rotko?

16 A.   No.

17 Q.   Is there any explanation in this arrest warrant for a

18 summons that was actually served on Mr. Rotko?

19 A.   No.

20 Q.   Okay.  Is there -- is there a statement, any statement by

21 the prosecutor, in this document as to a summons being served

22 or not served on Mr. Rotko?

23 A.   No.  They -- they said that they did -- it's my

24 recollection that they said that they didn't even attempt to

25 serve him a summons.

1 Q. And where is that in the -- in the document?

2 A. I'll have to look for it, because I don't -- I don't have

3 any markings here.

4 Q. Let me direct your attention to page Rotko 58 --

5 A. Yes.

6 Q. -- towards the bottom of the page.

7 A. Yes.

8 Q. Is -- does that help you?

9 A. Yes. That's what I'm -- that's what I'm trying to --

10 trying to read.

11 Yeah, there it is. The prosecutor says here that "It

12 has not been possible to issue an invitation to him."

13 Now, the reason why they say invitation in this

14 context -- it's not an accurate translation. What they

15 actually mean here is summons, because in Estonian the summons

16 is *kutse*. I'll spell that for you. It's k-u-t-s-e.

17 And it can also mean an invitation. To invite

18 someone is to *kutsuma*. So it can also mean an invitation, and

19 the translator here has made a -- it's an inaccurate

20 translation.

21 Q. All right.

22 A. So what they're actually saying here is that it has not

23 been possible to summon him, and there is no way to identify

24 the location of Aleksandr Rotko, and Aleksandr Rotko has been

25 declared fugitive.

1   Q.   So do you have -- do you have an explanation, if any, why

2   the judge in this case said that Rotko has not responded to

3   summons?

4   A.   Based on my own experience in criminal procedure, it's a

5   template ruling.  This is what they usually say.

6           So, I mean, usually the prosecutor will tell the

7   judge that "We tried to summon him.  He didn't appear.  Failed

8   to appear several times," and now this is what the judge

9   actually says here, although in this case they have failed to

10  note that the prosecutors didn't actually argue it.

11  Q.   Okay.  So let me turn to the prior page, 59, Rotko 59.

12  A.   Uh-huh.

13  Q.   And there's a statement in this section that has been

14  accorded by the government in its response to Mr. Rotko's

15  motion for bail, and it's at the bottom of page 59, Rotko 59.

16  A.   Uh-huh.

17  Q.   And it says, "On the assessment of the total of the above,

18  it has been proven that Aleksandr Rotko and Olga Kotova are

19  aware of the pending criminal case against them and are

20  deliberately avoiding the criminal proceeding."

21  A.   Uh-huh.

22  Q.   Is that -- is this a finding by the Court in the arrest

23  warrant?

24  A.   No.

25  Q.   Okay.  What is this?

1   A.   This is the -- this is the prosecutor's argument.

2   Q.   Okay.  So this is in the portion where the prosecutor

3   is --

4   A.   Yes.

5   Q.   -- presenting to the --

6   A.   Yes.

7   Q.   -- Court.

8   A.   Yes.

9         THE COURT:  And do you conclude that because of what

10  is stated in the paragraph above where it says, "The

11  prosecutor's office is of the view"?

12        THE WITNESS:  That is -- yeah, that's also one of

13  the -- one of the arguments made by the prosecutor.

14        And it begins by setting out the prosecutor's -- the

15  prosecutor's arguments, and then it concludes, in the final

16  paragraph, with what the Court has determined, what the Court's

17  determination is.

18        So the Court has reviewed all of what was presented

19  to it, and then by saying, "The Court, after hearing the

20  prosecutor's explanations accompanying the request and having

21  reviewed and submitted -- the submitted material considers

22  that . . ."  Right?

23        So anything prior to that would be the prosecutor's

24  argument, and the last paragraph is the Court's determination.

25        It would be useful if they -- if they had formatted

1  the ruling in the way that they mostly do these days, is that

2  they separate them out by bold headings.

3      So usually they separate them out and say, "Well,

4  this is the prosecutor's position," one bold heading, and then

5  it would be followed by another bold heading which is the

6  Court's position.

7      But in this case you have to look for it.

8  Q.  Okay.  And then it -- going back to page 60 where the

9  judge has what you described as a template ruling, what type of

10  ruling is this?  Is this a ruling that he has absconded?  Is it

11  a ruling to issue an arrest warrant?  Is it any other kind of

12  ruling?  What kind of ruling is it?

13  A.  It's a ruling to issue an arrest warrant.

14  Q.  Okay.

15  A.  It is not a final determination by any means of whether or

16  not Mr. Rotko absconded.

17      THE COURT:  An arrest warrant for what?

18      THE WITNESS:  For his arrest.

19      THE COURT:  For what though?  For doing what?  For --

20      THE WITNESS:  Well, he's a suspect, and the -- and

21  the reason why -- why you would arrest someone in Estonia, you

22  have two grounds:

23      Ground No. 1, he might abscond and not make himself

24  available for the proceedings.

25      Ground No. 2 is that he might continue committing

1 additional crimes, right?

2      And in this case what the judge has said, "Such facts

3 provide a basis to assume that the suspect may, while remaining

4 at large, continue avoiding the criminal proceedings."

5      So the arrest warrant has been made for the purpose

6 of avoiding that Mr. Rotko avoids criminal proceedings, so that

7 he's made available for the proceedings, is the reason why the

8 arrest warrant for issued.

9      THE COURT:  So is it for absconding?

10      THE WITNESS:  It's not for absconding.  It's to

11 prevent absconding.

12      THE COURT:  Okay.

13 BY MR. JIMENEZ:

14 Q.  And that -- that sentence, "Such facts provide a basis to

15 assume that the suspect may, while remaining at large, continue

16 avoiding criminal proceedings.  Therefore, the Court considers

17 here," is it your view that that is a forward-looking type of

18 determination?

19 A.  The determination would be based -- under the Estonian

20 law, it would be based on a forward-looking determination.

21 Q.  Okay.

22 A.  That's -- that's the reason why you would want to arrest

23 someone.

24 Q.  All right.  Now, in this case Estonia claims that the

25 statute -- going back to the statute of limitations, that it

1   has been -- that it has been extended from 5 to 15 years.

2         Is that the proper way to look at it?

3   A.   It's not the proper way of looking at it, no.

4   Q.   Okay.

5   A.   The way that the limitation period actually works is that,

6   as I said before, firstly, it starts to run.  Then, if you can

7   justifiably deem a person to have absconded, it pauses.  And it

8   can pause for a great deal of time until it starts to run

9   again.

10         What the 15 years comes from -- what the 15 years

11   comes from is that once 15 years have passed from the

12   commission of the last act, the time won't start to run again.

13   So effectively, it's the maximum.

14         But it doesn't have to be 15 years.  It can be -- it

15   can be shorter --

16   Q.   I understand.

17   A.   -- if the person turns up earlier, for example.

18   Q.   So it's not that there's an extension to 15 years, if I

19   understand your testimony correctly.  It is that the maximum

20   amount of time that can elapse is 15 years.

21   A.   Yes.

22   Q.   Okay.

23         THE COURT:  Can I ask one other question?

24         THE WITNESS:  Yes.

25         THE COURT:  Because it -- I don't know where you're

1   going next.

2           But you said that the Court's finding -- the Court's

3   findings are in the last paragraph, Bates No. 60.

4           THE WITNESS:  Yes.

5           THE COURT:  All right.  What about -- what about this

6   statement on page 58, Bates No. 58, excuse me.

7           Do you see where it says, "Aleksandr Rotko does not

8   have a criminal record"?

9           THE WITNESS:  Yes.

10          THE COURT:  All right.  Then the next sentence says,

11  "The prosecutor seeks permission to arrest the suspect."

12          THE WITNESS:  Uh-huh.

13          THE COURT:  And then it says, "During the

14  proceedings, it appears that Aleksandr Rotko is avoiding the

15  criminal proceedings and hiding his location."

16          THE WITNESS:  Yes.

17          THE COURT:  I read that as the Court summarizing what

18  the proceedings showed prior to providing the prosecutor's

19  point of view.

20          Is that how you read it?

21          THE WITNESS:  No.  No.

22          THE COURT:  All right.  How do you read it?

23          THE WITNESS:  The way I read it is that the

24  prosecutor is making an argument for the -- for seeking

25  permission to arrest Mr. Rotko.  And the basis for that is that

1  the prosecutor has found that it appears that Aleksandr Rotko

2  is avoiding the criminal proceedings and hiding his location.

3       THE COURT:  Okay.  And so --

4       THE WITNESS:  You don't -- you don't mix -- they

5  usually don't mix the Court's findings and the prosecutor's

6  arguments.  The prosecutor's arguments are contained in one

7  block, and then the Court's findings are contained in the other

8  block.

9       This is -- this is how I have always seen and

10 understood Estonian rulings to be.

11      THE COURT:  All right.  What I'm -- and let me ask

12 you another question, then, to follow up on that.

13      If you go back to Bates No. 60 where the Court is

14 making its findings --

15      THE WITNESS:  Yes.

16      THE COURT:  -- you -- it -- four lines down, a

17 sentence starts, "The criminal case materials show . . ."

18      Do you see that sentence?

19      THE WITNESS:  Yes.

20      THE COURT:  ". . . that A. Rotko is aware of the

21 criminal proceedings, but in spite of this he has realized his

22 property located in Estonia and has probably left the Republic

23 of Estonia"?

24      THE WITNESS:  Yes.

25      THE COURT:  And then it says, "In the criminal case

1　has been gathered enough factual material in which there are

2　grounds to deem the suspicion justified"?

3　　　　　THE WITNESS:  Yes.

4　　　　　THE COURT:  Isn't that a finding that he -- not

5　necessarily looking forward, but at that point in time that the

6　order -- or the hearing was and prior to it, that he had

7　absconded?

8　　　　　THE WITNESS:  No.  It means that the Court finds it

9　has been credibly demonstrated, not proven, not finally proven,

10　but credibly demonstrated that this has happened.

11　　　　　So when you seek an arrest, there are two elements in

12　Estonia, two elements to what an Estonian court must determine.

13　　　　　Firstly, the Estonian court must determine whether

14　the suspicion is justified at all.  You see here the judge

15　says, "In the criminal case, having gathered enough factual

16　material on which there are grounds to deem the suspicion

17　justified."  That's one element.

18　　　　　And the second -- the second element is about the

19　risk of absconding, yes.  But he may have already left Estonia,

20　so we -- we need him for the purpose of these proceedings.

21　　　　　THE COURT:  So you're drawing a distinction between

22　credibly demonstrated --

23　　　　　THE WITNESS:  Yes, yes, and proven.

24　　　　　THE COURT:  -- and proven.

25　　　　　THE WITNESS:  Yes.

1     THE COURT:  All right.

2     THE WITNESS:  And this is the -- this is a

3 longstanding practice of the Estonian Supreme Court as well,

4 that you don't -- the standard is completely different.

5     The standard in determining a person's guilt, which

6 is the element -- all elements of the crime, is beyond

7 reasonable doubt.  But here the prosecutor only has to make a

8 credible demonstration --

9     THE COURT:  So --

10     THE WITNESS:  -- and it's done ex parte.

11     THE COURT:  -- like probable cause versus having to

12 prove something beyond a reasonable doubt?

13     THE WITNESS:  I only have a layman's understanding of

14 what probable cause is.

15     THE COURT:  Yeah, well, it's probably as good as any.

16     THE WITNESS:  But -- but I suppose -- I suppose yes.

17     So a credible demonstration of the suspicion, why

18 they believe Mr. Rotko has committed these offenses, and then a

19 credible justification or credible demonstration of why they

20 think an arrest is warranted, why they -- why -- whether he

21 would abscond from the proceedings or whether he will continue

22 committing criminal offenses.

23     THE COURT:  And just out of curiosity, if it were

24 proved, not just reasonably demonstrated or proved that he

25 absconded, would that in and of itself -- and this is just -- I

1  think this is outside of what we're doing.  I'm just curious.

2         Would that in and of itself be a crime?

3         THE WITNESS:  No.

4         THE COURT:  Okay.  All right.

5         Go ahead.  I'm sorry.

6         MR. JIMENEZ:  Thank you.

7  BY MR. JIMENEZ:

8  Q.   So going to the absconding point, what is necessary --

9  whose burden would it be to show that Mr. Rotko absconded?

10 A.   It would be the burden of the state, the prosecutor.

11 Q.   Okay.  And are there -- are there different types of

12 absconding?

13 A.   There are, yes.  Actually, if you -- if you look at the --

14 if you look at the Supreme Court decision that I gave you as an

15 exhibit to my first legal opinion -- it's Exhibit 11 -- there

16 are two types.

17        There are -- there's active absconsion, and then

18 there's passive.

19        THE COURT:  Where are we going to find this?

20        THE WITNESS:  It's -- well, it's the same -- it's the

21 same document the U.S. attorney referred to.  It's --

22        MR. JIMENEZ:  The Estonian Supreme Court opinion

23 attached to --

24        THE WITNESS:  Yeah.

25        THE COURT:  So that's in -- for our purposes it's

1  document 17, Exhibit 14?

2        Is that right, Mr. Corsmeier?

3        MR. CORSMEIER:  Yes, Your Honor, page 50 is the

4  English translation.

5        THE COURT:  Yes, page 50 of document -- of the

6  attachments to document 17, 17-14.

7        All right.  Go ahead.

8        THE WITNESS:  And -- if you look at Article 8(2),

9  here the Supreme Court says, second sentence, "Absconding from

10  criminal proceedings may, in principle, lay in both acts and

11  omissions."

12  BY MR. JIMENEZ:

13  Q.  Okay.

14  A.  And they also go on to say that "If the body conducting

15  proceedings finds that absconding from criminal proceedings

16  lies in omissions, the omitted acts of conduct that are

17  required from the person and that can be considered as

18  absconding must be indicated."

19  Q.  Okay.

20  A.  Right?

21        Now, in the case of active absconsion, for example,

22  it would -- active absconsion can mean, for example, that

23  you -- you're at your house and you observe from the window

24  that the police are coming, and then you run out the back door

25  and you run away.  That is active absconsion.

1        Living under a fake ID would be -- would be active

2 absconsion.

3        But passive absconsion or absconding by omission can

4 only be the case when a person fails to do something that is

5 required of them.  And under the Estonian Code of Criminal

6 Procedure, there are only two things -- there are only two

7 things that a suspect is required to do.

8        They have a duty to appear once summoned and then

9 subject themselves to the procedural acts, for example, be

10 interrogated.

11        These are the only two things that a suspect, under

12 Estonian criminal procedure law, must do, and an omission can

13 lie in either -- in failing to do either of those.

14 Q.    So going -- going back to a different document now, which

15 I mentioned earlier, which is the subsequent letters or

16 responses by the Estonian prosecutor's office that were filed

17 by the government in this case -- one is dated December 16th,

18 and the second is dated December 17th, 2009.

19 A.    Yes.

20 Q.    I'm going to direct your attention to the first one, which

21 is December 16th, which is the letter that's addressed -- or

22 that generally covers this topic that we're on now, the statute

23 of limitations.

24        Does -- does the Estonian prosecutor take the

25 position in this letter as to what type of absconding they

```
 1   believe Mr. Rotko committed --
 2   A.    Yes.
 3   Q.    -- whether it's active or passive?
 4   A.    Yes.  It's absolutely clear here that in the -- in this
 5   case the prosecutor's position is that it's absconding by
 6   omission.
 7   Q.    And what leads you to say that?
 8   A.    I'm trying to turn to the English-language version of
 9   the --
10              THE COURT:  Yeah.  Is there a Bates number for that?
11              MR. JIMENEZ:  Your Honor, it's not Bates numbered,
12   but it is part of --
13              MR. MULLINS:  It's document 27.
14              MR. JIMENEZ:  Document 27, which were the letters
15   that -- I believe there was a notice of filing by the U.S.
16   Attorney's Office of the Estonian prosecutor's letters.
17              THE COURT:  Let me just find that.
18              THE WITNESS:  There are -- there are two places here,
19   if you look at page 2, that --
20              MR. JIMENEZ:  Wait.  Hold on.  Hold on.
21              THE WITNESS:  Yes.  Sorry.
22              THE COURT:  Do you see some -- page 2 of which
23   letter?
24              I have it now.
25              MR. JIMENEZ:  The December 16th letter, Your Honor.
```

1          THE WITNESS:  December 16th.

2          THE COURT:  December 16th?

3          THE WITNESS:  On page 2, the first and second

4    paragraphs.  First paragraph:  "Various measures have been

5    taken to capture him but have so far failed to produce

6    results."

7          I don't understand what this means because I don't

8    know what measures have been used to capture him.

9          But then he follows:  "In addition, Aleksandr Rotko

10   himself has not volunteered to appear before the body

11   conducting the proceedings in order to perform procedural

12   acts."

13         Now, that's omission.

14   BY MR. JIMENEZ:

15   Q.   Okay.

16   A.   However, Mr. Rotko wasn't required to do that.

17   Q.   Why do you say that he was not required to do that?

18   A.   Because there was no summons.

19   Q.   Okay.

20   A.   There would have had to be a summons in order for

21   Mr. Rotko to be compelled to appear.

22   Q.   If you are a suspect in Estonia or -- well, under Estonian

23   law or in an Estonian criminal investigation, if you are a

24   suspect, do you have an obligation to voluntarily appear?

25   A.   No.  I mean, that -- and this has been explained, again,

1   by the Estonian Supreme Court in Case No. 3-1-1-43-10

2   [verbatim], which I also referred to in my -- in my legal

3   opinion, that you are not under obligation to cooperate in

4   respect of your own prosecution.  You're only required to do

5   what you're told to do.

6           So essentially -- I'll give you another example.  If

7   you're at your house and you know that there are criminal

8   proceedings against you and you see the police going to your

9   neighbor house every day looking for you -- you simply look out

10  the window, do nothing -- then that's not absconding,

11  basically.  This is what it is.

12  Q.   So why would you be legally obligated to appear -- or what

13  would be required for you to appear?

14  A.   If they issue a summons.

15  Q.   And how is that done?

16  A.   And in the case of -- in the case of suspects who the

17  police believe might be a flight risk or might be a risk for --

18  might be at risk of absconding, it would have to be a written

19  summons.

20  Q.   Okay.

21          THE COURT:  Let me ask you a question about this.

22  Going back to the letter --

23          THE WITNESS:  Yeah --

24          THE COURT:  I think, if I had the right letter -- I

25  may have the December 12th letter.  It has the --

1           MR. JIMENEZ:  Oh, Your Honor, it has two dates on it.

2           THE COURT:  Oh, I see.  16 -- ours and yours.  Okay.

3           MR. JIMENEZ:  Yeah.

4           THE COURT:  Well, that's the same letter then.

5           MR. JIMENEZ:  Yeah.

6           THE COURT:  But if you -- if you look at the second

7 page of that letter that you were referring to earlier --

8           THE WITNESS:  Yes.

9           THE COURT:  -- do you see -- it would be the second

10 full paragraph:  "In a situation where the suspect begins

11 absconding from criminal proceedings, the limitation period is

12 interrupted."

13           THE WITNESS:  Yes.

14           THE COURT:  All right.

15           THE WITNESS:  Interrupted?  No, that's wrong.  It

16 would suspend.

17           THE COURT:  All right.  ". . . until the person is

18 captured or appears . . ."

19           If I'm -- if I'm understanding what you're saying, if

20 someone absconds by omission, then that has to be proved with a

21 summons, that they were summonsed; in other words, they knew

22 about the proceedings and were required to be somewhere.

23           THE WITNESS:  Not only knew but knew that they were

24 required to be somewhere and then failed to appear.

25           THE COURT:  All right.  And so when this letter is

being written, is -- does the person who's writing this letter
disagree with your view of that or have a different
interpretation of that?

Because they're saying that this -- what has happened
and what Mr. Rotko has done is -- they're saying interrupted.
You're saying -- you said it should have said suspended.

But do you see what I'm getting at?  In other words,
from what I'm hearing you say, what happened here would not
interrupt or suspend the statute of limitations.

Am I right about that?

THE WITNESS:  This is -- this is only a general
statement as to what the law says.

THE COURT:  Well, it says, "In a situation where" --
I read it as it's following the paragraph prior to it.

THE WITNESS:  Yes.

What the prosecutor says here is, "In a situation
where the suspect begins absconding from criminal proceedings,
the limitation of the offense -- the limitation period of the
offense is interrupted until the person is captured or appears
before the body conducting the proceedings."

THE COURT:  Right.  And then two sentences down it
says, "Therefore, in this case the limitation period should be
calculated starting from the date of the completion of the
acts, which according to the suspicion was no later than six
months [verbatim] by adding 15 years thereto."

