UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN THE MATTER OF THE
EXTRADITION OF                          Case No. 3:19-mc-27-J-39JRK
ALEKSANDR ROTKO

**UNITED STATES' MEMORANDUM OF LAW
IN SUPPORT OF EXTRADITION**

The United States, through the undersigned Assistant United States
Attorney, hereby submits this memorandum in support of the extradition of
Aleksandr Rotko. The discussion below incorporates much of the argument—
with modifications and additional argument—that was included in the United
States' Memorandum of Law Regarding Detention Pending Extradition
Proceedings (doc. 12), filed on December 6, 2019, and in the United States'
Response to Motion for Release on Bail (doc. 28), which was filed on
December 23, 2019. The government has included all of its arguments in this
memorandum, rather than incorporating its previous arguments by reference, to
ensure that the Court can review all of the government's arguments in one place,
without having to refer to the previous memoranda.

# BACKGROUND

## I.    Facts

"The requested person Aleksandr Rotko is suspected of using a movable of another in his possession for his own benefit and for the benefit of a third person committed by a group of persons, that is a criminal offense which is classified pursuant to the Estonian Penal Code § 201, 2 (4) and of damaging and destroying of a thing of another, by which he has caused to the owner of the thing, the Republic of Estonia, significant damage, which is a criminal offense which is classified pursuant to the Estonian Penal Code § 203."  Doc. 1-2 at 1.  A warrant for Rotko's arrest was issued on August 25, 2007, by the Harju County Court, in Tallinn, Estonia.  *See id*. at 14-18.  The warrant was issued on the basis of the following facts.

Rotko served as the Supervisory Board Member of three companies (AS Verest, OÜ Agrin Partion, and AS BPV), as well a board member of a fourth company (ELA Tolli AS), all of which conducted business at Küti 17 and Küti 17a in the Seaplane Harbor district of Tallinn, Estonia.[1]  *Id*. at 15.  According to the government of Estonia, the four companies, along with another company, OÜ B & E, illegally possessed these properties (which were formerly in the

---

[1]       Rotko was also the sole shareholder of the holding company that owned OÜ Agrin Partion.  Doc. 1-4 at 45.

possession of the Soviet Union). *See id*. at 2. Therefore, in 1997, Estonia filed an action with the Tallinn City Court against three of the companies, asking the Court to recognize Estonia's ownership of the land and property. *Id*. In February, 2005, Estonia submitted a supplemental claim seeking to evict the defendant companies from the property. *Id*. at 3. Shortly thereafter, Estonia added the remaining two companies as defendants in the action. *Id*.

On July 4, 2005, the Tallinn City Court ruled in favor of Estonia in all respects except that it dismissed the action against defendant AS BPV. *Id*. On March 1, 2006, an appellate court affirmed the decision, except that it reversed the dismissal with respect to AS BPV, and thus ruled in favor of Estonia in all respects. *Id*. On June 7, 2006, the Supreme Court of Estonia refused to grant leave for the defendants to appeal further. *Id*. The companies were ordered to vacate Küti 17 and Küti 17a by July 31, 2006. *Id*.

Before complying with that order, the companies, which operated under the direction of Rotko, removed certain property located at the premises and other property was destroyed in the process. *Id*. at 3-4. Witnesses saw workmen removing concrete slabs from the pier, as well as railroad tracks and a boiler, and saw cranes being dismantled. *See id*. at 3, 46, 55; doc. 1-3 at 2. The roof was removed from the boiler room in order to evacuate the boiler. *Id*. at 46. According to the bookkeeper for one of the companies, Olga Novoseltseva, Rotko

tried to sell anything he had installed that could be sold because of the order to vacate. Doc 1-3 at 52.

Pursuant to contracts executed by Rotko, the rails were sold to AS Kuusakoski, a company that purchases scrap metal, for 204,328.80 kroons (approximately USD $14,650) (*see* doc. 1-2 at 16), and the concrete slabs were sold to another company, Paldiski Sadamate AS, for 2,528,727.20 kroons (approximately USD $181,310) (*see* doc. 1-3 at 14). At AS BPV's direction, Paldiski Sadamate AS transferred the latter amount, less VAT, to a bank account for a Danish company, Merimpex Co. Ltd., which was managed by Rotko. Doc. 1-3 at 15. Rotko was also the sole shareholder of that company. Doc. 1-4 at 8, 12.

When Estonia took possession of the property at Küti 17 and Küti 17a on August 1, 2006, the government found that railway tracks, berth cover plates, boilers, hatches to the openings of the seaplane hangar canopy, and gates had been removed. Doc. 1-2 at 3-4. The government further observed that the administrative building had sustained damage due to the water, heat, and power—which had previously been supplied—having been cut off. *Id.* at 4. In addition, locks had been destroyed. *Id.* As a result of the above, Estonia incurred

1,988,260 kroons in damages.[2]  *Id.*  *See also* doc. 1-3 (Suspect Interrogation Record for Olga Kotova) at 34-35 (listing and valuing property removed and damaged).

After Estonia took possession of the property, Rotko left the country in the fall of 2006, after Novoseltseva had informed him of the pending criminal case against him.  Doc. 1-2 at 6; doc. 1-4 at 35-36.  He was subsequently discovered to be living in the United States.  Doc. 1-2 at 6

The Estonian prosecutor then sought an arrest warrant.  In a ruling dated August 25, 2007, Judge Eha Popova of the Harju County Court conducted a detailed review of the evidence presented by the prosecutor and found that an arrest warrant for Rotko should be issued.  *See* doc. 1-2 at 14-18.  In the concluding paragraph of the ruling, the court stated the following:

> The court, after hearing the prosecutor's explanations accompanying the request, and having reviewed the submitted material, considers that the request is reasonable and being guided CCP §§ 21, 24 subsection 4, 130, 131, 132 and Constitution § 20, the preliminary investigation judge holds that Aleksandr Rotko is to be arrested. The criminal case materials show that A. Rotko is aware of the criminal proceedings, but in spite of this he has realized his property located in Estonia and has probably left the Republic of Estonia.  In the criminal case has been gathered enough factual material on which there are grounds to deem the suspicion justified.  A. Rotko

---

[2]      The Estonian prosecutor stated that, as of January 30, 2013, 15.64 kroons equaled one euro (doc. 1-2 at 2), which would convert 1,988,260 kroons to approximately 127,127 euros.  At current exchange rates—according to the currency converter at bankrate.com (accessed on March 9, 2020)—127,127 euros converts to 143,525 U.S. dollars.

has not responded to summons and has repeatedly failed to appear at the body conducting the proceedings. Such facts provide a basis to assume that the suspect may while remaining at large continue to avoid the criminal proceedings. Therefore, the court considers that there is sufficient reason to arrest the suspect fugitive A. Rotko.