1          Do you see --

2          THE WITNESS:  Yes, but that is wrong.  It won't be 15

3     years.

4          THE COURT:  Well, that's my -- that's my point.  You

5     disagree with that statement.

6          THE WITNESS:  It's 15 years -- 15 years is wrong

7     because it's 5 years.

8          THE COURT:  Yeah.  I'm not asking my question well.

9          I'm thinking that you and the prosecutor are looking

10    at the same thing that happened --

11         THE WITNESS:  Yes.

12         THE COURT:  -- and the prosecutor's saying that

13    should extend the limitation --

14         THE WITNESS:  Yes.

15         THE COURT:  -- and you're saying it doesn't.

16         Am I right?

17         THE WITNESS:  It doesn't.  Yes.

18         THE COURT:  Are you and the prosecutor interpreting

19    that differently?

20         THE WITNESS:  We're interpreting the -- Mr. Rotko's

21    absconsion differently.

22         THE COURT:  Yeah.  That's what I --

23         THE WITNESS:  They --

24         THE COURT:  That's what I'm asking.

25         THE WITNESS:  They consider -- they consider

 1  Mr. Rotko to have absconded.  It is my firm belief that he

 2  didn't.

 3          THE COURT:  All right.

 4  BY MR. JIMENEZ:

 5  Q.   Let me ask you about that paragraph that Judge Klindt was

 6  just asking you about.

 7          In the -- in the -- towards the end of -- or the

 8  middle of the paragraph, do you see where it says, "A. Rotko

 9  was aware of the criminal proceedings against him, but instead

10  of contacting the body conducting the proceedings, he absconded

11  from the proceedings"?

12  A.   Yes.  Yes.

13  Q.   If Mr. Rotko was a suspect and if he was aware of the

14  criminal proceedings against him, did he have an obligation to

15  contact the body conducting --

16  A.   Absolutely not.

17  Q.   -- the proceedings?

18  A.   Absolutely not.

19  Q.   Okay.

20  A.   What it says here, it makes absolutely no sense because

21  they're sort of saying that absconding and contacting the

22  police voluntarily are the opposite ends of the same thing --

23  right? -- but that's not true.

24          Knowing that you're being summoned and then not

25  appearing, that's absconding.

1  Q.    Okay.

2  A.    But knowing that there are criminal proceedings, even if

3  that's -- that were proven, and not contacting the police is

4  not absconding.

5  Q.    Okay.

6        THE COURT:  But the prosecutor's taking a different

7  view here, it looks to me like --

8        MR. JIMENEZ:  Uh-huh.

9        THE COURT:  -- than you're taking.

10       THE WITNESS:  It seems so, yes, but the

11  prosecutor's -- the prosecutor's view is, again, different from

12  the view of the Supreme Court --

13       THE COURT:  All right.

14       THE WITNESS:  -- and I refer to the opinion of the

15  Supreme Court.

16       THE COURT:  All right.

17  BY MR. JIMENEZ:

18  Q.    So then the next sentence says, "Thus, the limitation

19  proceeding" -- no.  I'm sorry.

20        "Thus, the limitation period of the criminal offenses

21  was suspended, and it cannot be argued that in the meantime, he

22  has made any efforts of his own to interrupt the suspension."

23  A.    Uh-huh.

24  Q.    What does -- does -- what does that indicate to you, the

25  "Thus, the limitation was suspended" in the -- in other words,

```
 1  what is the prosecutor --
 2  A.   The prosecutor is saying --
 3  Q.   -- saying in this letter?
 4  A.   -- that because Mr. Rotko didn't contact the body
 5  conducting the proceedings, that is, the police --
 6  Q.   Yes.
 7  A.   -- the limitation period was suspended.
 8  Q.   Got it.
 9  A.   That's what he's saying.
10  Q.   All right.
11           THE COURT:  And you're saying that's not the law.
12           THE WITNESS:  That's wrong as a matter of the law.
13           THE COURT:  All right.
14           THE WITNESS:  Patently wrong.
15  BY MR. JIMENEZ:
16  Q.   So let me ask you some general questions about absconding.
17           Is being outside of the -- of Estonia itself an act
18  of absconding --
19  A.   No.
20  Q.   -- if you're a suspect?
21  A.   No.
22  Q.   Is selling your house an act of absconding?
23  A.   No.
24  Q.   Okay.  Is -- if there's a summons -- if there's an attempt
25  to serve a summons on your wife or a friend, is -- does that
```

1  contact -- and not on the suspect, Mr. Rotko, is that

2  absconding --

3  A.    No.

4  Q.    -- by Mr. Rotko?

5  A.    No.

6  Q.    Okay.  Now, going back to the same paragraph we were just

7  on, the prosecutor notes -- and this -- this we do have a

8  docket entry cite for.  "It is important to note that the

9  Tallinn Circuit Court's ruling of 10 October 2016 (Rotko

10  attachments docket entry 17-14 at page 73) contains a reference

11  to the fact that O. Kotova, A. Rotko's wife, has signed a

12  document on December 2nd, 2007, in which she explicitly states

13  that every measure has been taken against them as defendants,

14  including such pertaining to criminal proceedings."

15  A.    Uh-huh.

16  Q.    Have you reviewed that -- page 73 of that document that's

17  referenced there?

18  A.    The Tallinn Circuit Court's ruling, yes, I have.

19  Q.    Okay.  Could you explain what that ruling was about?

20  A.    That ruling was about the arrest of Ms. Kotova.

21  Q.    Okay.  And what happened to Ms. Kotova, generally?

22  A.    Generally, as far as I know, Ms. Kotova left Estonia at

23  the end of 2006, or in the autumn of 2006, and left to Russia.

24  Q.    Okay.

25  A.    Then stayed in Russia for a wee while, then traveled to

1    Canada and subsequently to the United States, I believe.

2         And then in 2016 she traveled to Helsinki, Finland,

3    where she was apprehended at the airport, detained by the -- by

4    Finnish police, extradited to Estonia, held by the Estonian

5    police, interrogated, and then the criminal proceedings were

6    terminated in exchange for the payment of 20 -- 32,000 euros.

7    Q.   Okay.  So is it accurate to say that she settled or came

8    to an agreement with the prosecutor's office to terminate the

9    criminal proceedings?

10   A.   It's not a settlement.  It's not correct to use the word

11   "settlement."

12        But what it means is that the prosecutor has formed a

13   view on the -- on the activities of Olga Kotova, and the

14   prosecutor himself finds the crimes have been committed, or

15   rather, the prosecutor finds that the facts of the case are

16   clear.

17        And then, in return for payment of the money and in

18   return for Olga Kotova's agreement not to proceed to court, not

19   to have the case tried in court, the case would simply be

20   terminated.

21        It's not a conviction, and it's not an acquittal.

22   It's simply a termination of the case based on the fact that

23   the prosecutor finds the case to be clear.  There's no public

24   interest -- that's also another aspect.  There's no public

25   interest in pursuing the case any further, and the payment of

1   the money.

2   Q.   All right.  And this court ruling was in her case in

3   Estonia.

4   A.   Yes.

5   Q.   Okay.  And could you turn to that page and describe to us

6   what is referred to there?

7   A.   I don't -- I don't believe I have this -- this ruling with

8   me.

9        MR. JIMENEZ:  Your Honor, if I could just have a

10  moment to find it?

11       (Brief pause.)

12       THE COURT:  Mr. Jimenez, can you take those papers

13  off the microphone?  It's right there.  It blasts the court

14  reporter's --

15       MR. JIMENEZ:  Sorry.

16       (Brief pause.)

17       MR. JIMENEZ:  I believe it's Rotko 194 is where --

18  where I'm at.

19       (Brief pause.)

20       MR. JIMENEZ:  Your Honor, I can't find this -- I

21  can't find it right now for the moment, but I will come back to

22  that because --

23       THE WITNESS:  Wait.  I just remembered it might be --

24  it might be appended to my -- to my legal opinion.

25       MR. JIMENEZ:  I was trying to find the actual portion

1  of the exhibit to the government's complaint, but I can't find

2  that particular page right now.

3          THE WITNESS:  Hang on.  I might -- I might find it.

4      (Brief pause.)

5          THE WITNESS:  I'm terribly sorry.  I found it.  It's

6  an exhibit to my legal opinion, yes.

7  BY MR. JIMENEZ:

8  Q.   Okay.  And what exhibit number is that and which -- is

9  that your first legal opinion?

10  A.   It's my first legal opinion, Exhibit 14.

11  Q.   Oh, yes.

12          And what -- what page are you on?

13  A.   It contains no page numbers, but I'm at -- well, say, for

14  example, I'm at paragraph 7, The Position of the Circuit Court.

15  Q.   Okay.  That paragraph 7 is on Rotko 192.

16          And is there a reference in this proceeding -- or,

17  I'm sorry, in this ruling, to -- and I'm directing your

18  attention to 194, which I had before.  I just wasn't focusing

19  on it.

20          In the middle of the page it says, "The Republic of

21  Estonia is currently using all coercive measures to eliminate

22  defendants."

23          And then it says, "Thus, O. Kotova specifically

24  stated that she is aware of the ongoing criminal proceedings

25  and the fact that the investigator has tried to contact her two

1  relatives."

2  A.   I see that, yes.

3  Q.   Yeah.  What is that referring to?  Which is the same thing

4  that the prosecutor refers to here in his December 16th letter.

5  A.   What is that referring to, which proceedings, or what is

6  the --

7  Q.   Yes.  When it says that "The circuit court attaches great

8  importance to a copy of an additional request submitted by

9  Verest AS, Agrin, and BPV."

10  A.   Uh-huh.

11  Q.   Are you familiar with that?

12  A.   I'm familiar with those companies, yes.

13  Q.   Okay.  How are you familiar with those companies?

14  A.   Because they are relevant to the other legal opinions that

15  I have been giving to the counsel for ELA USA.

16  Q.   Okay.  And that's in the international arbitration?

17  A.   That's in the international arbitration case, yes.

18  Q.   Okay.  So you're also assisting those entities?

19  A.   Yes, as I have outlined in my opinion.

20  Q.   Okay.  So when it says Point II, and it talks about --

21  that Rotko's wife signed a document in which she explicitly

22  states that every measure has been taken against them as

23  defendants --

24  A.   Uh-huh.

25  Q.   -- what is your understanding of what that is referring

1   to?

2   A.    It refers to the companies Verest, Agrin Partion, BPV,

3   Defendants I, II, and III.

4   Q.    So it's not a reference to Mr. Rotko or to Ms. Kotova.

5   A.    No.

6   Q.    It's a reference to Verest, Agrin, and BPV, which are

7   referred to as Defendants I, II, and III.

8   A.    Yes.  And the reason why I think that is you always have

9   to look at -- in order to determine what something means, you

10   have to also look at the Estonian version of the ruling.

11           And by defendants here, Olga Kotova refers to --

12   refers to an Estonian word *kostji*.  It's k-o-s-t-j-i.  And

13   that's not a criminal defendant.  That's a civil defendant.

14   Q.    Okay.  So --

15   A.    And they were.  These companies were civil defendants in a

16   civil case between those companies and the Republic of Estonia.

17   Q.    Okay.  So looking at this court -- the -- looking at page

18   73 of your -- of the exhibits to your declaration, "The Court

19   attached great importance to a copy of an additional request

20   submitted by those three companies in the civil case against

21   them as defendants," correct?

22   A.    Yes.

23   Q.    And does -- does that refer in any way to Mr. Rotko?

24   A.    No.

25   Q.    Okay.  Does that -- does that have anything to do with

1   Mr. Rotko?

2   A.   No, it didn't because it wasn't -- it wasn't an

3   application submitted by Mr. Rotko.

4   Q.   Okay.  Got it.

5        Now, is -- in your view, is there anything in this

6   record showing that Mr. Rotko was -- we talked about the

7   Estonians -- let me start again.

8        We talked about the fact that the Estonian December

9   16th letter focuses on absconding by omission, by not

10  volunteering to appear.

11  A.   Yes.

12  Q.   Is there anything in the record that shows you that there

13  was an active absconding by Mr. Rotko that either interrupted

14  or suspended the --

15  A.   No.  No.  I don't see any of it.

16       And the reason why I don't -- why I have formed the

17  expert opinion that I don't see any of it is that, according to

18  my understanding, Mr. Rotko came to the United States, where he

19  was a permanent resident, and he lived here openly all the

20  time.

21       He didn't attempt to hide himself.  He was living

22  openly.  He was paying his taxes.  He had -- he had his -- he

23  had disclosed his address, as required under your laws, I

24  believe.

25  Q.   Is there anything in the record showing that the Estonian

1 government knew that Mr. Rotko was in the United States?

2 A.    Certainly.

3 Q.    Okay.

4 A.    There is -- there is -- there is an interrogation report

5 of Ms. Olga Kotova -- oh, sorry, Olga Novoseltseva --

6 Q.    How do you spell Novoseltseva?

7 A.    Novoseltseva is N-o-v -- no.  It's a Russian name.  I'm

8 sorry.  N-o-v-o-s-e-l-t-s-e-v-a, Novoseltseva.

9 Q.    Okay.  Can we call her Olga N. for short?

10 A.    That would make it easier, yes.

11 Q.    Okay.  So you said there was a witness statement by -- or

12 an interrogation statement by Olga N.?

13 A.    Yes, on the 20th of February.  And on the 20th of

14 February, Olga N. told the police that according to her

15 knowledge, the -- Mr. Rotko was probably living in the United

16 States.

17 Q.    Is there anything in the record showing that the Estonian

18 government did anything --

19 A.    No.

20 Q.    -- in response to that information?

21 A.    No.

22 Q.    Is there anything in the record you've read -- well, let

23 me ask a different question.

24        What is -- was there a mechanism to serve Mr. Rotko

25 while he was living in the U.S.?

1  A.    Yes.  It is my opinion that the Estonian government, the

2  Republic of Estonia, might have availed itself of the

3  provisions contained in the Mutual Assistance Treaty to serve a

4  summons, for example, on Mr. Rotko under that treaty.

5  Q.    And is there any indication in the file you've read that

6  between August 25, 2007, when the arrest warrant was issued,

7  and August 25, 2012, five years later, that Estonia tried to

8  serve a summons?

9  A.    No.

10  Q.    Is there any indication in the file that between the date

11  of the arrest warrant, August 25, 2007, and five years later,

12  August 25, 2012, that Estonia did anything at all --

13  A.    No.

14  Q.    -- to further this criminal case?

15  A.    No.

16  Q.    Is it unusual that there would be -- that there would be

17  nothing done for five years after an arrest warrant is issued?

18         MR. CORSMEIER:  Your Honor, I object to the form of

19  the question, unusual.

20         And is he an expert in extradition law, and what --

21  how many extraditions has he handled?

22         MR. JIMENEZ:  Your Honor, I'm not asking about

23  extradition.  I'm asking if it's unusual for the Estonian

24  authorities to do nothing after five years.  He's an expert in

25  Estonian law.

1          THE COURT:  Overruled.  Go ahead.

2          THE WITNESS:  The -- that would be very unusual

3  because, you see, the Estonian government let the case lay

4  dormant for more than five years in between the issuance of the

5  arrest warrant and when they actually -- and until when they

6  actually filed the extradition request.

7          That's more than five years.  That's more than the

8  entire duration of the -- of the limitation period.  It's very

9  unusual.

10 BY MR. JIMENEZ:

11 Q.   All right.  Let's -- let's turn -- let's leave the statute

12 of limitations and turn to the other issue that I would like to

13 talk to you about, which is the requirement of a charging

14 document.

15         THE COURT:  Can I ask one other question --

16         MR. JIMENEZ:  Yes, Your Honor.

17         THE COURT:  -- prior to that, please?

18         Going back to the court ruling -- I think that we

19 might have almost started with that.  That's Rotko 56, the

20 court ruling where you said it was forward looking -- a

21 forward-looking ruling regarding absconding?

22         THE WITNESS:  Yeah.

23         THE COURT:  I'm curious.  Given your testimony about

24 whether there was any active or -- any -- I think you said that

25 there was no evidence of any active absconding or absconding by

1    omission --

2              THE WITNESS:  Yes.

3              THE COURT:  -- that you saw in the file.

4              THE WITNESS:  Yes.

5              THE COURT:  Is that right?

6              So is this ruling by the Court completely erroneous,

7    then?  Because if there has been no absconding, either active

8    or by omission, then what basis would there be to find that

9    there would be -- that Mr. Rotko would be absconding in the

10   future?

11             THE WITNESS:  In my -- well, simply because he's

12   living in a different country and might probably -- might

13   probably not respond to a summons.

14             Courts do that all the time, because it's more

15   convenient for Estonian authorities to have a suspect in

16   Estonia to conduct the criminal proceedings rather than --

17   rather than have them live in the United States, where he may

18   or may not be reached.

19             THE COURT:  Well, I understand that.  I guess I'm

20   looking at, though, what the basis was for -- for finding -- if

21   he hadn't absconded under Estonian law at all, what the basis

22   was for finding that in the future he's going to, I guess.  It

23   doesn't make sense to me.

24             THE WITNESS:  Well, this is a -- it's entirely

25   possible.

1    A person -- a person might be living a normal life,

2    and then he becomes a suspect.  The police and the prosecutor

3    are able to make a case that "We believe that he might abscond

4    or we believe that he might continue in his criminal activity,

5    so therefore we ask the Court to arrest him," and the Court

6    does so.

7    And especially in an ex parte case where the suspect

8    has no say, they're unable to present any evidence, they're

9    unable to review any of the evidence, the courts will usually

10   simply take the prosecutor's word for it.

11   But in the -- in the case of that 25th of August

12   ruling, many things that we see there would not be

13   absconding -- all of the things we see here would not be

14   absconding because --

15   THE COURT:  Because you said -- you said there's

16   absolutely no evidence of active or absconding by omission in

17   the record --

18   THE WITNESS:  Yes.

19   THE COURT:  -- so I'm assuming you didn't see any in

20   what the prosecutor proffered here.

21   THE WITNESS:  No.  No.

22   THE COURT:  You saw none.

23   THE WITNESS:  Because -- because selling his house,

24   for example, unless the house was sold for the purpose of not

25   being available for the criminal proceedings, that's not

1  absconding.

2  Leaving Estonia -- I believe Mr. Rotko left Estonia

3  in the autumn of 2006, which is approximately the same time

4  when the criminal proceedings were started.  But nobody would

5  have known about it, so he wouldn't have been aware of the

6  conduct of the criminal proceedings.

7  Or simply -- you know, even if he were but he didn't

8  know what was expected of him, he would not have absconded

9  under the text set out by the Supreme Court in case 78-10.

10  Deliberate evasion -- or deliberate activity or

11  inactivity in order to not make oneself available to the

12  authorities, that's the test.

13  THE COURT:  No.  I understand.  I guess what I'm

14  getting at is would you have been surprised if the judge said,

15  "Look, you haven't offered any evidence of active absconding or

16  absconding by omission, so I'm not going to give you a

17  warrant -- I'm not going to give you a court ruling or a

18  warrant to go arrest someone who hasn't -- hasn't absconded

19  either actively or by omission."

20  Would that have surprised you if the judge had

21  rejected the warrant for arrest?

22  THE WITNESS:  It wouldn't have surprised me.

23  THE COURT:  It wouldn't have?

24  THE WITNESS:  No.

25  THE COURT:  Okay.

1          THE WITNESS:  But, of course, in 2007 we didn't have

2     the -- we didn't have the Supreme Court decision yet --

3          THE COURT:  I understand.

4          THE WITNESS:  -- where they made it very clear.

5          THE COURT:  All right.

6          All right.  You were going to shift gears now?

7          MR. JIMENEZ:  Yes, Your Honor.

8     BY MR. JIMENEZ:

9     Q.    Have you reviewed both the Estonian-language version and

10    the U.S.-language version of the extradition treaty?

11    A.    Yes, I have.

12    Q.    Okay.  And directing your attention to Articles 1 and 8,

13    is there any difference in the language between the two?

14    A.    Articles 1 and 8.

15    Q.    Yes.

16    A.    Yes, there is a -- there is a -- and I'm trying to find it

17    to refresh my memory.

18          A difference between 1 and 8, both -- sorry.  The

19    difference between 1 and 1 of the English- and

20    Estonian-language versions of the treaty is that in the

21    Estonian-language version, the definition of extraditable

22    persons are "those that the state party suspects, accuses, or

23    has convicted of an offense."

24    Q.    That's in the Estonian --

25    A.    That's the Estonian.

1  Q.   Okay.

2  A.   The English-language version says "whom the authorities in

3  the requesting state have charged with or convicted of an

4  extraditable defense," so there's one difference there.