*Id.* at 18. On April 9, 2013, Estonia submitted a request for Rotko's extradition pursuant to its extradition treaty with the United States (the "treaty").[3] *See* doc. 1-1 at 5.

Subsequently, the person alleged to have been Rotko's co-conspirator, Olga Kotova, appealed Judge Popova's ruling insofar as it found that Kotova was a flight risk and therefore should be detained. *See* doc. 1-4 at 34. Her attorney argued—similarly to an argument that Rotko has made in this case—that "O. Kotova left for a place of residence abroad in December 2006, that is before she learned that the police were looking for her" and that there were not "any indications that O. Kotova would have been aware of the criminal proceedings initiated against her," and therefore that Judge Popova "erroneously found that O. Kotova deliberately absconded from criminal proceedings." *See id*. at 37. The Tallinn Circuit Court, Criminal Chamber, in a ruling dated October 10, 2016, rejected Kotova's appeal. *See id*. at 37. In rejecting the appeal, the court

---

[3] The Treaty Between the United States and Estonia for Extradition of Fugitives from Justice, U.S.-Est., Nov. 8, 1923, 43 Stat 1849, *as amended by* the Extradition Treaty Between the United State of America and Estonia, U.S.-Est. February 8, 2006 S. Treaty Doc. No. 109-16 (2006).

discussed the evidence showing that Rotko was aware of the criminal

proceedings, as follows:

> It should also be noted that, according to the materials of the matter, Olgo Novoseltseva has given testimony as a witness during the hearing of 06.11.2012 (vol.1 file pp. 299-301), which shows that O. Novoseltseva communicated with A. Rotko on the telephone and told the latter that she had testified to the police in connection with the investigation that had been started and that the police would like to speak, among other things, with A. Rotko.  To this, A. Rotko replied that O. Novoseltseva did not have to worry.

> Thus, A. Rotko was aware of the criminal proceedings.  Since A. Rotko was the spouse of O. Kotova during the aforementioned period, the District Court does not consider it credible that O. Kotova was not aware of her being declared fugitive.  It is also worth noting that A. Rotko's behavior pattern was similar to that of O. Kotova: although he interacted with the people in Estonia but did so without that, they had no information on how to contact A. Rotko (witness O. Novoselskaja [*sic*] claimed that A. Rotko always contacted her by calling the landline phone.  O. Novoselskaja [*sic*] said that she did not know where A. Rotko was staying and how to contact him).

*See id*. at 35-36.

On April 18, 2018, Rotko filed a claim against Estonia on behalf of his

company in an international arbitration tribunal.  *See* doc. 17-9 at 3, ¶ 3.  In the

arbitration proceeding, Rotko claims that Estonia, in violation of international

law, "strip[ed] the port away from [the company's] Estonian subsidiaries and

affiliates and depriv[ed] [the company] of its investments in Estonia."  *See* doc.

17-1 at 5, ¶ 4.

## II.    Procedural History

The United States, in accordance with its obligations under the treaty and pursuant to 18 U.S.C. § 3181 *et seq.*, filed a complaint in this District seeking a warrant for Rotko's arrest. *See* doc. 1. This Court issued the arrest warrant and Rotko was arrested and made his initial appearance on December 3, 2019. *See* doc. 8 (Clerk's Minutes). The government sought Rotko's detention and the Court conducted a detention hearing on January 7, 2020. *See* doc. 35 (Clerk's Minutes). On January 22, 2020, the Court issued an order (doc. 40) denying the government's motion for detention and granting Rotko's motion for bail. At a hearing conducted on January 29, 2020, the Court set bond conditions and Rotko was subsequently released under those conditions. *See* docs. 44 (Clerk's Minutes) and 46 (Order Setting Conditions of Release). An extradition hearing has been scheduled for April 27 and, if necessary, April 28, 2020. *See* doc. 50.

## LEGAL FRAMEWORK GOVERNING EXTRADITION PROCEEDINGS

## I.    The Limited Role of the Court

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Kastnerova v. United States*, 365 F.3d 980, 984

n.5 & 986 (11th Cir. 2004). The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828-29 (11th Cir. 1993). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Martin*, 993 F.2d at 828-29. If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

II.     **The Requirements for Certification**

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, *10 (S.D. Fla. Aug. 31, 2017); *In re Extradition of Shaw*, 2015 WL 3442022, *5 (S.D. Fla. May 28, 2015) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). The following sections discuss each of those requirements.

A.     **Authority over the proceedings**

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," *In re Extradition of Kirby*, 106 F.3d 855, 866 (9th Cir. 1996), but rather is acting in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325

(1st Cir. 1993).  Both magistrate judges and district judges may render a

certification under Section 3184.  *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir.

1993); *see also, e.g., Martin*, 993 F.2d at 828 ("The extradition magistrate conducts

a hearing simply to determine whether there is evidence sufficient to sustain the

charge against the defendant under the provisions of the proper treaty or

convention") (internal quotation marks, brackets, and citation omitted).  The

Local Rules for this District specifically delegate the authority to handle

extradition matters to magistrate judges.  Rule 6.01(c)(9), Local Rules of the U.S.

District Court of the Middle District of Florida.

### B.     Jurisdiction over the fugitive

The Court has jurisdiction over fugitives who are found within its

jurisdictional boundaries.  18 U.S.C. § 3184 ("[A judge] may, upon complaint

made under oath, charging any person found within his jurisdiction . . . issue his

warrant for the apprehension of the person so charged").  Because Rotko was

found in the Middle District of Florida, this Court has jurisdiction over him.

### C.     Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations,

including whenever a treaty or convention for extradition is in force between the

United States and the requesting state.  *See id.*; *see also Arias v. Warden*, 928 F.3d

1281, 1285 (11th Cir. 2019); *Kastnerova*, 365 F.3d at 987.  The government

submitted with the initial complaint for extradition a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State attesting that there is a treaty in full force and effect between the United States and Estonia. *See* doc. 1-1 at 2 ("The relevant and applicable treaty provisions in full force and effect between the United States and Estonia are found in the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Estonia, signed on February 8, 2006"). The Court must defer to the Department of State's determination in that regard. *Arias*, 928 F.3d at 1288 (where "[Department of State] declaration set forth the United States Executive Branch's position—that the treaty remains in full force," courts "have no answer but this: the treaty remains in effect"); *Kastnerova*, 365 F.3d at 985-87; *Martinelli Berrocal*, 2017 WL 3776953, at *11 (noting that "every Circuit Court, including our own, has deferred to the executive branch" as to whether an extradition treaty is in force).