5          And Article 8 --

6  Q.   So just turning to the English-language version for a

7  minute --

8  A.   Yes.

9  Q.   -- Article 1 is contained on Rotko 19, Bates No. 19, just

10  for the record.

11          And it states that "The parties agree to extradite to

12  each other, pursuant to the provisions of the treaty, persons

13  whom the authorities in the requested state have charged with

14  or convicted of an extraditable offense."

15  A.   Yes.

16  Q.   So if I understand your testimony correctly, that the only

17  difference is that in the Estonian-language version, they add

18  the word "suspected of an offense."

19  A.   Yes.

20  Q.   Is that correct?

21  A.   That is correct.

22  Q.   Okay.  Any difference in Article 8 between the two

23  treaties?

24  A.   There is a difference in Article 8 as well.  The

25  English-language version of Article 8(3)(b) requires the

1   production of a charging document, whereas the Estonian version

2   of Article 8(3)(b) requires a suspicion order.  In Estonian

3   it's *kahtlustatavaks tunnistamise määrus*.

4            THE COURT:  You'll have to spell that later --

5            THE WITNESS:  Later.

6            THE COURT:  -- for the court reporter.

7            THE WITNESS:  Yeah.

8   BY MR. JIMENEZ:

9   Q.    Okay.  So if I could summarize, for Article 8(3)(b), the

10  English-language version uses the word "charging document."

11  A.    Yes.

12  Q.    And the Estonian-language version uses the phrase that you

13  just read, that you will later spell --

14  A.    Yeah.

15  Q.    -- that is translated as?

16  A.    A suspicion order.

17  Q.    A suspicion order.

18  A.    Yes.  It can also be translated as a ruling, a suspicion

19  ruling.

20  Q.    Okay.

21  A.    Suspicion order, suspicion ruling.

22  Q.    Okay.  So are you familiar with what a suspicion order is

23  or was under Estonian criminal law procedure?

24  A.    I am, and this is the subject matter of my third legal

25  opinion.

1          A suspicion order, as it was, was an order or a

2    ruling issued by an investigator, by the investigator

3    conducting the proceedings, for the purposes of attributing

4    suspect status to a person.

5    Q.    So was it issued by a court or --

6    A.    No.  No, no, no, no.  No.  It can't be issued by a Court.

7    The court only determines allegations -- makes the

8    determinations based on allegations presented by the

9    prosecutor.  A court never suspects or charges anyone in

10   Estonia.  We have a -- we have an adversarial proceeding.

11   Q.    So even though it uses the word "order" --

12   A.    Yeah.

13   Q.    -- it was issued by the prosecutor.

14   A.    Or the investigative -- or the police.

15   Q.    Or the police.

16   A.    It would have -- it would have been issued by the police.

17   Q.    All right.

18   A.    And this -- this is -- no such instrument exists under

19   Estonian law anymore.  It was contained in the old Code of

20   Criminal Procedure, and it was abolished in 2002, 28th of July,

21   2002.  It no longer exists.  There's no such document under --

22   in the Estonian Code of Criminal Procedure.

23   Q.    And that's as of 2002?

24   A.    Yes.

25   Q.    So that's before the offenses in this case that are the

1  subject of this case --

2  A.   Yes.

3  Q.   -- before anything.

4  A.   Yes.

5  Q.   What is the date of this treaty?

6  A.   2006.

7  Q.   So four years before the treaty was -- the date of the

8  treaty was ratified --

9  A.   Yes.

10  Q.   -- the Estonian criminal procedure eliminated the order of

11  suspicion or the suspicion order.

12  A.   Yes.

13  Q.   Do I have that right?

14  A.   Yes.

15  Q.   Okay.  And what was the purpose of that document again?

16  A.   The purpose of that document was to officially attribute

17  suspect status to a person suspected of an offense --

18  Q.   Okay.

19  A.   -- of committing an offense.

20  Q.   So it -- turning now to "charging document," the word

21  that's used in the English-language version --

22  A.   Yes.

23  Q.   -- in the United States, in federal court, for example, we

24  have an indictment or an information.  That's the charging

25  document.

1  A.    Yes.

2  Q.    Is there an equivalent or a charging document in Estonia?

3  A.    Yes.  I have reviewed your definitions of the indictment

4  or information, and we have an equivalent under Estonian law,

5  and that would be a statement of charges.

6  Q.    Okay.  And is there a statement of charges in this record

7  with respect to Mr. Rotko?

8  A.    No.

9  Q.    Okay.  And does the Estonian criminal code have a section

10  dealing with statement of charges?

11  A.    Yes, it does.  It's 154.

12  Q.    Is the -- is the suspicion order that's referred to in the

13  English -- I'm sorry, the Estonian-language version of the

14  treaty the same as a statement of charges under Section 154?

15  A.    No, it's not.

16  Q.    Okay.  Now, in the memorandum that the government

17  submitted in this case, it says that the suspicion order --

18  that they, I believe, argue that the suspicion order is

19  equivalent to a charging document.

20        Is that correct in your view?

21  A.    It's not equivalent to a statement of charges under

22  Estonian law.  Certainly not.

23  Q.    And do you see either a charging document or a suspicion

24  order against Mr. Rotko in the file?

25  A.    No.

1  Q.    Okay.   Is the arrest warrant an order of suspicion?

2  A.    No.

3  Q.    Okay.   The one that we've been talking about, the August

4  25th, 2007.

5  A.    It's not an order of suspicion because, first of all, it's

6  been issued by the wrong entity.   The Court is not the

7  investigator.   And -- well, secondly, there wouldn't have been

8  a suspicion order set out in the law at the time the ruling was

9  issued.

10        Secondly, the entity is wrong.

11        And, thirdly, in order to arrest the suspect, the

12  person would already have to be a suspect.   Whereas the purpose

13  of the suspicion order -- the purpose of a suspicion order was

14  to officially attribute suspect status.   So they're entirely

15  different things.

16  Q.    Now, turning to the Estonian-language version, did you

17  perform any research in Estonia as to that version, the

18  Estonian-language version, of the treaty?

19  A.    Yes, I did.

20  Q.    What research did you perform?

21  A.    Well, I did some research in the Estonian -- on the

22  website of the Estonian parliament, where we have drafting

23  materials.   And I also called the -- or rang the Estonian

24  Ministry of Justice, the person who specializes in

25  international relations and treaties, and I asked them --

1    Q.    Time out.

2          What is the Ministry of Justice?

3    A.    The Ministry of Justice is a governmental body, much --

4    very similar to your Department of Justice, which it is in

5    charge of governmental activity in the judicial sphere --

6    Q.    Okay.

7    A.    -- so courts, prosecutors, criminal law, that sort of

8    stuff.

9    Q.    Okay.  So I interrupted you.

10          You said you called the Ministry of Justice?

11   A.    Yes, I did.  Yes.  I rang them, and I asked them whether

12   there were any documents issued in connection with the

13   conclusion of the treaty.

14          And they said -- well, the person didn't know by

15   heart, but she directed me back to the website of the Estonian

16   parliament where the drafting materials were and instructed me

17   how to find them.

18          And so I did.  And what I -- what I found there was

19   an explanatory note that was issued by the Ministry of Justice

20   and the -- and the Foreign Ministry in connection with this

21   treaty.

22          And it set out the reasons why the treaty was

23   concluded in the first place, the necessity for ratification of

24   the treaty, and also a brief description of each of the

25   treaty's articles.

1       And this material, along with the treaty itself and

2   the ratification law, was then passed to the parliament to see

3   whether the parliament might be willing to ratify it by

4   adopting the specific law for that purpose.

5   Q.   So is the parliament the legislative body for Estonia?

6   A.   The parliament is the legislative body for Estonia.

7       And in order for international treaties to become

8   effective, they would have to be ratified by the parliament

9   following the conclusion or following the signing.

10  Q.   And this note was submitted by the Ministry of Justice to

11  the parliament, you said?

12  A.   The note was first passed by the Ministry of Justice to

13  the government, the general government, and then the general

14  government passed it to the parliament, yes.

15  Q.   Okay.  And did you attach that note to any of your

16  declarations?

17  A.   Yes, my third legal opinion.  I think it was Exhibit 2 of

18  my third legal opinion.

19  Q.   And does that note have any explanation about the articles

20  that we've been talking about here, Articles 1 and Articles 8

21  of the treaty?

22  A.   It has a -- it has a brief description of both.

23       Now, I have to -- I have to apologize.  I only had

24  this in Estonian, and I was only able to attach it in Estonian,

25  because we simply -- I didn't -- I didn't have time to get

1  the -- to commission the translation of it.

2  But Article 1 -- so the relevant articles here that

3  we've been talking about are Article 1 and Article 8.

4  And what I was specifically looking for with regard

5  to Article 8 is why they would have used the language

6  "suspicion order" or *kahtlustatavaks tunnistamise määrus*.

7  They say nothing here about why the language was

8  used.  It simply states here that, "Article 8 lists or sets out

9  the documents that must be appended to an extradition request."

10  It doesn't detail what those documents are or why they chose

11  those documents or why it reads that those documents would be

12  required.

13  Q.   What about Article 1?  What does it say about --

14  A.   And Article 1 --

15  Q.   -- that?

16  A.   Article 1 says that -- or they explain that "This article

17  sets out the reciprocal obligation to extradite persons who the

18  requesting state" -- "or whom the requesting state charges or

19  has convicted of an offense" -- "of an extraditable offense."

20  Q.   And -- and that's similar to the U.S.-language version,

21  not to the Estonian-language version, correct?

22  A.   That is correct, because -- because in the

23  Estonian-language version, there's also -- they also said --

24  they talked about a suspect.

25  Q.   Yeah.

1   A.   But the explanatory note makes no reference to a suspect

2   at all.

3   Q.   Okay.

4         MR. JIMENEZ:  I don't have any further questions,

5   Your Honor.

6         THE COURT:  All right.  Well, let's do this.

7   Let's -- why don't we take a lunch break.  If it works for

8   everyone, we'll be in recess till 1 o'clock, and then we'll

9   resume with Mr. Corsmeier asking questions.

10        I wanted to ask one thing, though, before I forget.

11        Could you describe what is in a summons, exactly what

12   would be contained in a summons?

13        THE WITNESS:  In a summons?

14        THE COURT:  Yes.  Well, going back to the first --

15        THE WITNESS:  The summons is a document.  It contains

16   information about -- information about the authority issuing

17   the summons, so police, for example, the address of the

18   institution.

19        It contains the name of the person being summoned.

20   It would contain the name of the officer issuing the summons.

21   And it would contain the reasons why the person is being

22   summoned and also whether -- what is the -- what is the

23   procedural status of that person, so, for example, whether

24   they're being summoned as a witness, whether they're being

25   summoned as -- as a suspect, whether they're being summoned as

1   a -- as a victim.

2          But those are all the -- all the required data that a

3   summons must -- must include.

4          THE COURT:  Would it include a direction to appear --

5          THE WITNESS:  Yes.

6          THE COURT:  -- at some proceeding?

7          THE WITNESS:  Yes.  Oh, yes.  Absolutely.  The date

8   and time and place where they would have to appear, and the

9   summons would also set out, or outline, rather, the

10  consequences of not appearing or failing to appear.

11         THE COURT:  All right.  Thank you.

12         Let's -- we'll be in recess.

13         COURT SECURITY OFFICER:  All rise.

14     (Recess from 12:17 p.m. until 1:07 p.m.; all parties

15  present.)

16         COURT SECURITY OFFICER:  All rise.  This Honorable

17  Court is now in session.

18         Please be seated.

19         THE COURT:  All right.  Mr. Corsmeier, are you ready

20  to proceed?

21         MR. CORSMEIER:  Yes, Your Honor.

22         THE COURT:  Sir, I'll remind you you're still under

23  oath.

24         You understand that?

25         THE WITNESS:  I do, yes.

1          THE COURT:  Okay.  Thank you.

2          You may proceed.

3          MR. CORSMEIER:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5   BY MR. CORSMEIER:

6   Q.   Good afternoon, Mr. Keres.  I want to start -- I'm going

7   to go backwards.

8          I'm going to start with the language of the

9   extradition treaty that you were asked about toward the end of

10  your testimony.

11         And I guess the last thing you were asked about was

12  the explanatory note that was sent with the treaty when it was

13  ratified by the Estonian parliament --

14  A.   Uh-huh.

15  Q.   -- and that it, I guess, conflicts with the actual

16  language of the treaty.

17         In your view, if there's a conflict, doesn't the

18  actual language of the treaty control?

19  A.   Well, one thing I would like -- I would like to make clear

20  is I'm not a treaty lawyer, so I'm not a specialist in

21  international law.

22         What I can tell you is what does the treaty contain

23  and what we understand that to mean under Estonian law.

24  Q.   Okay.  And -- well, let me just, on that topic -- and I'll

25  get to what the treaty contains.

1        But when the members of parliament were ratifying

2  this treaty, they weren't ratifying the explanatory note.  They

3  were ratifying the treaty itself.

4  A.   That's true.

5  Q.   And the treaty itself, in the Estonian language, as you

6  put in your most recent declaration, on -- and I'm looking

7  at -- I don't know what it is for you there, but it's document

8  33-2 in the record, and it's page 3 of 74 of the attachments.

9        But it's page 2 of 6 of your June -- I'm sorry,

10  January 2nd, 2020, declaration.

11  A.   Page 2.

12  Q.   Yes.

13  A.   Yes.

14  Q.   Where paragraph 8 gives your Estonian translation of the

15  English text, and you talked about this in your direct

16  examination, that the people -- and I'm paraphrasing at the

17  beginning.  People to be extradited are "persons who are

18  suspected, accused, or convicted in the requesting state of an

19  offense subject to extradition."

20        And that's -- in Estonian -- that's an accurate

21  translation of what the treaty says in Estonian.

22  A.   Yes, I believe so.

23  Q.   And -- and you talked about Article 8(3)(b) also on that

24  same page, and you talked about the suspicion order, and you

25  give the Estonian words for that in paragraph 6 there of your

1  declaration.

2       But does anything -- is there any language in Article

3  8(3)(b) that refers to this statement of charges that you're

4  talking about?

5  A.   The Estonian-language version?

6  Q.   Yes.

7  A.   No.

8  Q.   Okay.  And -- because -- well, I'll leave it at that.

9       And so an Estonian prosecutor looking at the Estonian

10  treaty -- maybe does or doesn't know English or read it or

11  speak it -- is looking at the treaty and saying, "Okay, Article

12  1 says that the United States agrees to extradite people who

13  are suspected, accused, or convicted of an offense in Estonia."

14       Wouldn't you agree with me that that prosecutor would

15  say, "Okay.  We can -- we can seek to extradite Mr. Rotko

16  because he's suspected of an offense"?

17  A.   I think an Estonian prosecutor would know who a suspect

18  is, and in the Estonian prosecutor's view, Mr. Rotko would be a

19  suspect.

20  Q.   Okay.

21       THE COURT:  So does that mean -- does that mean you

22  agree with him that that would be a fair interpretation of the

23  treaty, then, by the prosecutor?

24       THE WITNESS:  As I said, Your Honor, I don't want to

25  get into the interpretation of the treaty because that's a

1  matter of international law.  I wouldn't go there.

2         But I would -- I would say that if I were the

3  Estonian prosecutor, I would be reading the treaty.  It says

4  suspect.  And I would look at Mr. Rotko, whether he's a

5  suspect, and I would say, yes, he's a suspect.

6         THE COURT:  All right.

7  BY MR. CORSMEIER:

8  Q.   And the English version has this -- the language "have

9  been charged with or convicted of an extraditable offense" --

10 well, strike that.

11        I want to look at Article 8(3)(b) first.

12 A.   Uh-huh.

13 Q.   It talks about a charging document -- or -- yes.

14 A.   The English-language version.

15 Q.   The English-language version.

16 A.   Yes, yes.  Charging document, yes.

17 Q.   And if -- if, in the Estonian-language version, they

18 wanted to include a requirement of a charging document,

19 wouldn't that state "statement of charges" that you mentioned

20 before in Estonian?

21 A.   If they wanted to -- if they wanted to use the words

22 "statement of charges," they would use the statement of

23 charges.

24        If they wanted to -- if they wanted to use

25 indictment, they would use statement of charges.

```
 1   Q.   Okay.  Well, then I guess my question -- so the best word
 2   to use, if they meant -- if they intended to say "charging
 3   document," that in Estonian, a statement of charges would be
 4   the charging document.
 5   A.   As the charging document is an English term -- it's an
 6   English term understood by American lawyers.
 7        If you wanted an indictment, you would use statement
 8   of charges.
 9   Q.   All right.  And that is -- and then I'll spell it, in
10   Estonian, S-ü-ü, each with what I would call an umlaut; it may
11   be called the same thing.  S-ü-ü, each with two dots over them,
12   d-i-s-t-u-s-a-k-t.
13   A.   Yes.
14   Q.   That's the statement of charges.
15   A.   Yes.
16   Q.   And nowhere in the Estonian version of the treaty does it
17   use that word.
18   A.   No.
19   Q.   Okay.  You say you're not -- you're not an expert, I
20   guess, on treaties or things like that, but let me just ask
21   you, and you can say that you're not -- you don't have the --
22   the background to answer this.
23        But can't Estonia or an Estonian prosecutor rely on
24   that Estonian version of the treaty without looking to the
25   English version?
```

1   A.   I believe an Estonian prosecutor, in seeking extradition,

2   would be looking at the Estonian-language version, yes.

3   Q.   All right.  And the Estonian-language version of the

4   treaty is just as valid as the English-language version.

5   A.   Well, that's something I can't answer.

6   Q.   Okay.  And let me ask you about something that was

7   included in the most recent filing by Mr. Rotko, which is

8   document 34, and it has an attachment -- or has attachments --

9   or an attachment.

10          And as you may have heard when I was up here arguing

11  before -- and you were in the courtroom the whole time, right?

12  A.   I was, yes.  I was sitting over there.

13  Q.   That in this tribunal -- are you -- so you're involved

14  with the arbitration proceeding?

15  A.   No.

16  Q.   Oh, you're not?  Okay.

17          But you have been involved in similar arbitration

18  proceedings.

19  A.   Investor state arbitration proceedings, no, I am not.

20  Q.   Okay.  I misunderstood.  I'm sorry.

21  A.   I'm -- I have been asked to give a legal opinion on

22  Estonian law for ELA also in the arbitration proceeding.

23  Q.   Okay.

24  A.   That's what I meant, but I'm not involved --

25  Q.   Right.

1  A.    -- in the proceedings --

2  Q.    You're not a part of it, a representative part.

3  A.    I'm not a --

4  Q.    You're not a representative part.

5  A.    No, I'm not.

6  Q.    Okay.  And of the -- did you read the -- the response by

7  the Estonian government that was submitted on January 6th of

8  this year?

9  A.    Yes, I did.  Yeah.

10  Q.    Okay.

11  A.    Yes, I did.

12  Q.    And did you see what I mentioned earlier where the

13  Estonian government -- and I have to find it, I'm sorry --

14  says, on page 4 of 54 in document 34-1 -- in other words, page

15  4 of the Estonian response, in paragraph -- I'm sorry.  It

16  starts on the previous page.

17         Paragraph 11 at the bottom of page 3, where it says,

18  "A statement of charges is also not required before requesting

19  extradition.  Pursuant to Section 457 of the Code of Criminal

20  Procedure, extradition may be requested if a suspect is located

21  abroad and is evading criminal proceedings due to which the

22  continuation of the proceedings is impeded"?

23  A.    Yes, I see that.

24  Q.    Do you have any -- do you agree or disagree -- well, let

25  me ask you first about the second sentence, pursuant to Section

1    457.

2    A.    Uh-huh.

3    Q.    Do you agree or disagree with that statement?

4    A.    Can I -- can I use my phone to look up Section 457?

5    Q.    Let me show you -- and on page 54 of 54 in that

6    attachment, there is the Estonian-language version, I believe,

7    of -- they've attached it, the Estonian government has, of

8    Section 457.

9    A.    I only have -- I only have the brief.

10   Q.    Right.  I was going to bring it to you, show it to you,

11   and ask you to translate it for the Court.

12   A.    Okay.

13          MR. CORSMEIER:  May I approach, Your Honor?

14          THE COURT:  Yes.

15          THE WITNESS:  Thank you.

16          So you want me to translate this.

17   BY MR. CORSMEIER:

18   Q.    Yeah, the provision, including the heading, and the

19   provision.

20   A.    All right.  I'll do my best.

21          Commencement -- so the title reads Commencement of

22   the Extradition Proceedings of a Person From a Foreign State,

23   title.