### D.    Crime covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 2 of the treaty defines offenses as extraditable if the criminal conduct is punishable under the laws of both the United States and Estonia by deprivation of liberty for a period

of more than one year or by a more severe penalty. This requirement is known as "dual criminality." *See Arias*, 928 F.3d at 1292.

In assessing whether the crime for which extradition is requested meets the dual criminality requirement of the treaty, the Court should examine the description of criminal conduct provided by Estonia in support of its charge and decide whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See id.* at 1293 (noting that "courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"); *see also, e.g.*, *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000). A requesting country need not establish that its crimes are identical to ours. *Arias*, 928 F.3d at 1293 ("Dual criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours") (internal quotation marks and citation omitted). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular

act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).[4]

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 298-300 (1933); *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

In this case, Rotko is suspected of committing embezzlement under section 201(2), clause 4, of the Estonian Penal Code and injuring or destruction of a thing under section 203(1) of the Penal Code. *See* doc. 1-2 at 1. Each of these offenses is punishable by a term of imprisonment of up to three years. *See* doc. 27-1 at 10. The conduct underlying the alleged offense of embezzlement is punishable under

---

[4] Article 2 of the treaty in this case specifically provides, "For the purposes of this Article, an offense shall be an extraditable offense . . . whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology." Doc. 1-1 at 20.

the laws of the State of Florida in Section 812.014(1) of the Florida Statutes,

which provides as follows:

> (1) A person commits theft if he or she knowingly obtains or uses,[5] or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
>
>> (a) Deprive the other person of a right to the property or a benefit from the property.
>>
>> (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

Furthermore, if the property stolen is valued at $100,000 or more, Section

812.014(2)(a)1 provides that the offense is punishable as a first-degree felony

under Section 775.082(3)(b), which authorizes a maximum term of imprisonment

of 30 years.  According to the Estonian prosecutor, the property allegedly stolen

---

[5]     Section 812.012(3) of the Florida Statutes defines "obtains or uses" as:

(a) Taking or exercising control over property.

(b) Making any unauthorized use, disposition, or transfer of property.

(c) Obtaining property by fraud, willful misrepresentation of a future act, or false promise.

(d)     1. Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception; or

2. Other conduct similar in nature.

and/or destroyed by Rotko was valued at 1,988,260 EEK (Estonian Kroon). Doc. 1-2 at 2. As noted in footnote 2, above, 1,988,260 EEK converts to approximately $143,525. Thus, both the Estonian offense and the Florida offense are punishable by more than one year of imprisonment, the Estonian offense by up to three years and the Florida offense by up to 30 years.[6]

The conduct underlying the alleged offense of injuring or destruction of a thing is punishable under the laws of the State of Florida in Section 806.13(1)(a) of the Florida Statutes, which provides as follows:

> A person commits the offense of criminal mischief if he or she willfully and maliciously injures or damages by any means any real or personal property belonging to another, including, but not limited to, the placement of graffiti thereon or other acts of vandalism thereto.

If the value of the property is $1,000 or greater, Section 806.13(1)(b)3 provides that the offense is punishable as a third-degree felony under Section 775.082(3)(e), which authorizes a maximum term of imprisonment of five years. Thus, again, both the Estonian offense and the Florida offense are punishable by more than one year of imprisonment, the Estonian offense by up to three years and the Florida offense by up to five years.

---

[6] Even if the value of the property was less than the estimate provided by the government of Estonia, the statute provides that the threshold for a felony offense is when the theft involves property with a value of $750 or more. *See* Section 812.014(2)(c)1.

As this discussion establishes, the offenses for which Estonia seeks extradition encompass criminal conduct that is punishable under the laws of both Estonia and the State of Florida by deprivation of liberty for a period of more than one year. Accordingly, the offenses are ones for which extradition under the treaty is authorized.

### E. Probable cause that the fugitive has committed the offense

To certify the evidence to the Secretary of State, the Court must conclude that there is probable cause to believe that the crimes charged by Estonia were committed by the person before the Court. *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1432 (S.D. Fla. 1993). Probable is established by demonstrating a substantial probability that a crime has been committed and that a specific individual has committed the crime. *See Illinois v. Gates*, 462 U.S. 213, 231 (1983); *see also Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (probable cause is established if a "prudent man" would "believ[e] that the (suspect) had committed or was committing an offense") (internal quotation marks and citation omitted); *Jimenez v. Aristeguieta*, 311 F.2d 547, 562 (5th Cir. 1962) (in extradition case, stating that magistrate "should not require evidence to convince himself that the defendant was guilty, but only that 'furnishing good reason to believe that the crime alleged had been committed by the person charged with having committed it'") (quoting *United States v. Burr*, 25 Fed. Cas. 2, 12 (C.C.D. Va. 1807)).

The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.2 (9th Cir. 1981)). The government will address probable cause in its argument, below.

## III.  An Extradition Hearing Follows Unique Procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828. Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *Martinelli Berrocal*, 263 F. Supp. 3d at 1284, and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

The Federal Rules of Evidence do not apply to extradition proceedings. *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition"). Hearsay evidence is admissible. *See, e.g., Afanasjev*, 418 F.3d at 1165 (unsworn statements may be sufficient to justify extradition) (citing *Collins*, 259 U.S. at 317); *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1212-13 & 1226-29 (S.D. Cal. 1997) (statements of co-conspirators and other witnesses sufficient in extradition to Mexico). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

"A certification of extradition is generally based entirely on the authenticated documentary evidence provided by the requesting government." *Martinelli Berrocal*, 2017 WL 3776953, at *9; *see also In re Extradition of Shaw*, 2015 WL 3442022, *9 (S.D. Fla. May 28, 2015) ("'The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination'")

(quoting *In re Extradition of Atta*, 706 F. Supp. 1032, 1050-51

(E.D.N.Y.1989)).  Nothing more is required, and typically nothing more is

provided.  *See*, *e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1287

(S.D. Fla. 2011) ("It is exceedingly rare for the Government to submit anything

other than documents in support of an extradition request").  "An extradition

hearing is therefore akin to a preliminary hearing" and the only evidence a subject

may present at an extradition hearing is evidence that will "clarify or explain" the

government's evidence; "contradictory evidence against the requesting country's

case is inadmissible."  *Martinelli Berrocal*, 2017 WL 3776953, at *9.  "'"Generally,

evidence that explains away or completely obliterates probable cause is the only

evidence admissible at an extradition hearing, whereas evidence that merely

controverts the existence of probable cause, or raises a defense, is not

admissible."'"  *Id*. (quoting *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005)

(quoting *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999))).