24   Q.    Okay.

25   A.    Okay.  Then we have Section 1 of paragraph -- of 457.  It

1    says here that extradition shall be sought if a suspect or a

2    defendant is in a foreign state and is evading criminal

3    proceedings, and further conduct of the criminal proceedings is

4    significantly impeded or ruled out -- or impossible without the

5    presence of the suspect or the defendant, or if a decision

6    issued in respect of a convicted person requires his --

7    requires that he be extradited or requires his extradition.

8    Q.   All right.  So at least with regard to that provision of

9    Estonian law, extradition can be sought for someone who's just

10   suspected of an offense.

11   A.   Yes, and has absconded.

12   Q.   Right.  All right.  Thank you.

13        Can I get that back from you?

14   A.   Yes, yes.

15   Q.   Let me ask you now about, since -- since you just

16   mentioned absconded and that statute mentions that, in your --

17   one of your declarations, I believe it's the first one --

18   A.   Uh-huh.

19   Q.   -- you give the opinion that -- and you talked about it on

20   your direct examination, that before a person can be found to

21   have absconded, it has to be shown that they've actually been

22   served with a summons to appear.

23   A.   If the allegation is that they absconded by omission, yes.

24   Q.   Right.  Okay.  So let's assume that's the allegation, and

25   that's the case we're talking about.

1    A.    Uh-huh.

2    Q.    What is -- and in your -- in your declaration you cite to

3    this Supreme Court case, Estonian Supreme Court case.

4    A.    Yes.

5    Q.    And there's no other authority for the proposition that a

6    summons is required other than that Supreme Court case.

7    A.    There is -- there is really very little to go on because I

8    read the commentary on the penal code with respect to paragraph

9    81, and that simply reads what's stated in the -- in the

10   provision itself.

11          And that was, in my recollection, when I wrote,

12   the -- the only Supreme Court decision I could find on the

13   subject of absconding by omission.

14   Q.    Okay.  So -- so there's no other authority other than the

15   Supreme Court that a summons is required to establish -- a

16   summons has to be served before you can establish that someone

17   absconded.

18   A.    No, but that's a very good authority.

19   Q.    All right.  Well, let's look at -- let's look at that

20   authority.

21   A.    Okay.

22          THE COURT:  What is that page again, Mr. Corsmeier?

23          MR. CORSMEIER:  It's in document 17-14 --

24          THE COURT:  Yes.

25          MR. CORSMEIER:  -- page 50 of 86.

1    THE COURT:  Thank you.

2    MR. CORSMEIER:  And I'm not sure -- let's see.

3  BY MR. CORSMEIER:

4  Q.   That's your declaration of December 9th, 2019, and it

5  is -- do you have that before you?

6  A.   The --

7  Q.   Do you have the English-translation version?

8  A.   Yes, I do.  Yes.

9  Q.   Okay.  I wanted to make sure we were looking at the same

10  thing.

11    All right.  And in that -- in that case, as I

12  mentioned before when I was discussing it with the Court, the

13  Court does talk about this purported defendant or suspect, T.

14  Koit, and talks about how the lower court erroneously found

15  that he was -- he was aware of the proceedings because, kind of

16  about in the middle, it says that, "Although the circuit court

17  stated that T. Koit was summoned to the interrogation at the

18  Pärnu," if I'm pronouncing that correctly --

19  A.   Perfect.

20  Q.   -- "Police Station for several times" -- "for several

21  times," while the translation just means several times.

22  A.   Yeah.

23  Q.   -- "the judgment of the circuit court did not reveal

24  whether T. Koit actually received the summons."

25    And then they go on, in paragraph 8.4, to conclude

1   that "The materials in the criminal case do not include

2   information that serves as a basis for a firm conclusion that,

3   being aware of the criminal proceedings conducted with respect

4   to him, T. Koit absconded from precourt proceedings, and that

5   would preclude" -- essentially, the -- I'll call it the

6   extension of the statute of limitations, even though that's not

7   really what it is.  I understand that.

8   A.    Uh-huh.

9   Q.    And then the last two sentences say, "The county court

10  must ascertain at the new hearing of the criminal case whether

11  T. Koit was aware of the criminal proceedings conducted with

12  respect to him and, nevertheless, acted in a manner that can be

13  considered as absconding from criminal proceedings.

14          "Only after the adjudication of these matters, a

15  decision can be made on the expiry of the limitation period of

16  criminal offenses attributed to T. Koit."

17          So where in this opinion does the Court say that a

18  summons must be issued -- actually issued to a person before

19  they can be found to have absconded?

20  A.    Let me explain.  So 8.4 must be read with the other

21  subsections where the Supreme Court discusses the issue, and

22  especially together with 8.2.

23          And, you see, at 8.2, the Supreme Court gives you the

24  general rule, which is that "Absconding from criminal

25  proceedings may, in principle, lie both in acts and omissions,

and if the body conducting proceedings finds that absconding

from criminal proceedings lies in omissions, the admitted acts

of conduct that are required from a person and that can be

considered as absconding must be indicated," right?

And then at 8.4 the Court says to the lower courts --

the Supreme Court says to the lower courts, "The county court

must ascertain whether he was aware of the criminal proceedings

with respect to him and, nevertheless, acted in a manner that

can be considered as absconding from criminal proceedings."

So, now, if the test is that absconding is the

deliberate evasion of proceedings and absconding by omission

means the failure to do what is required from that person, then

that obviously leads to the summons.

The reason for that is, as I indicated in my direct

examination, there are only two things that an Estonian suspect

is duty-bound to do.  Firstly, they are duty-bound to appear

when summoned, and secondly, as they appear, do what is told.

Q.   Okay.

A.   Otherwise, I mean, simply being aware of proceedings does

not require anyone to appear, "Here I am."

Q.   What if you're aware of the proceedings and the

prosecutor's office, the police, or whoever attempts a few

times to serve you with a summons and can't, and in their view

you're evading that --

A.   Well, if you don't serve the summons, then you don't make

1    the person aware of what is required of them.  That's -- that's

2    the thing.

3    Q.    Even if you prove that they're aware of the criminal

4    proceedings.

5    A.    Well, are you -- are they aware of the summons being

6    served, and are they aware of the contents of the summons?

7    Q.    Okay.

8    A.    That's the crucial issue here.

9    Q.    So even if they're aware of the criminal proceedings, if

10   they're not aware of the summons --

11   A.    No.

12   Q.    -- then they haven't absconded.

13   A.    No.

14   Q.    All right.  And you're saying that's obvious from that

15   opinion?

16   A.    Yes.

17   Q.    And the Court can decide on its own, but I don't know --

18   and I don't -- I don't know what the international -- or other

19   countries' legal training involves or what words they use.

20         But do you use the word "holding," the holding of the

21   case in your practice as we do in America?

22   A.    We don't use the word.

23   Q.    Okay.  And we can just assume -- I'll try to explain it.

24   I may not get it right, but just for the purpose of this

25   question, assume this, that it's the essential finding of the

1  Court that's necessary to the resolution of the case.

2  A.    We call it a statement of reasons.

3  Q.    Okay.

4  A.    Yeah.

5  Q.    Okay.  And isn't the -- the essential conclusions or what

6  I would call the holding in paragraph 8.4 that the -- this T.

7  Koit, in order to be found to have absconded, must have been

8  aware of the proceedings and, nevertheless, acted in a manner

9  that can be considered as absconding from the criminal

10 proceedings?

11 A.    Yes.

12 Q.    Okay.

13 A.    And --

14 Q.    And there's no requirement that he be served with a

15 summons.

16 A.    There is a requirement.  There is a requirement,

17 precisely --

18 Q.    Okay.  Where in there does it say that there's a

19 requirement that he be served with a summons?

20 A.    Because absconding -- according to what the Supreme Court

21 says here -- it's set out in black and white at 8.2 -- you need

22 to deliberately evade proceedings conducted with respect to you

23 in order to be deemed to have absconded.  That's the rule.

24 Q.    Okay.

25 A.    If you're aware of proceedings and do nothing, which you

1  is well within your rights to do, then you haven't necessarily

2  absconded --

3  Q.    Okay.

4  A.    -- as the Supreme Court says here.

5        Simply not residing at your residence -- place of

6  address or residence, that's not absconding.  Your relatives

7  not being aware of where you are, that's not absconding.  Only

8  if you know exactly what is required of you and you fail to do

9  that have you absconded.

10       THE COURT:  Is -- and that statement that you just

11  made, is that in this opinion, or are you --

12       THE WITNESS:  It's in the opinion.

13       THE COURT:  All right.  And point that to me -- out

14  to me, then.

15       THE WITNESS:  8.2 --

16       THE COURT:  Okay.

17       THE WITNESS:  -- third sentence:  "If the body

18  conducting proceedings finds that absconding from criminal

19  proceedings lies in omissions, the omitted acts of conduct that

20  are required from the person and that can be considered as

21  absconding must be indicated."

22       So if, under -- if, under criminal procedure law, you

23  would be required to tell your relatives where you are and you

24  haven't, then that might be absconding, but that would be

25  absurd because there is no such requirement under the Estonian

1    Code of Criminal Procedure.

2         THE COURT:  And as to the requirements, what is

3    required and what's not required, are you reading on into 8.3?

4         THE WITNESS:  Well, this is -- this is in the -- in

5    the present case here, in the case of Thomas Koit, the police

6    thought that if they simply told the -- if they simply

7    established that Mr. Koit wasn't residing at his registered

8    address, then that might be absconding, and if his relatives

9    don't know where Mr. Koit was, that might also be absconding.

10        But then the Supreme Court said, no, that's not,

11   because drawing -- coming back to 8.2, it has to be deliberate,

12   deliberate evasion of proceedings.

13        THE COURT:  All right.

14        THE WITNESS:  And in the -- in the failure -- in the

15   case of a failure to appear, the person must be aware where he

16   needs to appear and when.

17        THE COURT:  All right.  Because the facts that are

18   alleged by the Estonian government here go beyond the person

19   just not residing where he should reside and just not being

20   somewhere where he should be.  It's that Mr. Rotko actually

21   knew he was suspected of the crime and that he fled.

22        That's -- that's what's alleged here, which goes

23   beyond a little bit what's discussed in this case.

24        But you're saying even in that event, unless there

25   was some place -- some time, some place that Mr. Rotko needed

1   to be and had been advised of that via -- it would be a

2   summons, absent that, he can -- he did not abscond.

3           THE WITNESS:  Fleeing would be active.  That would be

4   actively absconding.  I'm taking deliberate steps to get away

5   from the police, for example, that is, if you see them coming

6   and you run.

7           THE COURT:  Well, what if -- what if you know that

8   they're investigating you -- not necessarily coming at you, but

9   you know they suspect you.  You know the police are asking

10  questions.  You know they think you committed a crime and then

11  you knowingly decide to take off, to run.  Is that active?

12          THE WITNESS:  For the purpose -- yes, for the

13  purpose -- for the purpose of absconding.  So the -- the

14  fleeing, the action -- the act to flee must be based on the

15  deliberation, the intent not to be made available or not to

16  make oneself available to the police.

17          That is the -- it's intent.

18          THE COURT:  Yes.  All right.  All right.

19          THE WITNESS:  It depends on the intent.

20          THE COURT:  But for purposes of either -- whether

21  it's interrupting or suspending the statute of limitations,

22  then, if it can be proved that someone had the intent to flee,

23  knowing an investigation was going on, would that then suspend

24  the statute of limitations or the period?

25          THE WITNESS:  If it were proven that they fled --

1    THE COURT:  Yes.

2    THE WITNESS:  -- for the purpose of, yes, fleeing the

3    proceedings, yes, that would be active --

4    THE COURT:  All right.

5    THE WITNESS:  -- active absconsion.

6    THE COURT:  All right.

7    THE WITNESS:  This is not what is -- what is alleged

8    here.

9    THE COURT:  All right.

10   BY MR. CORSMEIER:

11   Q.   All right.  And I guess the last thing I'll ask you about

12   this Supreme Court opinion, so an important -- what the county

13   court in this case needed to understand was T. Koit had to have

14   been served with a summons in order for the Court to find him

15   having absconded, and the record didn't show he had been served

16   with a summons, so therefore the county court was wrong.

17   A.   Yes.

18   Q.   All right.  So -- and can you give me a reason why those

19   final couple sentences, the Court wouldn't have -- if that's

20   true, the Court wouldn't have said, "The county court must

21   ascertain at the new hearing in the criminal case whether T.

22   Koit was aware of the criminal proceedings conducted with

23   respect to him and was served with a summons and, nevertheless,

24   acted in a manner that could be considered absconding"?

25   Why didn't they say that if that was important?

1  A.   Because if he -- if he was served with a summons, then the

2  act of -- then acting -- that acting in a way that could be

3  considered as absconding would be a failure to appear as

4  summoned.

5  Q.   So a summons didn't need to be served on him for him to --

6  A.   I don't understand.

7  Q.   Why -- why don't they say, "You need to make sure he was

8  served with a summons before you find that he absconded," if

9  that's what you're saying the requirement is?

10  A.   Because otherwise, if you don't prove that he was served

11  with a summons, you cannot prove conclusively that he knew what

12  was expected of him and what he had to do.

13  Q.   Exactly.

14       So why don't they tell the county court, "You need to

15  find that he was served with a summons before you can find him

16  absconding"?

17  A.   This is what they're saying, isn't it?

18  Q.   Okay.  Okay.

19       THE COURT:  Let me ask you this, though, and I guess

20  I'm going to have to read this a few more times.

21       But the Court, in the opinion we're talking about, in

22  paragraph 8.2, it discusses both acts and omissions, right?

23       THE WITNESS:  Yes.

24       THE COURT:  All right.  And could you read this

25  opinion, especially the part that Mr. Corsmeier is focusing on,

where it says that, in paragraph 8.4, "The county court must

ascertain at a new hearing in the criminal case whether he was

aware of the criminal proceedings conducted and, nevertheless,

acted in a manner to be considered absconding" -- could they be

saying there, "All right. You haven't -- you haven't proved

and you can't prove absconding by omission, because there

hasn't been a summons, but you need to determine and look to

see if there's active absconding?"

Could that be what the Court's saying?

THE WITNESS: It could be.

THE COURT: Because they're saying, "Go back and look

at something," and if we already know there's no summons, then

can they be directing the lower court to go back and look for

absconding by omission or must they be telling the Court,

"You've got to -- you've got to see if there's any evidence of

absconding actively."

THE WITNESS: Well, of course. The state is free to

present their case as they wish. They can say that he has

actively absconded, which is to say, for example, he lived

under a fake ID, he tried to hide himself, and so on and so

forth. He fled the police. That would be active absconding.

You can look at that.

Or you can say that he absconded by omission, which

is basically not -- which is basically to -- failure to appear

when summoned.

1    THE COURT:  Okay.

2  BY MR. CORSMEIER:

3  Q.    All right.  So if a suspect -- the police or the

4  prosecutor, however it works, want to summon him -- well,

5  first, let me ask you this.

6        Is the Estonian prosecutor correct that before a

7  statement of charges can be filed, the suspect has to be

8  interrogated, under Estonian law?

9  A.    Yes.

10 Q.    Okay.  If -- if I'm a suspect in Estonia and the police

11 think I've committed a crime and they try to summons me in for

12 that interrogation but they can't reach me -- turns out I'm in

13 the United States, and so they can't reach me there, and so

14 they can never interrogate me, and so no charges can ever be

15 brought -- I can escape liability for a criminal offense just

16 by that action.

17 A.    I wouldn't call it escaping --

18 Q.    Okay.

19 A.    -- because if you're simply -- if you simply live in a

20 different country, that's no fault of yours, is it?  You live

21 in a different country.

22        And if the police are incapable -- and this is --

23 this is what I said in my opinion.  If the police are incapable

24 or disinterested in seeking you out under the respective Mutual

25 Assistance Treaties, the case will go stale and will become

1  time-barred.

2  Q.   All right.  Well, let's talk about that, a mutual legal

3  assistance treaty request.

4         So Estonia requests the United States to serve a

5  summons on Mr. Rotko arising out of this case, under an MLAT.

6  They serve the summons.  He ignores it.

7         How is he brought to justice for a criminal offense

8  that Estonia believes he committed?

9  A.   Well, in that case, first of all, you would have

10  absconding, wouldn't you?  That would be absconding by

11  omission, and that would give you the benefit of a paused

12  limitation period.

13  Q.   Right.  But the 15 years runs out during that pause, and

14  now he can't be brought to justice, right?

15  A.   Well, in -- if the 15 years run -- if the 15 years runs,

16  then, yes, that's true.

17  Q.   And there's nothing Estonia can do about that but seek his

18  extradition.

19  A.   True, yes.

20  Q.   Okay.  So an MLAT doesn't really help at all, does it, to

21  bring him before the Estonian authorities?

22  A.   Well, are we talking about practical matters, or are we

23  discussing the law?

24  Q.   Well --

25  A.   If we're talking about --

1  Q.   -- as a practical matter, he's never going to be brought

2  before the Estonians if he just stays away for 15 years.

3  A.   I cannot opine on that.

4  Q.   Okay.

5  A.   But I can tell you when a person is deemed to have

6  absconded and when he's not.

7  Q.   All right.  Let's go to that Harju County Court ruling of

8  August 25th, 2007.

9  A.   Okay.

10  Q.   I'm looking at your December 9th, 2019, declaration.  It's

11  document 17-13, and it's -- begins on page 16 of, looks like,

12  72 of document 17-13.  But it's Exhibit M, your declaration's

13  Exhibit M.

14  A.   Is that the 9th of December?

15  Q.   Yes.  I'm sorry.  It's Exhibit 1 of your declaration.

16  A.   Uh-huh.  Okay.

17         THE COURT:  What page did you say?

18         MR. CORSMEIER:  Page 16, Your Honor, of 17-13.

19         THE COURT:  Thank you.

20  BY MR. CORSMEIER:

21  Q.   And you said that everything in -- well, not the

22  procedural stuff at the beginning, but then everything in here

23  until the last paragraph is merely a statement of the

24  prosecutor.

25  A.   Yes.

1   Q.   What does it mean, then, by -- on page 1, after the advice

2   of an appeals procedure, where it says, "The preliminary

3   investigation judge found out, on hearing of the application of

4   arrest, colon" -- what does that mean?

5   A.   This is where the judge is referring to the -- to the

6   application.

7   Q.   Who is the preliminary investigation judge?

8   A.   Eha Popova.

9   Q.   Pardon me?

10   A.   Eha Popova, E-h-a, P-o-p-o-v-a.

11   Q.   Okay.  So isn't -- doesn't that say that, "Here follow my

12   findings upon hearing the application"?

13   A.   No.

14   Q.   Okay.

15   A.   Because in that case where would the -- where would the

16   application be?

17   Q.   It would be in what the prosecutor provided her.

18   A.   Yeah, but that also has to be referenced.

19   Q.   Has to be referenced?

20   A.   It has to be.  It always is referenced --

21   Q.   Okay.

22   A.   -- and this is what is referenced.

23   Q.   All right.

24   A.   Because if you -- if you -- if you read the -- if you read

25   the ruling -- I would also say that it would be -- it would be

1  entirely illogical for all of this to be a judge's finding,

2  because then on one page the judge says that "It was impossible

3  to summons Mr. Rotko," and then on the final page, she goes on

4  to say that -- that "Mr. Rotko hasn't responded to a summons

5  and has failed to appear several times," diametrically opposed

6  statements.  It wouldn't make any sense.

7  Q.    All right.

8  A.    Now, the first bit of this ruling is a reference to what

9  the prosecutor said, and then the final -- the final paragraph,

10  "The Court having," da, da, da, da, da, that's the Court's

11  assessment.  That's the Court's determination.

12  Q.    Okay.  Based on everything that comes before it.

13  A.    Yes.

14  Q.    And that Court's determination was that "The criminal case

15  materials show that A. Rotko is aware of the criminal

16  proceedings, but in spite of this has realized" -- and that

17  probably means liquidated or something like that -- "his

18  property located in Estonia and has probably left the Republic

19  of Estonia"?

20  A.    Once again, please?

21  Q.    Well, it's on page -- it's on the last page, and I don't

22  need to read it again.  I think we've already read it a couple

23  times.

24       The last page, the last paragraph, you said, are the

25  Court's findings.

A.    And which finding is that exactly that you were --

Q.    "The criminal case materials show that A. Rotko is aware of the criminal proceedings," and then it goes on.

A.    Uh-huh.  Okay.

Well, that doesn't make any sense either because the criminal case was started -- the case commenced in September 2006 -- didn't it? -- and Mr. Rotko also left Estonia in September 2006.

But the first time that anyone was ever contacted about the case, whether it be Ms. Kotova, whether it was a -- whether it was an attempted summons or the witnesses, all of that occurred at the end of the year after Mr. Rotko had left or in the beginning of the next year.