The Federal Rules of Criminal Procedure also do not apply to extradition

proceedings.  *See, e.g., Afanasjev*, 418 F.3d at 1164-65; *see also* Fed. R. Crim. P.

1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition

and rendition of a fugitive").  Furthermore, many constitutional protections

applicable in criminal cases do not apply.  For example: a fugitive has no right to

cross-examine witnesses who might testify at the hearing, *see, e.g., Nunez-Garrido*,

829 F. Supp. 2d at 1282-83 (collecting cases holding that there is no right to cross-examination in extradition hearing); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *Martin*, 993 F.2d at 829; the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *In re Extradition of Batchelder*, 494 F. Supp. 2d 1302, 1309 (N.D. Fla. 2007) ("Double jeopardy has no role at all in an extradition proceeding") (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. *See, e.g.*, *Nunez-Garrido*, 829 F. Supp. 2d at 1281. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913); *Schmeer v. Warden of Santa Rosa Cty. Jail*, 2014 WL 5430310, *4 (N.D. Fla. Oct. 22, 2014). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *Shaw*, 2015 WL 3442022, at *8 ("Defendant has consistently attempted to contradict the case brought against him in [the

requesting country]. . . . This the Defendant cannot do").  "The extent to which a fugitive may offer explanatory proof is largely within the discretion of the court." *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"); *Martinelli Berrocal*, 2017 WL 3776953, at *27 (citing cases); *Fernandez-Morris*, 99 F. Supp. 2d at 1373 n.5.  These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

## IV.  **Rule of Non-Inquiry**

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court.  *See* 18 U.S.C. §§ 3184 & 3186.  For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds.  *Arias*, 928 F.3d at 1295 ("We have neither the power nor competence to consider a foreign fugitive's

concern about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch"); *Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate.  Rather, humanitarian considerations are matters properly reviewed by the Department of State") (citation omitted); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted).  This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## ARGUMENT AND CITATIONS OF AUTHORITY

The government believes that the primary contested issues at the hearing will be (1) whether prosecution of the offenses for which extradition is sought is barred by "lapse of time" under Article 6 of the treaty—that is, whether the

limitations period under Estonian law has run, (2) whether the documentary requirements of the treaty have been met—that is, whether the Estonian government has provided the "charging document" required under the treaty, and (3) whether the documents submitted by the Estonian government establish probable cause to believe that Rotko committed the offenses.

## I.    The Limitations Period Has Not Run

In seeking release on bond, Rotko claimed that he had a high likelihood of success in defeating the extradition request because, he argued, the limitations period has run for the offenses he is alleged to have committed in Estonia. This argument is grounded in his contention that he did not "abscond" under Estonian law and therefore that the limitations period is not fifteen years under section 81 of the Estonian penal code but is instead five years under that same section. To support this contention, he submitted declarations from Paul Keres, an Estonian lawyer who also testified at the detention hearing held on January 7, 2020. In his declarations and testimony, Mr. Keres opined that the 15-year limitations period does not apply because the evidence, he says, does not establish that Rotko knew about the pending criminal proceedings and, therefore, Rotko could not have absconded under Estonian law. *See* doc. 17-13 (Exhibit M) at 12-13. In one of his declarations and, especially, at the hearing, Mr. Keres cited and discussed an Estonian Supreme Court case that purportedly supported his position. *See id.* at

9-10 & 17-14 at 50 (excerpt of Supreme Court opinion); doc. 37 at 24-26 (transcript of excerpt of detention hearing).

At the detention hearing, Mr. Keres—although his testimony was not crystal clear on this point—appeared to be opining that Rotko was required to be served with a summons before he could be found to have absconded under Estonian law such that the 15-year rather than the 5-year limitations period should apply. *See* doc. 37 at 24-30, 69-81. However, during part of his cross-examination, and upon questioning by the Court, the following exchange occurred:

> THE COURT: Well, what if -- what if you know that they're investigating you -- not necessarily coming at you, but you know they suspect you. You know the police are asking questions. You know they think you committed a crime and then you knowingly decide to take off, to run. Is that active?

> THE WITNESS: For the purpose -- yes, for the purpose -- for the purpose of absconding. So the -- the fleeing, the action -- the act to flee must be based on the deliberation, the intent not to be made available or not to make oneself available to the police. That is the -- it's intent.

> THE COURT: Yes. All right. All right.

> THE WITNESS: It depends on the intent.

> THE COURT: But for purposes of either -- whether it's interrupting or suspending the statute of limitations, then, if it can be proved that someone had the intent to flee, knowing an investigation was going on, would that then suspend the statute of limitations or the period?

THE WITNESS:  If it were proven that they fled --

THE COURT:  Yes.

THE WITNESS:  -- for the purpose of, yes, fleeing the proceedings, yes, that would be active --

THE COURT:  All right.

THE WITNESS:  -- active absconsion.

THE COURT:  All right.

THE WITNESS:  This is not what is -- what is alleged here.

THE COURT:  All right.

*Id.* at 77-78; *see also id.* at 99 ("Q. . . . So somebody can abscond without being summonsed if it's active absconding, if they know of a criminal proceedings and intentionally leave to avoid the criminal proceedings.  A.  Yes").  Although Mr. Keres concluded this part of his testimony by saying that Rotko's actively absconding was not alleged in this case, his conclusion is simply wrong.  In fact, the scenario about which the Court questioned him is exactly what is alleged in this case.