Q.    As far as you know.

A.    Well, as per the documents in the file.

Q.    Okay.  So as far as you know from the documents in the file.

A.    As far as I know from the documents in the file.

Q.    So you just disagree with what the judge found.

A.    With that statement, yes, I disagree.

Q.    Okay.

A.    It's inaccurate.

Q.    And in your view -- I was going to get to this later -- but the statute of limitations ran long ago.

A.    2012.

1   Q.   Okay.  And you said that -- that this was not a final

2 determination of absconding for statute of limitation purposes,

3 and that will be made when he's -- when he -- that would be

4 made later in the case.

5   A.   That would be made at trial.

6   Q.   Okay.  And the only way that can be made is if Mr. Rotko

7 is either taken to Estonia or makes himself available in

8 Estonia.

9   A.   In Estonian court proceedings, yes --

10   Q.   Yes.

11   A.   -- that would be -- that would be it.

12   Q.   And if it's as clear as you say, the case would just be

13 dismissed pretty quickly, correct?

14   A.   I cannot say.

15   Q.   Well --

16   A.   You're asking me to hypothesize.

17   Q.   Well, even hypothesizing, most of this -- you're an

18 expert -- you're an expert witness.  You've been hypothesizing

19 for most of this testimony.

20         And I think you're saying that it's crystal clear

21 that the statute of limitations has run.

22   A.   In my expert opinion --

23   Q.   Okay.

24   A.   -- that is -- that is my assessment.

25   Q.   So in -- then in your opinion, then, a court could

1  disagree.

2  A.    They very well might.

3  Q.    And in this case this Court disagrees.

4  A.    This Court didn't disagree because the -- at the time when

5  the -- when the ruling was made on the 25th of August, 2007,

6  the expiration period had only run for less than a year.

7  Q.    Okay.  But this Court disagrees and found that he did

8  flee.  He was absconding.

9  A.    He didn't say that.  The Court didn't say that.

10  Q.    Okay.  Well, maybe they're not using the words -- those

11  words, but what the Court says is that he was aware of the

12  criminal proceedings, and it also -- and in spite of that, has

13  left Estonia and that he may remain at large and continue

14  avoiding the criminal proceedings.

15        That's not absconding, in your view?

16  A.    In the future, avoid criminal proceedings, yes, that would

17  be absconding --

18  Q.    Then that would be --

19  A.    -- and that's exactly the point why you would issue an

20  arrest warrant.

21        THE COURT:  That would be active absconding.

22  Knowing -- knowing that there's a proceeding, a criminal

23  proceeding, and you -- purposely, to avoid the proceeding, you

24  flee, that's active absconding.  You told me that a minute ago.

25        THE WITNESS:  Yes.

1    THE COURT:  And you say here the Court's not finding

2  that that's happened already.  It's just that it could happen

3  in the future.  That's your opinion.

4    THE WITNESS:  The -- what I said was that the purpose

5  of this ruling is to prevent the person from absconding, right?

6  Now, if he has already absconded . . .

7    THE COURT:  What -- okay.  So let's say the judge

8  found here, "I find he's already absconded."

9    Are you saying he wouldn't have issued an arrest

10  warrant?

11    THE WITNESS:  She might have.  It's a she.

12    THE COURT:  A she.  I'm sorry.

13    She wouldn't have --

14    THE WITNESS:  She might have but perhaps for the

15  purposes of bringing -- bringing Mr. Rotko in.

16    THE COURT:  Well, if he had already absconded, he's

17  likely to continue absconding.

18    THE WITNESS:  Yes, true.

19    THE COURT:  Right?

20    THE WITNESS:  Yeah, true.

21    THE COURT:  That -- it seems like it's a fine line

22  you're drawing between her finding that whether he's -- because

23  it would be like this.  It would be like here we are on -- what

24  is today?  Is today Tuesday?

25    Here we are on Tuesday.

1      THE WITNESS:  Yes.

2      THE COURT:  I'm not finding that he absconded based

3  on this, but as soon as I sign this two seconds later, I find

4  that -- what were your words, that there's -- I'm making a

5  determination that he's going to.  Well, that determination's

6  made on me thinking he's absconded now.

7      THE WITNESS:  Yes.  The reason why I say it's a

8  forward-looking statement --

9      THE COURT:  Yes.

10      THE WITNESS:  -- is because under the Estonian Code

11  of Criminal Procedure, you don't arrest someone because they

12  have absconded.  You arrest someone for the purpose of avoiding

13  their absconsion or avoiding that they might continue

14  committing crimes in the future.

15      That's on black and white.  That's the legal

16  requirement.  You're not --

17      THE COURT:  Okay.

18      THE WITNESS:  An Estonian court does not have to make

19  the determination that you have absconded in order to issue an

20  arrest warrant.

21      THE COURT:  All right.

22      THE WITNESS:  That's based on, I believe, paragraph

23  130 of the Estonian Code of Criminal Procedure.

24      THE COURT:  You know, I don't know if everybody does,

25  but all I can do is try to relate that to what I know about our

1  legal system.

2           THE WITNESS:  Yes, sir.

3           THE COURT:  And some of what you're saying, to me at

4  least, is counterintuitive to it.  But that's -- that's

5  something -- because what you're -- what you're talking about

6  is what we call anticipatory warrants.

7           You think a crime is going to be committed sometime

8  down the road --

9           THE WITNESS:  Yeah.

10          THE COURT:  -- and then you issue a warrant.  If

11  certain things happen, then you have the warrant, and you

12  execute the warrant.

13          But -- but the way you're teeing it up, it almost

14  seems to me like this judge who issued that would have had to

15  have thought that all of the, I don't know, elements were in

16  place to think that he had absconded.  But --

17          THE WITNESS:  Well --

18          THE COURT:  -- but I see what you're saying.

19          THE WITNESS:  -- let me explain it in a different

20  way.

21          THE COURT:  Okay.

22          THE WITNESS:  Say, for example, that we're in

23  Estonia -- that's a bad example.

24          Say, for example, that we're here in the United

25  States.  We have criminal proceedings ongoing here in the

United States under the Estonian Code of Criminal Procedure.
The suspect lives in Canada -- or lives in Canada and the
United States, goes back and forth between Canada and the
United States.

And the prosecutor is able to establish to this Court
that it might very well be that if the suspect finds out, while
being in Canada, that there are criminal proceedings against
them, that they might not return.

So we need your arrest warrant in order to take him
in, put him in -- put him in custody and keep him there for the
duration of the proceedings.

This is what I mean when I say it's a
forward-looking -- forward-looking arrest warrant.  This is --
this is -- and all of the -- all of the information contained
therein, what are the reasons why I think that this person
might not return?  Those are the reasons.

THE COURT:  Because he's already gone.

THE WITNESS:  Yeah.

THE COURT:  Okay.

Go ahead.

THE WITNESS:  Basically it, yeah.  But, again, as I
say, this is not a final determination.  It's been done ex
parte.

THE COURT:  I understand.

BY MR. CORSMEIER:

1　Q.　And in your -- in your direct testimony -- and correct me

2　if I'm wrong, but didn't you say that what the judge is finding

3　here is that -- and the words you used were "credibly

4　demonstrated," that it has been credibly demonstrated that

5　Mr. Rotko is avoiding criminal proceedings.

6　A.　Let's see.　Well, it's been credibly demonstrated what the

7　judge says here.　Has left Estonia, has sold his -- has sold

8　his apartment.　Realized his property is what they say.

9　That's -- again, it's -- realized his property means sold

10　his -- sold his apartment.

11　Q.　Now, the last sentence says, "Such facts provide a basis

12　to assume that suspect may, while remaining at large, continue

13　avoiding criminal proceedings."

14　　　Doesn't that imply that he already was avoiding

15　criminal proceedings?

16　A.　Might imply that.

17　Q.　It might.

18　　　You can't answer yes or no to that?

19　A.　So what the Court has found -- as I said before, what the

20　Court has found here -- what the criminal case materials tell

21　the Court is that he's aware of the criminal proceedings.　In

22　spite of this, he has realized his property located in Estonia

23　and has probably left the Republic of Estonia.

24　　　In the criminal case, there has been gathered enough

25　material, factual material, on which there are grounds to deem

1    the suspicion justified.  Aleksandr Rotko has not responded to

2    summons and has repeatedly failed to appear at the body

3    conducting the proceedings.

4            So, yeah, I mean, if Aleksandr Rotko has not

5    responded to summons and has repeatedly failed to appear at the

6    body conducting the proceedings, such facts provide the basis

7    to assume that the suspect may, while remaining at large,

8    continue avoiding the criminal proceedings.

9            Not responding to a summons and repeatedly failing to

10   appear would be to avoid criminal proceedings.

11   Q.   All right.  But the statement of the prosecutor doesn't

12   say that he did that, right?  It just says they attempted to

13   serve him and couldn't.

14   A.   Which is -- which is why it's surprising that the Court

15   has taken this view.

16   Q.   Right.  Could that be a mistake?

17   A.   The fundamental part of the ruling -- if the fundamental

18   part of the ruling is a mistake, then the whole ruling is a

19   mistake.

20   Q.   Okay.  Let me ask you about the -- you were asked about

21   Olga Kotova's case, and -- I think you were asked about it, but

22   even if you weren't, I'm going to ask you about it.

23           The -- her -- and I would call it -- correct me if

24   I'm wrong.  Her appeal of the August 25th, 2007, order that she

25   should essentially be detained --

1  A.    Yes.

2  Q.    Do you recall that circuit court ruling?

3  A.    (Nods head up and down.)

4  Q.    All right.  And in that ruling the Court -- do you have

5  that in front of you?

6  A.    Yes.

7  Q.    Okay.

8        THE COURT:  Which one is that, Mr. Corsmeier?

9        MR. CORSMEIER:  Your Honor, it's document 17-14.  The

10 order begins on page 68 of 86 --

11       THE COURT:  Thank you.

12       MR. CORSMEIER:  -- and I'm looking at page 71 of 86,

13 paragraph 6.1.

14       THE COURT:  Thank you.

15 BY MR. CORSMEIER:

16 Q.    And where the -- her defense attorney, apparently, says --

17 is arguing that she didn't really abscond because of those

18 facts that are listed there, and I'm not going to -- to repeat

19 them.

20       And then saying, "There weren't any indications that

21 she would have been aware of the criminal proceeding initiated

22 against her."  That's the next paragraph down.

23       And that therefore --

24 A.    Which -- what's the number of the paragraph?

25 Q.    It's paragraph 6.1, I'm sorry --

1    A.    6.1.

2    Q.    Yes.

3    A.    Okay.

4    Q.    The first paragraph was essentially the facts that her

5    attorney was arguing showed that she didn't abscond.

6    A.    Uh-huh.

7    Q.    So is the second paragraph, but it says that he or she

8    argued that there's no indication that she would be aware of

9    the criminal proceedings, filed some documents to support that,

10    and therefore the defense attorney argued that the county court

11    was wrong.

12         But the circuit court, reviewing those materials,

13    rules against her and orders that she should still be detained.

14    In paragraph 8, the second paragraph of paragraph 8, it says,

15    "There's no dispute that the attempt to serve O. Kotova with a

16    summons to the investigator failed"?

17    A.    Uh-huh.

18    Q.    So she was never served with a summons.

19    A.    Uh-huh.

20    Q.    And then they go through the facts that show that she did

21    deliberately abscond.

22         And if you go to paragraph 9 on -- in the exhibits,

23    it's -- I mean, I'm sorry, in document 17-14 it's page 73, but

24    paragraph 9.  It says, "In view of the above circumstances, the

25    circuit court agrees with the county court that O. Kotova was

aware of the criminal proceedings but deliberately absconded
from it."

A.    Uh-huh.

Q.    But there was never a summons served in that case, so how
could they find that she deliberately absconded?

A.    Because I think what the Supreme Court actually -- not the
Supreme Court, sorry, the district court.  I think it's been
translated circuit court.  They actually call them district
courts.

        I think the -- the main bit here, which shows why the
Court arrived at the -- at the conclusion that it did, is
paragraph 8.  So paragraph 8 starts at the very bottom of the
page, so you turn to the next page.

        And then at the bottom, second to last paragraph,
"Thus, according to the surveillance file, Olga Kotova actively
interacted with her relatives who had been asked to give her
information that Olga Kotova was subjected to criminal
proceedings.  So there is a reason to believe that this
information was known to Olga Kotova.

        "However, the behavior of Kotova's relatives show
that Olga Kotova absconded from criminal proceedings.  Although
they interacted with Olga Kotova, they told the police that
they did not know the exact location of the suspect.

        "According to the Court, the aforementioned" -- "the
aforementioned suggests two alternative possibilities:  whether

Olga Kotova lied to her relatives about her whereabouts (for
example, claiming to be staying in Russia) or her relatives
knew her whereabouts, but, in agreement with Olga Kotova,
provided false information to the police about her location."

So what this is is actually active absconding,
absconding actively by conspiring to give false information, by
conspiring to hide your whereabouts, and so on and so forth, so
this is active.

And, indeed, there is -- and this indicates that Olga
Kotova -- the prosecutor wouldn't be able to establish that she
absconded by omission because she wasn't served a summons.

Q.    All right.  So the -- and I may not be using the technical
term.  The 15-year statute of limitations -- well, first of
all, let me ask you this.

So somebody can abscond without being summonsed if
it's active absconding, if they know of a criminal proceedings
and intentionally leave to avoid the criminal proceedings.

A.    Yes.

Q.    Okay.  And that type of absconding does the same thing as
the active absconding.  It can -- and I'll use the word extend
or take the statute of limitations out further.

A.    Yes.

THE COURT:  The active and the passive.

THE WITNESS:  Yes.  You have one coin, and there are
different sides of the same coin.

1           THE COURT:  Yes.  But either one --

2           THE WITNESS:  Yes.

3           THE COURT:  -- can have the effect on the statute of

4    limitations.

5           THE WITNESS:  Yes.

6           THE COURT:  All right.

7           THE WITNESS:  Absconding has the effect.

8           THE COURT:  Yes.

9           THE WITNESS:  And absconding can be done in two ways,

10   either by actively absconding or --

11          THE COURT:  Passively.

12          THE WITNESS:  -- passively.

13          THE COURT:  All right.

14   BY MR. CORSMEIER:

15   Q.    All right.  So if, in fact, Mr. Rotko actively absconded,

16   then the statute of limitations would not expire until 15 years

17   after the -- and I know it's not exactly that.  If he's brought

18   back before the expiration, then the continued five years would

19   still apply.

20          But if he's not brought back before the 15 years and

21   he actively -- it's shown he's actively absconded, then it

22   would expire, the statute of limitations.  He couldn't be

23   charged.

24   A.    Yes.

25   Q.    Okay.  All right.  And you said earlier in your

1  cross-examination that you're not an expert -- and I'm not sure

2  exactly how you put it, but essentially in extradition law or

3  in treaty law?

4  A.    Treaty law.

5  Q.    Okay.

6  A.    So I don't want to go into the interpretation of treaties

7  because I'm not equipped to do that.

8  Q.    Have you been involved, either as an advocate or an

9  expert, in other cases involving extradition of persons from

10  the United States to Estonia?

11  A.    Our firm has been engaged in a proceeding involving the

12  extradition of a person from Estonia to the U.S.

13  Q.    Okay.  But not the other way around.

14  A.    Not the other way around.

15  Q.    Have you been personally involved in that matter that your

16  firm's been involved with?

17  A.    No.

18  Q.    Okay.  So when you testify that it's very unusual for

19  Estonia to wait five years to seek an extradition after the

20  arrest warrant, you don't have any basis for that, do you?

21  A.    I absolutely do.

22  Q.    What is that?

23  A.    Because an Estonian prosecutor, upon obtaining an arrest

24  warrant, would not let it sit on the shelf for another five

25  years.

1  Q.    Okay.  And on what do you base that?

2  A.    Because there would be a five-year limitation period.

3         As I explained before, upon obtaining the arrest

4  warrant, the initial limitation period was interrupted and

5  began anew.

6         A prosecutor would do anything in their power to get

7  the suspect to appear, to go through the motions, to do the

8  procedural acts that they need to do in order to put the file

9  together and to then file the charges with the court because

10 there's not a lot of time, is there?

11        To simply let it sit means that you're either

12 disinterested in the case -- it's not important -- or that you

13 feel that you don't have a lot to go on.

14 Q.    All right.  And all of that is based on pure speculation?

15 A.    It's based on my experience.

16 Q.    Okay.  What experience?  Explain the exact experience

17 you're talking about.

18 A.    So usually -- usually prosecutors in Estonia don't find

19 white-collar cases, unless it's a major case of corruption --

20 they don't find it very important.

21 Q.    All right.  So would that be a reason that a prosecutor

22 might wait to seek extradition?

23 A.    It would -- it would -- it would go more slowly --

24 Q.    Okay.

25 A.    -- right, because you don't find it to be -- you don't

find it to be very important.

But in a case where you think -- I mean, in a case where you think that you're not able to catch the guy, the suspect; the suspect is somewhere at large; you have an arrest warrant -- usually in white-collar cases you don't even issue arrest warrants.  It's also very -- very unusual.

As I said, in cases of bribery, corruption, high-level corruption, there might be.  But then it's not for the purpose of absconding because people don't usually abscond. It's for the purpose of having them -- preventing them from committing further crimes in the sense that -- destruction of evidence, instructing witnesses what to say, etc., etc.  That's the purpose of those arrest warrants.

But usually you wouldn't.

Q.    All right.  You've never been an Estonian prosecutor.

A.    I have never been an Estonian prosecutor, but this summer I was asked -- or I was offered the position of the general prosecutor of Estonia.

Q.    Okay.  And you didn't take it?

A.    I didn't.

Q.    And so you have no experience with prosecution.

A.    With prosecution, no.

Q.    Okay.  And you have no idea what was going through this prosecutor's mind.

A.    I wouldn't have any idea what's going through his mind,

1  no.

2  Q.   Right.  And so you don't have any idea whether this was

3  unusual or not in seeking extradition because you've never

4  dealt with extradition to the -- from the United States?

5  A.   What I would say is that in Estonian criminal court

6  proceedings, in criminal proceedings in Estonia, if you have

7  some -- if you obtain an arrest warrant in respect of someone

8  and then don't do anything for more than five years, for more

9  than the entire length of the limitation period, then that

10  would be very unusual.

11  Q.   Okay.  And, again, that's just based on what you believe.

12  A.   That is based on what I believe based on my experience as

13  an advocate involved in criminal proceedings.

14  Q.   Okay.

15  A.   I have never seen -- I have never seen such delays, as a

16  defense advocate.

17  Q.   Did you review other cases where Estonia requested

18  extradition from the United States?

19  A.   As I said, no.

20  Q.   So you have no idea how long those took.

21  A.   No.

22  Q.   Okay.

23          MR. CORSMEIER:  I believe that's all I have, Your

24  Honor.

25          THE COURT:  Did you ask about the charging document

1    situation?  I didn't remember if you -- if you had -- if you

2    started with that.

3            MR. CORSMEIER:  I asked about -- yes, Your Honor,

4    the -- what the -- I asked about the Estonian treaty, what it

5    said in the Estonian language, that it doesn't include a

6    charging document.  It's just people suspected of the crime.

7            I didn't -- I guess I didn't ask about the suspicion

8    order, but -- well, let me ask about that.

9    BY MR. CORSMEIER:

10   Q.   You said that could be translated as suspicion order or

11   suspicion ruling?

12   A.   Yes.

13   Q.   And you said that's not a ruling by the Court?

14   A.   No.  It's a ruling -- we have rulings by the

15   investigative -- rulings that are made by the investigative

16   authorities and rulings that are made by the Court.

17   Q.   Okay.  So it would be a ruling by the investigative

18   authorities that a person is suspected of a crime.

19   A.   A ruling -- a ruling and an order are the same thing.  In

20   Estonian we use the word *määrus*, m-a-a-r-u-s, and that word can

21   be translated into English as either a ruling or an order.

22   Q.   Okay.  And it can mean the same in the United States.

23           But it is a finding or a -- I don't know what to call

24   it, a conclusion by the investigating authorities that we

25   suspect this person of a crime.

1  A.   It's a procedural -- a procedural finding, a procedural

2  order, yes.

3  Q.   Okay.  That we suspect this person of committing a crime.

4  A.   As I -- the suspicion order, as it existed until 2002,

5  28th of July -- suspicion order had the very specific purpose

6  of attributing suspect status to someone, right?

7       Prior to the issuance of that order, the person

8  wouldn't have been a suspect.  After the issuance of that

9  order, he would have been a suspect.