As set out above, the Harju County Court, although noting that "A. Rotko has not responded to summons and has repeatedly failed to appear at the body conducting the proceedings," also found that "[t]he criminal case materials show that A. Rotko is aware of the criminal proceedings, but in spite of this he has realized his property located in Estonia and has probably left the Republic of

26

Estonia." *See* doc. 1-2 at 18. Mr. Keres testified that he disagreed with the finding that Rotko was aware of the criminal proceedings, stating in response to the question, "So you're right and the judge is wrong, yes or no?" as follows: "Based on this evidence, yes." Doc. 37 at 122. However, his belief that he is right and the judge is wrong cannot be the basis for this Court to disregard the rulings of two Estonian courts and reach a contrary conclusion. Although the Estonian courts were not directly addressing whether the limitations period had run, their finding that Rotko was aware of the criminal proceedings and absconded logically leads to only one conclusion: that the 15-year period applies and therefore the prosecution is not barred by lapse of time. *See, e.g., Fejfar v. United States*, 724 Fed. App'x 621, 622 (9th Cir. 2018) (rejecting a Czech fugitive's statute of limitations argument where a Czech court "held that [his] sentence was not statute-barred for lapse of time"); *Skaftouros v. United States*, 667 F.3d 144, 160 n.20 (2d Cir. 2011) (stating that "we defer to the Greek courts, which may consider whether [the fugitive] or the Greek prosecutors have the better of the argument"); *United States v. Struga*, 231 F. Supp. 3d 244, 251 (E.D. Mich. 2017) (relying on Albanian court decision holding that the statute of limitations had not run because "it is not for this Court to second-guess or preempt the Albanian courts"); *In re Extradition of Jimenez*, 2014 WL 7239941, *2 (D. Md. Dec. 16, 2014) ("[T]his Court will not question the reliability or trustworthiness of a judicial

decree from a foreign nation") (citing *Jhirad v. Ferradina,* 536 F.2d 478, 484-85 (2d Cir. 1976) ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another nation")); *In re Extradition of Hughes*, 2013 WL 1124294, *7-8 (C.D. Cal. Mar. 18, 2013) (relying on decision of a Mexican court finding that the statute of limitations expired almost three years later than when fugitive claimed it expired); *see also United States v. Trabelsi*, 845 F.3d 1181, 1192 (D.C. Cir. 2017) ("U.S. courts will defer to the judgment of foreign courts construing their own laws"); *In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980) ("We often have difficulty discerning the laws of neighboring States, which operate under the same legal system as we do; the chance of error is much greater when we try to construe the law of a country whose legal system is much different from our own").

Rotko's argument that the limitations period has run is also contrary to the conclusion of the Estonian prosecutor's office. In an October 23, 2019, response to an inquiry by the Department of Justice, the Estonian prosecutor's office stated the following:

> Criminal proceedings against Aleksandr Rotko in the criminal matter No. 06730000427 were continued on a general basis. Pursuant to section 81 of the Penal Code, if the suspect or accused person absconds from criminal proceedings, the time limit for prosecuting this person for the commission of a criminal offence in the second degree expires in fifteen years after the commission of the said offence. Based on the time of the commission of the last episode of crime, the said time limit in Aleksandr Rotko's case

would expire on 6 September 2021. Until then, Aleksandr Rotko
can be prosecuted and tried by a court.

Doc. 1-4 at 46; *see also* doc. 27-1 (December 16, 2019, response of Estonian

prosecutor) at 9 ("[I]n this case, the limitation period should be calculated starting

from date of the completion of the acts, which according to the suspicion was no

later than 6 September 2006, and by adding 15 years thereto, thus making the

date of expiry 6 September 2021"). The Court should defer to the Estonian

government's interpretation of its own law because "[s]tatements from a foreign

government explaining its nation's laws constitute evidence of the law of that

foreign nation." *Cornea v. United States AG*, 771 Fed. App'x 944, 947 (11th Cir.

2019) (following the "authoritative statement" provided by the Greek government

and rejecting a Greek fugitive's (and his expert's) argument that the limitations

period for the offense for which his extradition had been sought had run); *see also*,

*e.g.*, *Grin v. Shine*, 187 U.S. 181, 190 (1902) ("[I]t can hardly be expected of us that

we should become conversant with the criminal laws of [the requesting country],

or with the forms of warrants of arrest used for the apprehension of criminals");

*In re Extradition of Schumann*, 2018 WL 4777562, *4 (N.D. Ill. Oct. 3, 2018)

(relying on statement of Polish prosecutor regarding the date on which the statute

of limitations expires); *Schmeer v. Warden of Santa Rosa Cty. Jail*, 2014 WL

5430310, *5-6 (N.D. Fla. Oct. 22, 2014) (relying on statement by German

authorities that the statute of limitations had been "interrupted" and restarted anew).

Rotko has not established that prosecution of the alleged offenses is barred by lapse of time. As Mr. Keres stated at the detention hearing, the Harju County Court found that the prosecutor had "credibly demonstrated" in an *ex parte* proceeding that Rotko had absconded but it had not been "finally proven." Doc. 37 at 21-22, 87. This extradition proceeding is not the proper forum for a final resolution of the dispute over the statute of limitations. Given the limited role of the Court in this proceeding, as discussed above, the determination of the Estonian courts and the Estonian prosecutor that Rotko absconded—and by the prosecutor that the limitations period has not run—resolves the matter, at least for the purposes of extradition. As the case law cited above demonstrates, courts in the United States are ill-suited to interpret foreign law and should not undertake to do so, especially where, as in this case, a judge in the foreign jurisdiction already has issued a definitive interpretation. Rotko can raise any defenses he may have to the allegations, including a statute of limitations defense, with the State Department to try to convince the Secretary of State to exercise his discretion and refrain from ordering extradition and, if that attempt fails, with the courts in Estonia after his extradition. Even if it is not clear whether the prosecution is time-barred, "the general rule allows the prosecuting state to

resolve the issue" because "[t]he extraditee has an opportunity to raise the defense in the requesting country." *Kamrin v. United States*, 725 F.2d 1225, 1227 (9th Cir. 1984).

## II. The Treaty Requirement of a "Charging Document" Has Been Met

Article 8(3) of the official English version of the treaty provides as follows:

A request for extradition of a person who is sought for prosecution also shall include:

(a) a copy of the warrant or order of arrest issued by a judge, court, or other authority competent for this purpose;

(b) a copy of the charging document; and

(c) such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought.

Doc. 1-1 at 24-25. In his supplemental memorandum in support of his motion for release on bail, Rotko claims that because Estonia has not, in his view, provided a "charging document"—that is, in his view, a formal document initiating criminal proceedings against him, like an indictment in the United States—it has not complied with the treaty. Concomitantly, he claims that he must actually be charged with a crime before he can be extradited under the treaty, and that the judge's order authorizing his arrest is insufficient because it does not charge him with a crime.