10      And that suspicion order would have been issued in

11  the case that the person hasn't been detained and hasn't been

12  interrogated, meaning that they're at large.  In that case that

13  suspicion order would have been issued.

14  Q.   Okay.

15      THE COURT:  And you said, I believe, earlier that no

16  such order or ruling exists anymore.

17      THE WITNESS:  No.

18      THE COURT:  Is that correct?

19      THE WITNESS:  That is correct.

20      THE COURT:  All right.  And did you say why you

21  think, though, the Estonian version or translation of the

22  treaty still has scheduling order in it?

23      THE WITNESS:  A suspect --

24      THE COURT:  A suspect -- excuse me, a suspicion order

25  in it as a basis for extradition?

1      THE WITNESS:  I don't know why it's in there.

2  BY MR. CORSMEIER:

3  Q.   And I know technically it wasn't a suspicion order or a

4  suspicion ruling, but doesn't the Harju County Court ruling do

5  the -- do the same thing?

6      In other words, it lays out the reasons why somebody

7  is suspected, and the Court kind of ratifies it, "I see what

8  you're saying"?

9      And it's one-sided, but -- and so therefore it was

10 shown that he is a suspect.

11 A.   It's not the same thing.

12 Q.   It's not the same thing?

13 A.   We separate them very distinctly.

14      I mean, now, if you're an Estonian lawyer and you

15 have been asked to draft something, you would make a very clear

16 distinction between something that is issued by the court and

17 what is issued by the investigators.

18 Q.   Okay.

19 A.   There is no way that you can conflate those two.

20 Q.   You said most of this ruling, though, was the prosecutor's

21 statement.

22 A.   Well, they would have to refer to the prosecutor's

23 statements in making a ruling.

24 Q.   Right.  And I'm not saying this is technically a suspicion

25 order under Estonian law, but wouldn't a suspicion order have

1 laid out the same sorts of things by the investigating --

2 A.    Well, the suspicion order would have -- would have laid

3 out several things, as I have indicated in my -- in my report

4 made on the -- on the 2nd of January.

5          It's at paragraph 13 of my opinion.

6          THE COURT:   Just one minute.  Let me find that.

7          THE WITNESS:   Uh-huh.

8          THE COURT:   What paragraph did you say?

9          THE WITNESS:   13.

10          THE COURT:   All right.  Go ahead.

11          THE WITNESS:   So I have -- I have copied the --

12 copied the text.  And a suspicion order shall set out the

13 official title, given name, and surname of the person who

14 prepared the suspicion order.  Well, we don't know that.

15 BY MR. CORSMEIER:

16 Q.    Well, does it say who's submitting the application,

17 Prosecutor Maria Sutt-Tehver, or however you pronounce that?

18 A.    Well, that wouldn't be an order.  That would be an

19 application.

20 Q.    All I'm asking is --

21 A.    That would be a petition.  That's an entirely different

22 thing altogether, again.

23 Q.    So --

24 A.    Then there's the time and place of preparation.

25 Q.    So a prosecutor wouldn't prepare a suspicion order?

1    A.    It can be -- no.  It's an investigator.

2    Q.    Okay.  And who's -- and so -- well, this says -- I know it

3    doesn't have the name and a surname, but the preliminary

4    investigation found out on hearing the application of arrest --

5    is that Judge Popova or someone else?

6    A.    The --

7    Q.    Where the order says -- is she the preliminary

8    investigation judge?

9    A.    She's the --

10   Q.    Okay.

11   A.    She's the judge, yes.

12   Q.    So we don't have the name of the person who prepared the

13   suspicion order.  Okay.

14   A.    And we don't know when it was -- when it -- when the

15   document that you consider to be a suspicion order -- when it

16   was entered, because, as I said before, the suspicion order had

17   the effect of attributing official witness -- oh, sorry,

18   suspect status to a person.

19          So it would have to have the time and place.  The

20   name and surname of the suspect, well, we have that.  Criminal

21   offense of which the person is suspected.  We have some of

22   that.  Qualification, which is the paragraphs.  We have that.

23          We have some of it, but this is not the same

24   document.  This is not it.

25          MR. CORSMEIER:  Okay.  That's all I have, Your Honor.

1    THE COURT:  Let me ask you this.  Are there some

2 crimes in Estonia for which there's no statute of limitations?

3    THE WITNESS:  Yes, there are.  Off the top of my

4 head, I can -- I think genocide, crimes against humanity,

5 terrorism, I believe.

6    THE COURT:  All right.  So is it -- I guess it's

7 possible that someone could have been the subject of a

8 suspicion order when those were still in effect --

9    THE WITNESS:  Yes.

10    THE COURT:  -- and that person could have fled and so

11 could -- in your opinion, is it possible that's why a suspicion

12 order would still carry over here, to cover those kinds of

13 persons, rather than going forward since there isn't one?

14    THE WITNESS:  I think so, yes.

15    I mean, for example, unfortunately, the --

16 unfortunately, Estonia was also involved in the Second World

17 War.  We weren't the -- we weren't the actors, but we were --

18 our country were where some of the battles took place, and we

19 were also under German occupation, and there were Nazi

20 concentration camps also in Estonia.  And there were Estonian

21 nationals who participated in those atrocities.

22    And if someone, for example, for those crimes would

23 have been declared a suspect under the suspicion order, there

24 would be no limitation for that.  Then that would be applicable

25 here.

1    THE COURT: All right. Okay.

2    Anything else?

3    MR. CORSMEIER: Your Honor, just quickly, because I

4    couldn't find it quickly.

5    BY MR. CORSMEIER:

6    Q.    Anywhere in your -- any of your three declarations, did

7    you provide a translation of Section 8(3)(b) of the treaty?

8    A.    I don't believe I did.

9    Q.    Do you happen to have the Estonian-language version of

10   Section 8(3)(b)?

11   A.    Yes, I do.

12   Q.    Can you translate it for us?  Because the prosecutor did

13   in a document, but I want to make sure that there's no

14   disagreement between you and him about what that says.

15   A.    So you want me to translate suspicion order.

16   Q.    Well, is that -- is that the only thing in 8(3)(b)?  Is

17   that the only --

18   A.    "Suspicion order and."

19   Q.    Okay.

20   A.    "Suspicion order and."

21   Q.    Okay.

22   A.    Actually, it's suspicion order, semicolon, and.

23   Q.    And what comes after the "and"?

24   A.    I'm trying to find it.

25   MR. JIMENEZ: Your Honor, I have a chart that I'm

1  happy to show Mr. Corsmeier.

2  BY MR. CORSMEIER:

3  Q.   All right.  And so this chart, I assume, comes from your

4  providing the translation.

5  A.   What comes after "and" is (c), which in my opinion, is

6  identical to the English-language version.

7  Q.   Okay.

8       MR. CORSMEIER:  Your Honor, Mr. Jimenez provided me

9  with other copies.

10      Can I provide them to the Court?

11      THE COURT:  May I look at one?  Thank you.

12      MR. CORSMEIER:  And may I approach the witness, Your

13  Honor?

14      THE COURT:  Yes.

15      THE WITNESS:  Thank you.

16 BY MR. CORSMEIER:

17 Q.   So that translation of Article 8, the Estonian-language

18 text, did you prepare that?

19 A.   (No response.)

20 Q.   If you didn't, is that correct, if you look at the

21 Estonian-language version and compare it with the English

22 translation?

23 A.   I'll pull up the Estonian-language version of 8, Article

24 8, and then compare the translation.

25      Article 8(3).

Q.   And I don't want to belabor this, because it looks like

(a) and (b) are pretty much -- or (a) and (c) are pretty much

identical so we're only talking about (b), now that I look at

it.

     And I guess my only question is, where it says, "A

copy of the," that doesn't include the word for "statement of

charges" that we talked about yesterday.

A.   You are correct, yes.  That is accurate.  It only says

"suspicion order."

          MR. CORSMEIER:  Okay.  That's all I have, Your Honor.

          THE COURT:  All right.  Thank you.

          Mr. Jimenez?

          MR. JIMENEZ:  A few questions, Your Honor.

          THE COURT:  Yes, of course.

                    REDIRECT EXAMINATION

BY MR. JIMENEZ:

Q.   Mr. Keres, you don't have this document, but I'm going to

direct your attention to document 12 at page 23, which is the

government's memorandum of law regarding detention pending

extradition proceedings filed December 6th of 2019.

     And in there the government represented the following

at page 23:  "Estonian authorities have determined that Rotko

left Estonia at least as of the fall of 2006, after

Novoseltseva informed him of the criminal proceedings against

him."

1          And then it says -- it cites to, "Request at 48 and

2    70," which are the Bates numbers.

3          Do you see any evidence in the record that Mr. Rotko

4    left Estonia after Olga Novoseltseva informed him of the

5    criminal proceedings against him?

6    A.    I see conclusive evidence to the contrary.

7    Q.    Okay.  And the cited pages I'm going to show you, because

8    you may not have them, the first page is 48, which is entitled

9    Northern District Prosecutor's Office Request for Extradition

10   of Aleksandr Rotko dated January 30th of 2013.

11         And showing you page 48, is there anything in that

12   page that says that Novoseltseva informed Mr. Rotko of the

13   criminal proceedings before he left Estonia?

14   A.    No.

15   Q.    And if you could turn to page 70, the Bates numbers at the

16   bottom.

17              THE COURT:  What was that page he was just on?

18              MR. JIMENEZ:  48, Your Honor.

19              THE COURT:  48.  Thank you.

20   BY MR. JIMENEZ:

21   Q.    If you could turn to -- the other page the government

22   cited in this memo is page 70, Bates No. 70.

23         Is there any indication in there that Olga

24   Novoseltseva told Mr. Rotko that there was a criminal

25   proceeding against him before he left Estonia?

1  A.    No, sir.

2  Q.    Okay.  And just to save time, I'm going to read or

3  represent to you that document 24-1, which is a copy of

4  Mr. Rotko's Estonian passport, has an entry date into the

5  United States of October 8th of 2006, and there are no entries

6  after that.

7         If the -- when did the criminal proceedings commence,

8  according to the Estonian authorities in this case?

9  A.    22nd of September.

10 Q.    So that was about two weeks before October 8th --

11 A.    Yes.

12 Q.    -- give or take?

13 A.    Yes.

14 Q.    Okay.  Is there any indication in the file that any --

15 anyone in the world knew that there was a criminal proceeding

16 before October 8th of 2006?

17 A.    There is some.  I believe the investigators knew, but no

18 one outside of the --

19 Q.    Okay.

20 A.    -- of that.

21 Q.    And if you are a permanent resident, like Mr. Rotko was,

22 since 1999, is leaving Estonia to go to the United -- to a

23 country where you're the permanent resident of, is that active

24 absconding?

25 A.    No.

1   Q.   Is it active absconding to sell your house?

2   A.   No.

3   Q.   Okay.  Let's turn again to page 60, which is the --

4   A.   Where is 60?

5   Q.   -- the August 27th ruling.  I'm going to have you look

6   at Judge Popova's --

7   A.   Uh-huh.  Yeah.

8   Q.   You were asked some questions about the final paragraph, I

9   think, by Judge Klindt and Mr. Corsmeier.

10          In there it says Alex Rotko or, "A. Rotko has not

11   responded to summons and has repeatedly failed to appear at the

12   body conducting proceedings."

13          Is there a credible demonstration that that is true?

14   A.   No.

15   Q.   Okay.

16   A.   No, there is none, because no summons was ever issued.

17   Q.   Okay.  And does being -- and I'm referring to the prior

18   sentence, being aware of the criminal proceedings.  We've

19   covered this.

20          That -- simply being aware is not active absconding,

21   correct?

22   A.   No, it's not.

23   Q.   And realizing your property, or selling your apartment I

24   just asked you about, that's -- that's not --

25   A.   No.

1  Q.   You've already answered that.

2       And leaving the republic alone to go to the United

3  States is not active absconding.

4  A.   No.

5  Q.   Is there anything else in this paragraph, above the words

6  "continue avoiding" that the judge refers to when it comes to

7  anything that could possibly be interpreted as active

8  absconding?

9  A.   Active absconding --

10 Q.   Yes.

11 A.   -- no.

12 Q.   Okay.

13 A.   The only -- the only indication of absconding is the -- to

14 repeatedly fail to appear at the body conducting the

15 proceedings and not responding to summons.

16 Q.   Okay.

17 A.   That's an indication of absconding.

18 Q.   Right.  And you were asked about the summons.

19       Is there a section of the Estonian Code of Criminal

20 Procedure that deals with a procedure for service of a summons?

21 A.   Yes.

22 Q.   What section is that?

23 A.   It's -- I believe it's somewhere 162, -3, or -4.

24 Q.   Okay.  And what is that procedure?  How is it -- how would

25 a summons be served?

1  A.  By registered post, ordinary post, e-mail, electronically.

2  Q.  How about in person?

3  A.  In person.

4  Q.  Okay.  Is there any indication that that was done in any

5  of those forms when it comes to Mr. Rotko?

6  A.  No.

7  Q.  So a -- you could do it by an e-mail?

8  A.  Yes.

9  Q.  Or by just regular mail?

10  A.  By ordinary post, yes.  But in that case it would be

11  difficult to prove that you served him, right?  Because with

12  registered mail you get a return slip.

13  Q.  I see.

14  A.  Yeah.

15  Q.  So you would not need an MLAT.  Your could do it by e-mail

16  or by --

17  A.  Yes.

18  Q.  -- registered mail.

19  A.  Or e-mail -- or e-mail is also quite secure or quite

20  reliable because you can determine whether someone has received

21  the e-mail and whether they've opened it.

22  Q.  Okay.  Judge Klindt asked you about -- or said that we --

23  you know, we tend to relate other countries to our procedures.

24  A.  Yes.

25  Q.  And I will represent to you that in the United States, we

1   first -- at least in federal court, unless it's an unusual

2   warrant, we first charge somebody, either by indictment or

3   information, and then the judge signs the arrest warrant, okay?

4   And if a person is just outside the country, they can be

5   considered a fugitive for that reason.

6           In Estonia, is there a concept of being a fugitive?

7   A.   It would not be -- the word "fugitive" in that sense would

8   not be used.

9   Q.   Okay.

10  A.   It has a very negative connotation to it, the way that you

11  put it.

12          In Estonian what we use is -- well, I suppose you can

13  translate it into being a fugitive, but the more correct term

14  is "a sought-after person."

15  Q.   Okay.

16  A.   Right?  And that you do.  You declare someone "a person

17  sought," where you're unable to reach them.  And this can be --

18  this can be a suspect, so a suspect can be a person sought.  It

19  can be a witness.  A victim can be a person sought.  The civil

20  defendant can be a person sought.

21          And if they've been declared a person sought and on

22  that basis, the -- they're -- an order for their arrest or a

23  warrant for their arrest has been issued, then upon their

24  apprehension, they would be taken to the nearest police station

25  for the purpose of why they were sought after.

1  Q.   All right.  But do you use the word "fugitive" in Estonian

2  criminal practice?

3  A.   In Estonian criminal practice we speak Estonian --

4  Q.   Okay.

5        MR. JIMENEZ:  I think I should stop there Your Honor.

6        THE WITNESS:  -- and we say "a person sought."

7  BY MR. JIMENEZ:

8  Q.   "A person sought."

9  A.   Yeah.  I'm directly translating from Estonian, but I think

10  it conveys the essence of what it is.

11  Q.   A person who's being sought.

12  A.   A person who's being sought.

13  Q.   And if -- but if you are -- if you happen to be outside of

14  Estonia because you are a U.S. permanent resident, does that

15  automatically make you a person sought?

16  A.   It doesn't automatically make you a person sought, but, of

17  course, if you're unable to determine where this person is, who

18  he is, where is he, then you may declare him as a person

19  sought.

20  Q.   Okay.

21  A.   And that might be a suspect.  It might be a witness.  A

22  representative of the government of Estonia, for example, can

23  be declared a person sought if they fail to appear once

24  summoned --

25  Q.   Okay.  All right.

1  A.    -- and arrested on that basis.

2         MR. JIMENEZ:  No further questions, Your Honor.

3         THE COURT:  Mr. Corsmeier, do you have anything else?

4  I need to take a brief recess.

5         MR. CORSMEIER:  I just have one question, Your Honor.

6         THE COURT:  All right.  Go ahead.

7                    RECROSS-EXAMINATION

8  BY MR. CORSMEIER:

9  Q.    Mr. Keres, you testified that there's no evidence that

10 Mr. Rotko was aware of the criminal proceedings before he left

11 Estonia, in your opinion; is that right?

12 A.    Yes.

13 Q.    Whether that was correct or not, that statement, there was

14 a finding in the county court order of August 25th, 2007, that

15 he was aware of the criminal proceedings and that he may

16 continue avoiding criminal proceedings, right?

17 A.    Uh --

18 Q.    As of that date at least, August 25th, 2007, the Court

19 found that there was evidence that he was aware of the criminal

20 proceedings.

21 A.    That would -- that would be very unlikely, and there is

22 nothing in the --

23         THE COURT:  Unlikely -- excuse me, sir.  Unlikely

24 that he knew or unlikely that it's in the order?

25         THE WITNESS:  Unlikely that he knew.

1    THE COURT:  Because he's asking --

2    THE WITNESS:  That determination cannot be made on

3    the basis of the application.

4    THE COURT:  But he's just asking you what was in the

5    order.  That was his question.

6    THE WITNESS:  Okay.  That was in order --

7    THE COURT:  All right.

8    THE WITNESS:  -- yes.

9    BY MR. CORSMEIER:

10   Q.   And you just disagree with the judge's conclusion.

11   A.   Well, I disagree with the judge's conclusion on the basis

12   of they're talking about whether Mr. Rotko knew of the criminal

13   proceedings from Olga N., Novoseltseva, right?

14        Now, the allegation is that Olga Novoseltseva told

15   him about the criminal proceedings, and thereupon, Mr. Rotko

16   decided to leave.

17        Mr. Rotko left in September/October 2006.  Olga

18   Novoseltseva learned of these proceedings upon being

19   interrogated as a witness.  Ms. Novoseltseva was first

20   interrogated as a witness in January and then in February.  And

21   in February, Ms. Novoseltseva told the police that she believed

22   Mr. Rotko was in the United States.

23   Q.   Okay.  So in your opinion, you're right; the judge is

24   wrong.

25   A.   Unless there's some sort of temporal flux.

1  Q.   Okay.  So you're right and the judge is wrong, yes or no?

2  A.   Based on this evidence, yes.

3         MR. CORSMEIER:  That's all I have, Your Honor.

4         THE COURT:  All right.  Anything else, Mr. Jimenez?

5         MR. JIMENEZ:  No, Your Honor.

6         THE COURT:  All right.  Let's take a 15-minute

7  recess.

8         COURT SECURITY OFFICER:  All rise.

9     (Recess from 2:35 p.m. until 2:58 p.m.; all parties

10  present.)

11        COURT SECURITY OFFICER:  All rise.  This Honorable

12  Court is now in session.

13        Please be seated.

14        THE COURT:  All right.  Mr. Jimenez, where do you

15  want to go from here?

16        MR. JIMENEZ:  Your Honor, I'm ready to just make

17  my -- make remarks when the Court's ready, or -- I don't know

18  which order you would like to go in.

19        THE COURT:  Well, let me see if Mr. Corsmeier has

20  anything else that he -- anything he wants to present or if it

21  will just be by way of argument.

22        MR. CORSMEIER:  It will just be by way of argument,

23  Your Honor.

24        THE COURT:  All right.  Well, it doesn't matter to

25  me.

1          Mr. Jimenez, why don't you go first.

2          MR. JIMENEZ:  Sure.  Thank you, Your Honor.

3          Your Honor, I'm going to go in reverse order that we

4   took Mr. Keres in and start with the charging document

5   requirement.

6          If the Court has the chart that we prepared with the

7   highlighted section?

8          THE COURT:  Yes.

9          MR. JIMENEZ:  There's no doubt that the language in

10  the treaties are different, but there is also no doubt that the

11  treaties each require two pieces of paper, two separate

12  documents:  (1) a copy of the warrant, which we have, the

13  August 25th, 2007, warrant; and No. 2, either a charging

14  document or a suspicion order.  And there is neither a charging

15  document or a suspicion order in this case.

16         So if the government is arguing, as I believe it is

17  arguing, that the suspicion order is, in essence, contained

18  within the arrest warrant, that's plainly improper, plainly not

19  allowed under the *Aguasvivas* decision that we cited and

20  discussed extensively in our supplemental memorandum.

21         That decision makes it clear that you have to have

22  two separate documents, and they have not produced two separate

23  documents in this case, only an arrest warrant, and that is

24  insufficient.

25         Now, in addition to that -- and that's just looking

1     at plainly the language in the treaty and the *Aguasvivas* case.