In support of his argument, Rotko cites *Aguasvivas v. Pompeo*, 2019 WL 4456034 (D.R.I. Sept. 18, 2019), stating that the court in *Aguasvivas* is the only one "to have examined a situation like this one" and that the court "denied extradition because of the requesting country's failure to produce the requisite charging document." Doc. 24 at 1. However, the order in *Aguasvivas* was appealed by the government and has been stayed by the First Circuit pending resolution of the appeal. *See Aguasvivas v. Pompeo*, Appeal No. 19-1937 (1st. Cir.). Oral argument was held on January 6, 2020, but as of the filing of this memorandum the court had not yet issued its opinion in the case. Accordingly, any reliance on the order in *Aguasvivas* as persuasive authority is premature. Furthermore, contrary to Rotko's claim, several other courts have determined that an order for the arrest of a subject can also be the document setting forth the charges against the defendant—that is, that two separate documents are not required—and that a formal charging document like an indictment is not necessary to comply with an extradition treaty.

One such case that squarely addressed whether a separate charging document was required is *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182 (W.D. Okla. 2015). In that case, the court noted that "[a]t the extradition hearing, Mr. Rios questioned whether an arrest warrant alone provided sufficient evidence that he has been 'charged with' aggravated homicide." *Id*. at 1186 n.2.

In response, the court stated, among other things, that "Judge Mercado Camarillo's arrest warrant 'is a charging document' in the sense that 'it identifies the offense in the [Zacatecas] criminal code, sets out the essential facts of the alleged crime, and details the evidentiary basis for the charge.'" *Id*. (bracketing in original) (quoting *Martinez v. United States,* 793 F.3d 533, 543-44 (6th Cir. 2015), opinion vacated and rehearing en banc granted (Oct. 14, 2015), on rehearing en banc, 828 F.3d 451 (6th Cir. 2016) (not specifically addressing whether arrest warrant can be "charging document" but holding, in part, that arrest warrant tolled the limitations period)); *see also Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("We agree that for the purpose of a civil proceeding such as an extradition, a Mexican arrest warrant is the equivalent of a United States indictment . . ."); *In re Extradition of Rovelli*, 977 F. Supp. 566, 568 (D. Conn. 1997) ("The arrest warrant issued by the Italian authorities constitutes a charging document under Italian Law . . .").

In *United States v. Nolan*, 651 F. Supp. 2d 784 (N.D. Ill. 2009), Nolan conceded that an arrest warrant could be a charging document in civil law countries but argued that the country seeking to extradite him, Costa Rica, was not a civil law country. *See id*. at 796. The court disagreed, relying on the description of the Costa Rican criminal justice system in a World Factbook compiled by the Bureau of Justice Statistics at the Department of Justice. *See id*.

33

That description stated that Costa Rica was a civil law country. *See id*. Based in part on that finding, the court found that an arrest warrant from Costa Rica was sufficient to satisfy the treaty's requirement of "the charging document, or any equivalent document issued by a judge or judicial authority." *See id*. at 796. Like Costa Rica, Estonia's legal system is based on the civil law model.[7]

In response to an inquiry from the Office of International Affairs ("OIA") at the Department of Justice, the Estonian prosecutor's office stated the following:

> In accordance with the criminal procedure rules of the Republic of Estonia, the State shall not prepare a penal claim addressed to a person as a separate document until presentation of the charges to court for hearing. In such an event, the Prosecutor shall prepare a statement of charges pursuant to § 154 and § 226 (1) of the Code of Criminal Procedure and presents it to the court.

> Before preparation of the statement of charges, the definition of the charge shall be defined as a part of the minutes of hearing that is formalised in the course of factual hearing of the suspect.

> Since Aleksandr Rotko absconds the proceedings and is hiding himself, suspicion has not been presented to him in person.

---

[7]      *See* Julia Laffranque, "The Judicial System of Estonia and European Union Law", 33 *Int'l Journal of Legal Information* Vol. 2, Art. 7 (2005), at 224 (available at: http://scholarship.law.cornell.edu/ijli/vol33/iss2/7; accessed Dec. 21, 2019) ("Estonia employs a civil law system and follows the legal traditions of continental Europe . . ."); InvestinEstonia.com (https://investinestonia.com/business-in-estonia/legal-system/; accessed Dec. 21, 2019) ("The legal system in Estonia is based on the Continental European civil law model and has been influenced by the German legal system").

Doc. 1-3 (Estonian prosecutor response dated Dec. 12, 2017) at 16. In response

to a later inquiry from OIA, the prosecutor stated that "[p]ursuant to the Code of

Criminal Procedure in force in the Republic of Estonia, a person must be

interrogated as a suspect before bringing charges and sending the case to court

(subsection 33 (2) of the Code of Criminal Procedure)." *See* doc. 27-2 (Estonian

prosecutor response dated Dec. 17, 2019) at 7. That is, because Rotko has not yet

been interrogated, it has not been possible to formally charge him. *See id*.; *see also*

*id*. at 8 ("At the moment, A. Rotko's criminal matter is pending before the police,

as it has not been possible to perform the procedural acts necessary for bringing

charges. In order to do so, it is required, as a minimum, to interrogate A. Rotko

as a suspect"). Given the requirement that a suspect be interrogated before he can

be formally charged, it would make no sense for the extradition treaty to require a

formal charge before an extradition could be undertaken, as it would render the

treaty nugatory if suspects could insulate themselves from extradition simply by

fleeing the country before the interrogation required under Estonian law.

The prosecutor also states the following in this response:

Article I of the Estonian-language version of the Extradition Treaty
between the Government of the Republic of Estonia and the
Government of the United States of America (adopted on 8
February 2006) reads as follows:

> "*Obligation to Extradite*
> *The Parties undertake to extradite to each other, pursuant to this Treaty,*
> *persons who are <u>suspected</u>, accused or convicted by the Requesting State of an*
> *extraditable offence.*"

*Id*. at 8-9 (emphases in original).[8]  This reading of the treaty is in harmony with

Section 457 of the Estonian Code of Criminal Procedure.  That section, entitled

"Commencement of the Extradition Proceedings of a Person From a Foreign

State", provides as follows:

> Extradition shall be sought if a suspect or a defendant is in a foreign
> state and is evading criminal proceedings, and further conduct of the
> criminal proceedings is significantly impeded or impossible without
> the presence of the suspect or the defendant, or if a decision issued in
> respect of a convicted person requires his extradition.

*See* doc. 37 at 67-68; doc. 34-1 at 54.  Because, as noted above, Rotko must be

interrogated before he can be formally charged, further conduct of the criminal

proceedings is impossible without his presence.