2     And by the way, we have found no case to the contrary.  All the

3     other cases, as the Court noted at the beginning of today, are

4     based on old treaties which only required an arrest warrant.

5           This is a modern treaty in 2006, and it has that same

6     type of dual-document requirement that was in the treaty in

7     *Aguasvivas*.

8           But if you look at international law and how you

9     interpret treaties when they conflict, as we discuss in our

10    memo, you have to look at the Vienna Convention.  And we -- we

11    went through this extensively in our memorandum, so I won't

12    belabor it too much, but I do want to summarize a bit of it

13    because I think it's important.

14          First of all, we are dealing with, in this case, the

15    English-language version of the treaty, and there -- that's --

16    and the Estonian version.  But in the English-language version,

17    it's clear that you have to have a charging document, and

18    they've admitted that there's no charging document.

19          In the State Department transmission to the Senate,

20    it makes it very clear that you have to have both an arrest

21    warrant and a charging document and such information as would

22    be -- would provide a reasonable basis to believe that the

23    person committed the offense.

24          That's the probable cause requirement, the latter

25    which we will deal with at the extradition hearing.  But in

1   this case we're simply dealing with the first two -- our

2   argument deals with the first two documents that are -- or the

3   first two points that are required, an arrest warrant and a

4   charging document.

5          I should note that the U.S. has only ratified the

6   English-language version of the treaty, so the only version of

7   the treaty that governs in this case is the English-language

8   version.  That's the only version of the treaty that the Senate

9   ratified.

10         Now, even if you look at the Estonian version of the

11  treaty, it doesn't change the result for the following reasons.

12  As I mentioned, the Vienna Convention on the Law of Treaties

13  applies, and I'm going to focus on Articles 31, 32, and 33, in

14  that order.

15         First, Article 31 requires that you look at the

16  ordinary meaning and purpose of the treaty.  And the plain

17  language of the treaty supports the requirement that you have

18  to produce a formal charging document or an order of suspicion,

19  and they have not done that in this case.

20         Secondly, Article 31(3)(a) provides that if the

21  countries agree on the interpretation, then that controls.

22         And we have provided to the Court both the Senate --

23  I'm sorry, the letter sent to the Senate, which I just

24  mentioned, from the State Department, and the Ministry of

25  Justice letter that was sent to the Estonian parliament.  And

1  those both agree that you have to have a charging document, and

2  you have to have an arrest warrant, and there is not a charging

3  document in this case.

4       Secondly, you look at -- after that you look at

5  Article 32 of the Vienna treaty, which says if you don't -- if

6  for whatever reason you don't decide that there is an agreement

7  on this point, that there still is a conflict between the two

8  treaties, you can look at the contemporaneous documents of just

9  one party to the treaty.

10      And -- and even if you don't consider it an

11 agreement, each party, both the U.S. and the Estonian

12 government, told their respective legislative bodies that what

13 you needed in this case -- that what you need for extradition

14 is a charging document and an arrest warrant.

15      And that's consistent, Your Honor, with our practice.

16 We don't have people extradited to the United States just based

17 on mere suspicion.  You have them extradited because they have

18 been charged and because an arrest warrant has been issued for

19 their arrest.

20      And then finally, our -- you look at Article 33 of

21 the Vienna law convention, subsection 4, and what they say is

22 even if there are two different meanings and there are two

23 different types of requirements, you've got to go back and look

24 at Articles 31 and 32.

25      So it's a little bit of a complicated argument under

1   the Vienna treaty, but it -- essentially, at the end of the

2   day, like I started with, a suspicion order, even if you look

3   solely at the Estonian treaty, is not a charging document.

4   There has been no charge, so under the U.S. treaty, that

5   requirement's not met.

6           But even if you disregarded that -- and you

7   shouldn't, but even if you did, there was no separate order of

8   suspicion in this case, which is required.

9           THE COURT:  Because there can't be because there

10  isn't one.

11          MR. JIMENEZ:  And, Your Honor, I should also just

12  finally point out that Mr. Keres did, in his final supplemental

13  declaration, his second one, at page 3, state that under

14  Section 108(3) of the old criminal procedure code, there was a

15  process for doing a suspicion order, which is that the

16  investigator prepares a suspicion order, and then -- and then

17  it has things that must be set out in the suspicion order.

18          And I'm looking at paragraph 13 of his second

19  declaration, supplemental declaration, which is DE 33-2 at page

20  4.

21          And that provides that you have to have the official

22  title, given name, and surname of the person who prepared the

23  order, the time and place of preparation, the given name and

24  surname of the suspect, the criminal offense, the circumstances

25  of the criminal offense, the qualification of the criminal

1    offense, the reasons for declaring a person a suspect, and then

2    that order is communicated to the suspect.

3         And that just simply did not occur in this case.

4         And I should have noted at the outset that what we're

5    talking about here -- we're still at the detention hearing.

6    It's gone on for a while, but this is not the final hearing.

7    So we're really talking about special circumstances.

8         And under the law there are more than just

9    likelihood-of-success special circumstances, which I'll get to

10   in a minute.  But the second likelihood-of-success special

11   circumstance is -- that we've spent a good deal of time on

12   today, which is the statute of limitations issue.

13        Now, I know the government very well in these cases

14   will stand up and will say to you, "You have to rely on the

15   judge's ruling of August 25, 2007, and you can't second-guess

16   that."

17        And, you know, I would ordinarily agree with that,

18   that that's what the law of extradition provides.  But you

19   don't have to put on blinders and rubber-stamp a decision that

20   is clearly wrong and inconsistent on its face.  I'm not aware

21   of an extradition case out there that says that.

22        When this judge said, "A. Rotko has not responded to

23   summons and has failed to appear at proceedings," it's plain

24   wrong.  I mean, there's just no way to get around that.

25        I mean, I think that Mr. Keres, you know, somewhat

1    vocally, used the word "time flux," and he was referring more

2    to the other incontrovertible fact, which is that Mr. Rotko did

3    not know about these proceedings prior to October 8th because

4    no one knew outside the investigators' office.  That's made

5    clear in the record.

6           But if you just look at the summons issue, this

7    judge, as Mr. Keres testified, was filling out a template and

8    was doing a template order and was putting in language that is

9    just simply wrong.

10          Because in the very same order, or in the very same

11    document, I should say, the prosecutor had just advised the

12    judge that it has not been possible to serve him with a

13    summons.  So how could he respond or fail to appear in response

14    to a summons?  It's just not possible.

15          And Mr. Rotko also -- I'm sorry, Mr. Keres also

16    explained that the other things in that paragraph that the

17    judge mentioned, you know, realizing his assets, selling his

18    house, or not voluntarily appearing, those are not acts of

19    actual absconding.

20          And that was, importantly, before the Supreme Court

21    opinion that came out that made it clear that to have

22    absconding by not responding to a summons, you have to actually

23    have a summons, and you have to have the service for the

24    summons.

25          So we believe that that is also a situation where

1   Mr. Rotko has a high likelihood of success and that that should

2   be a special circumstance that leads to his bond.

3          And just to go back -- and I didn't -- I didn't

4   discuss this earlier, but I want to go back and just make some

5   very clear points about what the facts of this case are that

6   are not in dispute.

7          Mr. Rotko was a permanent resident of the United

8   States since the late 1990s.  That is not in dispute.

9          He had an American company, ELA USA, that was

10  involved in a case, and he had poured his life savings into it.

11  And the government basically took that away from him, and he

12  then left the country because the business had been taken from

13  him.

14         And he moved here, and he lived openly, without

15  hiding his whereabouts.  I don't think that there -- we've

16  heard anything differently.  I don't think there's anything in

17  the court file that suggests anything to the contrary.

18         What's also not in dispute is that after the arrest

19  warrant of August 25th, 2007, the Estonian government did

20  absolutely nothing, zero, for more than six years.

21         And the government has cherry-picked documents and

22  has produced them as part of its exhibits to its complaint, and

23  those documents don't show any action whatsoever between August

24  25th of 2007 and January 13th -- January of 2013.

25         So I know Mr. Keres testified a little bit about it,

1    but they did nothing.  So any concern about delay, any argument

2    that there's some sort of diplomatic necessity or urgency

3    during that time frame is just not well taken.  There's nothing

4    to support it.

5          What's also not in dispute is that the alleged

6    offenses of embezzlement involved only about $144,000, that

7    that's a low-priority criminal case, as Mr. Keres testified.

8    That may or may not explain why they did nothing for six years,

9    but at the end of the day, they still did nothing for six

10   years.

11         And then after 2013, there was -- the file that we've

12   been given shows nothing other than -- well, it does show that

13   in 2014 additional supplemental information was provided.

14         But significantly, and this is very, very

15   significant, I have not seen anything in the file -- and if

16   there is, I would appreciate someone pointing it out to me --

17   that anything at all happened between 2014 and the very end of

18   2017, more than three years later.

19         That delay is on the government of Estonia and on the

20   extradition -- or the people behind the extradition.  I know

21   that Mr. Corsmeier was not involved at that time.  But that

22   delay is not explained at all in this record.

23         What's also undisputed is that what happened during

24   that interim time frame is that in August of 2017, Mr. Rotko,

25   through his counsel Mr. Appleton, who's here in the

courtroom -- and I neglected to introduce before.  He is his chief counsel, along with Mr. Mullins and Mr. Sox on behalf of ELA USA.

Mr. Appleton sent a letter to the prime minister of Estonia that said, "We intend to commence a $188 million arbitration against you."

And then what happens?  All of a sudden, in December of 2017, there's another letter from the Estonian prosecutor to the Department of Justice providing additional information.

THE COURT:  When was that?

MR. JIMENEZ:  December of 2017.

THE COURT:  All right.

MR. JIMENEZ:  And, Your Honor, I will note for the record that that is Bates No. Rotko 106.  It's a letter dated December 22nd, 2017, and it says, "The Ministry of Justice of Estonia hereby presents additional information in the extradition case of Aleksandr Rotko."

That was not an accident, that after three-and-a-half years, when nothing has happened, all of a sudden additional information was presented, because he had -- it was clearly a retaliatory move because of his giving notice to the Estonian government that he was going to commence an arbitration against them, which he did later in 2018.

And now the Estonian government, through their separate counsel in the international arbitration case, has the

1    gall to suggest that Mr. -- and the government, I think, to

2    some extent has said this in its memorandum, that Mr. Rotko's

3    trying to wait out the statute of limitations, that he's trying

4    to ride it out, I think is what they said, and that counsel has

5    the gall to suggest that it's not this extradition that should

6    be suspended but it's the international arbitration that should

7    be suspended.

8          That's what they're trying to do in the first place.

9    They're trying to knock him out so that he's not available to

10   be a witness.  They're trying to knock him out because it's

11   impossible for him to testify in the Hague, which is where the

12   international arbitration is pending, and it's impossible for

13   him to effectively deal with his lawyers when he's sitting

14   behind a glass wall at the Nassau County Jail.  And the only

15   way you can hand him a document is underneath the little slip

16   in the glass wall, sitting on a steel stool.

17         So that's what's going on, and that's a special

18   circumstance that you don't see in international -- I'm sorry,

19   in extradition cases, and we briefed this in our papers.

20         So I will leave it at that, but I wanted to go

21   through that history because it is illuminating, and it shows

22   what's really going on here.

23         Another special circumstance is Mr. Rotko's health.

24   Now, the government says that health generally is not a special

25   circumstance.  But we have cited cases, and the Court has them

1   in our papers, that make it very clear that when your health is

2   deteriorating as a result of your imprisonment, that can be

3   considered a special circumstance, and other cases -- other

4   courts have recognized that.

5          And here are the spec- -- here's what's happened

6   while he's been incarcerated.  Mr. Rotko generally does --

7   does -- is subject to high blood pressure, but he doesn't take

8   blood pressure medicine all the time because it can go too low.

9          So he has a very carefully prescribed regime of

10   different drugs that his doctor gives him so that his blood

11   pressure is maintained.  He keeps -- he takes his readings at

12   home three or four times a day.

13          Since he's been at the Nassau County Jail, his blood

14   pressure has been spiking up, and that's been manifesting

15   itself because of the severe anxiety he's going through.

16          When I visited him last, which was around the

17   Christmas holiday, he had a visible hemorrhage in his right

18   eye, which our Dr. Haddad, who submitted a declaration in this

19   case -- I'm sorry, an evaluation in this case that's attached

20   to Exhibit C to our reply memo, noticed as well.

21          Since he's been in jail, he's had double vision,

22   which is very concerning and must be evaluated urgently,

23   according to Dr. Haddad.

24          Before his incarceration, he had a colonoscopy, and

25   that revealed 11 precancerous polyps which had to be removed,

1 and he was told that he had to go in January to have another

2 colonoscopy. That has not been scheduled. He has not been

3 able to do that. That's a threat to his health.

4 And since Dr. Haddad saw him, on January 3rd -- and

5 I'm proffering this to the Court. I will supplement it with

6 the declaration of Mr. Rotko as soon as I can, but he's here

7 today and he can confirm that or he can answer any questions

8 the Court would have.

9 But on January 3rd he woke up and his abdomen was

10 swollen. He was -- he was concerned that either he had an

11 appendix issue, a hernia issue. It might be related to his

12 polyps, and he has not been seen for that.

13 They told him, "Oh, we're going to get you an

14 ultrasound," but that has not been scheduled. He's been told,

15 "We going to do a psychiatric evaluation," but that has not

16 been scheduled.

17 There is no doubt in this case that Estonia's

18 vengeful act of having him arrested to interfere with the

19 international arbitration that was commenced is -- has resulted

20 in incarceration that is actually detrimental to his health,

21 which has worsened while he's been in Nassau County Jail.

22 THE COURT: I didn't want to interrupt you before,

23 but I was looking at something on my timeline.

24 MR. JIMENEZ: Yes.

25 THE COURT: And can I ask you about this since you

1  brought up this retaliation issue again?

2         MR. JIMENEZ:  Yes.

3         THE COURT:  I think you said something about Estonia

4  reinstituting or cranking up, for lack of a better word --

5         MR. JIMENEZ:  Yeah.

6         THE COURT:  -- the extradition proceedings in

7  December 2017.

8         MR. JIMENEZ:  Yes.

9         THE COURT:  All right.  But I think there was --

10 there was a State Department request where the State Department

11 requested additional information related to the Estonia --

12 Estonia's extradition.

13         And, of course, my question on my timeline is "What

14 prompted the request from the government for additional

15 information?"

16         But I was thinking the response, at least in 2017,

17 December, by Estonia was -- wasn't necessarily, at least at

18 that point, a retaliatory act but that there -- this was a

19 response to the government's -- the U.S. government's request.

20         MR. JIMENEZ:  Well, that -- that may be true, Your

21 Honor, but I don't have the date of the request by the State

22 Department.

23         THE COURT:  It's document 17, page 8, is where

24 I . . .

25         MR. JIMENEZ:  17, page 8?

1      THE COURT:  Document 17.

2      I don't want to get you off track of where you were

3 going, but . . .

4      MR. JIMENEZ:  No, no.

5      Your Honor, I may not be at the right place as you,

6 but 17-8 is our -- is the letter where Barry Appleton -- of

7 August 1, 2017, where Mr. Appleton writes the prime minister of

8 Estonia and says, "We are writing to notify you of the

9 existence of an investment dispute."  That's document 17-8.

10      THE COURT:  Yeah.  I think I'm looking at page 8 of

11 document 17.

12      MR. JIMENEZ:  Okay.  Just a --

13      MR. CORSMEIER:  Your Honor, can I just ask what that

14 date again was of the letter?  I just couldn't find it quickly,

15 August --

16      MR. JIMENEZ:  Which letter?

17      MR. CORSMEIER:  The letter to the Estonian prime

18 minister about the investment --

19      MR. JIMENEZ:  August 1, 2017.

20      THE COURT:  It's August 1st, right --

21      MR. JIMENEZ:  Yes.

22      THE COURT:  -- that letter.

23      MR. JIMENEZ:  Yes, Your Honor.

24      That was in November of 2017, and that's -- that's

25 exactly my point, which is that it wasn't until August 1st --

1    I'm sorry.  It wasn't till after August 1st -- if you look at

2    page 8 of document 17 -- and by page 8, I assume the Court is

3    referring to the top -- the top number?

4             THE COURT:  Yes.

5             MR. JIMENEZ:  It's actually page 7 of our memo.

6             THE COURT:  Just one minute.  Let me see.

7             MR. JIMENEZ:  You'll see that on August 1st of 2017,

8    ELA USA notified Estonia of the intent to file an arbitration

9    pursuant to the treaty, and that's the letter I just read from

10   Mr. Appleton.

11            THE COURT:  Right.  Right.

12            MR. JIMENEZ:  It was only after that, after three

13   years of inaction, that the State Department requested

14   additional evidence related to Estonia's extradition request in

15   November of 2017.

16            And we've asked the government to give us the letters

17   that they sent to Estonia asking for information, but they've

18   refused to provide them.

19            MR. CORSMEIER:  Your Honor, I wasn't asked

20   specifically for that.  I was asked for a general production of

21   documents.  If we were asked specifically for that, we may have

22   been able to produce them.

23            MR. JIMENEZ:  Well, we would like to see all the

24   letters that were sent by the U.S. government to Estonia,

25   because I think the Court should see those letters because it

1    may -- it may help the Court rule in this case, but we'd like

2    to see them so that we can determine what they say.

3              But the point is, regardless of what the letter says,

4    it wasn't sent until November 17th, after three years of

5    nothing.  That's not an accident.  It was -- it was just two

6    months after Mr. Appleton's letter to the prime minister of

7    Estonia.

8              THE COURT:  All right.  Go ahead.

9              MR. JIMENEZ:  So that's a special circumstance.  His

10   health is a special circumstance.

11             Where I was going to go next is diplomatic necessity.

12   And the government has pointed out a couple cases, but as we

13   said in our reply memo, all the cases that we found, except for

14   one, deal with delays of only two or three years.

15             This is a delay of more than six years from the time

16   that the arrest warrant was issued, or about six years, and

17   then a delay of another six years between the extradition

18   request and the time that Mr. Rotko was arrested.

19             That's not Mr. Rotko's fault.  That shows that this

20   is not a diplomatic necessity.  That's exactly what this

21   case -- that's exactly -- if this is not a case where there's a

22   lack of diplomatic necessity, I'd be hard-pressed to think of

23   one because they haven't been -- they weren't in a hurry to do

24   anything.

25             So, you know, I'm not going to belabor the cases we

cited.  The government cited one case where there was a 10- or 12-year delay, but that was not the basis of the Court's ruling.

The Court said, "Even if we were inclined to find that to be a diplomatic" -- "a lack of diplomatic necessity, we're not going to grant bond for other reasons."

So to look at just diplomatic necessity cases, they deal with much shorter time periods.  And I don't understand. I mean, no reasons have been given by the government of the United States or the government of Estonia for these inexcusable delays.

So -- and I've covered the investment treaty arbitration.  And I will just -- I will just end with this. Let me talk about flight risk for a minute, which we haven't talked about.

Mr. Rotko is a U.S. citizen.  He is -- he is an American, just like everybody else in this courtroom, and he has been a longtime permanent resident, since 1997.

He and his wife own several properties that together are worth well in excess of $1 million, which is ten times the amount that is allegedly involved in this case in Estonia, and he's willing to put those up.

And we have provided a notice to the Court where, with respect to -- and this -- you know, of course, Mr. Rotko and his wife jointly own two of them, and Mr. Rotko owns one of

them independently.

He's willing to not just sign a bond, and she would, of course, have to cosign, but they're willing to actually pledge them to the Court so that they could be immediately executed upon if he leaves, ten times the amount at issue in this case.  And he's willing to do that.

And we've -- we've spent some time getting those papers together.  We called over to the -- another magistrate judge in the Middle District who confirmed that this procedure had been done in another case.  And that's available to be done, and he would gladly do that.

His Estonian passport is expired.  His U.S. passport is in the possession of our side.  We'll gladly give it up. The government, the State Department, issued him a passport right in the middle of all these extradition proceedings, so by giving him a U.S. passport, they must not have thought he was a flight risk, at least not at that time.

He's in the -- he's in the middle of an international arbitration case, which -- in which he is trying to vindicate his entire life's work.  He would not only be giving up the three properties -- the four properties -- or four if you count the one in California, if he flees.  He and his wife both would give those up or lose those.

But he would give up a $188 million arbitration claim that these lawyers that are sitting behind me have been working

1  very hard on for years.

2       The -- so he has nowhere to go.  He's here.  He lives

3  in St. Johns County.  He's not a flight risk.