---

[8]     This translation is essentially the same as that provided by
Mr. Keres, which is the following:

> Article 1 – Obligation to Extradite
>
> The Contracting Parties undertake to extradite to each other, in
> accordance with this Agreement, persons who are <u>suspected</u>,
> accused or convicted in the requesting State of an offense subject to
> extradition.

Doc. 33-2 at 3 (emphasis added); *see also* doc. 37 at 62.

The English translation of the Estonian version of the treaty does not

perfectly mirror the official English version, in which Article I reads as follows:

Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the
provisions of this Treaty, persons whom the authorities in the
Requesting State have charged with or convicted of an extraditable
offense.

*See* doc. 1-1 at 20. However, as stated at the end of the treaty, "both [the English

and Estonian] texts are equally authentic." *See id.* at 34; *see also Martinez v. United*

*States*, 828 F.3d 451, 459 (6th Cir. 2016) (en banc) ("In this case, as in many cases

involving treaty interpretation, we have not one official text but two—the English

and Spanish versions of the treaty, each of which is "'equally authentic'"); Vienna

Convention on the Law of Treaties, art. 33, May 23, 1969, 1155 U.N.T.S. 331

(hereinafter "Vienna Convention") ("When a treaty has been authenticated in

two or more languages, the text is equally authoritative in each language, unless

the treaty provides or the parties agree that, in case of divergence, a particular text

shall prevail").[9] The Court should therefore conclude that Estonia properly

sought Rotko's extradition even though a formal charge, as that term would be

---

[9] "Although the United States has not ratified the Vienna Convention
on the Law of Treaties, our Court relies upon it as an authoritative guide to the
customary international law of treaties, insofar as it reflects actual state
practices." *Mora v. New York*, 524 F.3d 183, 196 n.19 (2d Cir. 2008) (internal
quotation marks omitted).

understood in the United States, has not yet been brought.  *See*, *e.g.*, *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 986-88 (D. Or. 2011) (rejecting the argument of a Bosnian fugitive that because he was not formally charged he could not be extradited as "merely a suspect wanted for investigation").

Furthermore, the treaty's requirement in Article 8(3)(b) that the requesting country provide what is listed as a "charging document" in the official English version of the treaty requires a "kahtlustatatavaks tunnistamise määruse" in the Estonian version, which translates as "suspicion order" (*see* doc. 37 at 50), not "charging document", which again comports with the prosecutor's translation. The word "süüdistusakt", translated as "statement of charges", does not appear anywhere in the Estonian version of the treaty.  *See* doc. 37 at 62, 64-65; doc. 24-5 at 8-9.

At the detention hearing, Mr. Keres testified that a "suspicion order" was a term of art that had a specific meaning under Estonian law, as follows: "A suspicion order, as it was, was an order or a ruling issued by an investigator, by the investigator conducting the proceedings, for the purposes of attributing suspect status to a person."  Doc. 37 at 51; doc. 33-2 at 4.  He testified that the term "suspicion order" "was contained in the old Code of Criminal Procedure, and it was abolished in 2002, 28th of July, 2002."  Doc. 37 at 52; doc. 33-2 at 4. Nevertheless, the term is included in the Estonian version of the treaty, which

38

was last amended on February 8, 2006. *See* n.2, above. And the August 25, 2007, ruling by Judge Popova, who is described by Mr. Keres as "the preliminary investigation judge" (*see* doc. 37 at 84), is the functional equivalent of a "suspicion order" as that term was defined by Mr. Keres, that is, a ruling issued by an investigator conducting the proceedings for the purpose of attributing suspect status to Rotko. Even if the ruling by Judge Popova is not technically a "suspicion order" as that term is used in Estonian law, the treaty's inclusion of the term "suspicion order" demonstrates that the parties intended the treaty to cover persons who were suspected of crimes but were not yet charged. *See* Vienna Convention, art. 31.1 (the text of a treaty is to be interpreted "in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose").

In view of the above, the documentary requirements of the treaty have been met. Judge Popova's order for the arrest of Rotko is a "charging document" in the sense that it identifies the offenses in the Estonian criminal code, sets out the essential facts of the alleged crimes, and details the evidentiary basis for the charges. *See Sarellano*, 142 F. Supp. 3d at 1186 n.2; *see also*, *e.g.*, *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) ("Form is not to be insisted upon beyond the requirements of safety and justice"); *Grin v. Shine*, 187 U.S. 181, 191 (1902) (noting that a Soviet order, "while it is not in the form of a warrant of arrest as

39

used in this country, it is evidently designed to secure the arrest of the accused," and concluding that the order satisfied the treaty's requirement); *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) ("We will not second guess th[e] determination" by the Government of Bosnia that a "[d]irective to find and arrest" the fugitive constituted the "arrest warrant" required under the applicable extradition treaty).

Moreover, both the United States and Estonia agree that the charging and documentary requirements of the treaty have been met in this case. As the Supreme Court has explained, "[w]hen the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982). "It is well settled that the Executive Branch's interpretation of a treaty is entitled to great weight." *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (internal quotation marks and citation omitted). Such deference is particularly warranted when its view is consistent with that of its treaty partner, as is the case here. *See*, *e.g.*, *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight"); *Arias*, 928 F.3d at 1288 (holding that the U.S.-Colombia extradition treaty is in full force and effect because, *inter alia*, both the United States and

40

Colombia understand it to be in effect). The mutual understanding of the United

States and Estonia as to what the treaty requires and whether the requirements

have been met is another reason the Court should reject Rotko's contrary view.

An additional reason is the canon of interpretation that a treaty should be

construed liberally in favor of extradition. As the Supreme Court articulated in

*Factor v. Laubenheimer*, "if a treaty fairly admits of two constructions, one

restricting the rights which may be claimed under it, and the other enlarging it,

the more liberal construction is to be preferred." 290 U.S. 276, 293-94 (1933); *see*

*also Grin*, 187 U.S. at 184 ("These treaties should be faithfully observed, and

interpreted with a view to fulfil our just obligations to other powers, without

sacrificing the legal or constitutional rights of the accused"). Numerous courts

have observed that *Factor* demands that ambiguities in an extradition treaty be

construed in favor of the state signatories—that is, in favor of surrendering a

fugitive to the requesting country. *See*, *e.g.*, *Martinez v. United States*, 828 F.3d 451,

463 (6th Cir. 2016) (en banc) ("For ambiguity in an extradition treaty must be

construed in favor of the 'rights' the 'parties' may claim under it"); *United States v.*

*Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) ("[E]xtradition treaties, unlike

criminal statutes, are to be construed liberally in favor of enforcement"); *In re*

*Extradition of Howard*, 996 F.2d 1320, 1330 (1st Cir. 1993) ("[C]ontrolling

precedent requires that, where possible, we interpret extradition treaties to

produce reciprocity between, and expanded rights on behalf of, the signatories");

*In re Necolaiciuc*, 2011 WL 798144, *12 (M.D. Fla. Mar. 1, 2011) ("In applying an

extradition treaty, the Court is to construe it liberally in favor of the requesting

nation").  Accordingly, to the extent that the Court finds the charging and

documentary requirements ambiguous, it must liberally interpret the provisions

and find that Estonia has fulfilled them.