4       So I think that we've demonstrated, Your Honor, with

5  all due respect, that there are -- even though we spent a lot

6  of time today on the likelihood of success, that's not the only

7  special circumstance.  There are other special circumstances

8  that can suffice, and -- and I've covered them.

9       And we would urge the Court to consider those in

10 granting bond and exercise its discretion, which it has, to do

11 that.

12      THE COURT:  All right.  Thank you.

13      Mr. Corsmeier?

14      MR. CORSMEIER:  Sorry, Your Honor.  I --

15      THE COURT:  Do you need a minute?  We can take a

16 brief recess if you . . .

17      MR. CORSMEIER:  I was really just looking for that --

18 that December 2016 request -- or response by the Estonian

19 prosecutor to the request from the Department of Justice, which

20 I just had in front of me, and now I can't find it.

21      THE COURT:  Was that the supplemental --

22      MR. JIMENEZ:  This?

23      THE COURT:  -- filing?

24      MR. CORSMEIER:  I think so.

25      Yeah.  And the Court noted what I was going to note,

1  in that that was a response from the Estonians to a request

2  from the Department of Justice Office of International Affairs

3  in their review of the file and determining that we need

4  additional information to continue to process this request.

5         And so I guess the Department of Justice is

6  retaliating against Mr. Rotko for his filing that arbitration

7  proceeding against -- against the government of Estonia because

8  this comes from the Department of Justice.

9         The prosecutor isn't just sending this off on his

10  own.  It's requested by the Department of Justice Office of

11  International Affairs.

12         It's complete speculation and based solely on the

13  timing.  It's just complete speculation.  There's no other

14  evidence that this was done in retaliation for that arbitration

15  proceeding other than the timing, and the timing doesn't even

16  work because this is a response to a request from the

17  Department of Justice.

18         THE COURT:  And do you know when the Department of

19  Justice had last taken any action or why there was a delay by

20  them asking for information?

21         MR. CORSMEIER:  The only thing -- it was just in

22  general, Your Honor, that the attorney assigned to it now took

23  it over -- and I don't want to say a year.  There was some year

24  after 2013, a couple years after 2013.

25         And she said that when she took it over, she did look

1   into it, start asking -- or looking at the request and did ask

2   for some additional information before sending it out to our

3   office.

4           But I don't know.  I don't have the details of that

5   timing, Your Honor.

6           THE COURT:  All right.  Thank you.

7           MR. CORSMEIER:  And I'll back up to the beginning of

8   Mr. Jimenez's arguments.

9           He started with, I think, this -- the idea that there

10  must be two separate documents, an arrest warrant and a

11  charging document.  And as far as I can tell, the only case

12  he's relying on is *Aguasvivas*.  At least that's the only case I

13  know of, and we don't know what's going to come out of that.

14          The First Circuit is looking at it.  They may

15  completely disagree with that judge, that district judge in

16  *Aguasvivas*, and it may be helpful if they would come out with

17  an opinion fairly quickly.  I know they're looking at it on an

18  expedited basis so they may.  Oral argument was yesterday.  I

19  confirmed that.

20          But I would just go back to the cases that we cited,

21  Your Honor, that point to or support the proposition that two

22  separate documents aren't required, that you can take care of

23  those requirements in two separate pieces of paper.  As long as

24  you take care of those requirements, they can be taken care of

25  in one document.

1  It's a formality.  It's just, you know, elevating

2  form over substance to say we need two pieces of paper instead

3  of both of those things being in one document.

4  THE COURT:  Is that the government's argument in the

5  First Circuit, basically?

6  MR. CORSMEIER:  I believe so, Your Honor.  I can

7  actually -- I don't know if the Court found them, but I can

8  provide the briefs that the government filed.  They're

9  available publicly, but I pulled them up.

10  THE COURT:  All right.

11  MR. CORSMEIER:  I was just trying to look at that to

12  see exactly.

13  And, yes, that is.  That is, Your Honor.  That's

14  essentially their argument.  I -- you know, they make it --

15  they make it more articulately than I am doing, but that is

16  essentially their argument, Your Honor, yes, that -- that these

17  treaties are intended to be interpreted to enforce the rights

18  of the parties and that that's essentially elevating form over

19  substance.

20  And Mr. Jimenez talked about that the -- in the

21  English-language version, it says charging document, that the

22  transmitting papers talked about a charging document, that the

23  U.S. only ratified the English-language version.

24  Well, Estonia only ratified the Estonian-language

25  version.  But as we said in one of our memos, the treaty itself

says, at the end, "Done at Tallinn in duplicate this 8th day of February, 2006, in the English and Estonian languages, both texts being equally authentic."

So in approving -- in ratifying this English-language treaty, they were also ratifying that both of these texts are equally authentic. And Estonians relied, as they would, on the Estonian version of the treaty, and that treaty is also valid. And that treaty says that it's meant to allow the extradition of people that are only suspected of committing offenses.

The -- going back to Judge Popova's order, Mr. Jimenez says that she does say that Mr. Rotko failed to respond to a summons, which is -- I agree is wrong, but also the order itself contains those prosecutors' arguments, according to Mr. Keres. And it does clearly say that he didn't -- he couldn't be served with a summons. They tried, but it couldn't happen.

But in any event, after she says that, she says that -- and paraphrasing -- well, paraphrasing and quoting, that "he knew of the criminal proceedings and that he may continue to avoid those criminal proceedings."

So she's making that finding as well, based on what the prosecutor provided. And so even in Mr. Keres's view, I think, that is active -- active absconding, and no summons would be required.

And even on that, I would just say, Your Honor, that

1    my view of that Estonian Supreme Court case, and Mr. Keres

2    disagreed, is that there's nothing in there that clearly says

3    that a summons is required for somebody to be found to, I

4    guess, passively abscond.

5         It just talks about knowledge of the criminal

6    proceedings, and then -- and goes from beyond that.

7         THE COURT:  That's why I wasn't clear if that

8    discussion was about active absconding, but -- and I think

9    Mr. Keres would not agree that that order found active

10   absconding, the order that Judge Popova wrote.

11        MR. CORSMEIER:  Yes, Your Honor.

12        THE COURT:  He said it found that it's likely in the

13   future.

14        MR. CORSMEIER:  And Mr. Jimenez said, "Well, the

15   government's wrong," and maybe we were, that -- or maybe

16   there's nothing in the record to show that Mr. Rotko knew of

17   these criminal proceedings when he left Estonia.

18        But the -- the order of August of 2007 talks more

19   about -- talks about more than his knowledge as of whatever it

20   would be, October 2006.  It talks about events that occurred in

21   2007, interviews of witnesses, things of that nature.

22        And the Court finds, as of August 25th, 2007, at

23   least, he was aware of the criminal proceedings and was

24   avoiding them and may continue to avoid them.

25        So whether he knew in October of 2006 or not, it does

1   say that as of August 2007, he was aware and that he may

2   continue to avoid the criminal proceedings, as has already

3   happened.

4           And I already talked about the -- the provision of

5   additional information by the Estonian prosecutors in response

6   to the Department of Justice request.

7           And, Your Honor, I -- I don't have any objection -- I

8   will check with the Office of International Affairs -- to

9   giving whatever letters were sent to the Estonians asking for

10  more information and providing that to Mr. Rotko's attorneys.

11  I think it could be helpful for the Court and so --

12          THE COURT:  Thank you.

13          MR. CORSMEIER:  And as to the diplomatic necessity,

14  Your Honor, I don't have anything else to add other than what

15  we said in our response.

16          As I said, I don't -- well, I would say that -- that

17  as to the delay or the period between the -- the issuing of the

18  arrest warrant and the request for extradition, there were

19  things going on in -- during that time.

20          And I closed it, and now I can't find it again, as

21  that request -- request -- the later request from -- or

22  response to the request from the Department of Justice shows.

23          I'm sorry, Your Honor.

24          THE COURT:  It's all right.  Take your time.

25      (Brief pause.)

1    MR. CORSMEIER:  In -- at least as of 2016 -- and I

2  don't know.  Mr. Jimenez said nothing occurred between 2014 and

3  2017, but at least as of 2016, that's when Olga Kotova had been

4  apprehended, and -- on August 8th of 2016.  This is reflected

5  in page 4 of the English-language translation of the

6  prosecutor's response as of December 12th, 2017.

7    And I think that that at least would be important to

8  the Estonian government because she was alleged to be a --

9  essentially a co-conspirator, and she was allowed to

10  essentially pay a fine and avoid the criminal charges.

11    But not only, you know, is there -- is there required

12  to be a finding that -- and I forget what the words were of

13  Mr. Keres, but -- in any event, my point is going to be there

14  was also a finding that she was a -- sort of a minor player,

15  that she wasn't as involved or she -- that Mr. Rotko was the

16  main person.  So, "Here, we'll resolve this if you pay this

17  fine, and we'll dismiss the criminal proceedings."

18    But anyway, talking to her, I'm sure, was important

19  to the -- to the Estonian authorities.  I mean, they had

20  already presented the extradition request, but that was further

21  investigation that occurred in 2016, at least, about three

22  years after the extradition request.

23    With regard to the health of Mr. Rotko, I mean,

24  there's -- I generally can't dispute what a doctor says, what

25  he says.  I mean, we're not going to ask for a medical exam to

1 look into this.  It's not worth that.

2    But -- and there may be a simple answer to this.  But

3 my question is how does he know his blood pressure is spiking,

4 and has he -- has he gone to the medical staff there and asked

5 them to look into it and try to fix it?

6    The doctor's report that he has a hemorrhage, I guess

7 the doctor could see that through the glass.  But the doctor

8 also reported something else that he, I guess, is assuming that

9 was caused by the -- there was a cause of the hemorrhage, which

10 I don't see how he could do without a medical exam.

11    But I would just reiterate that there is medical care

12 available in the -- in the facility.  This defendant isn't in

13 state custody, and those articles that Mr. Rotko submitted --

14 and I shouldn't say defendant.  This person, Mr. Rotko, is not

15 in state custody.  He's in federal custody.  He's with the

16 marshals.  They know that they are required to assure that

17 somebody gets appropriate medical care.

18    If Mr. Rotko's having issues, has he reported it?

19 Has he been unable to get that medical care?  None of that's

20 been alleged.  It's just he has these issues, and he needs

21 medical care.  And he can probably get it -- get better access

22 to medical care if he's out than if he's in.

23    But he can get appropriate medical care while he's in

24 custody, and I don't think all those articles about essentially

25 state -- people in state custody are really relevant.

1        The risk of flight, I don't have a whole lot to add

2   besides what we said in our memo except, I think, at least to

3   say, first of all, that maybe those medical conditions may make

4   him more of a risk of flight because if he says that they're

5   all caused by him being incarcerated -- that he has this

6   depression and anxiety.  His blood pressure is spiking.

7        And so if he's let out, we have an extradition

8   hearing.  He's ordered extradited.  Then I guess if he's not at

9   least taken into custody immediately, he may have an incentive

10  to flee because "I really don't want to go through that again

11  and be in custody."

12       But also he apparently -- and as we said in the memo,

13  he said he's pledging all of his resources, but we have several

14  attorneys here today.  He's still pursuing the arbitration.

15  Mr. Keres was apparently flown from Estonia to give this

16  testimony.  I assume that he paid for that time and everything

17  he does here.  He seems to be a highly accomplished lawyer.  I

18  didn't ask him how much he's being paid.  I thought about it.

19       But I just think there are resources out there,

20  despite what Mr. Rotko says, that if he really wanted to flee,

21  he could -- he could find those resources to flee.

22       And other than that, I don't think I have anything

23  else to add other than what's in the memo.

24       I think that's all, Your Honor.

25       THE COURT:  All right.  Thank you.

1          Mr. Jimenez?

2          Well, I'll tell you what.  Why don't we take -- why

3    don't we take about a ten-minute recess, and then if there's

4    anything else you have to say --

5          MR. JIMENEZ:  Okay.

6          THE COURT:  And we can -- we can talk about where

7    we're going from here, all right?

8          MR. JIMENEZ:  Thank you, Your Honor.

9          THE COURT:  We're in recess.

10         COURT SECURITY OFFICER:  All rise.

11      (Recess from 3:47 p.m. until 4:04 p.m.; all parties

12    present.)

13         COURT SECURITY OFFICER:  All rise.  This Honorable

14    Court is now in session.

15         Please be seated.

16         THE COURT:  All right.  Mr. Jimenez?

17         MR. JIMENEZ:  Your Honor, just a couple of final

18    points.

19         First of all, my comments about retaliation were not

20    obviously directed to the United States.  In fact, we haven't

21    seen the letters to Estonia.  We've only seen the letters from

22    Estonia to the United States.  None of those letters talk about

23    the international arbitration.

24         Our position is simply that the government of the

25    United States is being used by the government of Estonia for

the purpose of interfering with that international arbitration.

And that's laid out not just in the fact -- that's shown not just by the fact that they didn't advise the government that that international arbitration -- of the United States, they didn't advise the government that that international arbitration had been commenced, but it's also laid out in the filings -- in the notice of filing that we did yesterday and what the Estonian lawyers in that case are telling the international tribunal.

You know, I -- on the health issue, I can tell you -- I did say that Mr. Rotko has asked for help for his swollen abdomen, and nothing has been done. He has asked for the medicine that he was given over time by his doctor outside the jail, and that has not been given to him.

THE COURT: What was that second one?

MR. JIMENEZ: The second thing is he had a prescribed regimen of medicine that includes not just high blood pressure medicine but other medicine that he would take in moments when his blood pressure spiked up.

He has asked for that medicine, and it has not been given to him. He has been told that that medicine can be abused in the jail so it won't be given to him.

So there are things that he has asked for that have not been done, and so that's simply incorrect.

And as far as his flight risk, I think we've -- I

1  have nothing else to say about that other than what I've

2  already said.

3       And on the lack of diplomatic necessity, I don't

4  think we heard -- I don't think I've heard very much indicating

5  why there is a diplomatic necessity in this case.

6       THE COURT:  Let me ask you this.

7       MR. JIMENEZ:  Sure.

8       THE COURT:  And I didn't look at it this morning.

9       But my recollection was there was some either

10  discrepancies or differences in the financial information that

11  was provided to the pretrial services officer and then the

12  posting or the offer to post certain properties.

13       And I just can't -- I just can't remember exactly

14  what we have in terms of knowing about Mr. Rotko's financial

15  situation in general.

16       MR. JIMENEZ:  Right.  Well, it's -- and I meant to

17  address that, Your Honor.

18       There was a suggestion that Mr. Rotko has access to a

19  lot more because there are lawyers -- a lot of lawyers in the

20  room.  I can -- I can assure you that the presence of lawyers

21  in the room are not directly to Mr. Rotko's personal resources.

22       His assets -- and I haven't studied the pretrial

23  services report again today since I came into the courtroom,

24  but he's certainly willing to disclose and, I believe, has

25  disclosed what they are.

1       He lives -- because he manages this apartment

2   building that he owns, which is in Jacksonville Beach, I

3   believe.  That's his -- that's his current source of income.

4       He has a bank account with some funds in it.  He has

5   three properties.  And I haven't -- again, I haven't studied

6   that to see if all the properties are in there.

7       But it's clear that one of those properties is only

8   registered to -- or it's only titled in the name of his wife.

9   Two of the properties, the apartment building I just mentioned

10  and the house he currently lives in, are jointly titled.  He

11  might have been confused when he spoke to the pretrial services

12  officer.  I don't know.

13      But those are his assets, his three -- his primary --

14  really only assets of any significance are the three properties

15  here in Florida and then there's a fourth property in

16  California that his daughter lives in that is, I believe, a

17  condominium.  So there are two personal residences here, an

18  apartment building here, and the condominium in California.

19      And I think Mr. Barksdale is willing to chat about

20  the procedure if the Court wants to hear more about that in

21  terms of how those would be posted.

22      That was the only other thing I was going to mention.

23      THE COURT:  All right.  Thank you.

24      Mr. Corsmeier, did you want to say anything else, or

25  do you want to say anything else?

1    MR. CORSMEIER:  I hesitate to prolong, Your Honor,

2  but just one thing.

3    THE COURT:  That's fine.

4    MR. CORSMEIER:  Mr. Jimenez said he could assure the

5  Court that the lawyers in this room are not related in any

6  way -- I think I'm getting close to the quote -- to his

7  personal assets.  So my next question is, so where is all this

8  money coming from?

9    There's somebody that's willing to help him by paying

10 a lot of money, if it's not him, and that somebody could help

11 him abscond if that's what he desired.

12    THE COURT:  All right.  Anything else on that,

13 Mr. Jimenez?

14    MR. JIMENEZ:  No, Your Honor.

15    THE COURT:  All right.  Here's what I'm going to do.

16    First of all, I think I forgot to mention this each

17 time we've come back from a recess, but obviously Mr. Rotko's

18 been present in court for the entire proceedings, and I want to

19 make sure the record is clear on that.

20    Second, as to the immediate health concerns, I am

21 going to ask the marshal to look into the situation regarding

22 the swollen abdomen, see what can be done about the medication

23 situation.

24    And also you mentioned a psychological examination,

25 Mr. Jimenez?

1          MR. JIMENEZ:  Yes, and also he had a colonoscopy

2    coming up.

3          THE COURT:  And then the colonoscopy situation.

4          THE MARSHAL:  Very well.

5          THE COURT:  If you would look into that, please, and

6    then you can just report to me once you've done that.

7          THE MARSHAL:  Yes, sir.

8          THE COURT:  I appreciate that.

9          And then what I'm going to do is I'm going to get an

10   order out as soon as I can, and I'll try to do it -- do it

11   quickly because I know that -- that this is something that just

12   needs to be resolved.  There are obviously two, as I said at

13   the beginning of the hearing, opposite positions on almost

14   every single issue.

15         So I'll get something out.  It's probably not going

16   to be a book or a book and a movie.  I'm going to try to get

17   right to the issues, address them.

18         And we have a record here -- I don't know if anyone's

19   going to order a transcript, but we've got a record here of the

20   various arguments and positions, so I'll try to get something

21   out.

22         If I do enter an order denying the request for

23   detention and releasing Mr. Rotko on bond, I'll set the

24   conditions in the order.  And then what we'll do is convene for

25   a hearing regarding what needs to be done to meet those

1   conditions and what the parameters of his release will be, and

2   then we'll go from there.

3           But I'll be guided, if I do set a bond, by the

4   information that Mr. Barksdale has provided via the notice.

5           MR. JIMENEZ:  Your Honor, I think we talked about

6   this in the papers, but just in case we didn't, and just so

7   it's clear, Mr. Rotko's obviously willing to be subject to home

8   arrest, electronic monitoring, all the monitoring technology

9   that we have that helps ensure people stay.

10          THE COURT:  All right.  Thank you.

11          Yes, Mr. Barksdale.

12          MR. BARKSDALE:  Your Honor, I'm sorry.  I just -- I

13  can't resist.

14          With respect to -- I know the Court said you would

15  convene again.  The practicalities concern me because I know

16  they'll fall to me, and I assume we'll just deal with them at

17  that hearing --

18          THE COURT:  Yes.

19          MR. BARKSDALE:  -- correct?

20          THE COURT:  Yes.

21          MR. BARKSDALE:  All right.  Thank you.

22          THE COURT:  Yes, we'll do that at that hearing.

23          And like I said, I'll try to -- you know, there's a

24  lot to go through.  I do want to look at additional cases

25  and -- because of the different points that some of you made.

1        But I think -- I think when it gets down to it, I

2    think I know -- I think I have the issues, the way I'm viewing

3    them, framed pretty well, so I should be able to move pretty

4    quickly on it.

5        Mr. Corsmeier, is there anything else?

6        MR. CORSMEIER:  No, Your Honor.

7        THE COURT:  Mr. Jimenez?

8        MR. JIMENEZ:  No, Your Honor.

9        THE COURT:  All right.  Well, let me just say I

10   really -- I do appreciate the briefing that you-all have done

11   and the work that -- that has been done on this, because

12   it's -- it's been very helpful in terms of at least

13   understanding the issues.

14       And I think that it's always a lot more fun in this

15   position to work when you have good lawyers on both sides, and

16   I think both of -- or all of you who have participated in this

17   have really done a fine job, from my perspective, and I

18   appreciate it.

19       So I'll try to get something out as soon as I can.

20       All right.  We're in recess.

21       COURT SECURITY OFFICER:  All rise.

22    (The proceedings were concluded at 4:13 p.m.)

23                    - - -

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4   UNITED STATES DISTRICT COURT )

5   MIDDLE DISTRICT OF FLORIDA   )

6

7          I hereby certify that the foregoing transcript is a

8   true and correct computer-aided transcription of my stenotype

9   notes taken at the time and place indicated therein.

10

11         DATED this 27th day of January, 2020.

12

13                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR, CRC
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25