III.    **The Documents Submitted by Estonia Establish Probable Cause that
        Rotko Committed the Offenses for which Extradition is Sought**

The government set forth above the facts that the government of Estonia

alleges support a finding, at least by a preponderance of the evidence, that Rotko

committed the crimes of which he is suspected.  In this case, Rotko is suspected of

committing embezzlement under section 201(2), clause 4, of the Estonian Penal

Code and injuring or destruction of a thing under section 203(1) of the Penal

Code.  *See* doc. 1-2 at 1.  The relevant sections of the Penal Code in effect at the

time of the alleged offenses provide as follows, in English translation:

Penal Code § 201. Embezzlement

(1) A person who illegally converts into his or her use or the use of a
third person movable property which is in the possession of another
person or other assets belonging to another person which have been
entrusted to the person shall be punished by a pecuniary punishment
or up to one year of imprisonment.

(2) The same act, if committed:

42

1) by a person who has previously committed larceny or embezzlement;

2) on a large-scale basis;

3) by an official; or

4) by a group or a criminal organization;

is punishable by a pecuniary punishment or up to three years' imprisonment.

Penal Code § 203. Injuring or destruction of thing

Injuring or destroying a thing of another, if significant damage is thereby caused, is punishable by a pecuniary punishment or up to three years' imprisonment.

Doc. 27-1 at 10.

As discussed above, these offenses arise out of Rotko's directing the removal of property in July, 2006, from Küti 17 and Küti 17a in the Seaplane Harbor district of Tallinn, Estonia. Rotko controlled the companies that occupied the property. Olga Novoseltseva, who worked as a bookkeeper for the companies, stated that although she did not know on whose order the property was removed or damaged, she could "guess, that such order was given by Aleksandr Rotko, as no-one else gave orders there." Doc. 1-2 at 29. Other witnesses confirmed that Rotko was in charge of the site and directed the removal of the property. *See id*. at 4 ("The testimony of the witnesses (Valdo Seiler, Tiit Einberg, Olga Savitskaja, Aleksei Bassenkov, Tonu Rinaldi, Olga Novoseltseva)

heard in the course of criminal proceedings has confirmed that the berth plate and railway rails were removed in the summer of 2006, and the orders for that were issued by Aleksandr Rotko"); *id*. at 42 (Olga Savitskaja: "I knew, that Aleksandr Rotko was directing the company"); *id*. at 46 (Tiit Einberg: "As far as I understand, the regular operation on that territory was directed by Aleksandr Rotko"); *id*. at 55 (Tou Rinaldi: "Aleksandr Rotko ordered some company there, which removed first probably the cover slabs of the dock, then the railroad tracks, the cranes, the boiler house").

The removal of the property came after the Estonian courts ruled that the property belonged to the Estonian government and after the companies had exhausted all appeals, with the Supreme Court denying leave for appeal to that court on June 7, 2006.  *See id*. at 3.  Knowing that the property then legally belonged to the Republic of Estonia, Rotko nevertheless removed items that were clearly fixtures on the property, including railroad tracks, concrete slabs, cranes, hatches, gates, and locks.  *See id*. at 3-4, 46.  He also caused a roof to be removed from a building so that a boiler could be extracted.  *Id.* at 46.  Apparently believing that the courts' rulings were unjust, he tried to remove and sell anything that could be sold, in view of the order requiring his companies to vacate the premises.  *See* doc. 1-3 at 52.

Once the courts had ruled that the property belonged to Estonia, Rotko had no legal right to remove fixtures from the property, even if he had paid to have those fixtures installed. *Cf. Voelker v. State*, 882 So. 2d 526, 527 (Fla. 4th DCA 2004) (defendant convicted of theft from a mobile home, including both outside doors, after it was purchased by a new owner); *Branker v. State*, 650 So. 2d 195, 196 (Fla. 4th DCA 1995) (discussing restitution for theft by the defendant from her foreclosed home of, among other things, an air conditioning unit, security system, locks, and a garage door opener). Rotko, as evidenced by the claim he has submitted for international arbitration, apparently believes that the property was essentially "stolen" from him by the Estonian government. *See, e.g.*, doc. 17-1 at 5, ¶ 4. However, this belief did not justify his flouting the ruling of the courts; he should have—as he ultimately did through his arbitration claim—sought redress through legal means. His simply removing everything he could, including fixtures integrated into the property, before the Estonian government took possession of the property was, if proven, a crime. Accordingly, the documents submitted by Estonia establish probable cause that Rotko committed the alleged crimes.[10]

---

[10]    The documents also include photographs of Rotko, establishing that the person before the Court is the Aleksandr Rotko to whom the Estonian government is referring. *See* doc. 1-2 at 19; doc. 1-4 at 10 & 21 (photo line-up presented to Olga Novoseltseva).

**CONCLUSION**

For the foregoing reasons, the Court should certify Estonia's request for

Rotko's extradition so that it may be considered by the Secretary of State.


<div style="margin-left:40%">

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney


By:    /s/ Arnold B. Corsmeier
       ARNOLD B. CORSMEIER
       Assistant United States Attorney
       Florida Bar No. 869139
       300 N. Hogan Street, Suite 700
       Jacksonville, Florida 32202-4270
       Telephone: (904) 301-6300
       Facsimile: (904) 301-6310
       E-mail:     chip.corsmeier@usdoj.gov

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2020, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a

notice of electronic filing to the following:

O. David Barksdale, Esq.
Marcos D. Jimenez, Esq.
John R. Byrne, Esq.
Allan F. Brooke, II, Esq.

<div style="margin-left:40%">

s/ Arnold B. Corsmeier
ARNOLD B. CORSMEIER
Assistant United States Attorney

</div>